CLINTON BROWN, Self-Represented
16821 Edgar Street
Pacific Palisades, CA 90272
clinton@atlasinc.solar
310-487-6453

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON BROWN, | No.  2:23-cv-02938-MEMF-KS |
| Plaintiff, | **<u>AMENDED COMPLAINT</u>** |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| STEVE SMEAD | **Judge:** Honorable Maame Ewusi-Mensah Frimpong |
| Defendant. | **Chief Magistrate Judge**: Karen L. Stevenson |

Clinton Brown ("Plaintiff") for his complaint against Steve Smead ("Defendant"), alleges as follows:

### I. NATURE OF ACTIONS

#### A. Securities: What's in a name?

1. This Amended Complaint is filed pursuant to the Court's Order dated December 6, 2023, which granted defendant motion to dismiss the original complaint filed by Plaintiff. ECF No. 40 at 16. The Court granted the Plaintiff leave to amend the complaint to adequately plead the existence of a security as defined under Federal securities laws and to meet the pleading requirements of Rule 9(b) and the PSLRA. In addition, the amended complaint is filed in accordance with L.R. 15-1 (separate document), L.R. 15-2 (complete document) and L.R. 15-3 (served to parties). ECF No. 40 at 3, lines 10-16 is inaccurate.

2. The origins of securities regulation in Anglo-American history date back to 1697, when the British Parliament passed the first law to govern stockjobbers and prevent practices that threatened Government stability.[1] The First Congress, when establishing the Treasury

---

[1] 'William III, 1696-7: An Act to Restrain the Number and Ill Practice of Brokers and Stock-Jobbers. [Chapter XXXII. Rot. Parl. 8 & 9 Gul. III. p.11.nu.1.]', in Statutes of the Realm: Volume 7, 1695-1701, ed. John Raithby (s.l, 1820), pp. 285-287. British History Online [http://www.british-history.ac.uk/statutes-realm/vol7/pp285-287]

Department, incorporated a clause that explicitly forbade officials from using '*insider information*' to gain profit, either directly or indirectly. *See* An Act to establish the Treasury Department, Section 8, 1 Stat. 65, 67 (Sept. 2, 1789); 31 U.S.C. § 329. Before Congress established Federal oversight with the enactment of the Securities Act of 1933 (archived on December 20, 2023 at https://perma.cc/2KZW-VL8K) and the Exchange Act of 1934 (archived on December 31, 2023 at https://perma.cc/2KZW-VL8K) individual states managed securities regulation through what were known as 'Blue Sky' laws. These laws were named to describe speculative investments that had no more basis than so many feet of 'blue sky,' harking back to the unfounded 'Flying Ships' featured prominently in the 1720 London play 'Exchange-Alley.'[2] See also; *Hall v. Geiger-Jones Co.,* 242 U.S. 539, 37 S. Ct. 217, 220-221 (1917).

3.      In Anglo-American legal history, the rules governing equitable interests in real property arose primarily in the context of what we now call mortgages. In the 12th century, when Glanville wrote down the law of his day, a "gage"—French for "pledge"—was property handed over to a lender as security for a loan.[3] Glenn, 1 Mortgages, Deeds of Trust, and Other Security Devices as to Land at 3 (1943). A "mort gage"—meaning a "dead pledge"—took the form of a conveyance. Specifically, the borrower (the mortgagor) would typically grant the lender (the mortgagee) a fee simple interest in land, with provision for reconveyance of the land back to the borrower upon full payment of the amount owed, on a specific date—known as the "law day." In courts of law these agreements were strictly construed: writing in the 1470s, Littleton said that, if the borrower failed for any reason to repay the full amount due on the law day, "then the land which is put in pledge is taken from him forever, and so dead to him[.]" 1 Edward Coke, Institutes of the Laws of England, 205a (1628).

4.      But irrevocable forfeiture of the debtor's entire interest in the land, no matter what the reason for the borrower's failure to pay on the law day—for example if, on that day, the

---

[2] Banner, Stuart, Anglo-American Securities Regulation: Cultural and Political Roots, 1690–1860, pp. 48-51 (2002).
[3] Nature of Allegations, Nos. 3-15 are primarily adopted from the well-researched opinion by Judge Kethledge from the 6th Circuit Court of Appeals as cited in the Supreme Court's *Tyler* decision on May 25, 2023. *Hall v. Meisner*, No. 21-1700 (6th Cir. Oct. 13, 2022). (cleaned up).

(accessed 21 December 2023).

lender was nowhere to be found (cue the fraud!)—was before long regarded as an intolerably harsh sanction for the borrower's default. And meanwhile, by the year 1500, as Maitland observed, "we must reckon the Court of Chancery as one of the established courts of justice, and it has an equitable jurisdiction; beside the common law there is growing up another mass of rules which is contrasted with the common law and which is known as equity." Maitland, The Constitutional History of England 225 (1908). The ground upon which equitable jurisdiction arose was "that a wrong is done, for which there is no plain, adequate, and complete remedy at the Courts of Common Law." Story, Commentaries on Equity Jurisprudence 53 (1836).

5.      The Court of Chancery soon interposed to assuage the harshness of enforcement of mortgages in courts of law. In equity (as a leading American court put it later) courts looked through the form of a contract to its substance. *Lansing v. Goelet*, 9 Cow. 346 (N.Y. 1827). And by 1625 the Court of Chancery saw that, while a mortgage agreement took the form of a conveyance in fee simple, it was in substance "<u>but a Security</u>[.]" *Emanuel College v. Evans*, 21 Eng. Rep. 494, 494–95 (1625). A *security was merely personal property*, leaving the mortgagor (i.e., the borrower) with an equitable interest in the land. To vindicate that interest, the Court of Chancery recognized the mortgagor's "Equity of Redemption[,]" which allowed him to regain legal title to the land by repayment of the amount due even after the law day. *Dutchess of Hamilton v. Countess of Dirlton and Lord Cranborne*, 21 Eng. Rep. 539 (1654). In 1678 Lord Hale called the mortgagor's interest "a title in equity." *Pawlett v. Attorney General*, 145 Eng. Rep. 550, 551 (1678). Sixty years later the Chancery Court clarified matters further, by stating expressly that a "mortgage in fee"—the lender's interest in the land—"is considered as personal assets[,]" meaning personal property. *Casborne v. Scarfe*, 26 Eng. Rep. 377, 379 (1737) That court further observed that "[t]he interest of the land"—meaning the interest in real property—"must be some where, and cannot be in abeyance; but it is not in the mortgagee [the lender], and therefore must remain in the mortgagor [the landowner]." Id. "Thus the courts conceived the mortgagee's right as a right to money rather than land." Sugarman & Warrington, Land Law, Citizenship, and the Invention of "Englishness", in Early Modern Conceptions of Property 111,

120 (1995)

6.      By 1759, Lord Mansfield—among English jurists, exceeded in eminence perhaps only by Coke and Hale—would say that the mortgagor's "equity of redemption is the fee simple in the land." *Burgess v. Wheate*, 28 Eng. Rep. 652, 670 (1759). Hence the mortgagor's "equity to redeem" had itself become "a right of property." 6 Holdsworth, A History of English Law 663 (1924). The mortgagor "had an equitable estate in the land; and subject to the legal rights of the mortgagee, was, in equity, regarded as its owner." *Id.* And this equitable estate—which, following Hale, the courts would later call "equitable title"—could be devised or conveyed like any other interest in property. Casborne, 26 Eng. Rep. at 379.

7.      Yet the Court of Chancery also recognized, at least nominally, the lender's right to foreclose upon the land. At some point after the law day—when the lender thought he had waited long enough without payment of the amount due—the lender could petition the Court of Chancery for a decree providing that the delinquent landowner "do from this point stand absolutely debarred and foreclosed of and from all right, title, interest and equity of redemption of, in, and to the said mortgaged premises." Glenn, 1 Mortgages at 402. This process was known as "strict foreclosure," since it would extinguish the landowner's equitable interest in the property and grant the lender full ownership of land whose value might far exceed the amount of the unpaid debt. *Id.* at 397; see also *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) ("This remedy was called strict foreclosure because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity").

8.      The English courts resisted strict foreclosure for the same reasons they recognized the landowner's equity of redemption. Indeed, the Court of Chancery would refuse to enforce even a landowner's separate agreement (executed at the time of the mortgage) not to assert a right of redemption later. As the court said in *Newcomb v. Bonham*, "once a mortgage always a mortgage"—meaning that, as a practical matter, the lender could not convert his security interest as mortgagee into fee-simple title to the land. 23 Eng. Rep. 266, 267 (1681). And even when the Court of Chancery granted a decree of strict foreclosure, it remained open to vacatur years later

if the landowner filed a petition to that effect. Glenn, 1 Mortgages at 403. Thus, in English courts of equity, the lender's right to foreclose upon the land was nearly always honored in the breach. As Joseph Story put it later: the "Courts of Equity constantly allow a redemption, although there is a forfeiture at law." Story, Commentaries on Equity Jurisprudence at 106.

9.      By the end of the 18th century American courts of equity had begun to address these issues for themselves. The American courts were uniformly hostile to strict foreclosure in cases—*like this one*—where the land's value exceeded the amount of the debt. New York's highest court in equity, for example, opined that, in cases where "the mortgaged premises exceed the amount of the debt in value," strict foreclosure would be "unconscionable[.]" *Lansing v. Goelet*, 9 Cow. 346, 355,1827 WL 2536 (N.Y. 1827). Joseph Story likewise recognized the "unconscionableness" of "taking the land for the money." Story, Commentaries on Equity Jurisprudence at 106 n.2. In another case the court opined that "strict foreclosure" had "no appropriate place in a system of laws and jurisprudence where . . . the mortgage does not operate as a conveyance of the legal title," but is only "a lien upon the land as security for the debt or other obligation of the mortgagor." *Moulton v. Cornish,* 138 N.Y. 133, 141 (1893).

10.      Yet the American courts—more so than the English courts of the time—recognized a creditor's right to "have the full effect of his *securities*." Lansing, 9 Cow. at 353. That "full effect," however, did not entitle the creditor to recover more than the amount owed. Magna Charta itself had provided that a debtor's lands could be taken only to the extent necessary to satisfy the debt. *Magna Charta* ¶ 26 (1215); see also *Den ex dem. Murray v. Hoboken Land & Imp. Co*., 59 U.S. 272, 277 (1855). As Justice Scalia later explained, American courts reconciled these competing interests "with the development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure." *Resolution Trust Corp*., 511 U.S. at 541.

11.      The innovation of foreclosure by sale exemplified the ability of courts of equity to craft an appropriate remedy where courts of law could not. The New York court in *Lansing* explained—as a matter of judicial power in equity, irrespective of any statute—that "the court

may, when equity requires it, interpose at the instance of the mortgagor to direct a sale, when the estate is of greater value than the debt, in order to prevent a strict foreclosure to his prejudice[.]" 9 Cow. at 355. Only by that means, rather than by strict foreclosure, could the landowner's equitable interest in the property be extinguished. The land was after all "*a resource*" for payment of the debt; a "public sale [was] the truest test of the value" of the landowner's equitable interest in the land; and thus a sale was "the best mode of disposing of the property, for the interest of both." *Id.* at 356. If the land was worth at least as much as the debt, its proceeds afforded the lender full payment and thus the "full effect" of his security; and if the land was worth more than the debt, the "surplus" would compensate the landowner for the loss of his equitable interest, as the new buyer took legal and equitable title alike. *Id.* at 353, 356.

12.     For these reasons, by the mid-1800s, foreclosure by sale was "firmly established" in the law of most states, to the exclusion of strict foreclosure. Osborne, Mortgages at 661 (1970); see also, e.g., 1 Glenn Mortgages at 460; *Clark v. Reyburn*, 75 U.S. 318, 323–24 (1868) (reversing an order of strict foreclosure); *Moulton*, 138 N.Y. at 141 ("strict foreclosure is very rarely resorted to in the American courts"). American courts' insistence upon foreclosure by sale, rather than strict foreclosure, extended fully to foreclosures for payment of unpaid taxes. Indeed—given the absence of any agreement by the landowner (as with a mortgage) to forfeit the land upon default—the foreclosure remedy was more limited in tax cases. This limitation was the same one prescribed in Magna Charta, and it underscored the precision upon which the courts insisted whenever land was used to satisfy a debt. In an 1808 case, for example, Chief Justice Marshall held that a tax collector had "unquestionably exceeded his authority" when he had sold more land than "necessary to pay the tax in arrear." *Stead's Ex'rs v. Course*, 8 U.S. 403, 414 (1808); see also, e.g., *Margraff v. Cunningham's Heirs*, 57 Md. 585, 588 (1882) (tax collector's "duty is to sell no more than is reasonably sufficient to pay the taxes and charges thereon, when a division is practicable without injury"); *Loomis v. Pingree*, 43 Me. 299, 311 (Me. 1857) (applying the same rule); *Martin v. Snowden*, 59 Va. 100, 118–19, 139 (1868) (same).

13.     Likewise well-settled by the mid-1800s, and indeed earlier, was the specific

property interest retained by a landowner when land served as security for a debt. That interest was what Lord Hale had said it was, namely equitable title; and that interest was an interest in property like any other. In 1843 the Supreme Court nicely summarized the creditor and debtor's respective property interests when land served as security for a debt, particularly in the instance of the debtor's default. "According to the long-settled rules of law and equity in all the states whose jurisprudence has been modelled upon the common law," the Court wrote, "legal title to the premises in question vested" in the creditor upon the debtor's default; yet the landowner still held "equitable title" to the property. *Bronson v. Kinzie*, 42 U.S. 311, 318 (1843). To "extinguish the equitable title of the" debtor, the creditor was required "to go into the Court of Chancery and obtain its order for the sale of the whole mortgaged property (if the whole is necessary,) free and discharged from the equitable interest of the" debtor. *Id.* at 318–19. The sale, moreover, was required to be a public one. *See* Thomas M. Cooley, A Treatise on the Law of Taxation, Including the Law of Local Assessments, 489 (1886). Under those same long-settled principles, the debtor would then be entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished. *Resolution Trust Corp.*, 511 U.S. at 541

14.     *But that proposition*, as shown above, overlooks the very reasons why a property owner has a right to the surplus. That right does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from his possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title.

15.     The defendant forcibly took property worth vastly more than the debts the plaintiff owes and failed to refund any of the difference. "In some legal precincts that sort of behavior is called theft." *Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (dissenting opinion).

**B. Investment Contract**

16.     The touchstone in defining a security is the presence of an investment in a

common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court means either capital appreciation resulting from the development of the initial investment, or a participation in earnings resulting from the use of investors' funds. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S. Ct. 120 (1943).

17.    A "security," as used in the Securities Act, includes "commonly known documents traded for speculation or investment" and "securities of a more variable character," including "investment contract[s]." S.*E.C. v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946). An "investment contract" is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298.

18.    The Court perceives no distinction between an investment contract and an instrument commonly known as a security. In either case, the basic test for distinguishing the transaction from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 852, 95 S. Ct. 2051 (1975).

### C. Security Laws

19.    Together, the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. §77a et seq., and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. §78a et seq., form the backbone of American securities law. *Slack v. Pirani,* 598 U.S. 759, 143 S. Ct. 1433, 1438 (2023). *Congress* enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment. *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S. Ct. 945 (1990). *Congress* meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face-to-face. *SEC v. Zandford*, 535 U.S. 813, 822, 122 S. Ct. 1899 (2002). The end to which *Congress* intends to accomplish, which is providing robust protections for investors and promoting transparency and fairness in financial markets, is treated as the controlling factor of the law. *A. C. Frost & Co. v. Coeur D'Alene Mines*

*Corp.*, 312 U.S. 38, 45, S. Ct. 414 (1941).

20.     Securities laws are meant to be flexible and remedial, not restrictive, to effectively combat fraud. The Acts set higher conduct standards…and *are not limited to common-law fraud doctrines.* (Emphasis added). The equal sharing of risk of error is achieved by using a preponderance-of-the-evidence standard, which doesn't favor any side. *Herman & Maclean v. Huddlesto*n, 459 U.S. 375, 390, 382 103 S. Ct. 683 (1983). Given the broadly remedial purposes of Federal securities legislation, the burden of proof is reasonably imposed on an issuer[4] who pleads exemption. *SEC v. Ralston Purina Co*., 346 U.S. 119, 126 (1953) (citing *Schlemmer v. Buffalo, R. & P. R. Co*., 205 U.S. 1, 10 (1907)); Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, preamble (1933). Private contracts cannot supersede Federal security laws. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S. Ct. 1917 (1989). An investment scheme promising a fixed rate of return can be an investment contract and thus a security subject to Federal security laws. *SEC v. Edwards*, 540 U.S. 389, 124 S. Ct. 892, 899 (2004). The investment contract in question also involved communications and instruments across state lines and "even where the offense is local and subject only to state prosecution, [*Congress* has] the power to refuse the mails to those conducting the unlawful intrastate enterprise [where it exists]. *SEC v. Crude Oil Co*., 7 Cir., 93 F.2d 844, 849. (1937).

21.     The misappropriation theory holds that a person commits fraud "*in connection with*" a securities transaction if a fiduciary uses undisclosed information to their own advantage in a security transaction; it is defrauding the principal by taking exclusive use of that information. *United States v. O'Hagan*, 521 U.S. 642 652-653, 117 S. Ct. 2199 (1997). This action dupes the principal. *Id.* Thus, it is unlawful to use or employ, in connection with the purchase or sale of any security *or any security not so registered*, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, *in*

---

[4] The term "issuer" means any person who issues or proposes to issue any security [investment contract]. Section 3(a)(8), 1933 Act.

*connection with the purchase or sale of any security*. Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (as amended through P.L. 117- 328, enacted December 29, 2022); 17 CFR § 240.10b-5. (2023).

22.     Nonpublic material confidential information is property of the [principal]. *Carpenter v. United States*, 484 U.S. 19, 26, (1987) (citing *Ruckelshaus v. Monsanto Co*., 467 U. 8. 986, 1001-1004 (1984); *Dirks v. SEC*, 463 U.S. 646, 658, n. 10 (1983); *Board of Trade of Chicago v. Christie Grain & Stock Co*., 198 U.S. 236, 250-251 (1905)); *Cf.* 5 U.S.C. §552(b)(4). Therefore, a person who trades *on the basis of material, nonpublic information*, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public. *Supra, O'Hagan*. There is no question that fraudulent uses of confidential information fall within § 10(b)'s prohibition if the fraud is "*in connection with*" a security [investment contract] transaction. *Id*.

23.     The Defendant had a fiduciary-like relationship with the Plaintiff because the relationship was based upon trust and confidence. *United States v. Kosinski*, 976 F.3d 135, 146, (2d Cir. 2020). In an inside-trading case this fraud derives from the inherent unfairness involved where one takes advantage of information intended to be available only for a [specific] purpose… and not to the personal benefit of anyone. *Id*. The intent of Congress to prohibit "any" transaction that undermines a free and fair market is clear and has been reaffirmed, *iterum et iterum*, since the Acts have been enacted, and before that, in the states' "Blue-Sky" laws. The misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information. *O'Hagan* at 652.

## II. JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States, specifically the Securities Act of 1933 and the Securities Exchange Act of 1934.

25.     Subject matter jurisdiction is conferred by 15 U.S.C. § 77v(a), under the Securities Act of 1933, and 15 U.S.C. § 78aa(a), under the Securities Exchange Act of 1934

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred within this District.

27.     Without jurisdiction the Court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining for the court is that of announcing the fact and dismissing the cause. *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 815 (9th Cir. 2001).

28.     Here, there [is] no clear lack of subject matter jurisdiction, the issue was fully briefed and presented to the District Court in a motion to dismiss, and the District Court decided the jurisdictional question. Given these circumstances, as the Third Circuit has observed, "even the issue of subject matter jurisdiction must at some point be laid to rest." *Hodge v. Hodge*, 621 F.2d 590, 592 (3d Cir. 1980) (per curiam).

29.     Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided *after* and not before the Court has assumed jurisdiction over the controversy. *Bell v. Hood*, 327 U.S. 678, 66 S. Ct. 773, 682 (1946).

30.     Lastly, "These [1933 and 1934 Acts] are Federal laws. Bringing claims under these laws is sufficient for subject matter jurisdiction." ECF No. 40 at 9, A. The Court has subject matter jurisdiction. Full stop.

### III. PARTIES

31.     Plaintiff, Clinton Brown, resides at: 16821 Edgar St., Pacific Palisades, CA 90272.

32.     Defendant, Steve Smead, resides at: 352 E. Harvard Blvd., Santa Paula, CA 93060.



## IV: FACTUAL ALLEGATIONS

33.     The Defendant is an accredited investor per regulations set forth in 17 C.F.R. § 230.501(a) (2023). [5]

34.     The Plaintiff is not an accredited investor per regulations set forth in 17 C.F.R. § 230.501(a) (2023).

35.      In April 2020, the Plaintiff bought property in Malibu for $290,000, backed by two deeds of trust, one of which was held by the defendant.[6]



36.     The appraised value of the Malibu property in February 2021 was $450,000.



---

[5]  17 CFR § 230.501 & 17 CFR § 230.215 attribute the same definition to the 1933 and 1934 Acts. (a) Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person: (5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000.

[6]  A "deed of trust" refers to a loan agreement between a property purchaser and a lender where title to the property is held by either the lender or a third-party trustee (as opposed to the purchaser) until the loan is repaid. *See* Deed, Black's Law Dictionary (11th ed. 2019).

37.     The Defendant gained sole control of the Malibu deed of trust in May 2021. *See* "Deeds of Trust" incl. Los Angeles County Recorder. (2021, May 21). Substitution of Trustee and Full Reconveyance. Document No. 202105210190066. Property APN: 4451-001-021; Varon, B. (2021, February 12). Appraisal Report: APN/Parcel ID: 4451-015-021, Malibu, CA 90265. Appraised value: $450,000; Los Angeles County Recorder. (2021, May 21). Substitution of Trustee and Full Reconveyance. Doc. No. 202105210190066. Property APN: 4451-001-021.

38.     In June 2021, following the procurement of solar development permits for the Utah property, it had significantly appreciated in value and appraised at $240,000, an increase of $190,000 from the purchase price in 2020.

39.     In June 2021, the defendant issued a deed of trust for a portion of Plaintiff's equitable title, which included an additional $100,000 of paper[7], related to Harper, on back of the Utah property.

40.     In June 2021 Defendant recorded a deed of trust for $200,000. *See* ("Appraisals") Colliers International, File #: SLC210208. (2021, June 8). Appraisal Report: APN/Parcel ID(s): 8710-1. Appraised value: $240,000; Millard County Recorder. (2021, June 29). ("Deeds of Trust") Trust Deed: APN/Parcel ID 8710-1. Notarized in New York by Jenice Hernandez, Notary Public, State of New York, No. OLHE6359254. Recorded at 12:24 PM, Entry #: 00215042. Amount: $200,000.



---

[7] This term is understood by the Plaintiff as a debt that is recorded, but the lender of that debt just records the 'paper' and does not expend the money in the transaction. Hence, carrying paper.

41.    In November 2020, the Defendant issued a $150,000 second deed of trust on the Harper property, stipulating a repayment sum of $300,000.

42.    In May 2022, the Plaintiff shared the Harper appraisal indicating a significant value increase from the purchase price of $498,000. In July 2022, the defendant purchased the first deed of trust from the prior owner and the assignment was recorded thereafter. *See* ("Appraisals") and ("Trust Deeds") Pacific Valuation. (2021, December 20). Restricted Appraisal Report: APN/Parcel ID(s): 0490- 091-09 and 0490-091-19. Appraised value: $1,100,000. San Bernardino County Recorder. (2022, July 19). Corporation Assignment of Deed of Trust. Document No. 2022-0251090. Property APN/Parcel ID(s): 0490-091-09 and 0490-091-19.

**Harper Lake purchase docs.**

STEVE SMEAD <stsmead@gmail.com>                                    Mon, Jul 11, 2022 at 4:57 PM
To: Clinton Brown <clinton@atlasinc.solar>

Please forward me the original purchase docs for Harper lake including the original note and deed of trust for the first TD.

Are trying to wrap up the purchase of the 1st TD.

Give me a call A.S.A.P.

Thanks,  Steve

43.     The Malibu, Utah and Harper properties had a combined appraised value of $1,790,000 in 2021.

44.    The original purchase prices for Harper, Malibu and Utah amounted to $837,999.

45.    The equity in Malibu, Utah, and Harper in 2021 was $952,001.

46.    In 2021 the projects had a non-marketable value of at least $14,390,000 and a marketable value of $21,400,000. Bay Valuation Advisors, LLC. (2021). Atlas, Inc. Valuation of Common Stock (409a). Oakland, CA. Valuation Date: June 30, 2021. Report Date: September 21, 2021. Fair Market Value (FMV): $21,400,000.



47.     In August 2022, the Defendant filed Notice of Default on all three (3) properties.



48.     The plaintiff did not consent to a deed in lieu of foreclosure arrangement. Furthermore, had the Plaintiff been aware that the defendant intended to foreclose on Harper's first deed of trust the following month, he would not have willingly facilitated the assignment of that deed of trust. Instead, the Plaintiff would have pursued a different course of action.



49.     The defendant purchased a Nevada solar property deed of trust from the Plaintiff for 50% of the recorded value on or around September 2022.

50.     The properties and the Plaintiff's equitable title were unceremoniously taken by the defendant in a "so-called" public auction in January 2023, despite multiple attempts to stave off foreclosure and attempting to file for Chapter 11 Sub V. ECF No. 22 at 3-4. ("Brown Decl.") at 4.

---

### Update on Utah, Harper and Malibu Properties, and Proposal for Harper Lake Promissory Note

**Clinton Brown** <clinton@atlasinc.solar>                    Fri, Aug 5, 2022 at 8:23 PM
To: STEVE SMEAD <stsmead@gmail.com>

Steve,

Per your email for filing the NOD's today. First, you had told me September 1st, 2022 as the day to file on two different phone calls. The assumption on your part I believe is that a 7-day close is not possible, which is what I did in Nevada though. Therefore, I believe there is still time to get this done and, in my view, filing an NOD only hurts us both.

Furthermore, if you indeed plan to file the NOD then what incentive do I have to sell you the $44k note for $22k? Escrow has not recorded this, and you indicated that I still had time to decide because there still needs to be one more signature for the transaction to close. I didn't want to sell this in the first place, and it was a very poor choice on my part to move this far ahead with it.

I forwarded you an email from Steve Weera about the funding and I really can't help that he committed to one thing and then changed to another due to his escrow closing on 8/15/2022. You are free to contact him via his email tonasut@cs.com or phone 818-436-2498, but I can't get blood out of a turnip here until 8/15 with him, at least.

Lastly, I don't understand the hell fire urgency to torpedo projects that you and I know very well have the ability to succeed. I'm not sure how involved you were with your other private borrower's projects, but it seems to me that something doesn't add up here. I've been open to your advice and have taken it on multiple occasions and the bottom line is that it is a timing issue. An NOD doesn't one thing to change my direction on these projects, it just seems like you have lost confidence in the projects we are doing or you need to get money in your bank account. Lord knows I need some.

It is just very disappointing and for no good reason that I can see that this can't be worked out. However, we will make the best of it and exercise any and all rights we have under the law should you proceed, but I hope that I can spend my time and effort on these projects that benefit both of us instead.

Hope we can reach a viable agreement,
Clinton

---

51.     Plaintiff is informed, believes, and thereon alleges that the Malibu La Costa Owners Association ("Association") is authorized to issue a total of 550 shares, each intrinsically tied to the ownership of a lot within Tract 10570 ("Malibu") as recorded with the Los Angeles County Recorder. The value of the Association, as appraised, is $30,000,000 [8] with 319 current shareholders and a freeze on the issuance of new shares since 2021, the value per share stands at $125,392.48. The Plaintiff's ownership of the lot in April 2020, and consequently the share in the

---

[8] W. Mcilrath, Residential Restricted Appraisal Report for 21440 Pacific Coast Highway, Malibu, California 90265 (June 22, 2018). There are additional properties Association shareholders own that are an intrinsic part of value of the total investment contract. (i.e. tennis club). Some of the shareholders lease their memberships for profit. (i.e. access). *See* "Association Docs"

Association, is inextricably linked to the overall value of the property, which cannot be divided from the equitable title the Plaintiff holds in the Malibu Property.

52.     On June 21, 2023, the Plaintiff is informed, believes, and thereon alleges that the defendant instructed the Association to revoke the Plaintiff's share and at the Defendant's direction the Association unjustly revoked it. This resulted in immediate and tangible harm to the Plaintiff, including but not limited to, the loss of access to the Beach Club. ECF No. 26 (Exhibit). This act not only impacted Plaintiff's property rights but also his shareholder interests, which are considered securities under the Acts.

53.     Plaintiff alleges that the revocation of his shareholder status and the accompanying rights constitutes a violation of his security interests as protected by Federal law. The revocation and the harm caused thereby are directly attributable to the Defendant's actions, which have caused a devaluation of the Plaintiff's property and equitable title. *See* "Association Docs" Malibu La Costa Owner's Association, Articles of Incorporation, art. 4, at 5, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). Malibu La Costa Owner's Association, Articles of Incorporation, art. 7, at 6, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). This organization was established in the same year that the Supreme Court issued its decision in the case of *SEC v. Howey*.

54.     The Malibu lot was insured against any loss and subrogation's primary purpose, therefore, is to prevent the insured from obtaining double recovery. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1120 (9th Cir. 2010); *See* "Sale Exhibits" WFG National Title Insurance Co., Trustee's Sale Guarantee issued on August 18, 2022; Steve Smead, Email to Legal Notices, Re: Lawsuit against me but, not you yet, May 18, 2023; Clinton Brown [Borrower] and Steve Smead [Lender], Deed of Trust (Nov. 4, 2020) (*unrecorded*) (describing property at 21472 Calle Del Barco, Los Angeles County, California, with APN: 4451-015-021).

55.     The Plaintiff has reason to believe that the Utah and Harper properties were also insured and thus there's a question of fact whether there's a subrogation claim.

17

56. "The notes and deed of trust were only between me and Clinton Brown. No other parties, other than the trustee, were set forth in these." (Smead Decl. ¶ 3). This is false. The assignment of the first Harper deed of trust was negotiated between Plaintiff, Defendant and Adam Ahmed at American Pacific Investments, LLC, the first deed of trust holder.



57.    "I had no interest in. and was not involved in, any of the businesses of Clinton Brown… referenced properties were a part. I never invested in any of the businesses that Mr. Brown may have had. I never became a joint venturer, partner, shareholder, or any other type of equity holder in any of Mr. Brown's businesses. (Smead Decl. ¶ 5). The texts, emails, phone conversations show differently. Once again, this is blatantly false, and the defendant will fold like a cheap suit under cross-examination.



Communication from on or about July 2021.

58.     "To the best of my knowledge, Mr. Brown had no active solar energy businesses, but rather plans, hopes, and dreams to one day have such a business. I had no interest or intention to. invest in any solar energy business with Mr. Brown, and there was never an agreement that I would do so. l relied on the present value of the individual properties securing the Note and Deed of Trust for such individual properties when making a loan to Mr. Brown." (Smead Decl. ¶ 6).

**verizon**✓   Billing period Jul 3, 2022 to Aug 2, 2022 | Account #

310.487.6453
iPhone 13 Pro Max

**Talk activity (cont.)**

| Date | Time | Number | Origination | Destination | Min. |
|------|------|--------|-------------|-------------|------|
| Jul 6 | 1:08 PM | 888.844.7979 | Los Angele, CA | Incoming, CL | 3 |
| Jul 6 | 1:41 PM | 631.640.6280 | Pacific PA, CA | Amityville, NY | 1 |
| Jul 6 | 1:41 PM | 631.640.6280 | Pacific PA, CA | Amityville, NY | 1 |
| Jul 6 | 2:39 PM | 800.829.4933 | Pacific PA, CA | Toll-Free, CL | 2 |
| Jul 6 | 2:40 PM | 800.829.4933 | Pacific PA, CA | Toll-Free, CL | 3 |
| Jul 6 | 3:07 PM | 310.929.2520 | Pacific PA, CA | Incoming, CL | 1 |
| Jul 6 | 3:29 PM | 304.707.9490 | Pacific PA, CA | Incoming, CL | 91 |
| Jul 7 | 12:02 PM | 631.640.6280 | WIFICL | Amityville, NY | 9 |
| Jul 7 | 2:00 PM | 800.829.4933 | Los Angele, CA | Toll-Free, CL | 2 |
| Jul 7 | 2:39 PM | 304.707.9490 | Los Angele, CA | Incoming, CL | 36 |
| Jul 11 | 1:22 PM | 209.821.1775 | Los Angele, CA | Incoming, CL | 1 |
| Jul 12 | 9:19 AM | 805.200.7411 | Pacific PA, CA | Oxnard, CA | 1 |
| Jul 12 | 10:49 AM | 805.200.7411 | Los Angele, CA | Incoming, CL | 56 |

59.     Between September 2020 and March 2023, the Plaintiff and Defendant had at least two hundred eighty-seven (287) written email communications. *See* ("Phone and Emails") Gmail Conversation Log, Clinton Brown v. Steve Smead, No. 2:23-cv-02938 (C.D. Cal. January 1, 2024)

60.     In 2022 the Plaintiff and Defendant had at least twenty-nine (29) phone call conversations equal to no less than 643 minutes.  *See* ("Phone and Emails") Phone Call Record Log, Clinton Brown v. Steve Smead, No. 2:23-cv-02938 (C.D. Cal. January 1, 2024). This information is attested as true by the Plaintiff and upon the opening of discovery, Plaintiff will

provide the defendant with true exact copies of the Verizon phone bills highlighting each call as such. Again, the emails, texts and phone records don't lie, but defendant does.

61. The Plaintiff and Defendant exchanged CONFIDENTIAL information regarding Haper Lake's proposed offer from a third-party solar developer on October 16, 2022. (Brown, Clinton. Email exchange with Steve Smead. "CONFIDENTIAL" 16-17 October 2022, Email #265 and #266, respectively).

**CONFIDENTIAL**
1 message

Clinton Brown <clinton@atlasinc.solar>                    Sun, Oct 16, 2022 at 7:59 PM
To: STEVE SMEAD <stsmead@gmail.com>

Steve,

Can you look at this and propose how we can make this work? I've looked over it and I have my professional opinion and I'd like to know yours.

Thank you,

62. The Plaintiff sent a Proposal to stave off foreclosure for (6) six months on December 3, 2022. (Brown, Clinton. Email to Steve Smead. "Proposal" 03 December 2022, Email #276).

63. The Plaintiff sent the third-party solar developer contract to the Defendant on December 15, 2022, for the Harper property. (Brown, Clinton. Email to Steve Smead. "Lease for Harper" 15 December 2022, Email #278). The Plaintiff did not end up signing this agreement, even though he had the legal title at the time. The developer wanted to take the mineral rights, regardless of if the project went forward. This was a non-starter and whomever ends up with this property will have the Plaintiff to thank for that. For the signature, a payment of $34,000 was going to be paid. It was not right for the project, property, or any interested party despite the Plaintiff being at the verge of insolvency. (Brown Decl. at 3-4).

64. The Plaintiff notified the Defendant of a Chapter 11 Sub V bankruptcy filing and the automatic stay on December 28, 2022, and December 29, 2022, respectively. (Brown, Clinton. Emails to Steve Smead. "Information Regarding Chapter 11 Subchapter V Filing and Alternative."; "Automatic Stay Chapter 11 Subchapter V," 28-29 December 2022, Emails #279-282).

---

## Information Regarding Chapter 11 Subchapter V Filing and Alternative

1 message

**Clinton Brown** <clinton@atlasinc.solar>                    Tue, Dec 27, 2022 at 5:43 PM
To: STEVE SMEAD <stsmead@gmail.com>

Steve,

I am writing to inform you about what will happen should I file for a Chapter 11 Subchapter V bankruptcy.

Under the Small Business Reorganization Act of 2019, signed by President Trump, Subchapter V is a type of bankruptcy which allows *the debtor to remain in possession of their assets and continue to operate their business during the bankruptcy*. (Emphasis added) The debtor must propose a reorganization plan which must be "fair and equitable" to all creditors and must provide for the payment of all creditors in full over a period not to exceed 5 years.
For the Harper Lake, Millard and Malibu debts, the plan must provide for the payment of all debts in full, or the value of property to be distributed under the plan must not be less than the projected disposable income of the debtor for the next three to five years. The plan must also provide for the payment of all secured claims under the cramdown of secured claims section, 11 U.S.C. § 1129(b)(2)(A).*
*Please note that if creditors do not fully consent or vote for the debtor's plan, the plan will still be confirmed as long as it does not discriminate unfairly and provides that all of the debtor's projected disposable income will be applied to the plan payments for the next three to five years, or the value of property to be distributed under plan is not less than the projected disposable income of the debtor for the next three to five years.

Therefore, *filing Chapter 11 under the Subchapter V of the Bankruptcy Code allows a debtor with substantial equity from real property to pay their creditors when the property is sold within three to five years, without using their disposable income.* (Emphasis added) This is because, under Subchapter V, a debtor may propose a plan of reorganization that does not require any payments from the debtor's disposable income. Subchapter V also allows the debtor to keep their property while they are in the bankruptcy process and continue normal business operations.

If we are able to extend the deeds of trust by one year and avoid Federal Court intervention, it would save us both time and money. This way, you can focus on your retirement and I can focus on building on the equity I have earned, which will pay you off without an inequity to either of us and in a shorter amount of time.
Please let me know what route you'd like to take on this.

| **Clinton Brown**

22

**Solar Development Contract Offer (Utah)**

1 message

Clinton Brown <clinton@atlasinc.solar>                                    Sun, Aug 20, 2023 at 6:32 PM
To: attydavidyoung@gmail.com

David,

Hope you're surviving the hurricane and Earthquakes this Sunday afternoon. As you may know or may not know I've been working on putting together a development deal for the Utah property for some time now and it appears that is coming to fruition. Unfortunately, the property in Utah is under dispute in this litigation and obviously that's something that a developer does not want.

In light of this, a deal will not go through on the development if there is litigation and appeals. By not going through, I mean with this particular property. The developer can do without it, really, if that's the direction that has to be taken.

I'm sending this over for you and your Client's review and we can go from there.

Sincerely,

--

| **Clinton Brown**

65. As late as August 20, 2023, defendant's Counsel was notified of a solar development contract offer from Lightsource that the Plaintiff had been working on since 2022. The defendant stands to gain millions of dollars from a deal that is still active. *See* BP Corporate News, BP agrees to take full ownership of Lightsource BP, November 30, 2023, at https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-agrees-to-take-full-ownership-of-lightsource-bp.html).

| DEVELOPER | LIGHTSOURCE RENEWABLE ENERGY DEVELOPMENT, LLC, a Delaware limited liability company |
|---|---|
| DEVELOPER'S ADDRESS FOR NOTICES | Lightsource Renewable Energy Development, LLC 400 Montgomery Street, 8th Floor San Francisco, CA 94104 Attn: Real Estate Department Email: USAssetServices@lightsourcebp.com legalnoticesus@lightsourcebp.com |
| PROPERTY | That real property consisting of the parcel(s) located in the County of Millard State of Utah as more particularly described on **Exhibit A** together with any improvements located thereon and rights, benefits and easements appurtenant to the parcel(s). From time to time following the Effective Date, Developer may update and replace **Exhibit A** with the legal description of the Property in accordance with Section 2.5 of this Agreement. |

## Steve Smead Payment Schedule.xlsx

| A | B | C |
|---|---|---|
| 5 | $500.00 | $46,500.00 |
| 6 | $600.00 | $96,600.00 |
| 7 | $612.00 | $98,532.00 |
| 8 | $624.24 | $100,502.64 |
| 9 | $636.72 | $102,512.69 |
| 10 | $649.46 | $104,562.95 |
| 11 | $662.45 | $106,654.21 |
| 12 | $675.70 | $108,787.29 |
| 13 | $689.21 | $110,963.04 |
| 14 | $703.00 | $113,182.30 |
| 15 | $717.06 | $115,445.94 |
| 16 | $731.40 | $117,754.86 |
| 17 | $746.02 | $120,109.96 |
| 18 | $760.95 | $122,512.16 |
| 19 | $776.16 | $124,962.40 |
| 20 | $791.69 | $127,461.65 |
| 21 | $807.52 | $130,010.88 |
| 22 | $823.67 | $132,611.10 |
| 23 | $840.14 | $135,263.32 |
| 24 | $856.95 | $137,968.59 |
| 25 | $874.09 | $140,727.96 |
| 26 | $891.57 | $143,542.52 |
| 27 | $909.40 | $146,413.37 |
| 28 | $927.59 | $149,341.64 |
| 29 | $946.14 | $152,328.47 |
| 30 | $965.06 | $155,375.04 |
| 31 | $984.36 | $158,482.54 |
| 32 | $1,004.05 | $161,652.19 |
| 33 | $1,024.13 | $164,885.23 |
| 34 | $1,044.61 | $168,182.94 |
| 35 | $1,065.51 | $171,546.60 |
| 36 | $1,086.82 | $174,977.53 |
| 37 | $1,108.55 | $178,477.08 |
| 38 | $1,130.72 | $182,046.62 |
| 39 | $1,153.34 | $185,687.55 |
| 40 | $1,176.41 | $189,401.30 |
| 41 | $1,199.93 | $193,189.33 |
| 42 | $1,223.93 | $197,053.12 |
| 43 | $1,248.41 | $200,994.18 |
| 44 | $1,273.38 | $205,014.06 |
| 45 | $1,298.85 | $209,114.34 |
| 46 | $1,324.82 | $213,296.63 |
| Total | $38,106.01 | $6,135,068.21 |

66.     "In no way was this motivated by an investment in or related to any of Mr. Brown's business schemes and dreams, I did this out of my own sheer economic necessity and survival." (Smead Decl. ¶ 9). The facts say otherwise.

67.     "I did not expect to, nor did I participate in the profits from any of the businesses of Clinton Brown. My only expectation was that I would be paid the principal of the loan, and interest, as stated in the Individual Notes secured by the individual Deeds of Trust" (Smead Decl. ¶ 7). This too is false. Why would anyone just settle for principal and interest when they could receive millions of dollars more from the efforts of another party? That would be more like a truth, out of sheer economic necessity and survival. The sad part is that the Plaintiff continues to wrestle with these projects in hope of solution that will be equitable to all parties. It is unjust that the defendant will reap the benefits of a solar development contract with BP and the Plaintiff is left with none. IF this is the law then no wonder people break it. Better to get the millions and spend it on lawyer fees to defend against civil suits than do the right thing. That is fraud anyway you look at it, or at least, it's a 'strong inference' that there might be fraud.

68.     The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668. As set out in § 21D(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Congress left the key term "strong inference" undefined. *Tellabs, Inc. v. Makor Issues & Rights, Ltd* 551 U.S. 308 (2007). To qualify as "strong" within the intendment of § 21D(b)(2), an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Id*. Millions of dollars from carefully reviewed and studied properties OR loan & interest money? Gee let's see.

## COUNT I:

## Unregistered Offers and Sales of Securities in Violation of Section 5(a)

69.     Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

70.     The definition of a "security" under the Federal securities laws includes a wide range of investment vehicles, including "investment contracts." 15 U.S.C. § 77b(a)(1); Securities Act Section 2(a)(1).

71.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

72.     Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypt assets, and enterprises that exist only on the Internet.

73.     As the United States Supreme Court noted in *SEC v. W.J. Howey Co*., Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the [sweat equity] money of others on the promise of profits." *Id*. at 299 (1946).

74.     A common enterprise exists wherever there is "horizontal commonality" between the purchaser and a given defendant. Such commonality, moreover, is established if each investor's fortunes are "ti[ed] ... to the fortunes of the other investors by the pooling of assets," and there is a "pro-rata distribution of profits" earned from these combined assets. *Revak v. SEC Realty Corp*., 18 F.3d 81, 87 (2d Cir. 1994) In essence, the properties were "pooled" together in the investment contract and, through the managerial efforts of the Plaintiff, were expected to generate profits that would then be paid to the Defendant and the Plaintiff, in other words, on a pro-rata basis. *Id*, *Supra Edwards* at 397. Even if there's a "fixed" rate of return, in this case, the

pro-rata basis increased when defendant charged a default rate of 5%, even though he allowed the default to occur. The Plaintiff only found out about this when the property 'loan' was to be reinstated. Regardless, the only way to pay back the defendant was the capital appreciation or from the projects themselves. Thus, an investment contract.

75.     The scheme, as alleged, is the very disguised public distribution that Section 5 seeks to prohibit. (i.e. an investment contract scheme that is unregistered and sold to a person of the investing public) [9]

76.     In determining whether a financial interest constitutes an "investment contract," the "expectation of profits produced by the efforts of others" requirement is met when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1131 (9th Cir. 1991)

77.     In determining whether a financial interest constitutes an "investment contract," the second prong of the test requires either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality). Vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters. One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter. *Id.*

78.     The Plaintiff is entitled to his equitable title as a claim of recission under Section 5, even if the Court does not find a 10(b)(5) violation in this controversy. A finding of a 10(b)(5) violation would entitle the Plaintiff to damages.

## COUNT II:

---

[9] The simplest way to break through the noise of the terms, in the Plaintiff's view, is to look at who 'sold' the money, *in this case*. The defendant, each time, purposely 'sold' his money at lower rates, to keep control of the deeds of trust and to ensure that he would receive all the equitable title, *at his discretion*. The Plaintiff 'bought' the money which had to be paid back with the equitable title (capital appreciation) or the profits from the project via the investment contract. Howey doesn't squarely say that the 'buyer' cannot also be the 'managerial' part of the investment contract as well. After all, the defendant did advise the Plaintiff on his projects, whether that advice was welcomed or not.

**Violation of 10b-5 'in connection with' the offer or sale of an unregistered security.**

79.     "Security" is defined in both § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities and Exchange Act of 1934, 15 U.S.C.. § 78c(a)(10), to include "investment contracts."

80.     This action arises from the Defendants' use of 'insider information' to take control of Plaintiff's real estate investments to their unjust enrichment. The Defendant, who is purportedly an 'accredited investor', and unbeknownst to the Plaintiff at the time, the Defendant acquired the properties through deceptive means, *intera alia*, misappropriating insider information given to the Defendant in hopes of averting the thing that happened; the taking of the equitable title from the Plaintiff. The Defendant, acting within a semi-fiduciary capacity and/or recklessly, knowingly and with scienter violated 10(b)(5) of the 1934 Securities and Exchange Act.

81.     In interpreting the Securities Act of 1933 and the Securities and Exchange Act of 1934 the Court is not bound by legal formalisms, but instead takes account of the economics of the transaction under investigation. A thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. *SEC v. R.G. Reynolds Enters*., 952 F.2d 1125 (9th Cir. 1991)

82.     Courts construe the Securities Act of 1933, 15 U.S.C § 77b(1), and the Securities and Exchange Act of 1934, 15 U.S.C. § 78(c)(a)(10), broadly to effectuate Congress's purpose to protect investors.

83.     The $64,000 equity investment in the Utah property was a result of the entrepreneurial and managerial efforts of the Plaintiff in the common enterprise with pooled money. Thus, an investment contract. Thus, a security.

84.     The investment contracts, ultimately, allowed the defendant to control the common enterprise and take the Plaintiff's equitable title fraudulently.

85.     Defendant knew that he would *only* be paid back if the projects were successful.

86.     Plaintiff has reason to believe that the investment into the common enterprise was

with the intent to deceive and defraud the Plaintiff of his equitable title based on the alleged facts in this case.

87.     The definition of security under Securities Act 2(a)(1) and Exchange Act Section 3(a)(10) includes a "receipt for" a security. The defendant could convert his holdings back to himself at any time. As a result, this is also a security because it is a "receipt for" a security. In any event, the investment contract was not registered and therefore is an illegal security.

88.     Whether the defendant knew or didn't know that he sold an investment contract is immaterial. Failing to register an investment contract is failing to register an investment contract [security] and it's illegal. This failure resulted in Plaintiff's losses.

89.     Once the Plaintiff, as in this amended complaint, satisfies its *prima facie* burden under Section 5 of the Securities Act, the burden shifts to the defendants to affirmatively plead an entitlement to the exemption. *SEC v. Canavagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

90.     Defendants will fail to make the necessary showing. Nor is an exemption clear from the face of the amended complaint. *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020). Proof of scienter, it is well-established, is not needed to show Section 5 liability. *Cavanagh*, 445 F.3d at 11 n.13

91.     Under Exchange Act Section 10(b) and Securities Act Section 17(a)(1), *scienter can be pled* either by "alleg[ing] facts establishing a motive to commit fraud and an opportunity to do so" *or* by "alleg[ing] facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner*, 9 F. 3d at 269. (Emphasis added).

92.     Securities legislation enacted for the purpose of avoiding frauds is intended by Congress to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, especially at the pleading stage for private causes of action, not related to class actions, where the discovery process can cost millions of dollars once commenced.

93.     By virtue of the foregoing, Defendants, directly and indirectly: without a registration statement in effect as to that [investment contract] security, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the

mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

1. Appointment of a temporary receiver under Rule 66 and Local Rule (L.R.) 66-1, to prevent the premature sale of the investment contract (i.e. Property);

2. Declare the Plaintiff's share in the Association as a security interest inseparable from his equitable interest in Malibu;

3. Joinder the Defendant pursuant to Rule 20 in Case No. 2:23-cv-02972-MEMF-KS (Defendants Emil Assentato, Tax Deed Enterprises, and Steve Weera Tonasut Trust)

4. Consolidate the actions pursuant to Rule 19 in *all* related cases.

5. Award compensatory damages for the loss of value and access, along with any other damages proven at trial;

6. Such other or further relief as the Court may deem appropriate, just, and equitable pursuant to 28 U.S.C § 2201 or Federal common law.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial for all claims so triable.

Dated: January 1, 2024                    */s/ Clinton Brown*, Self-Represented
                                          16821 Edgar Street,
                                          Pacific Palisades, CA 90272
                                          clinton@atlasinc.solar
                                          310-487-6453

CC: All Counsel of Record (via ECF) on January 1, 2024