**Joelette Quinn**

| | |
|---|---|
| **From:** | Legal Notices <legalnotices@SuperiorLoanServicing.com> |
| **Sent:** | Thursday, May 18, 2023 5:31 PM |
| **To:** | STEVE SMEAD |
| **Subject:** | RE: Lawsuit against me but, not you yet. |

Mr. Smead,

As we briefly discussed, I am providing you with the attorney who represents Superior Loan Servicing quite often and who may be able to assist you.

His information is as follows:

**Law Offices of Edward Weber**

**17151 Newhope St.**

**Fountain Valley, CA  92708**

**(657) 235-8359**

Please let us know if we can be of further assistance.

**Joelette Quinn, Manager**
Corporate Compliance/ Quality Control and Legal
Superior Loan Servicing
**(818) 483-0027, Ext. 8201**



**JOELETTE QUINN**
Corporate Compliance / Legal Manager

joelette@superiorloanservicing.com

ph: 818-483-0027 x8201
fx: 818-876-0337

7525 Topanga Canyon Blvd. Canoga Park, CA 91303
8920 W. Tropicana Ave. Ste. 103 Las Vegas, NV 89147

www.superiorloanservicing.com

YOUR TRUSTED LOAN SERVICING PARTNER

**SUPERIOR LOAN SERVICING EMAIL CONTACTS:**

**New Document Orders:** Docs@slsbox.com
**Loan Servicing Specialist (Customer Service):** LSS@slsbox.com
**Payoff Demand Request:** Demands@slsbox.com
**Insurance Monitoring:** Insurance@slsbox.com

**New Servicing Orders:** Boarding@slsbox.com
**Draw Request:** Draws@slsbox.com
**Recons/Sat. of Mortgage:** LienReleases@slsbox.com
**Accounting:** Accounting@slsbox.com

This e-mail transmission and any documents, files or previous e-mail messages attached to it, contains information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, confidential and/or privileged. If you are not the intended recipient (or authorized to receive on their behalf), you are hereby notified that any viewing, copying, disclosure, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please notify the sender by reply e-mail, and delete the original transmission without reading, making copies or saving it in any manner. Thank you.

**This email might be or include an attempt to collect a debt and any information obtained may be used for that purpose.**

Please do not send any attachments in a zipped, and/or password-protected format.
FINAL PAYMENT: All payoff funds must be made payable to Superior Loan Servicing.  Payoff funds will only be accepted via Title Check, Cashiers Check or Wire (wiring instructions provided upon request).

1

*Think Green.  Please consider the environment before printing this email.*

---

**From:** STEVE SMEAD <stsmead@gmail.com>
**Sent:** Thursday, May 18, 2023 5:06 PM
**To:** Legal Notices <legalnotices@SuperiorLoanServicing.com>
**Subject:** Re: Lawsuit against me but, not you yet.

Give me a call A.S.A.P.  in regard to a former borrower that Superior did a foreclosure on 1/4/2023.

Borrower: Clinton Brown
Acct. #BRG-051321

Thanks,
Steve Smead
805-200-7411

On Wed, May 17, 2023 at 2:22 PM STEVE SMEAD <stsmead@gmail.com> wrote:

Give me a call A.S.A.P.  in regard to a former borrower that Superior did a foreclosure on 1/4/2023.

Borrower: Clinton Brown
Acct. #BRG-051321

Thanks,
Steve Smead
805-200-7411



**TRUSTEE'S SALE GUARANTEE**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE AND THE CONDITIONS ATTACHED HERETO AND
MADE A PART OF THIS GUARANTEE

**WFG NATIONAL TITLE INSURANCE COMPANY**
a South Carolina corporation, herein called the Company

GUARANTEES

the Assured named in Schedule A of this Guarantee

against loss or damage not exceeding the liability amount stated in Schedule A sustained by the Assured by reason
of any incorrectness in the assurances set forth in  Paragraph 3 of Schedule A.

**In Witness Whereof**, WFG NATIONAL TITLE INSURANCE COMPANY has caused this guarantee to be signed
and sealed by its duly authorized officers as of Date of Guarantee shown in Schedule A.

**WFG NATIONAL TITLE INSURANCE COMPANY**

By: _____
President

ATTEST: _____
Secretary

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

**TRUSTEE'S SALE GUARANTEE**

**SCHEDULE A**

| | | | |
|---|---|---|---|
| Guarantee No.: | **3174406-6626083** | Liability: | **$305,000.00** |
| File No.: | **2190565CAD** | | |
| Your No.: | **2022-01537** | | |
| Date of Guarantee: | **August 18, 2022** | Fee: | **$625.00** |

1.   Name of Assured:

**Asset Default Management, Inc., Superior Loan Servicing and Steve Smead**

2.   The estate or interest in the Land that is the subject of this Guarantee is:

**Fee Simple**

3.   Assurances:

According to the Public Records as of the Date of Guarantee,

a.   Title to the estate or interest is vested in:

**Clinton Brown, a Single Man**

b.   Title to the estate or interest is subject to defects, liens or encumbrances shown in Schedule B which are not necessarily shown in the order of their priority.

c.   The Land referred to in this Guarantee is situated in the State of California, County of Los Angeles, and is described as follows:

**See Exhibit "A" attached hereto and made a part hereof**

d.   Relative to the Mortgage shown in Paragraph 11 of Schedule B:

i.   For the purposes of California Civil Code §§ 2924b (b) and (d), the address of the trustor or mortgagor as shown in the Mortgage is:

**Clinton Brown
21472 Calle Del Barco
Malibu CA 90265**

ii.   The names and addresses of all persons who have recorded requests for a copy of notice of default and for a copy of notice of sale as provided by California Civil Code §§ 2924b (a), (b) and (d) are:

**None**

iii.   The names and addresses of all additional persons who are entitled to receive a copy of notice of default and a copy of notice of sale as provided by California Civil Code §§ 2924b (c) (1), (2) and (3) are:

**Clinton Brown
10226 Regent Street
Los Angeles, CA 90034**

**Affects: Vesting**

iv.   The names and addresses of all associations defined in California Civil Code §§ 4080 or 6528 that have recorded a request for notice that are entitled to receive a copy of any trustee's deed upon sale as provided by California Civil Code § 2924b (f) are:

**None**

v.   The names and addresses of all state taxing agencies that are entitled to receive a copy of notice of sale as provided by California Civil Code § 2924b (c) (3) are:

**State of California
Franchise Tax Board
Sacramento, CA 95812-2952**

**Affects: Item #10**

**State of California**
**Franchise Tax Board**
**Special Procedures Section**
**PO Box 2952**
**Sacramento, CA 95812-2952**

**Affects: Item #10**

vi.  The address of the Internal Revenue Service to which a copy of notice of sale is to be mailed as provided by California Civil Code § 2924b (c) (4) is:

**Not Applicable**

vii.  The name of each city in which the Land is located is:

**Malibu**

If not in a city, each public notice district in which the land is located is:

**Not Applicable**

viii.  The name of a newspaper of general circulation for the publication of a notice of sale as required by California Civil Code § 2924f (b) (1) is:

**Malibu Times**
**Published: Thursday**

**TRUSTEE'S SALE GUARANTEE**

**SCHEDULE B**

1. Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2022-2023.

2. Said land has been declared tax defaulted for delinquent taxes for the Fiscal Year 2021-2022.

   Amount to redeem:         $6,512.14
   Prior to:                 August 31, 2022

   For proration purpose said taxes were shown as:

   First Installment:        $3,157.47, Delinquent
   Second Installment:       $3,167.45, Delinquent
   Code Area:                10865
   Parcel Number:            4451-015-021

3. Assessments, if any, for Community Facility Districts affecting said land which may exist by virtue of assessment map or notices filed by said districts. Said assessments are collected with the County Taxes.

4. The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

5. Said land disclosed herein is also known by the County Tax Assessor as the following parcel number(s):

   4451-015-021

6. Covenants, conditions, or restrictions, if any, appearing in the Public Records; but omitting, except to the extent permitted by any applicable federal or state law, covenants or restrictions, if any, based on race, color, religion, sex, familial status, national origin, handicap, sexual orientation, marital status, ancestry, source of income, disability, medical condition, or other unlawful basis.

7. Any easements, servitudes, or senior encumbrances appearing in the Public Records.

8. Any lease, grant, exception, or reservation of mineral rights appearing in the Public Records.

9. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

   Amount:                   $170,000.00
   Dated:                    March 16, 2020
   Trustor:                  Clinton Brown, a Single Man
   Trustee:                  Superior Loan Servicing
   Lender:                   Steve Smead, a Married Man as his sole and separate property
   Recorded:                 April 22, 2020
   Instrument No.:           20200445573, of Official Records

10. A tax lien for the amount shown, and other amounts due thereunder, in favor of the State of California in the amount of $2,444.93, filed by Franchise Tax Board of the State of California, Taxpayer Clinton Brown, Certificate No. 20308244214, recorded November 4, 2020, as Instrument No. 20201389185, of Official Records.

    Note: We are unable to determine if the taxpayer/debtor in the above mentioned document is the same person as the vestee herein.

11. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

    Amount:                  $300,000.00
    Dated:                   May 14, 2021
    Trustor:                 Clinton Brown, a Single Man
    Trustee:                 Superior Loan Servicing
    Lender:                  Steve Smead , a Married Man as his Sole and Separate Property, as to an Undivided 100.000% Interest
    Recorded:                May 21, 2021
    Instrument No.:          20210822632, of Official Records

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

A Notice of Default recorded August 18, 2022, as Instrument No. 20220828300, of Official Records.

12.  Any claim arising out of a bankruptcy proceeding that is not disclosed by notice pursuant to U.S.C. § 549 (c).


NOTE:  If the property which is the subject of this report or guarantee has been used, is being used, or was acquired with the intent that it be used in connection with a marijuana related enterprise, including but not limited to the cultivation, storage, distribution, transport, manufacture or sale of marijuana and/or products containing marijuana, the federal government (or the state or local government if such use is deemed to be noncompliant with state or local law) may claim a preeminent right to the property automatically effective as of the date of the use which it deems illegal. Nothing in this report or guarantee provides assurances against the exercise of such a governmental forfeiture, regulatory or police power, and further, Company expressly reserves the right to decline to close or insure such a property following the completion of any litigation or foreclosure action conducted on said property. You are advised to consult your legal counsel on whether it is required, advisable, or inadvisable to give notice to the Federal and/or State government in order to address potential forfeiture issues.

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

Real property in the City of Malibu, County of Los Angeles, State of California, described as follows:

Lot 182 of Tract 10570, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 161 Pages 36 to 42 inclusive of maps, in the office of the county recorder of Los Angeles County, State of California.

Excepting therefrom all Minerals, Oil, Petroleum Asphaltum, Gas, Coal, Hydrocarbon substances and water contained in on, within and under said lands and every part thereof, this reservation shall not reserve or shall it be construed as reserving to grantor the right to go upon said lands for the purpose of Extracting any of said substance.

NOTE:   For information purposes only, for which the Company assumes no liability for any inaccuracies or omissions, the purported street address of said land as determined from the latest County Assessor's Roll is:

21472 Calle Del Barco, Malibu, CA  90265

**WFG** National Title Insurance Company®
a Williston Financial Group company

## WFG NATIONAL TITLE INSURANCE COMPANY

## <u>EXCLUSIONS FROM COVERAGE</u>

1. Except to the extent of the assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of any law, ordinance, governmental regulation or any other police power adopted or promulgated by any federal or state government authority purporting to regulate non-judicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.

2. Notwithstanding any assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of the following:

(a) Defects, liens, encumbrances, adverse claims or other matters affecting the title to any property beyond the lines of the Land expressly described in the description set forth in Schedule A of this Guarantee, or title to streets, roads, avenues, lanes, ways or waterways to which such Land abuts, or the right to maintain therein vaults, tunnels, ramps or any structure or improvements; or any rights or easements therein, unless such property, rights or easements are expressly and specifically set forth in said description.

(b) Defects, liens, encumbrances, adverse claims or other matters, whether or not shown by the Public Records (1) that are created, suffered, assumed or agreed to by one or more of the Assureds; (2) that result in no loss to the Assured; or (3) that do not result either in the invalidity of any non-judicial proceeding to foreclose the lien of the Mortgage or the failure of any such non-judicial foreclosure proceeding to divest a lien, estate or interest subordinate or subject to the lien of the Mortgage.

(c) Defects, liens, encumbrances, adverse claims or other matters against the title, not shown by the Public Records.

(d) The identity of any party shown or referred to in Schedule A.

(e) The validity, legal effect or priority of any matter shown or referred to in this Guarantee.

(f) Any law, ordinance, governmental regulation or any other police power adopted or promulgated by any county, city, or any other local government authority purporting to regulate non-judicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.

(g) (1) Taxes or assessments of any taxing authority that levies taxes or assessments on real property; or, (2) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not the matters excluded under (1) or (2) are shown by the records of the taxing authority or by the Public Records.

(h) (1) Unpatented mining claims; (2) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (3) water rights, claims or title to water, whether or not the matters excluded under (1), (2) or (3) are shown by the Public Records.

## WFG NATIONAL TITLE INSURANCE COMPANY

## <u>INFORMATIONAL NOTES</u>

No assurances as set forth in Paragraph 3 of Schedule A are provided in connection with the following information and the Company assumes no liability for any inaccuracies in or omissions from the information.  This information is not intended to be comprehensive and does not necessarily include all laws and regulations that might affect the contemplated foreclosure.

1. Attention is called to Article I commencing with California Civil Code Sections 2920 et. seq, of Chapter 2, Title 14, Part 4, Division 3, that govern the actions of mortgagees, beneficiaries, mortgage servicers, trustees, and their agents with respect to non-judicial foreclosures.

2. Attention is called to the Servicemembers Civil Relief Act (SCRA) (*50 USC §§3901 et seq.*), the Military Reservist Relief Act of 1991 (*California Military and Veterans Code §§ 800 et seq.*), and Military and Veterans Code § 408, that contain restrictions against the sale of land under a deed of trust or mortgage if the owner is entitled to the benefits of those laws.

3. Attention is called to the Federal Tax Lien Act of 1966 (26 USC §§ 6321 et seq.), that, among other things, provides for the giving of written notice of sale in a specified manner to the Secretary of Treasury or his or her delegate as a requirement for the discharge or divestment of a Federal Tax Lien in a non-judicial sale, and establishes with respect to that lien a right in the United States to redeem the property within a period of 120 days from the date of the sale.

4. Attention is called to California Government Code § 16187, that, among other things, provides for the giving of written notice of sale in a specified manner to the Controller of the State of California necessary for the discharge or divestment in a non-judicial sale of a Notice of Lien for Postponed Property Taxes recorded in the public records subsequent to the recording of a notice of default.

## TRUSTEE'S SALE GUARANTEE CONDITIONS

1. **Definition of Terms.**
   The following terms when used in the Guarantee mean:
   (a) the "Assured": (i) the party or parties named as the Assured in Schedule A, or on a supplemental writing executed by the Company, (ii) the duly substituted trustee of the Mortgage and (iii) the owner of the indebtedness or other obligation secured by the Mortgage.
   (b) "Land":  the Land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property.  The term "Land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.
   (c) "Mortgage":  the mortgage, deed of trust, trust deed, or other security instrument set forth in  Paragraph 3.d. of Schedule A.
   (d) "Public Records":  those records established under California statutes at Date of Guarantee for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge.
   (e) "Date of Guarantee":   the Date of Guarantee set forth in Schedule A

2. **Notice of Claim to be Given by Assured.**
   The Assured shall notify the Company promptly in writing in case knowledge shall come to the Assured of any assertion of facts, or claims of title or interest that are contrary to the assurances set forth in Paragraph 3 of Schedule A and that might cause loss or damage for which the Company may be liable under this Guarantee. If prompt notice shall not be given to the Company, then all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of the Assured under this Guarantee unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

3. **No Duty to Defend or Prosecute.**
   The Company shall have no duty to defend or prosecute any action or proceeding to which the Assured is a party, notwithstanding the nature of any allegation in such action or proceeding.

4. **Company's Option to Defend or Prosecute Actions; Duty of Assured to Cooperate.**
   Even though the Company has no duty to defend or prosecute as set forth in Paragraph 3 above:
   (a) The Company shall have the right, at its sole option and cost, to institute and prosecute any action or proceeding, interpose a defense, as limited in Paragraph 4.b. or to do any other act which in its opinion may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A or to prevent or reduce loss or damage to the Assured including, but not limited to, repeating the trustee's sale proceeding.  The Company may take any appropriate action under the terms of this Guarantee, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this Guarantee.  If the Company shall exercise its rights under this paragraph, it shall do so diligently.
   (b) If the Company elects to exercise its options as stated in Paragraph 4.a. the Company shall have the right to select counsel of its choice (subject to the right of the Assured to object for reasonable cause) to represent the Assured and shall not be liable for and will not pay the fees of any other counsel, nor will the Company pay any fees, costs or expenses incurred by the Assured in the defense of those causes of action which allege matters not covered by this Guarantee.
   (c) Whenever the Company shall have brought an action or interposed a defense as permitted by the provisions of this Guarantee, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from an adverse judgment or order.
   (d) In all cases where this Guarantee permits the Company to prosecute or provide for the defense of any action or proceeding, the Assured shall secure to the Company the right to so prosecute or provide for the defense of any action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the Assured for this purpose.  Whenever requested by the Company, the Assured, at the Company's expense, shall give the Company all reasonable aid in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or lawful act which in the opinion of the Company may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A.  If the Company is prejudiced by the failure of the Assured to furnish the required cooperation, the Company's obligations to the Assured under the Guarantee shall terminate.

5. **Proof of Loss or Damage.**

(a) In addition to and after the notices required under Section 2 of these Conditions have been provided to the Company, a proof of loss or damage signed and sworn to by the Assured shall be furnished to the Company within ninety (90) days after the Assured shall ascertain the facts giving rise to the loss or damage.  The proof of loss or damage shall describe the matters covered by this Guarantee which constitute the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.   If the Company is prejudiced by the failure of the Assured to provide the required proof of loss or damage, the Company's obligation to the Assured under the Guarantee shall terminate.

(b) The Company may reasonably require the Assured  to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Guarantee, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Assured shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Assured provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Assured  to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this Guarantee as to that claim.

6. **Options to Pay or Otherwise Settle Claims:  Termination of Liability.**

In case of a claim under this Guarantee, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Guarantee or to Purchase the Indebtedness.

   i. To pay or tender payment of the full amount of this Guarantee together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

   ii. To purchase the indebtedness secured by the Mortgage for the amount owing thereon, together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company so purchases such indebtedness, the owner thereof shall transfer, assign, and convey to the Company the indebtedness and the Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6.a.i. or 6.a.ii., all liability and obligations of the Company to the Assured under this Guarantee, other than to make the payment required in those paragraphs, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

(b) To Pay or Otherwise Settle With Parties Other Than the Assured or With the Assured.

   i. To pay or otherwise settle with other parties for or in the name of an Assured  any claim assured against under this Guarantee. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

   ii. To pay or otherwise settle with the Assured  the loss or damage provided for under this Guarantee, together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6. b.i. or  6.b.ii., the Company's obligations to the Assured under this Guarantee for the claimed loss or damage, other than the payments required to be made, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

**7. Limitation of Liability.**

This Guarantee is a contract of Indemnity against actual monetary loss or damage sustained or incurred by the Assured who has suffered loss or damage by reason of reliance upon the assurances set forth in Paragraph 3 of Schedule A and only to the extent herein described, and subject to the Exclusions From Coverage and Conditions of this Guarantee.

(a) The liability of the Company under this Guarantee to the Assured shall not exceed the least of:

    i.    the amount of liability stated in Schedule A;

    ii.    the amount of the unpaid principal indebtedness secured by the Mortgage as limited or as reduced under Paragraph 8 of these Conditions at the time the loss or damage assured against by this Guarantee occurs, together with interest thereon; or

    iii.    the difference between the value of the estate or interest set forth in Schedule A and the value of the estate or interest subject to any defect, lien, encumbrance or other matter assured against by this Guarantee..

(b) If the Company or the Assured under the direction of the Company at the Company's expense establishes the title, or removes the alleged defect, lien or, encumbrance or cures any other matter assured against by this Guarantee in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(c) In the event of any litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom.

(d) The Company shall not be liable for loss or damage to the Assured for liability voluntarily assumed by the Assured in settling any claim or suit without the prior written consent of the Company.

**8. Reduction of Liability or Termination of Liability.**

All payments under this Guarantee, except payments made for costs, attorneys' fees and expenses pursuant to Paragraph 4 shall reduce the amount of liability pro tanto.

**9. Payment of Loss.**

(a) No payment shall be made without producing this Guarantee for endorsement of the payment unless the Guarantee has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions the loss or damage shall be payable within thirty (30) days thereafter.

**10. Subrogation Upon Payment or Settlement.**

Whenever the Company shall have settled and paid a claim under this Guarantee, all right of subrogation shall vest in the Company unaffected by any act of the Assured.

The Company shall be subrogated to and be entitled to all rights and remedies which the Assured would have had against any person or property in respect to the claim had this Guarantee not been issued. If requested by the Company, the Assured shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Assured shall permit the Company to sue, compromise or settle in the name of the Assured and to use the name of the Assured in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Assured the Company shall be subrogated to all rights and remedies of the Assured after the Assured shall have recovered its principal, interest, and costs of collection.

**11. Arbitration.**

Either the Company or the Assured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Assured arising out of or relating to this Guarantee, any service in connection with its issuance or the breach of a Guarantee provision, or to any other controversy or claim arising out of the transaction giving rise to this Guarantee. All arbitrable matters when the amount of liability in Schedule A is $2,000,000 or less shall be arbitrated at the option of either the Company or the Assured. All arbitrable matters when the amount of liability in Schedule A is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Assured. Arbitration pursuant to this Guarantee and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**12. Liability Limited to This Guarantee; Guarantee Entire Contract.**

    (a) This Guarantee together with all endorsements, if any, attached hereto by the Company is the entire Guarantee and contract between the Assured and the Company.  In interpreting any provision of this Guarantee, this Guarantee shall be construed as a whole.

    (b) Any claim of loss or damage, whether or not based on negligence, or any action asserting such claim, shall be restricted to this Guarantee.

    (c) No amendment of or endorsement to this Guarantee can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**13. Notices, Where Sent.**

    All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this Guarantee and shall be addressed to the Company at 12909 SW 68th Parkway, Suite 350, Portland, OR 97223.  WFG National Title Insurance Company's telephone number is (800) 334-8885.



**Plain English Privacy Statement
for Appraisal, Title & Escrow Customers**

WFG believes it is important to protect your privacy and confidences.  We recognize and respect the privacy expectations of our customers. We believe that making you aware of how we collect information about you, how we use that information, and with whom we share that information will form the basis for a relationship of trust between us. This Privacy Policy provides that explanation. We reserve the right to change this Privacy Policy from time to time.

Williston Financial Group, LLC, WFG National Title Insurance Co. and each of the affiliates listed below (collectively "WFG" or the "WFG Family") are obligated to comply with Federal and state privacy laws. While there are some common requirements to those laws, the definitions and duties differ significantly from law-to-law and state-to-state. A privacy statement drafted to comply with all of the applicable privacy laws and their differing definitions would likely be confusing.  Therefore, in an attempt to better communicate our privacy policies, WFG designed this "Plain English" explanation, followed by the Gramm-Leach-Bliley Act model form and website links to State-Specific Privacy Notices in order to provide you with the complete, legal privacy notices and disclosures required under Federal and applicable State Laws.

WFG's primary business is providing appraisal, title insurance and, escrow services for the sale or refinance of real property. This can be a complicated process, involving multiple parties, many of whom have been selected by our customers, each filling a specialized role. In part, you have hired WFG to coordinate and smooth the passage of the information necessary for an efficient settlement or closing.

In the course of this process, WFG collects a significant amount of personal and identifying information about the parties to a transaction, including sensitive items that include but are not limited to: your contact information including email addresses, Social Security numbers, driver's license and, other identification numbers and information;  financial, bank and insurance information; information about past and proposed mortgages and loans; about properties you currently or previously owned; your mortgage application package; and the cookie, IP address, and other information captured automatically by computer systems.

Much of this information is gathered from searches of public land records, tax, court and credit records to make certain that any liens, challenges, or title defects are addressed properly.  Some of the information that is collected is provided by you, or the computer systems you use.  We also may receive information from real estate brokers and agents, mortgage brokers and, others working to facilitate your transaction. We also may receive information from public, private or governmental databases including credit bureaus, 'no-fly' lists, and terrorist 'watch lists' , as well as from your lenders and credit bureaus.

**What Information is Shared?**

**WFG DOES NOT SELL any of your information to non-affiliated companies for marketing or any other purpose.**

However, some of the same information does get shared with persons inside and outside the WFG Family in order to facilitate and complete your transaction.

For example:

- Information, draft documents, and closing costs will pass back and forth between WFG and your mortgage broker and lender to facilitate your transaction.
- Information, including purchase agreements and amendments, will pass back and forth between WFG and the real estate agents and brokers, the mortgage brokers and lenders, the lawyers and accountants, and others involved in facilitating the transaction.
- WFG may order property searches and examinations from title searchers, abstractors and title plants.
- WFG may use third parties to obtain tax information, lien information, payoff information, condominium and, homeowners' association information and payoff information.
- Third parties may be engaged to prepare documents in connection with your transaction.

- Surveys, appraisals and, inspections may be ordered.
- Within the WFG Family of companies, we may divide up the work to handle each closing in the most efficient manner possible and to meet specific legal and licensing requirements.   Certain parts of your closing (for example a search or disbursement) may be handled by another division or company within the WFG Family.
- When it is time for signatures, your complete closing package may be sent to a notary, remote online notary, or notary service company who will arrange to meet with you to sign documents.  The notary will, in turn, send signed copies back to us along with copies of your driver's license or other identity documents usually by mail, UPS, Federal Express or another courier service.
- Your deed, mortgage and other documents required to perfect title will be recorded with the local recorder of deeds.
- In some cases, we use an outside service to coordinate the recording or electronic-recording of those instruments, and they will receive copies of your deeds, mortgages and other recordable documents to process, scan and send on to the recording office.
- Various government agencies get involved.   The law requires us to provide certain information to the IRS, the US Treasury, local and state tax authorities and other governmental agencies.

You have a choice in the selection of a mortgage broker, lender, real estate broker or agent and others that make up your 'transaction team.' Information flows to and from the members of the transaction team you have selected to facilitate an efficient transaction for you.

When WFG selects and engages a third-party provider, we limit the scope of the information shared with that third party to the information reasonably necessary for that service provider to provide the requested services.  With most, we have entered into express agreements in which they expressly commit to maintain a WFG customer's information in strict confidence and use the information only for purposes of providing the requested services, clearing title, preventing fraud and addressing claims under our title insurance policies.

### How does WFG use your Information?

We may use your personal information in a variety of ways, including but not limited to:

- Provide the products, services and title insurance you have requested and to close and facilitate your transaction.
- Coordinate and manage the appraisal process.
- Handle a claim or provide other services relating to your title insurance policies.
- Create and manage your account.
- Operate and improve WFG's applications and websites, including WFG MyHome®, WFG's secure communication and transaction portal.  Your information is used for access management, payment processing, site administration, internal operations, troubleshooting, data analysis, testing, research, and for statistical purposes.
- Respond to your requests, feedback, or inquiries.
- Comply with laws, regulations, and other legal requirements.
- Comply with relevant industry standards and our policies, including managing WFG's risk profile through reinsurance.
- Protect and enforce your rights and the rights of other users against unlawful activity, including identity theft and fraud.
- Protect and enforce our collective rights arising under any agreements entered into between WFG and you or any other third party;
- Protect the integrity and maintain security of our applications, websites, and products;
- Operate, evaluate, and improve our business; and
- Provide you with information about products, services, and promotions, from WFG or third parties that may interest you.

### How Do We Store and Protect Your Personal Information?

Although no system can guarantee the complete security of your personal information, we will use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your personal information and our systems and sites from malicious intrusions or hacking.

## How Long Do We Keep Your Personal Information?

We keep your personal information for as long as necessary to comply with the purpose for which it was collected, our business needs, and our legal and regulatory obligations. We may store some personal information indefinitely. If we dispose of your personal information, we will do so in a way that is secure and appropriate to the nature of the information subject to disposal.

## Computer Information

When you access a WFG website, or communicate with us by e-mail, we may automatically collect and store more information than you are expressly providing when you fill out a survey or send an email.   This may include:

- Your IP Address.
- Your email address, your alias and, social media handles.
- The type of browser and operating system you use.
- The time of your visit.
- The pages of our site you visit.
- Cookies.

In order to provide you with customized service, we make use of Web browser cookies.  Cookies are files that help us identify your computer and personalize your online experience.  You may disable cookies on your computer, but you may not be able to download online documents or access certain sites unless cookies are enabled.

The technical information we collect is used for administrative and technical purposes and to prevent fraud and provide identity verification.  For instance, we may use it to count the number of visitors to our site and determine the most popular pages.  We may also use it to review types of technology you are using, determine which link brought you to our Web site, assess how our advertisements on other sites are working, help with maintenance, and improve our customers' experience.

We may compare information gathered on previous visits to verify that we are interacting with the same parties and not a potential imposter.

If we ask you to fill out any forms or surveys, we will use the information we receive only for the specific purposes indicated in those forms or surveys.

The information you and your transaction team send us in emails or attached to an email, or provide through any of our online tools, is used for purposes of providing title, escrow and appraisal management services and used for the purposes described above.

## Links to Third Party Sites

Our Applications and Websites may contain links to third-party websites and services. Please note that these links are provided for your convenience and information, and the websites and services may operate independently from us and have their own privacy policies or notices, which we strongly suggest you review. This Privacy Notice applies to WFG's applications and websites only.

## Do Not Track

Because there is not an industry-standard process or defined criteria to permit a user to opt-out of tracking their online activities (Do Not Track or DNT), our websites do not currently change the way they operate based upon detection of a "Do Not Track" or similar signal.  Likewise, we cannot assure that third parties are not able to collect information about your online activities on WFG websites or applications.

## Social Media Integration

Our applications, websites, and products contain links to and from social media platforms. You may choose to connect to us through a social media platform, such as Facebook, Twitter, Google, etc. When you do, we may collect additional information from or about you, such as your screen names, profile picture, contact information, contact list, and the profile pictures of your contacts, through the social media platform. The social media platforms may also collect information from you.

When you click on a social plug-in, such as Facebook's "Like" button, Twitter's "tweet" button or the Google+, that particular social network's plugin will be activated and your browser will directly connect to that provider's servers. Your action in clicking on the social plug-in causes information to be passed to the social media platform.

We do not have control over the collection, use and sharing practices of social media platforms. We, therefore,

encourage you to review their usage and disclosure policies and practices, including their data security practices, before using social media platforms.

**How Can You "Opt-Out?"**

We do not sell your information; therefore there is no need to opt-out of such reselling.  Under various laws, you can opt-out of the sharing of your information for more narrow purposes.  For additional detail, consult the Links under the "Legal" Notices attached below.

**The "Legal" Notices**

To comply with various federal and state laws, we are required to provide more complete legal notices and disclosures.  In reviewing these, you will find that these notices incorporate the definitions and terminology used in the respective privacy laws which can often be somewhat convoluted and may even seem inconsistent with the descriptions above.  The state-specific statutes may also give residents of those states additional rights and remedies.

**Privacy Notice for California Residents -** https://national.wfgnationaltitle.com/privacy-notice-california

**Privacy Notice for Oregon Residents -** https://national.wfgnationaltitle.com/privacy-notice-oregon

**How to Contact Us**

If you have any questions about WFG's privacy policy or how we protect your information, please contact WFG:

- By email: Consumerprivacy@willistonfinancial.com

- By telephone: 833-451-5718

- By fax: 503-974-9596

- By mail: 12909 SW 68th Pkwy, Suite 350, Portland, OR 97223

- In-person: 12909 SW 68th Pkwy, Suite 350, Portland, OR 97223

**WFG FAMILY**
WILLISTON FINANCIAL GROUP LLC
WFG NATIONAL TITLE INSURANCE COMPANY
WFG LENDER SERVICES, LLC
WFGLS TITLE AGENCY OF UTAH, LLC
WFG NATIONAL TITLE COMPANY OF WASHINGTON, LLC
WFG NATIONAL TITLE COMPANY OF CALIFORNIA
WFG NATIONAL TITLE COMPANY OF TEXAS, LLC D/B/A WFG NATIONAL TITLE COMPANY
UNIVERSAL TITLE PARTNERS, LLC
VALUTRUST SOLUTIONS, LLC
WILLISTON ENTERPRISE SOLUTIONS & TECHNOLOGY, LLC
WFG NATIONAL TITLE COMPANY OF CLARK COUNTY, WA, LLC D/B/A WFG NATIONAL TITLE

Revised 6.12.20

Rev. 12/2019

| FACTS | WHAT DOES WILLISTON FINANCIAL GROUP DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and other government identification information<br>• Your name, address, phone, and email<br>• Information about the property, any liens and restrictions<br>• Financial Information including credit history and other debt<br>• Financial account information, including wire transfer instructions. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Williston Financial Group chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Williston Financial Group share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes— to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes— information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| To limit our sharing | • Call 833-451-5718—our menu will prompt you through your choice(s)<br>• Visit us online: http://bit.ly/WFGsConsumerPrivacyInformationRequestPage or e-mailing us at consumerprivacy@willistonfinancial.com<br>• Mail the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 833-451-5718 or Email consumerprivacy@willistonfinancial.com |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Mail-In Form | |
|---|---|
| If you have a joint policy, your choices will apply to everyone on your account. | Mark any/all you want to limit:<br>[ ] Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br>[ ] Do not allow your affiliates to use my personal information to market to me.<br>[ ] Do not share my personal information with nonaffiliates to market their products and services to me. |

| Name | | Mail to: |
|---|---|---|
| Address | | Williston Financial Group |
| City, State, Zip | | PRIVACY DEPT |
| File Number | | 12909 SW 68th Pkwy, #350 Portland, OR 97223 |

Page 2

| Who we are | |
|---|---|
| Who is providing this notice | Williston Financial Group, LLC and its affiliates and subsidiaries as listed below: |

| What we do | |
|---|---|
| How does Williston Financial Group protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.  We limit access to your information to employees that need to use the information to process or protect transaction. We take industry standard (IPSEC) measures to protect against malicious intrusions or hacking |
| How does Williston Financial Group collect my personal information? | We collect your personal information, for example, when you<br>• Apply for insurance<br>• Engage us to provide appraisal, title and escrow services<br>• Give us your contact information<br>• Provide your mortgage information<br>• Show your driver's license<br><br>We also collect your personal information from others, such as real estate agents and brokers, mortgage brokers, lenders, credit bureaus, affiliates, and others |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your policy. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Our affiliates include companies with a common corporate identity, including those listed below. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Nonaffilliates we share with can include real estate agents and brokers, mortgage brokers, lenders, appraisers, abstractors and title searchers and others as appropriate to facilitate your transaction. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>Williston Financial Group does not jointly market. |

| Other important information |
|---|
| As a resident or citizen of certain states, we may have to provide additional state specific privacy notices and you may have rights other than as set forth above.  The links below will provide state specific information:<br><br>**Privacy Notice for California Residents -** https://national.wfgnationaltitle.com/privacy-notice-california<br><br>**Privacy Notice for Oregon Residents -** https://national.wfgnationaltitle.com/privacy-notice-oregon |

**Prepared By:**

Brown Realty Group

2945 Westwood Blvd

Los Angeles, CA 90064

**After Recording Return To**:

Steve Smead

145 S 8th Street

Santa Paula, CA 93060

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Parcel Number (APN): 4451-015-021

# DEED OF TRUST

**THIS DEED OF TRUST (the "Trust") dated November 04, 2020, is made by and between:**

Clinton Brown of 10226 Regent St, Los Angeles, California 90034
(the "Borrower")

**-AND-**

Steve Smead of 145 S 8th Street, Santa Paula, California 93060
(the "Lender")

**-AND-**

Brown Realty Group of 2945 Westwood Blvd, Los Angeles, California 90034
(the "Trustee")

**-AND-**

Clinton Brown of California, 10226 Regent St, Los Angeles 90034
(the "Guarantor")

**WITNESSETH:**

    **THAT FOR AND IN CONSIDERATION OF** the sum lent to the Borrower by the Lender, in the amount of $150,000 U.S. Dollars (the "Principal Amount") as evidenced by the promissory note (the "Note") dated November 04, 2020, the receipt of which the Borrower does hereby acknowledge itself indebted, the Borrower IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE, the following described real property (the "Property"), located at 21472 Calle Del Barco in the County of Los Angeles, State of California, with the following legal description:

TRACT NO 10570 LOT 182

    **TOGETHER WITH** all the improvements now or hereafter erected on the Property, and all easements, appurtenances, and fixtures now or hereafter a part of the Property. All replacements and additions will also be covered by this Trust.

    **BORROWER COVENANTS** that Borrower is the legal owner of the estate hereby

conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**To Protect the Security of this Deed of Trust, the parties do hereby agree as follows:**

## TERMS RELATING TO PAYMENT

1. **PROMISE TO PAY**. The Borrower, for value received, promises to pay to the Lender the Principal Amount, interest and all fees and costs on the terms outlined in this Trust or in any amendment, extension, or renewal of the Trust and any additional amounts secured by this Trust on the terms elsewhere provided for such debts and liabilities.

2. **PAYMENT LOCATION**. The Borrower will make payments to 145 S 8th Street, Santa Paula, California 93060, or at such other place as may be designated by Lender at a later date.

3. **OBLIGATION TO PAY**. The Borrower agrees to pay all moneys payable pursuant to this Trust and all additional amounts secured by this Trust without abatement, set-off or counterclaim. Should the Borrower make any claim against the Lender either initially or by way of abatement, set-off or counterclaim, the Borrower agrees that any such claim will not reduce or postpone their obligation to make all payments as provided by this Trust.

4. **APPLICATION OF PAYMENTS**. All payments paid by the Borrower and received by the Lender will first be applied in payment of the interest calculated at the Interest Rate, and second in payment of the Principal Amount. Such payments will be applied in the order in which it became due. However, if the Borrower defaults on payment, then the Lender will have the right to apply any payments received while in default as the Lender so chooses.

5. **PREPAYMENT PRIVILEGES**. When not in default, the Borrower may prepay, without penalty, all or a portion of the Principal Amount and Interest earlier than it is due (i.e., make payment prior to the time that it is due). Partial prepayment will not postpone the due date of any subsequent payment or change the payment amount, unless the Lender otherwise agrees in writing. Rather, prepayments will first be applied to the interest calculated at the Interest Rate, and second to the Principal Amount.

6. **ADDITIONAL CHARGES AND ENCUMBRANCES**. The Borrower must pay all taxes, assessments, charges, fines, and all other impositions attributable to the Property and all trusts, liens, and other encumbrances on the Property. To the extent that these items are Escrow Items, the Borrower will pay them in the manner provided in Section 4.

7. **RELEASE AND RECONVEYANCE**. Upon payment of all sums secured by this Trust, including the Principal Amount and interest, the Lender will request the Trustee to reconvey the

Property and must surrender this Trust and the Note evidencing debt secured by this Trust to Trustee. Trustee must reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs. The Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**8**. **NO SALE WITHOUT CONSENT**. The Trustee will not sell, transfer, assign, or otherwise dispose of all or part of the Property or any interest in the Property, without the Borrower's and Lender's prior written consent.

**9**. **PROPERTY INSURANCE**. The Borrower must keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which the Lender requires insurance. The insurance carrier providing the insurance will be chosen by the Borrower. However, the Lender will have the right to disapprove the Borrower's choice, which right may not be unreasonable.

If the Borrower fails to maintain any of the coverage's described above, then Lender may obtain insurance coverage, at Lender's discretion and Borrower's expense. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of the insurance that the Borrower could have obtained. However, any amounts paid by Lender will become additional debt of the Borrower and secured by this Trust. The amounts paid by the Lender will bear interest at the Interest Rate from the date of payment and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies must include a standard mortgage and/or trust clause and will name Lender as mortgagee and/or as an additional loss payee, stating that any loss is payable to the Lender. Borrower further agrees to generally assign rights to insurance proceeds to the Lender up to the amount of the outstanding loan balance. If, at the request of the Lender, Borrower will provide Lender (a) a copy of the insurance policy; (b) all receipts of paid premiums and renewal notices.

In the event of loss, the Borrower must give prompt notice to the insurance carrier and to the Lender. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds must be applied to restoration or repair of the Property, if the restoration or repair is economically feasible. If the restoration or repair is not economically feasible, the insurance proceeds will be applied to the remainder of this Trust, whether or not the balance of the Trust is then due, with the excess, if any, paid to the Borrower.

**10**. **OCCUPANCY, MAINTENANCE, AND REPAIR**. The Borrower will occupy, establish, and use the Property as Borrower's principal residence after the execution of this Trust. The Borrower will not allow the Property to become vacant without the written consent of the Lender. The Borrower will not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not the Borrower is residing at the Property, the Borrower will maintain the Property in order to prevent the Property from deteriorating or

decreasing value due to its condition. Unless repair or restoration is not economically feasible, Borrower will promptly make all necessary repairs, replacements, and improvements to avoid any further deterioration or damage. The Lender may, whenever necessary, make reasonable entries upon and inspections of the Property. If the Borrower neglects to maintain the Property in good condition or allows the Property to deteriorate resulting in decreased property value, the Lender will have the right to make such repairs and improvements as it considers necessary to maintain the Property.

**11**. **HAZARDOUS SUBSTANCES**. The Borrower will not cause or permit the presence, use, disposal, storage, or release of any hazardous substances on the Property. Hazardous substances include pollutants, wastes, and those substances defined as toxic or hazardous substances by environmental law, as well as the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. Furthermore, the Borrower will not, nor allow anyone else to do, anything affecting the Property involving any hazardous substances that would materially affect the value of the Property. The Borrower will promptly take all necessary remedial actions under federal, state, and local laws regarding hazardous substances.

**12**. **GUARANTEE**. Each person or entity signing or joining in this Trust as a Guarantor, Covenantor, or Co-signer agrees to the following terms:

    a. Guarantor covenants and agrees that all obligations and liability under this Trust will be joint and several. Additionally, where there is more than one Guarantor, each Guarantor will be jointly and severally liable to the other Guarantor(s) and Borrower.

    b. The Guarantor is bound to fulfill the terms and conditions of this Trust, provided the Borrower, as principal debtor, fails to do so;

    c. The Guarantor guarantees full performance and release of all the Borrower's obligations under this Trust;

    d. If the Guarantor assumes the Borrower's obligations under this Trust, the Guarantor will also obtain all of the Borrower's rights and benefits under this Trust;

    e. The Guarantor must indemnify and hold harmless the Lender against all claims, damages, and payments, or loss which might arise or have arisen from the failure of the Borrower and/or Guarantor to pay the amounts owed under this Trust;

    f. The Lender will have the choice to proceed against the Guarantor before proceeding against the Borrower to enforce any obligations due under this Trust in the event of default. Furthermore, any enforcement against such obligations can take place before, after, or during any enforcement of the Borrowers debts and/or obligations under this Trust;

    g. The Lender can, without the consent or approval of the Guarantor, modify and/or amend the Interest Rate, the Principal Amount and any other term of the Trust or any

obligation secured under this Trust. Furthermore, any amendment or modification of the Trust will not release or lessen the liability of the Guarantor;

h. The Guarantor will be bound and subject to any and all changes, modifications, variations, and amendments made to this Trust, regardless of whether such changes were made with or without the consent or approval of the Guarantor;

i. The Guarantor has read this Section and is aware of and fully agrees with its terms and in particular, the terms of this Section.

j. The Lender will serve notice to the Guarantor and any notice will be provided in same manner as provided in the Notice Section as outlines in this Trust.

## <u>DEFAULT AND REMEDIES</u>

**13**. **DEFAULT**. The Borrower will be considered in default under the terms of this Trust if any of the following conditions are met:

a. The Borrower fails to pay the sum of the Principal Amount, interest, or any other amounts due under this Trust.

b. The Borrower fails to perform or comply with any of the terms and conditions or any obligations or responsibilities due under this Trust.

c. The Borrower has given or made, at any time during the loan process, any materially false, misleading, or inaccurate information or statements to the Lender or any other party under this Trust in connection with the loan.

d. If any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Trust.

e. If a lien is registered against the Property, or if default occurs under any other lien or encumbrance existing against the Property;

f. The Borrower abandons or fails to occupy the Property.

g. The Property or any material part of the Property is expropriated.

**14**. **ACCELERATION**. If at any time the Borrower should be in default under this Trust, the Lender must give notice to the Borrower. The notice must specify: (a) the default; (b) the action required to cure the default (if allowable); (c) a date, not less than 30 days from the date of the notice, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Trust and sale of the Property. If the default is not curable and/or if the default is not cured on or before the date

specified in the notice, the Lender at its option may require immediate payment in full of all sums, including the Principal Amount, interest, and all other amounts secured by this Trust. If the default is cured, the Trust will be reinstated. If the default is not cured, the Lender may invoke the power of sale and begin foreclosure proceedings.

The Lender will at all times retain the right to require immediate payment in full in the event of default. Any forbearance on the part of the Lender upon default, which includes but is not limited to acceptance of late payment, acceptance of payment from third parties, or acceptance of payments less than the amount due, will not constitute a waiver to enforce acceleration on default.

**15**. **PROTECTION OF LENDER'S INTEREST**. If at any time the Borrower fails to perform the covenants and agreements under this Trust, or if there is a legal proceeding that significantly affects the Lender's interest in the Property, or if the Borrower has abandoned the Property, then the Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property and/or rights under this Trust, which includes, but is not limited to:

       a. Paying any sums secured by a lien which has priority over this Trust;

       b. Appearing in court;

       c. Paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Trust; and

       d. Paying for reasonable costs to repair and maintain the Property.

The Lender will at all times retain the right to take action under this Section. However, the Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that the Lender will not incur any liability for not taking any or all actions to perform such tasks. Furthermore, any amounts paid by the Lender will become additional debt of the Borrower secured by this Trust.

**16**. **POWER OF SALE.** If at any time the Borrower is in default under this Trust, the Lender will have the right and authority to foreclose and force the sale of the Property without any judicial proceeding. Any delay in the exercising of this right will not constitute a waiver to exercise this right at a later date should the Borrower remain in default or subsequently default again in the future.

**17**. **REMEDIES**. The Lender will have the right to invoke all remedies permitted under Applicable Law, whether or not such remedies are expressly granted in this Trust, including but not limited to any foreclosure proceedings.

If the Lender invokes the power of sale, the Trustee will execute a written notice of the occurrence of an event of default and of the Lender's decision to sell the Property. The Lender or Trustee will mail copies of the notice to the Borrower and Guarantor and will also give public notice of sale in the manner provided by Applicable Law. After the time required by Applicable Law, the Trustee will sell the Property at a public auction to the highest bidder at the time and place and under the

terms designated by the Trustee in the notice of sale. The Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Furthermore, the Lender or its designee may purchase the Property at any sale.

## MISCELLANEOUS TERMS

**18**. **GOVERNING LAW**. This Trust will be construed in accordance with the laws of the state of California ("Applicable Law"). Applicable Law will include all controlling applicable federal, state and local statutes. All rights and obligations under this Trust are subject to any requirements and limitations of Applicable Law.

**19**. **SEVERABILITY**. If any portion of this Trust will be held to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Trust is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited.

**20**. **JOINT SIGNATURES**. If the Borrower is more than one person or legal entity, each Borrower who signs this Trust will be jointly and severally bound to comply with all the obligations and liabilities of the other Borrower(s).

**21**. **STATUTORY PROVISIONS**. The provisions contained in this Trust are additional and supplemental, to the extent permitted by law, to the provisions set out in the Applicable Law as they relate to trusts.

**22**. **SUBSTITUTE TRUSTEE**. The Lender may, at its option, from time to time appoint a successor Trustee by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the property is located. The instrument will contain the name of the original Lender, Trustee, and Borrower, the book and page where this Trust is recorded and the name and address if the successor Trustee. Without conveyance of the Property, the successor trustee will succeed to all the title, powers and duties of the Trustee.

**23**. **STATEMENT OF OBLIGATION FEE**. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by § 2943 of the Civil Code of California.

**24**. **NOTICE**. All notice given by either party in connection with this Trust must be in writing. Notice will be considered sufficient when mailed by first class or certified mail to the address of the recipient. The recipient's address will be the property address as stated under this Trust unless another address has been designated. If there is a change of address by any party, that party must promptly notify all parties under this Trust of the change of address. Any notice will be considered effective on the same day that it was sent, unless the day falls on a national holiday, Saturday, or Sunday, in which case, the next business day will be considered as the day of receipt.

**IN WITNESS WHEREOF** this Trust has been executed by the Borrower and Guarantor in the manner prescribed by law as of November 04, 2020 as stated above.

**Borrower:**

By: _____*Clinton Brown*_____   Date: _____11/05/2020_____
        Clinton Brown

**Guarantor**:

By: _____*Clinton Brown*_____   Date: _____11/05/2020_____
        Clinton Brown

**[Notary Acknowledgment to Follow]**

**Borrower Acknowledgement**

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of   Florida                                                    )

County of   Hillsborough                                      )

On _____11/05/2020_____ before me, _____Amy Patrick_____, personally appeared Clinton Brown, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Session via online notarization. Produced ID: Driver's License

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public     Amy Patrick
_____10/08/2023_____
My commission expires

AMY PATRICK
Notary Public - State of Florida
Commission # GG 921064
Expires on October 8, 2023

Notarized online using audio-video communication

**Guarantor Acknowledgement**

---

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of   Florida                                            )

County of   Hillsborough                                     )

On ____11/05/2020_____ before me, _____ Amy Patrick _____, personally appeared Clinton Brown, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Session via online notarization. Produced ID: Driver's License

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
  Amy Patrick   GG 921064
Notary Public
____10/08/2023_____

My commission expires

AMY PATRICK
Notary Public - State of Florida
Commission # GG 921064
Expires on October 8, 2023

Notarized online using audio-video communication