Clinton Brown, *Self-Represented*
14 University Drive
Robina, QLD 4226, Australia
clinton@atlasinc.solar
310-487-6453

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CLINTON BROWN,<br><br>Plaintiff,<br><br>v.<br><br>STEVE SMEAD<br><br>Defendant. | **Case No.** 2:23-cv-02938-MEMF-KS<br><br>**RELATE BACK AMENDMENT**[1]<br><br>**JURY TRIAL DEMANDED**<br><br>**Judge:** Honorable Maame Ewusi-Mensah Frimpong<br><br>**Chief Magistrate Judge**: Karen L. Stevenson<br><br>**Date:** December 19, 2024<br><br>**Time:** 2 P.M.<br><br>**Place:** Courtroom 8B |

Clinton Brown ("Plaintiff") for his complaint against Steve Smead ("Defendant"), re-alleges and incorporates by occurrence all prior allegations contained in the original Complaint [ECF No. 1] and the First Amended Complaint ("FAC") [ECF No. 41] as fully set forth herein. This Relate Back Amendment ("RBA") is set forth in paragraphs consistent with Federal pleading rules and L.R. 15. The RBA is intended to serve as one complete document against the Defendant.[2]

*[Intentionally Left Blank]*

---

[1] *See* Civil Standing Order § IV, U.S. Dist. Ct., C.D. Cal. (May 3, 2024).

[2] All images incorporated in the RBA are exhibits and should be considered part of the numbered paragraph immediately preceding it. *See* Rule 10(c); Notes of Advisory Committee on Rules—1937 ("For written instruments as exhibits, *see* Ill.Rev.Stat. (1937) ch. 110, §160"). When discovery opens the Plaintiff will provide the Defendant and the Court with complete copies of the exhibits herein. *See also*, Rule 15(c)(1)(B).

**Table of Contents**

**Section**                                                                                          **Page No.**

I. Background .................................................................................................. 4

    A. What's In a Name? ........................................................................... 4

    B. Investment Contract ........................................................................ 10

    C. Security Laws .................................................................................. 11

        i. Misappropriation Theory under Federal Security Laws ................ 12

    D. RICO .............................................................................................. 13

II. Jurisdiction and Venue ................................................................................ 14

III. Parties ...................................................................................................... 15

IV. Factual Allegations .............................................................................. 15-31

V.  PSLRA ..................................................................................................... 31

Count I: ........................................................................................................ 32

Count II: ........................................................................................................ 34

Count III: ....................................................................................................... 36

    E. Rule 9(b)……………………………………………………….......46

Count IV: ……………………………………………………………………….......50

    F. 15(c)(1)(B) "Relate Back" Legal Standard……………………………….53

        i. Security Law, PSLRA & 9(B)………………………………………….54

        ii. RICO 9(B)…………………………………………………………….55

        iii. Usury…………………………………………………………...........55

        iv. California Usury Legal Standard……………………………...............56

        v.  30,000-Feet View – Transcript of Proceeding, ECF No. 66 at 1-17……..........59

        vi. *Panuwat*…………………………………………………………… 60

Prayer for Relief…………………………………………………………………...70

DEMAND FOR JURY TRIAL…………………………….………………………………….…...70

Table of Authorities…………………………………………………………………………...71

# I. Background

## A. **What's in a name?**[3]

1.      The origins of securities regulation in Anglo-American history date back to 1697, when the British Parliament passed the first law to govern stockjobbers and prevent practices that threatened Government stability.[4] The First Congress, when establishing the Treasury Department, incorporated a clause that explicitly forbade officials from using '*insider information*' to gain profit, either directly *or* indirectly. *See* An Act to establish the Treasury Department, Section 8, 1 Stat. 65, 67 (Sept. 2, 1789); 31 U.S.C. § 329. Before Congress established Federal oversight with the enactment of the Securities Act of 1933 (archived on December 20, 2023 at https://perma.cc/A55E-AAAJ) and the Exchange Act of 1934 (archived on December 31, 2023 at https://perma.cc/2KZW-VL8K) individual states managed securities regulation through what were known as 'Blue Sky' laws. These laws were named to describe speculative investments that had no more basis than so many feet of 'Blue Sky,' harking back to the unfounded 'Flying Ships' featured prominently in the 1720 London play 'Exchange-Alley.[5] *See also*; *Hall v. Geiger-Jones Co.,* 242 U.S. 539, 550-551 (1917).[6]

2.      In Anglo-American legal history, the rules governing equitable interests in real

---

[3] The historical background of Blue Sky & Federal security laws is essential to understanding the present force of the Acts and the Congress's later enactments to protect *individual investors*. Thus, "[w]hat matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." See *Northern Pipeline Constr. Co*., 458 U. S. 50, 69 n. 23 (1982) (plurality opinion). It is unequivocal in *Jarkesy* at 6 that [t]he [1933 & 1934 Acts] antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a [J]ury. (emphasis added). The [T]rial by [J]ury is justly dear to the American people. See *Parsons v. Bedford*, 28 U.S. 433, 445 (1830); *See also*, ECF No. 42-1 at 63 ("Plaintiff alleges that in some way this constitutes what is, in essence, common law deception and fraud, and common law interference with business and economic advantage."); *See id.* ([FAC is] "mostly irrelevant, purported legal history") Cf. *Jarkesy* slip op. at 11. ("Congress incorporated prohibitions from common law fraud into [F]ederal securities law"); *Jarkesy* at 12, 19-21. ("Congress's decision to draw upon common law fraud created an enduring link between [F]ederal securities fraud and its common law "ancestor." See *Foster v. Wilson*, 504 F. 3d 1046, 1050 (CA9 2007); *id*. ("[W]hen Congress transplants a common-law term, the old soil comes with it.") See *United States v. Hansen*, 599 U. S. 762, 778 (2023).

[4] 'William III, 1696-7: An Act to Restrain the Number and Ill Practice of Brokers and Stock-Jobbers. [Chapter XXXII. Rot. Parl. 8 & 9 Gul. III. p.11.nu.1.]', in Statutes of the Realm: Volume 7, 1695-1701, ed. John Raithby (s.l, 1820), pp. 285-287. British History Online [http://www.british-history.ac.uk/statutes-realm/vol7/pp285-287] (accessed 21 December 2023).

[5] Banner, Stuart, Anglo-American Securities Regulation: Cultural and Political Roots, 1690–1860, pp. 48-51 (2002).

[6] "No two state Blue Sky laws were identical." *See* David F. Hawkins, Corporate Financial Disclosure, 1900-1933: A Study of Management Inertia Within a Rapidly Changing Environment 133 (1962) (unpublished D.B.A. thesis, Harvard University), later published as Corporate Financial Disclosure, 1900-1933: A Study of Management Inertia Within a Rapidly Changing Environment (Garland Publishing, Inc. 1986).

property arose primarily in the context of what we now call mortgages. In the 12th century, when Glanville wrote down the law of his day, a "gage"—French for "pledge"—was property handed over to a lender as security for a loan.[7] Glenn, 1 Mortgages, Deeds of Trust, and Other Security Devices as to Land at 3 (1943). A "mort gage"—meaning a "dead pledge"—took the form of a conveyance. Specifically, the borrower (the mortgagor) would typically grant the lender (the mortgagee) a fee simple interest in land, with provision for reconveyance of the land back to the borrower upon full payment of the amount owed, on a specific date—known as the "law day." In courts of law these agreements were strictly construed: writing in the 1470s, Littleton said that, if the borrower failed for any reason to repay the full amount due on the law day, "then the land which is put in pledge is taken from him forever, and so dead to him[.]" 1 Edward Coke, Institutes of the Laws of England, 205a (1628).

3.      But irrevocable forfeiture of the debtor's entire interest in the land, no matter what the reason for the borrower's failure to pay on the law day—for example if, on that day, the lender was nowhere to be found (*cue the fraud!*)—was before long regarded as an intolerably harsh sanction for the borrower's default. And meanwhile, by the year 1500, as Maitland observed, "we must reckon the Court of Chancery as one of the established courts of justice, and it has an equitable jurisdiction; beside the common law there is growing up another mass of rules which is contrasted with the common law and which is known as equity." Maitland, The Constitutional History of England 225 (1908). The ground upon which equitable jurisdiction arose was "that a wrong is done, for which there is no plain, adequate, and complete remedy at the Courts of Common Law." Story, Commentaries on Equity Jurisprudence 53 (1836).

4.      The Court of Chancery soon interposed to assuage the harshness of enforcement of mortgages in courts of law. In equity (as a leading American court put it later) courts looked through the form of a contract to its substance. See *Lansing v. Goelet*, 9 Cow. 346 (N.Y. 1827). And by 1625 the Court of Chancery saw that, while a mortgage agreement took the form of a

---

[7] Background, Nos. 2-15 are primarily adopted from the well-researched opinion by Judge Kethledge from the 6th Circuit Court of Appeals as cited in the Supreme Court's *Tyler* decision on May 25, 2023. See *Hall v. Meisner*, No. 21-1700 (6th Cir. Oct. 13, 2022). (cleaned up).

conveyance in fee simple, it was in substance "*but a Security*[.]" See *Emanuel College v. Evans*, 21 Eng. Rep. 494, 494–95 (1625). A *security was merely personal property*, leaving the mortgagor (*i.e.*, the borrower) with an equitable interest in the land. To vindicate that interest, the Court of Chancery recognized the mortgagor's "Equity of Redemption[,]" which allowed him to regain legal title to the land by repayment of the amount due even after the law day. See *Dutchess of Hamilton v. Countess of Dirlton and Lord Cranborne*, 21 Eng. Rep. 539 (1654). In 1678 Lord Hale called the mortgagor's interest "a title in equity." See *Pawlett v. Attorney General*, 145 Eng. Rep. 550, 551 (1678). Sixty years later the Chancery Court clarified matters further, by stating expressly that a "mortgage in fee"—the lender's interest in the land—"is considered as personal assets[,]" meaning personal property. See *Casborne v. Scarfe*, 26 Eng. Rep. 377, 379 (1737) That court further observed that "[t]he interest of the land"—meaning the interest in real property— "must be some where, and cannot be in abeyance; but it is not in the mortgagee [the lender], and therefore must remain in the mortgagor [the landowner]." *Id.* "Thus the courts conceived the mortgagee's right as a right to money rather than land." Sugarman & Warrington, Land Law, Citizenship, and the Invention of "Englishness", in Early Modern Conceptions of Property 111, 120 (1995).

5.     By 1759, Lord Mansfield—among English jurists, exceeded in eminence perhaps only by Coke and Hale—would say that the mortgagor's "equity of redemption is the fee simple in the land." See *Burgess v. Wheate*, 28 Eng. Rep. 652, 670 (1759). Hence the mortgagor's "equity to redeem" had itself become "a right of property." 6 Holdsworth, A History of English Law 663 (1924). The mortgagor "had an equitable estate in the land; and subject to the legal rights of the mortgagee, was, in equity, regarded as its owner." *Id*. And this equitable estate—which, following Hale, the courts would later call "equitable title"—could be devised or conveyed like any other interest in property. *Casborne*, 26 Eng. Rep. at 379.

6.     Yet the Court of Chancery also recognized, at least nominally, the lender's right to foreclose upon the land. At some point after the law day—when the lender thought he had waited long enough without payment of the amount due—*the lender could petition* the Court of Chancery

6

for a decree providing that the delinquent landowner "do from this point stand absolutely debarred and foreclosed of and from all right, title, interest and equity of redemption of, in, and to the said mortgaged premises." Glenn, 1 Mortgages at 402.

7.     This process was known as "strict foreclosure," since it would extinguish the landowner's equitable interest in the property and grant the lender full ownership of land whose value might far exceed the amount of the unpaid debt. *Id.* at 397; See also, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) ("This remedy was called strict foreclosure because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity").

8.     The English courts resisted strict foreclosure for the same reasons they recognized the landowner's equity of redemption. Indeed, the Court of Chancery would refuse to enforce even a landowner's separate agreement (executed at the time of the mortgage) not to assert a right of redemption later. As the court said in *Newcomb v. Bonham*, "once a mortgage always a mortgage"—meaning that, as a practical matter, the lender could not convert his security interest as mortgagee into fee-simple title to the land. 23 Eng. Rep. 266, 267 (1681). And even when the Court of Chancery granted a decree of strict foreclosure, it remained open to vacatur years later if the landowner filed a petition to that effect. Glenn, 1 Mortgages at 403. Thus, in English courts of equity, the lender's right to foreclose upon the land was nearly always honored in the breach. As Joseph Story put it later: the "Courts of Equity constantly allow a redemption, although there is a forfeiture at law." Story, Commentaries on Equity Jurisprudence at 106.

9.     By the end of the 18th century American courts of equity had begun to address these issues for themselves. The American courts were uniformly hostile to strict foreclosure in cases—*like this one*—where the land's value exceeded the amount of the debt. New York's highest court in equity, for example, opined that, in cases where "the mortgaged premises exceed the amount of the debt in value," strict foreclosure would be "unconscionable[.]" See *Lansing v. Goelet*, 9 Cow. 346, 355, 1827 WL 2536 (N.Y. 1827). Joseph Story likewise recognized the "unconscionableness" of "taking the land for the money." Story, Commentaries on Equity Jurisprudence at 106 n.2. In another case the court opined that "strict foreclosure" had "no

appropriate place in a system of laws and jurisprudence where . . . the mortgage does not operate as a conveyance of the legal title," but is only "a lien upon the land as security for the debt or other obligation of the mortgagor." See *Moulton v. Cornish,* 138 N.Y. 133, 141 (1893).

10.     Yet the American courts—more so than the English courts of the time—recognized a creditor's right to "have the full effect of his *securities.*" *Lansing*, 9 Cow. at 353. That "full effect," however, did not entitle the creditor to recover more than the amount owed. Magna Charta itself had provided that a debtor's lands could be taken only to the extent necessary to satisfy the debt. See *Magna Charta* ¶ 26 (1215); See also, *Den ex dem. Murray v. Hoboken Land & Imp. Co*., 59 U.S. 272, 277 (1855). As Justice Scalia later explained, American courts reconciled these competing interests "with the development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure." *Resolution Trust Corp*., 511 U.S. at 541.

11.     The innovation of foreclosure by sale exemplified the ability of courts of equity to craft an appropriate remedy where courts of law could not. The New York court in *Lansing* explained—as a matter of judicial power in equity, *irrespective of any statute*—that "the court may, when equity requires it, interpose at the instance of the mortgagor to direct a sale, when the estate is of greater value than the debt, in order to prevent a strict foreclosure to his prejudice[.]" 9 Cow. at 355. Only by that means, rather than by strict foreclosure, could the landowner's equitable interest in the property be extinguished. The land was after all "*a resource*" for payment of the debt; a "public sale [was] the truest test of the value" of the landowner's equitable interest in the land; and thus a sale was "the best mode of disposing of the property, for the interest of both." *Id*. at 356. If the land was worth at least as much as the debt, its proceeds afforded the lender full payment and thus the "full effect" of his security; and if the land was worth more than the debt, the "surplus" would compensate the landowner for the loss of his equitable interest, as the new buyer took legal and equitable title alike. *Id*. at 353, 356.

12.     For these reasons, by the mid-1800s, foreclosure by sale was "firmly established" in the law of most states, to the exclusion of strict foreclosure. Osborne, Mortgages at 661 (1970);

*See also, e.g.*, 1 Glenn Mortgages at 460; *Clark v. Reyburn*, 75 U.S. 318, 323–24 (1868) (reversing an order of strict foreclosure); *Moulton*, 138 N.Y. at 141 ("strict foreclosure is very rarely resorted to in the American courts"). American courts' insistence upon foreclosure by sale, rather than strict foreclosure, extended fully to foreclosures for payment of unpaid taxes. Indeed—given the absence of any agreement by the landowner (as with a mortgage) to forfeit the land upon default—the foreclosure remedy was more limited in tax cases. This limitation was the same one prescribed in Magna Charta, and it underscored the precision upon which the courts insisted whenever land was used to satisfy a debt. In an 1808 case, for example, Chief Justice Marshall held that a tax collector had "unquestionably exceeded his authority" when he had sold more land than "necessary to pay the tax in arrear." See *Stead's Ex'rs v. Course*, 8 U.S. 403, 414 (1808); See also, e.g., *Margraff v. Cunningham's Heirs*, 57 Md. 585, 588 (1882) (tax collector's "duty is to sell no more than is reasonably sufficient to pay the taxes and charges thereon, when a division is practicable without injury"); *Loomis v. Pingree*, 43 Me. 299, 311 (Me. 1857) (applying the same rule); *Martin v. Snowden*, 59 Va. 100, 118–19, 139 (1868) (same).

13. Likewise well-settled by the mid-1800s, and indeed earlier, was the specific property interest retained by a landowner when land served as *security* for a debt. That interest was what Lord Hale had said it was, namely equitable title; and that interest was an interest in property like any other. In 1843 the Supreme Court nicely summarized the creditor and debtor's respective property interests when land served as *security* for a debt, particularly in the instance of the debtor's default. "According to the long-settled rules of law and equity in all the states whose jurisprudence has been modelled upon the common law," the Court wrote, "legal title to the premises in question vested" in the creditor upon the debtor's default; yet the landowner still held "equitable title" to the property. See *Bronson v. Kinzie*, 42 U.S. 311, 318 (1843). To "extinguish the equitable title of the" debtor, the creditor was required "to go into the Court of Chancery and obtain its order for the sale of the whole mortgaged property (*if the whole is necessary*,) free and discharged from the equitable interest of the" debtor. *Id.* at 318–19. (emphasis added). The sale, moreover, was required to be a public one. *See* Thomas M. Cooley, A Treatise on the Law of

Taxation, Including the Law of Local Assessments, 489 (1886). Under those same long-settled principles, the debtor would then be entitled to any surplus proceeds from the sale, which represented the value of the equitable title thus extinguished. *Resolution Trust Corp.*, 511 U.S. at 541.

14.     *But that proposition*, as shown above, overlooks the very reasons why a property owner has a right to the surplus. That right does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from his possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title.

15.     The Defendant [Smead] forcibly took property worth vastly more than the debts the Plaintiff owes and failed to refund any of the difference. "In some legal precincts that sort of behavior is called *theft*." See *Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (dissenting opinion).

**B. <u>Investment Contract</u>**

16.     The touchstone in defining a security is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial *or* managerial efforts of others. By profits, the Court means either capital appreciation resulting from the development of the initial investment, *or* a participation in earnings resulting from the use of investors' funds. See *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

17.      A "security," as used in the Securities Act, includes "commonly known documents traded for speculation *or* investment" and "securities of a more variable character," including "investment contract[s]." See S.*E.C. v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946). An "investment contract" is "a contract, transaction *or* scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter *or* a third party." *Id.* at 298.

18.     The Court perceives no distinction between an investment contract *and* an

instrument commonly known as a security. In either case, the basic test for distinguishing the transaction from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.[8] See *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 852 (1975).

### C. <u>Security Laws</u>

19.     Together, the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a *et seq*., and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. § 78a *et seq*., form the backbone of American securities law. See *Slack v. Pirani,* 598 U.S. 759, 762 (2023). *Congress* enacted a definition of security sufficiently broad to encompass virtually *any* instrument that might be sold as an investment. See *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). *Congress* meant to bar deceptive devices *and* contrivances in the purchase *or* sale of securities whether conducted in the organized markets *or* face-to-face. See *SEC v. Zandford*, 535 U.S. 813, 822 (2002). The end to which the *Congress* intends to accomplish, which is providing robust protections for investors and promoting transparency and fairness in financial markets[9], is treated as the controlling factor of the law. See *A. C. Frost & Co. v. Coeur D'Alene Mines Corp*., 312 U.S. 38, 45 (1941).

20.     Securities laws are meant to be flexible *and* remedial, *not* restrictive, to effectively combat fraud. The Acts set higher conduct standards…and *are not limited to common-law fraud doctrines*.[10] (emphasis added). The equal sharing of risk of error is achieved by using a

---

[8] There were numerous instances of the incorporation or quasi incorporation by the Colonies of proprietors of lands for the purpose of improving their property by concerted effort. The earliest of these occurred in Massachusetts in 1652, when thirteen owners of land upon Conduit street in Boston were incorporated (though with no company name) to enable them to supply houses on that street with water. Like almost all the land companies of the eighteenth century, it was a mere partnership. Some of these had nearly a thousand members; others only two or three. *See* Baldwin, Simeon Eben. American Business Corporations Before 1789, 258 (University of California Libraries, <u>1903</u>).

[9] The Real Estate Market is the largest 'financial market' in the United States. Indeed, in Q1 of 2024 the industry produced a seasonally adjusted annual economic output of <u>$5.4 trillion dollars</u>. *Cf*. Finance and insurance produced a seasonally adjusted annual economic output $3.95 trillion dollars, while the United States seasonally adjusted annual economic output is $49 trillion dollars. Note, this is *not* GDP and includes intermediate goods, *supra*. In other words, The Real Estate Market is a larger 'financial market' than finance and insurance by a long shot. *Bonus*: What caused the two most severe economic events in the past Century (*sans* COVID)? Yet, the Congress provided a remedy. (*i.e.* The Acts & Dodd-Frank).

[10] See *Securities and Exchange Commission v. Jarkesy*, 603 U.S. slip op. at 15 (June 27, 2024) (Sotomayor, J) (dissenting). "The inadequate remedies were the then-existing state statutory and common-law fraud causes of action. The solution was a comprehensive [F]ederal scheme of securities regulation consisting of the Securities Act of 1933, the Securities Exchange Act of 1934…"

preponderance-of-the-evidence standard, which doesn't favor any side. See *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390, (1983). Given the broadly remedial purposes of Federal securities legislation, the burden of proof is reasonably imposed on an issuer[11] who pleads exemption. See *SEC v. Ralston Purina Co*., 346 U.S. 119, 126 (1953) (citing *Schlemmer v. Buffalo, R. & P. R. Co*., 205 U.S. 1, 10 (1907)); Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, preamble (1933).

21.     Private contracts cannot supersede Federal security laws. See *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 483-484 (1989). An investment scheme promising a fixed rate of return can be an investment contract and thus a security subject to Federal security laws. See *SEC v. Edwards*, 540 U.S. 389, 397 (2004). The investment contract in question also involved communications *and* instruments across state lines…and "even where the offense is local and subject only to state prosecution, [*Congress* has] the power to refuse the mails to those conducting the unlawful intrastate enterprise [where it exists]." See *Securities and Exch. Com'n v. Crude Oil Corp*., 93 F.2d 844, 849 (7th Cir. 1937).

### i. <u>Misappropriation Theory under Federal Security Laws</u>

22.     The misappropriation theory holds that a person commits fraud "*in connection with*" a securities transaction if a fiduciary uses undisclosed information to their own advantage in a security transaction; it is defrauding the principal by taking exclusive use of that information. See *United States v. O'Hagan*, 521 U.S. 642, 652-653 (1997). This action dupes the principal. *Id*. Thus, it is unlawful to use or employ, in connection with the purchase or sale of any security *or any security not so registered*, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, *in connection with* the purchase *or* sale of any security. *See* Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (as amended through P.L. 117- 328, enacted December 29, 2022); 17 CFR § 240.10b-5. (2024).

23.     Nonpublic material confidential information is property of the [principal]. See

---

[11] The term "issuer" means any person who issues *or* proposes to issue any security [investment contract]. Section 3(a)(8), 1933 Act.

*Carpenter v. United States*, 484 U.S. 19, 26, (1987) (citing *Ruckelshaus v. Monsanto Co.*, 467 U. 8. 986, 1001-1004 (1984); *Dirks v. SEC*, 463 U.S. 646, 658, n. 10 (1983); *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-251 (1905)); *Cf.* 5 U.S.C. §552b(c)(4). Therefore, a person who trades *on the basis of material, nonpublic information*, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public, *supra, O'Hagan*. There is no question that fraudulent uses of confidential information fall within § 10(b)'s prohibition if the fraud is "*in connection with*" a security [investment contract] transaction. *Id.*

24.     The Defendant had a fiduciary-like relationship with the Plaintiff because the relationship was based upon trust and confidence. See *United States v. Kosinski*, 976 F.3d 135, 146 (2d Cir. 2020). In an inside-trading case this fraud derives from the inherent unfairness involved where one takes advantage of information intended to be available only for a [specific] purpose… and not to the personal benefit of anyone. *Id.* The intent of Congress to prohibit "any" transaction that undermines a free *and* fair market is clear and has been reaffirmed, *iterum et iterum*, since the Acts have been enacted, and before that, in the states' Blue Sky laws. The misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information. See *O'Hagan* at 652.

**D. RICO**

25.     The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, was enacted on October 15, 1970, as Title IX of the Organized Crime Control Act of 1970. *See* Pub. L. No. 91-452, 84 Stat. 941 (1970).[12]

26.     RICO provides for civil remedies. *See* 18 U.S.C. § 1964(c).[13]

27.     RICO provides powerful civil penalties for persons who engage in "collection of

---

[12] *See* https://perma.cc/F8SD-5LVH

[13] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

an unlawful debt" and who have a specified relationship to an "enterprise" that affects interstate *or* foreign commerce.

28.     Collection of unlawful debt is an alternate ground for RICO liability and proof of a pattern is not required. See *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020); *Goldenstein v. Repossessors Inc*., 815 F.3d 142, 147-148 n.5 (3d Cir. 2016); *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994); *United States v. Aucoi*n, 964 F.2d 1492, 1495- 1497 (5th Cir. 1992); *Dillon v. BMO Harris Bank, N.A*., 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014); but see, *Wright v. Shepard*, 919 F.2d 665, 673 (11th Cir. 1990).

29.     Private attorney general provisions, such as § 1964(c), are designed to fill gaps left by prosecutorial efforts. See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985).

## II. Jurisdiction and Venue

30.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States, specifically the Securities Act of 1933, Securities Exchange Act of 1934 & the Racketeer Influenced and Corrupt Organizations Act ("RICO").

31.     Subject matter jurisdiction is conferred by 15 U.S.C. § 77v(a), under the Securities Act of 1933, 15 U.S.C. § 78aa(a), under the Securities Exchange Act of 1934, & under RICO, 18 U.S.C. § 1964.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred within this District.

33.     Without jurisdiction the Court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining for the Court is that of announcing the fact and dismissing the cause. See *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 815 (9th Cir. 2001).

34.     Here, there [is] no clear lack of subject matter jurisdiction, the issue was fully briefed and presented to the District Court in a motion to dismiss, and the District Court decided the jurisdictional question. Given these circumstances, as the Third Circuit has observed, "even the issue of subject matter jurisdiction must at some point be laid to rest." See *Hodge v. Hodge*,

621 F.2d 590, 592 (3d Cir. 1980) (per curiam).

35.    Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided *after* and not before the Court has assumed jurisdiction over the controversy. See *Bell v. Hood*, 327 U.S. 678, 682 (1946).

36.    Last, "These [1933 and 1934 Acts] are Federal laws. Bringing claims under these laws is sufficient for subject matter jurisdiction." *See* ECF No. 40 at 9, A. So too is RICO…a Federal law. The Court has subject matter jurisdiction. Full stop.

## III. Parties

37.    Plaintiff, Clinton Brown, resides at: 14 University Dr., Robina, QLD 4226, Australia.

38.    Defendant, Steve Smead, resides at: 352 E. Harvard Blvd., Santa Paula, CA 93060.

## IV: Factual Allegations

**Investment Contract Scheme with Howey Test Components**



39.    The Defendant is an accredited investor per regulations set forth in 17 C.F.R. § 230.501(a) (2023). [14]

40.    The Plaintiff is not an accredited investor per regulations set forth in 17 C.F.R. § 230.501(a) (2023).

---

[14]  17 CFR § 230.501 & 17 CFR § 230.215 attribute the same definition to the 1933 and 1934 Acts. (a) Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person: (5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000.

41.     In April 2020, the Plaintiff bought property in Malibu for $290,000, backed by two deeds of trust, one of which was held by the Defendant.[15]



42.     The appraised value of the Malibu property in February 2021 was $450,000.

43.     Between November 2020 and May 2021, the Plaintiff and Defendant stayed in communication about the progress of the solar projects. In May 2021, the seller-financed second deed of trust on the Malibu property reached maturity. Despite the Plaintiff securing other financing that could have paid off the Defendant, the Defendant offered to pay off the seller-financed second deed of trust and create a new deed of trust that had a two (2) percent lower interest rate than what the Plaintiff had been able to obtain. After paying off the seller-financed portion of the deed of trust, the Defendant became the sole holder of the only deed of trust on the Malibu property.[16]



---

[15] A "deed of trust" refers to a loan agreement between a property purchaser and a lender where title to the property is held by either the lender or a third-party trustee (as opposed to the purchaser) until the loan is repaid. *See* Deed, Black's Law Dictionary (11th ed. 2019).
[16] Occurrence from ECF No. 1 at 2.

44.     The Defendant gained sole control of the Malibu deed of trust in May 2021. *See* "Deeds of Trust" incl. Los Angeles County Recorder. (2021, May 21). Substitution of Trustee and Full Reconveyance. Document No. 202105210190066. Property APN: 4451-001-021; Varon, B. (2021, February 12). Appraisal Report: APN/Parcel ID: 4451-015-021, Malibu, CA 90265. Appraised value: $450,000; Los Angeles County Recorder. (2021, May 21). Substitution of Trustee and Full Reconveyance. Doc. No. 202105210190066. Property APN: 4451-001-021.

45.     Between April 2020 and November 2020, the Plaintiff and Defendant engaged in conversations about the Plaintiff's solar energy business venture, with the Defendant expressing interest in investing in the industry. In July 2020, the Plaintiff purchased his first solar property located at 16390 South Black Rock Cutoff Road, Fillmore, Utah 84631 ("Utah") and began submitting applications for a Conditional Use Permit ("CUP") and Right-of-Way ("ROW") for the planned solar facility.[17]

46.     In June 2021, the Plaintiff sought to utilize the equity in the Utah property to advance the solar project. Plaintiff obtained a conditional loan commitment for the property, but it was contingent upon an appraisal. Colliers International conducted the appraisal, which valued the property at $240,000, significantly more than the original purchase price of $50,000. The Plaintiff shared this information with the Defendant.[18]

47.      In June 2021, following the procurement of solar development permits for the Utah property, it had significantly appreciated in value and appraised at $240,000, *an increase of $190,000 from the purchase price in 2020*.

48.     The Defendant then expressed concern about the $150,000 Harper interest not being recorded and secured by a deed of trust…*and* offered to provide capital for the equity created in Utah. The Defendant's offer was almost the same as the 50% loan-to-value of the conditional loan commitment [from a reputable lender]…which meant that the Plaintiff would receive a similar amount of capital *and* not have to worry about securing $100,000 of the $150,000 Harper interest

---

[17] Occurrence from ECF No. 1 at 2.
[18] Occurrence from ECF No. 1 at 2.

[on some other property]. The Plaintiff accepted the Defendant's *offer*, which required [the Plaintiff to] pay[] off the existing deed of trust, record[] the $100,000 Harper interest on the Utah deed of trust, and pay[] Escrow fees. The remaining funds, around $60,000, would be disbursed to the Plaintiff to utilize for the Utah solar project.[19]

49.    In June 2021, the Defendant issued a deed of trust for a portion of Plaintiff's equitable title, which included an additional $100,000 of paper[20], related to Harper, on back of the Utah property.

50.    In June 2021 Defendant recorded a deed of trust for $200,000. *See* ("Appraisals") Colliers International, File #: SLC210208. (2021, June 8). Appraisal Report: APN/Parcel ID(s): 8710-1. Appraised value: $240,000; Millard County Recorder. (2021, June 29). ("Deeds of Trust") Trust Deed: APN/Parcel ID 8710-1. Notarized in New York by Jenice Hernandez, Notary Public, State of New York, No. OLHE6359254. Recorded at 12:24 PM, Entry #: 00215042. Amount: $200,000.



51.    In November 2020, the Plaintiff risked losing a solar property contract for a 400-acre vacant lot located at 42829 Harper Lake Rd., Hinkley, CA 92347 ("Harper") and requested the Defendant's assistance in securing a second deed of trust behind the seller's first. The Defendant

---

[19] Occurrence from ECF No. 1 at 3.
[20] This term is understood by the Plaintiff as a debt that is recorded, but the lender of that debt just records the 'paper' and does not expend the money in the transaction. Hence, carrying paper.

agreed to *offer* a $150,000 second deed of trust for a $300,000 payoff upon the note's maturity, but Escrow rejected the terms as usurious. *See* ECF No. 69-1 at 2-4 ("Ordaz Declaration"). The Defendant then proposed a $150,000 second deed of trust with 8% interest *and* an additional interest payment of $150,000 when the second deed of trust became due. The Plaintiff agreed to the terms and Escrow closed.[21]

52.    In November 2020, the Defendant issued a $150,000 second deed of trust on the Harper property, stipulating a repayment sum of $300,000.

53.    In November 2021, the Harper seller-financed first deed of trust required a balloon payment, and the Plaintiff tried to refinance the solar property. In December 2021, an appraisal valued the Harper property at $1,100,000…and the Plaintiff shared this information with the Defendant, who held the second deed of trust.[22]

54.    The Defendant, without disclosing the intent to purchase Harper's first deed of trust, stopped regular communication with the Plaintiff. The Plaintiff attempted to find a solution to pay off the seller-financed first deed of trust while also continuing to move the Harper project forward.[23]

55.    In May 2022, the Plaintiff shared the Harper appraisal indicating a significant value increase from the purchase price of $498,000. In July 2022, the Defendant purchased the first deed of trust from the prior owner *and* the assignment was recorded thereafter. *See* ("Appraisals") and ("Trust Deeds") Pacific Valuation. (2021, December 20). Restricted Appraisal Report: APN/Parcel ID(s): 0490- 091-09 and 0490-091-19. Appraised value: $1,100,000. San Bernardino County Recorder. (2022, July 19). Corporation Assignment of Deed of Trust. Document No. 2022-0251090. Property APN/Parcel ID(s): 0490-091-09 and 0490-091-19.


[*Intentionally Left Blank*]


---

[21] Occurrence from ECF No. 1 at 2.
[22] Occurrence from ECF No. 1 at 3
[23] Occurrence from ECF No. 1 at 3.

56.     In July 2022, the Defendant purchased the seller-financed first deed of trust on Harper through an assignment at its full value for roughly $398,000. Beginning in August 2022, the Defendant filed notices of default on the deeds of trust for Harper, Malibu, and Utah.[24]

---

**Harper Lake purchase docs.**

STEVE SMEAD <stsmead@gmail.com>                                    Mon, Jul 11, 2022 at 4:57 PM
To: Clinton Brown <clinton@atlasinc.solar>

Please forward me the original purchase docs for Harper lake including the original note and deed of trust for the first TD.

Are trying to wrap up the purchase of the 1st TD.

Give me a call A.S.A.P.

Thanks,  Steve

57.      The Malibu, Utah and Harper properties had a combined appraised value of $1,790,000 in 2021.

58.     The original purchase prices for Harper, Malibu and Utah amounted to $837,999.

59.     The equity in Harper, Malibu and Utah in 2021 was $952,001.

60.     In 2021 the projects had a non-marketable value of at least $14,390,000 and a marketable value of $21,400,000. *See* Bay Valuation Advisors, LLC. (2021). Atlas, Inc. Valuation of Common Stock (409a). Oakland, CA. Valuation Date: June 30, 2021. Report Date: September 21, 2021. Fair Market Value (FMV): $21,400,000.

Sep 16, 2021 at 12:47 PM

Hi, Steve. I had a 409a valuation completed on my company and the value came out at $20m. Do you have any ideas where I can borrow $100k against my company stock? I'm available until 5 P.M. today if you're free to discuss. Thank you.

Never got accounting on Hinkley loan. Am out of town until October 6th. I will look at anything.

61.     In August 2022, the Defendant filed Notice of Default on all three (3) properties.

---

[24] Occurrence from ECF No. 1 at 3.

62.     The Plaintiff did not consent to a deed in lieu of foreclosure arrangement. Furthermore, had the Plaintiff been aware that the Defendant intended to foreclose on Harper's first deed of trust the following month, he would *not* have willingly facilitated the assignment of that deed of trust. Instead, the Plaintiff would have pursued a different course of action.



63.     The Defendant purchased a Nevada solar property deed of trust from the Plaintiff for 50% of the recorded value on or around September 28, 2022.



64.     The Plaintiff made several attempts to find a solution to avert notice of sales, including sharing a proposed contract from a solar development company for Harper that was worth over $10,000,000. The Plaintiff offered to borrow $100,000 secured by the solar contract to delay the foreclosures for six months. The Defendant rejected these proposals.[25]

65.     The properties and the Plaintiff's equitable title were unceremoniously taken by the defendant in a "so-called" public auction in January 2023, despite multiple attempts to stave off foreclosure *and* attempting to file for Chapter 11 Sub V. *See* ECF No. 22 at 3-4, 4 ("Brown Decl.").

---

[25] Occurrence from ECF No. 1 at 3.

66.      All properties were foreclosed in January 2023, with the Malibu property listed for

sale in April 2023.[26]

---

### Update on Utah, Harper and Malibu Properties, and Proposal for Harper Lake Promissory Note

Clinton Brown <clinton@atlasinc.solar>
To: STEVE SMEAD <stsmead@gmail.com>

Fri, Aug 5, 2022 at 8:23 PM

Steve,

Per your email for filing the NOD's today. First, you had told me September 1st, 2022 as the day to file on two different phone calls. The assumption on your part I believe is that a 7-day close is not possible, which is what I did in Nevada though. Therefore, I believe there is still time to get this done and, in my view, filing an NOD only hurts us both.

Furthermore, if you indeed plan to file the NOD then what incentive do I have to sell you the $44k note for $22k? Escrow has not recorded this, and you indicated that I still had time to decide because there still needs to be one more signature for the transaction to close. I didn't want to sell this in the first place, and it was a very poor choice on my part to move this far ahead with it.

I forwarded you an email from Steve Weera about the funding and I really can't help that he committed to one thing and then changed to another due to his escrow closing on 8/15/2022. You are free to contact him via his email tonasut@cs.com or phone 818-436-2498, but I can't get blood out of a turnip here until 8/15 with him, at least.

Lastly, I don't understand the hell fire urgency to torpedo projects that you and I know very well have the ability to succeed. I'm not sure how involved you were with your other private borrower's projects, but it seems to me that something doesn't add up here. I've been open to your advice and have taken it on multiple occasions and the bottom line is that it is a timing issue. An NOD doesn't do one thing to change my direction on these projects, it just seems like you have lost confidence in the projects we are doing or you need to get money in your bank account. Lord knows I need some.

It is just very disappointing and for no good reason that I can see that this can't be worked out. However, we will make the best of it and exercise any and all rights we have under the law should you proceed, but I hope that I can spend my time and effort on these projects that benefit both of us instead.

Hope we can reach a viable agreement,
Clinton

---

67.      In April 2020, the Plaintiff purchased a vacant lot at 21472 Calle del Barco, Malibu,

CA 90265 ("Malibu") with the intent to build a home [to sell]. The property was financed with

two deeds of trust, with the Defendant holding the first deed of trust and the prior owner holding

the second.[27]

68.      Plaintiff is informed, believes, and thereon alleges that the Malibu La Costa Owners

Association ("Association") is authorized to issue a total of 550 shares, each intrinsically tied to

the ownership of a lot within Tract 10570 ("Malibu") as recorded with the Los Angeles County

Recorder. The value of the Association, as appraised, is $30,000,000[28] with 319 current

---

[26] Occurrence from ECF No. 1 at 4.
[27] Occurrence from ECF No. 1 at 1-2.
[28] W. Mcilrath, Residential Restricted Appraisal Report for 21440 Pacific Coast Highway, Malibu, California 90265 (June 22, 2018). There are additional properties Association shareholders own that are an intrinsic part of value of the total investment contract. (*i.e.* tennis club). Some of the shareholders lease their memberships for profit. (*i.e.* access).

shareholders and a freeze on the issuance of new shares since 2021, the value per share stands at $125,392.48. The Plaintiff's ownership of the lot in April 2020, and consequently the share in the Association, is inextricably linked to the overall value of the property, which cannot be divided from the equitable title the Plaintiff holds in the Malibu Property.

69.     On June 21, 2023, the Plaintiff is informed, believes, and thereon alleges that the defendant instructed the Association to revoke the Plaintiff's share and at the Defendant's direction the Association unjustly revoked it. This resulted in immediate and tangible harm to the Plaintiff, including but not limited to, the loss of access to the Beach Club. *See* ECF No. 26. This act not only impacted Plaintiff's property rights but also his shareholder interests, which are considered securities under the Acts.

70.     Plaintiff alleges that the revocation of his shareholder status and the accompanying rights constitutes a violation of his security interests as protected by Federal law. The revocation and the harm caused thereby are directly attributable to the Defendant's actions, which have caused a devaluation of the Plaintiff's property and equitable title. *See* "Association Docs" Malibu La Costa Owner's Association, Articles of Incorporation, art. 4, at 5, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). Malibu La Costa Owner's Association, Articles of Incorporation, art. 7, at 6, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). This organization was established in the same year that the Supreme Court issued its decision in the case of *SEC v. Howey*.

71.     The Malibu lot was insured against any loss and subrogation's primary purpose, therefore, is to prevent the insured from obtaining double recovery. See *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1120 (9th Cir. 2010); *See* "Sale Exhibits" WFG National Title Insurance Co., Trustee's Sale Guarantee issued on August 18, 2022; Steve Smead, Email to Legal Notices, Re: Lawsuit against me but, not you yet, May 18, 2023; Clinton Brown [Borrower] and Steve Smead [Lender], Deed of Trust (Nov. 4, 2020) (*unrecorded*) (describing property at 21472 Calle Del Barco, Los Angeles County, California, with APN: 4451-015-021).

---

*See* "Association Docs"

72.     The Plaintiff has reason to believe that the Utah and Harper properties were also insured and thus there's a question of fact whether there's a subrogation claim.

73.     "The notes and deed of trust were only between me and Clinton Brown. No other parties, other than the trustee, were set forth in these." (Smead Decl. ¶ 3). This is false. The assignment of the first Harper deed of trust was negotiated between Plaintiff, Defendant and Adam Ahmed at American Pacific Investments, LLC, the first deed of trust holder.



74.     "I had no interest in. and was not involved in, any of the businesses of Clinton Brown… referenced properties were a part. I never invested in any of the businesses that Mr. Brown may have had. I never became a joint venturer, partner, shareholder, or any other type of equity holder in any of Mr. Brown's businesses. (Smead Decl. ¶ 5). The texts, emails, phone conversations show differently. Once again, this is blatantly false, and the Defendant will fold like a cheap suit under cross-examination.



Communications from on or about December 2020 & July 2021.

75.     "To the best of my knowledge, Mr. Brown had no active solar energy businesses, but rather plans, hopes, and dreams to one day have such a business. I had no interest or intention to. invest in any solar energy business with Mr. Brown, and there was never an agreement that I would do so. l relied on the present value of the individual properties securing the Note and Deed of Trust for such individual properties when making a loan to Mr. Brown." (Smead Decl. ¶ 6).

**verizon**✓   Billing period Jul 3, 2022 to Aug 2, 2022 | Account #

310.487.6453
iPhone 13 Pro Max

### Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. |
|------|------|--------|-------------|-------------|------|
| Jul 6 | 1:08 PM | 888.844.7979 | Los Angele ,CA | Incoming ,CL | 3 |
| Jul 6 | 1:41 PM | 631.640.6280 | Pacfic PA, CA | Amityville ,NY | 1 |
| Jul 6 | 1:41 PM | 631.640.6280 | Pacfic PA, CA | Amityville ,NY | 1 |
| Jul 6 | 2:39 PM | 800.829.4933 | Pacfic PA, CA | Toll-Free ,CL | 2 |
| Jul 6 | 2:40 PM | 800.829.4933 | Pacfic PA, CA | Toll-Free ,CL | 3 |
| Jul 6 | 3:07 PM | 310.929.2520 | Pacfic PA, CA | Incoming ,CL | 1 |
| Jul 6 | 3:29 PM | 304.707.9490 | Pacfic PA, CA | Incoming ,CL | 91 |
| Jul 7 | 12:02 PM | 631.640.6280 | WiFi CL | Amityville ,NY | 9 |
| Jul 7 | 2:00 PM | 800.829.4933 | Los Angele ,CA | Toll-Free ,CL | 2 |
| Jul 7 | 2:39 PM | 304.707.9490 | Los Angele ,CA | Incoming ,CL | 36 |
| Jul 11 | 1:22 PM | 209.821.1775 | Los Angele ,CA | Incoming ,CL | 1 |
| Jul 12 | 9:19 AM | 805.200.7411 | Pacfic PA, CA | Oxnard ,CA | 1 |
| Jul 12 | 10:49 AM | 805.200.7411 | Los Angele ,CA | Incoming ,CL | 56 |

76.     Between September 2020 and March 2023, the Plaintiff and Defendant had at least two hundred eighty-seven (287) written email communications. *See* ("Phone and Emails") Gmail Conversation Log, Clinton Brown v. Steve Smead, No. 2:23-cv-02938 (C.D. Cal. January 1, 2024).

77.     In 2022, the Plaintiff and Defendant had at least twenty-nine (29) phone call conversations equal to no less than 643 minutes.  *See* ("Phone and Emails") Phone Call Record Log, Clinton Brown v. Steve Smead, No. 2:23-cv-02938 (C.D. Cal. January 1, 2024). This information is attested as true by the Plaintiff and upon the opening of discovery, Plaintiff will provide the Defendant with true [and] exact copies of the Verizon phone bills highlighting each

call as such.[29] Again, the emails, texts and phone records don't lie, but the Defendant does.

78.     The Plaintiff and Defendant exchanged CONFIDENTIAL information regarding Haper Lake's proposed offer from a third-party solar developer on October 16, 2022. (Brown, Clinton. Email exchange with Steve Smead. "CONFIDENTIAL" 16-17 October 2022, Email #265 and #266, respectively).

---

**CONFIDENTIAL**
1 message

**Clinton Brown** <clinton@atlasinc.solar>                                        Sun, Oct 16, 2022 at 7:59 PM
To: STEVE SMEAD <stsmead@gmail.com>

Steve,

Can you look at this and propose how we can make this work? I've looked over it and I have my professional opinion and I'd like to know yours.

Thank you,

---

79.     The Plaintiff sent a Proposal to stave off foreclosure for (6) six months on December 3, 2022. (Brown, Clinton. Email to Steve Smead. "Proposal" 03 December 2022, Email #276).

80.     The Plaintiff sent the third-party solar developer contract to the Defendant on December 15, 2022, for the Harper property. (Brown, Clinton. Email to Steve Smead. "Lease for Harper" 15 December 2022, Email #278). The Plaintiff did not end up signing this agreement, even though he had the legal title at the time. The developer wanted to take the mineral rights, regardless of if the project went forward. This was a non-starter and whomever ends up with this property will have the Plaintiff to thank for that. For the signature, a payment of $34,000 was going to be paid. It was not right for the project, property, or any interested party despite the Plaintiff being at the verge of insolvency. (Brown Decl. at 3-4). In other words, '*good faith*.'

[*Intentionally Left Blank*]

---

[29] *See* Fed. Evid. Rule 106.

81.     The Plaintiff notified the Defendant of a Chapter 11 Sub V bankruptcy filing and the automatic stay on December 28, 2022, and December 29, 2022, respectively. (Brown, Clinton. Emails to Steve Smead. "Information Regarding Chapter 11 Subchapter V Filing and Alternative."; "Automatic Stay Chapter 11 Subchapter V," 28-29 December 2022, Emails #279-282).

---

## Information Regarding Chapter 11 Subchapter V Filing and Alternative

1 message

**Clinton Brown** <clinton@atlasinc.solar>
To: STEVE SMEAD <stsmead@gmail.com>

Tue, Dec 27, 2022 at 5:43 PM

Steve,

I am writing to inform you about what will happen should I file for a Chapter 11 Subchapter V bankruptcy.

Under the Small Business Reorganization Act of 2019, signed by President Trump, Subchapter V is a type of bankruptcy which allows *the debtor to remain in possession of their assets and continue to operate their business during the bankruptcy.* (Emphasis added) The debtor must propose a reorganization plan which must be "fair and equitable" to all creditors and must provide for the payment of all creditors in full over a period not to exceed 5 years.
For the Harper Lake, Millard and Malibu debts, the plan must provide for the payment of all debts in full, or the value of property to be distributed under the plan must not be less than the projected disposable income of the debtor for the next three to five years. The plan must also provide for the payment of all secured claims under the cramdown of secured claims section, 11 U.S.C. § 1129(b)(2)(A).*
*Please note that if creditors do not fully consent or vote for the debtor's plan, the plan will still be confirmed as long as it does not discriminate unfairly and provides that all of the debtor's projected disposable income will be applied to the plan payments for the next three to five years, or the value of property to be distributed under plan is not less than the projected disposable income of the debtor for the next three to five years.

Therefore, filing Chapter 11 under the Subchapter V of the Bankruptcy Code allows *a debtor with substantial equity from real property to pay their creditors when the property is sold within three to five years, without using their disposable income.* (Emphasis added) This is because, under Subchapter V, a debtor may propose a plan of reorganization that does not require any payments from the debtor's disposable income. Subchapter V also allows the debtor to keep their property while they are in the bankruptcy process and continue normal business operations.

If we are able to extend the deeds of trust by one year and avoid Federal Court intervention, it would save us both time and money. This way, you can focus on your retirement and I can focus on building on the equity I have earned, which will pay you off without an inequity to either of us and in a shorter amount of time.
Please let me know what route you'd like to take on this.

| Clinton Brown

82.     As late as August 20, 2023, defendant's Counsel was notified of a solar development contract offer from Lightsource that the Plaintiff had been working on since 2022. The defendant stands to gain millions of dollars from a deal that is still active. *See* BP Corporate News, BP agrees to take full ownership of Lightsource BP, November 30, 2023, at https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-agrees-to-take-full-ownership-of-lightsource-bp.html).

---

### Solar Development Contract Offer (Utah)

1 message

Clinton Brown <clinton@atlasinc.solar>                                    Sun, Aug 20, 2023 at 6:32 PM
To: attydavidyoung@gmail.com

David,

Hope you're surviving the hurricane and Earthquakes this Sunday afternoon. As you may know or may not know I've been working on putting together a development deal for the Utah property for some time now and it appears that is coming to fruition. Unfortunately, the property in Utah is under dispute in this litigation and obviously that's something that a developer does not want.

In light of this, a deal will not go through on the development if there is litigation and appeals. By not going through, I mean with this particular property. The developer can do without it, really, if that's the direction that has to be taken.

I'm sending this over for you and your Client's review and we can go from there.

Sincerely,

| | |
|---|---|
| **DEVELOPER** | LIGHTSOURCE RENEWABLE ENERGY DEVELOPMENT, LLC, a Delaware limited liability company |
| **DEVELOPER'S ADDRESS FOR NOTICES** | Lightsource Renewable Energy Development, LLC<br>400 Montgomery Street, 8th Floor<br>San Francisco, CA 94104<br>Attn: Real Estate Department<br>Email:  USAssetServices@lightsourcebp.com<br>legalnoticesus@lightsourcebp.com |
| **PROPERTY** | That real property consisting of the parcel(s) located in the County of Millard State of Utah as more particularly described on **Exhibit A** together with any improvements located thereon and rights, benefits and easements appurtenant to the parcel(s).  From time to time following the Effective Date, Developer may update and replace **Exhibit A** with the legal description of the Property in accordance with Section 2.5 of this Agreement. |

**Steve Smead Payment Schedule.xlsx**

| A | B | C |
|---|---|---|
| 5 | $500.00 | $48,300.00 |
| 6 | $600.00 | $96,600.00 |
| 7 | $612.00 | $98,532.00 |
| 8 | $624.24 | $100,502.64 |
| 9 | $636.72 | $102,512.69 |
| 10 | $649.46 | $104,562.95 |
| 11 | $662.45 | $106,654.21 |
| 12 | $675.70 | $108,787.29 |
| 13 | $689.21 | $110,963.04 |
| 14 | $703.00 | $113,182.30 |
| 15 | $717.06 | $115,445.94 |
| 16 | $731.40 | $117,754.86 |
| 17 | $746.02 | $120,109.96 |
| 18 | $760.95 | $122,512.16 |
| 19 | $776.16 | $124,962.40 |
| 20 | $791.69 | $127,461.65 |
| 21 | $807.52 | $130,010.88 |
| 22 | $823.67 | $132,611.10 |
| 23 | $840.14 | $135,263.32 |
| 24 | $856.95 | $137,968.59 |
| 25 | $874.09 | $140,727.96 |
| 26 | $891.57 | $143,542.52 |
| 27 | $909.40 | $146,413.37 |
| 28 | $927.59 | $149,341.64 |
| 29 | $946.14 | $152,328.47 |
| 30 | $965.06 | $155,375.04 |
| 31 | $984.36 | $158,482.54 |
| 32 | $1,004.05 | $161,652.19 |
| 33 | $1,024.13 | $164,885.23 |
| 34 | $1,044.61 | $168,182.94 |
| 35 | $1,065.51 | $171,546.60 |
| 36 | $1,086.82 | $174,977.53 |
| 37 | $1,108.55 | $178,477.08 |
| 38 | $1,130.72 | $182,046.62 |
| 39 | $1,153.34 | $185,687.55 |
| 40 | $1,176.41 | $189,401.30 |
| 41 | $1,199.93 | $193,189.33 |
| 42 | $1,223.93 | $197,053.12 |
| 43 | $1,248.41 | $200,994.18 |
| 44 | $1,273.38 | $205,014.06 |
| 45 | $1,298.85 | $209,114.34 |
| 46 | $1,324.82 | $213,296.63 |
| Total | $38,106.01 | $6,135,068.21 |

83.     The Utah Solar Farm project closed on May 16, 2024, without including Brown's property, resulting in Brown not receiving the $6,135,068.21 he would have earned if his property had been part of the executed contracts for the Utah Solar Farm. *See* Declaration of Sean Chaudhuri, ECF No. 64-1 at 3, No. 17. (May 17, 2024).

84.     "In no way was this motivated by an investment in or related to any of Mr. Brown's business schemes and dreams, I did this out of my own sheer economic necessity and survival." (Smead Decl. ¶ 9). The facts say otherwise.

85.     "I did not expect to, nor did I participate in the profits from any of the businesses of Clinton Brown. My only expectation was that I would be paid the principal of the loan, and interest, as stated in the Individual Notes secured by the individual Deeds of Trust" (Smead Decl. ¶ 7). This too is false. Why would anyone just settle for principal *and* interest when they could receive millions of dollars more from the efforts of another party? That is fraud anyway you look at it, or at least, it's a 'strong inference' that there might be fraud.

## V. PSLRA

86.     The PSLRA requires Plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the Defendant's intention "to deceive, manipulate, or defraud." See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, & n. 12 (1976). As set out in § 21D(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Congress left the key term "strong inference" undefined. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd* 551 U.S. 308, 314 (2007). To qualify as "strong" within the intendment of § 21D(b)(2), an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Id*. Millions of dollars from carefully reviewed and studied properties OR loan & interest money? *Gee let's see.*[30]

---

[30] Just because a solar farm contract has been signed does not mean that the property is now valueless *or* that the Defendant cannot seek *or* be awarded a solar contract. After all, this is capitalism *and* what matters is who gets it done first *at that location*.

## Count I:

## Unregistered Offers and Sales of Securities in Violation of Section 5(a)

87.     Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

88.     The definition of a "security" under the Federal securities laws includes a wide range of investment vehicles, including "investment contracts." 15 U.S.C. § 77b(a)(1); Securities Act Section 2(a)(1).

89.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

90.     Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypt assets, and enterprises that exist only on the Internet.

91.     As the United States Supreme Court noted in *SEC v. W.J. Howey Co*., Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the [sweat equity] money of others on the promise of profits." *Id*. at 299 (1946).

92.     A common enterprise exists wherever there is "horizontal commonality" between the purchaser and a given defendant. Such commonality, moreover, is established if each investor's fortunes are "ti[ed] ... to the fortunes of the other investors by the pooling of assets," and there is a "pro-rata distribution of profits" earned from these combined assets. See *Revak v. SEC Realty Corp*., 18 F.3d 81, 87 (2d Cir. 1994) In essence, the properties were "pooled" together in the investment contract and, through the managerial efforts of the Plaintiff, were expected to generate profits that would then be paid to the Defendant and the Plaintiff, in other words, on a pro-rata basis. *Id.*, *supra*, *Edwards* at 397. Even if there's a "fixed" rate of return, in this case, the pro-rata

basis increased when Defendant charged a default rate of 5%, even though he allowed the default to occur. The Plaintiff only found out about this when the property 'loan' was to be reinstated. Regardless, the only way to pay back the Defendant was the capital appreciation[31] *or* from the projects themselves. *Thus*, an investment contract.

93.     The scheme, as alleged, is the very disguised public distribution that Section 5 seeks to prohibit. (*i.e.* an investment contract scheme that is unregistered and sold to a person of the investing public).[32]

94.     In determining whether a financial interest constitutes an "investment contract," the "expectation of profits produced by the efforts of others" requirement is met when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. See *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1131 (9th Cir. 1991)

95.     In determining whether a financial interest constitutes an "investment contract," the second prong of the test requires either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality). Vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters. One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller *or* promoter. *Id.*

96.     The Plaintiff is entitled to his equitable title as a claim of recission under Section 5, even if the Court does not find a 10(b)(5) violation in this controversy. A finding of a 10(b)(5) violation would entitle the Plaintiff to damages.

---

[31] Even during the time of this Federal litigation, the capital appreciation of the properties have gone up. (citation omitted).

[32] The simplest way to break through the noise of the terms, in the Plaintiff's view, is to look at who 'sold' the money, *in this case*. The Defendant, each time, purposedly 'sold' his money at lower rates, to keep control of the deeds of trust and to ensure that he would receive *all* the equitable title, *at his discretion*. The Plaintiff 'bought' the money which had to be paid back with the equitable title (capital appreciation) *or* the profits from the project via the investment contract. *Howey* doesn't squarely say that the 'buyer' cannot also be the 'managerial' part of the investment contract as well. Last, the Defendant did advise the Plaintiff on his projects, whether that advice was welcomed *or* not.

## Count II:

## Violation of 10b-5 '*in connection with*' the offer *or* sale of an unregistered security [investment contract].

97.    "Security" is defined in both § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities and Exchange Act of 1934, 15 U.S.C.. § 78c(a)(10), to include "investment contracts."

98.    This action arises from the Defendants' use of 'insider information' to take control of Plaintiff's real estate investments to their unjust enrichment. The Defendant, who is purportedly an 'accredited investor', and unbeknownst to the Plaintiff at the time, the Defendant acquired the properties through deceptive means, *inter alia*, misappropriating insider information given to the Defendant in hopes of averting the thing that happened; the taking of the equitable title from the Plaintiff. The Defendant, acting within a semi-fiduciary capacity *and/or* recklessly, knowingly and with scienter violated 10(b)(5) of the 1934 Securities and Exchange Act.

99.    In interpreting the Securities Act of 1933 and the Securities and Exchange Act of 1934 the Court is not bound by legal formalisms, but instead takes account of the economics of the transaction under investigation. A thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. See *SEC v. R.G. Reynolds Enters*., 952 F.2d 1125, 1132 (9th Cir. 1991).

100.    Courts construe the Securities Act of 1933, 15 U.S.C § 77b(1), and the Securities and Exchange Act of 1934, 15 U.S.C. § 78(c)(a)(10), broadly to effectuate the Congress's purpose to protect [individual] investors.

101.    The $60,000 equity investment in the Utah property was a result of the entrepreneurial and managerial efforts of the Plaintiff in the common enterprise with pooled money. *Thus*, an investment contract. *Thus*, a security.

102.    The investment contracts, ultimately, allowed the Defendant to control the common enterprise and take the Plaintiff's equitable title fraudulently.

103.    Defendant knew that he would *only* be paid back if the projects were successful.

104.    Plaintiff has reason to believe that the investment into the common enterprise was with the intent to deceive and defraud the Plaintiff of his equitable title based on the alleged facts in this case.

105.    The definition of security under Securities Act 2(a)(1) and Exchange Act Section 3(a)(10) includes a "receipt for" a security. The Defendant could convert his holdings back to himself at any time. As a result, this is also a security because it is a "receipt for" a security. In any event, the investment contract was not registered and therefore is an illegal security.

106.    Whether the Defendant knew or didn't know that he sold an investment contract is immaterial. Failing to register an investment contract is failing to register an investment contract [security] is illegal. This failure resulted in Plaintiff's losses.

107.    Once the Plaintiff satisfies its *prima facie* burden under Section 5 of the Securities Act, the burden shifts to the defendants to affirmatively plead an entitlement to the exemption. See *SEC v. Canavagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

108.    Defendant will fail to make the necessary showing. Nor is an exemption clear from the face of the transaction. See *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020). Proof of scienter, it is well-established, is not needed to show Section 5 liability. See *Cavanagh*, 445 F.3d at 11 n.13.

109.    Under Exchange Act Section 10(b) and Securities Act Section 17(a)(1), *scienter can be pled* either by "alleg[ing] facts establishing a motive to commit fraud and an opportunity to do so" *or* by "alleg[ing] facts constituting circumstantial evidence of either reckless *or* conscious behavior." See *In re Time Warner*, 9 F. 3d 259, 269 (2d Cir. 1993).

110.    Securities legislation enacted for the purpose of avoiding frauds is intended by Congress to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, especially at the pleading stage for private causes of action, not related to class actions, where the discovery process can cost millions of dollars once commenced.

111.    By virtue of the foregoing, Defendant, directly and indirectly: without a registration statement in effect as to that [investment contract] security, (a) made use of the means and

instruments of transportation *or* communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried *or* caused to be carried through the mails *or* in interstate commerce, by any means *or* instruments of transportation, any such security for the purpose of sale *or* for delivery after sale; and (c) made use of the means and instruments of transportation *or* communication in interstate commerce *or* of the mails to offer to sell through the use or medium of a prospectus *or* otherwise, securities as to which no registration statement had been filed. Put another way, it is illegal to offer *or* sell an unregistered security.

## Count III:

## Violation of 18 U.S.C. § 1964(a)-(c)[33]

112.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, was enacted on October 15, 1970, as Title IX of the Organized Crime Control Act of 1970. *See* Pub. L. No. 91-452, 84 Stat. 941 (1970).[34]

113.   RICO provides for civil remedies. *See* 18 U.S.C. § 1964(c).[35]

114.   The Racketeer Influenced and Corrupt Organizations Act *is* to be read broadly, *infra*.

115.   There is no requirement that a private treble damages action under RICO must proceed only against a Defendant who has already been convicted of a predicate act *or* RICO violation. See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985).

116.   Section 1964(c) authorizes a private suit by "[a]ny person injured in his business or

---

[33] 18 U.S.C. § 1964(d) is also alleged as a conspiracy between and among the Defendants in, *Clinton Brown v. Emil Assentato, et al*., No. 2:23-cv-02972, Transcript of Proceedings, ECF No. 49 at 14 (C.D. Cal. June 6, 2024) ("...described it as personal loans [] that there's oversight with [] maybe, I mean state law…with how much interest you can charge, but as demonstrated in the next case [Smead], you can get around that, [] by filing paper on the back of another deed of trust.") (modified, alterations & emphasis added). However, because these controversies are not consolidated the facts alleged herein are separate and distinct in the RBA, *infra*.

[34] *See* https://perma.cc/F8SD-5LVH

[35] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

property by reason of a violation of § 1962." Section 1962 makes it unlawful for anyone—not just mobsters—to use money from [unlawful debt collection] activity to invest in, acquire control of, or conduct an enterprise. *Id*. at 495.

117.    No distinct "racketeering injury" requirement is necessary to maintain a private treble damages action under RICO…There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement. *Id*. & n. 7.

118.    RICO is designed to reach both "legitimate" and "illegitimate" enterprises. See *United States v. Turkette*, 452 U.S. 576, 580 (1981).

119.    Private attorney general provisions, such as § 1964(c), are designed to fill gaps left by prosecutorial efforts. See *Sedima*, 473 U.S .at 493.

120.    The [J]udiciary should not eliminate private actions where Congress has explicitly provided them. *Id*. at 499-500.

121.    RICO civil actions are subject to a four-year statute of limitations. See *Agency Holding Corp. v. Malley-Duff Assocs,* 483 U.S. 143, 152 (1987).

122.    RICO provides powerful civil penalties for persons who engage in "collection of an unlawful debt" and who have a specified relationship to an "enterprise" that affects interstate or foreign commerce. Collection of unlawful debt is an alternate ground for RICO liability and proof of a pattern is not required. See *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020); *Goldenstein v. Repossessors Inc*., 815 F.3d 142, 147 - 48 n.5 (3d Cir. 2016); *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994); *United States v. Aucoi*n, 964 F.2d 1492, 1495- 497 (5th Cir. 1992); *Dillon v. BMO Harris Bank, N.A*., 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014); but see, *Wright v. Shepard*, 919 F.2d 665, 673 (11th Cir. 1990).

123.    An action based on the collection of unlawful debts "requires only a single act of collection as a predicate for RICO liability." See *Proctor v. Metro. Money Store Corp*., 645 F. Supp. 2d 464, 481 (2009) (citing *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 232 (1989)).

124.    The [predicate] claim is *usura velata*, veiled or concealed usury, which consists in

giving a bond[36] for the loan, in the amount of which is included the stipulated interest. *See* Black's Law Dictionary 1713 (rev. 4th ed. 1968).

125.   The predicate covers only the collection of usurious debts…which [are] unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with…the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. (100% interest concealed within a real estate transaction[s] would presumably be usurious under California or Federal law (citation omitted)). See also, *Clinton Brown v. Emil Assentato, et al*., No. 2:23-cv-02972, Transcript of Proceedings, ECF No. 49 at 14 (C.D. Cal. June 6, 2024) ("...described it as personal loans [] that there's oversight with [] maybe, I mean state law…with how much interest you can charge, but as demonstrated in the next case [Smead], you can get around that, [] by filing paper on the back of another deed of trust.") (modified, alterations & emphasis added).

126.   RICO defines "enterprise" broadly in section 1961(4) but waits until the description of RICO's substantive offenses before introducing the commercial feature of RICO enterprises. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any [person]…with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through…collection of unlawful debt.").

127.   RICO Unlawful Debt Collection "Any person injured in his business or property by reason" of a RICO violation has a cause of action for treble damages and attorney fees. *See* 18 U.S.C. § 1964(c).

128.   An "unlawful debt" is a debt that arises from a collection of a single usurious debt…[which] is sufficient to satisfy Section 1961(6)…provided that it was incurred in connection with "the business of lending money…at a rate usurious…where the usurious rate is at least twice the enforceable rate. See *U.S. v. Weiner*, 3 F.3d 17, 23 (1st Cir. 1993).

129.   RICO Enterprise An "enterprise" includes any individual, partnership, corporation,

---

[36] A certificate *or* evidence of a debt. *See* Black's Law Dictionary 224 (rev. 4th ed. 1968).

association, or other legal entity, and any group of individuals associated in fact although not a legal entity.

130.   Collection of an unlawful debt appears to be the only instance in which the commission of a single predicate offense will support a RICO prosecution or cause of action. No proof of pattern seems to be necessary, *supra*.

131.   RICO Interstate Commerce The impact of the enterprise on interstate or foreign commerce need only be minimal to satisfy RICO requirements. Where the predicate offense[s] associated with an enterprise ha[s] an effect on interstate commerce, the enterprise is likely to have an effect on interstate commerce. See *United States v. Pipkins*, 378 F.3d 1281, 1295 (11th Cir. 2004) (finding that RICO conspirators' use of instrumentalities of interstate commerce, including pagers, telephones, and mobile phones, affected interstate commerce).

132.   18 U.S.C. § 1962(a) states, "It shall be unlawful for any person who has received any income derived…through collection of an unlawful debt…to use…any part of such income…in acquisition of any enterprise…" (subsections 1962(b) and (c) are similarly worded). Thus, the Plaintiff's payment of usura velata to the Defendant…and presumably the Defendant's use of that unlawful income…was used in acquisition of the Plaintiff's enterprise or furtherance of the Defendant's enterprise. (i.e. additional "personal" loans). *See* ECF No. 42-1 at 20-21 ("Smead Decl."); No. 2; ("I made personal loans…"); No. 3; ("The notes and deeds of trust were only between me and Clinton Brown…"); No. 9; ("…out of sheer business survival…"). If that's not an enterprise, then what is?

133.   *Congress* says that an enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. *See* 18 U.S.C. § 1961(4).

134.   In *Reves v. Ernst & Young*, the Supreme Court adopted the "operation or management" test to determine whether someone has conducted the affairs of an enterprise. To be sure, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," as well as third

parties who are somehow "associated with" the enterprise and exert control over it, *supra*.

135.   However, to be liable under § 1962(c), an individual must be a "direct participant" in the affairs of the enterprise and not merely "acting in an advisory professional capacity (even if in a knowingly fraudulent way)." See *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 214, 230 (E.D. Va. 2008). See also, *Hengle v. Asner*, 433 F. Supp. 3d 825, 897 (E.D. Va. 2020).

136.   The prohibition on the "collection of unlawful debt" under Racketeer Influenced and Corrupt Organizations Act (RICO) encompasses efforts to collect on a usurious loan, without distinguishing whether the collection is cash or collateral. See *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148-149 (3d Cir. 2016). Cf. *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) (holding that "a single act which would tend to induce another to repay on an unlawful debt incurred in the business of lending money" is sufficient for the predicate act, and there need not be "[a]n actual exchange of cash").

137.   Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the [Plaintiff] need only demonstrate a single collection." See *Giovanelli*, 945 F.2d at 490. The [Plaintiff] also must prove that the collection of the unlawful debt is connected to the enterprise, otherwise known as the requirement of "vertical relatedness." See *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). "The requisite vertical nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was enabled to commit the predicate offenses *solely* by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." *Id.* (citing *United States v. Robilotto*, 828 F.2d 940, 947–48 (2d Cir. 1987). See also, *U.S. v. Megale*, 363 F. Supp. 2d 359, 363-364 (D. Conn. 2005).

138.   Although Defendant[s] contend that the [Plaintiff] must also prove "horizontal relatedness," *i.e.* that the predicate racketeering acts are related to each other, *Minicone*, 960 F.2d at 1106, this concept necessarily applies only when the [Plaintiff] charge[s] a pattern of

racketeering activity and therefore must prove at least two predicate racketeering acts. *See* 18 U.S.C. § 1961(5) ("'pattern of racketeering activity' requires at least two acts of racketeering activity..."). Where the [Plaintiff] need only prove one collection of an unlawful debt, it would not be logical to require the [Plaintiff] to prove that this single act is related to other predicate acts. See *Megale* at n.5.

139.   The injury can be caused by either the predicate acts or the activities described specifically in § 1962(a)–(d), so long as it is the plaintiffs who are injured. See *Sedima* 473 U.S. at 495–497. See also, *Adams–Lundy v. Association of Professional Flight Attendants,* 844 F.2d 245, 250 (5th Cir. 1988) (only those directly injured may bring a RICO action).

140.   [Courts] must assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' See *Richards v. United States*, 369 U.S. 1, 9 (1962). The common or dictionary definition of the term includes 'right, title or legal share in something; participation in advantage, profit and responsibility.' *See* Webster's Third New International Dictionary 1178 (1971). It has also been defined as '(t)he most general term that can be employed to denote a right, claim, title, or legal share in something.' *See* Black's Law Dictionary 729 (5th ed. 1979)...Indeed, this understanding comports with the House Report's definition of 'interest' as inclusive of 'all property and interests, as broadly described, which are related to the violations.' H.R. Rep. No. 1549, 91st Cong., 2d Sess. 57, reprinted in (1970). See *United States v. Martino,* 681 F.2d 952 at 954, 955-56 (Former 5th Cir. 1982) (*en banc*). So defined, "interest" in fact encompasses all "property rights" in a business enterprise. See *U.S. v. Jacobson*, 691 F.2d 110, 112-113 (2d Cir. 1982).

141.   In addition, the Court of Appeals for the Third Circuit requires that under Section 1962(c) the "person" be distinct from the "enterprise." See *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993). Section 1962(c) liability attaches only to the "person." "[T]he RICO "person" is the active wrongdoer, while the RICO "enterprise" is the passive instrumentality through which the "person" performs the predicate acts." See *Leonard v. Shearson Lehman/American Exp. Inc,* 687 F.Supp. 177, 181–82 (E.D. Pa. 1988), (citing *Petro–Tech, Inc. v.*

*Western Co. of North America,* 824 F.2d 1349, 1359 (3d Cir. 1987)). A corporate defendant may be a "person" and thus liable under Section 1962(c), but only if it, through a pattern of racketeering, conducted the affairs of an enterprise other than itself. See *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 268 (3d Cir. 1995), See also, *Baglio v. Baska*, 940 F. Supp. 819, 832 (W.D. Pa. 1996).

142.    The Ninth Circuit ha[s] held that section 1962(b), unlike section 1962(c), permits a corporation to act as both the "person" liable and the alleged RICO enterprise. See, e.g*., Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1307 (7th Cir. 1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *Schreiber Distrib. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1397–98 (9th Cir. 1986).

143.    "Logic dictates that a corporation, receiving income from a pattern of racketeering in which it has participated as a principal, can invest that income in its own operations." See *Pennsylvania v. Derry Construction Co.,* 617 F.Supp. 940, 943 (W.D. Pa. 1985). Thus, we hold that where a corporation engages in racketeering activities and is the direct or indirect beneficiary of the pattern of racketeering activity, it can be both the "person" and the "enterprise" under section 1962(a). See *Haroco v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 402 (7th Cir. 1984).

144.    Similarly, section 1962(b) makes it unlawful to acquire an interest in or control of an enterprise through a pattern of racketeering activity. Where subsection (a) prohibits the use of money derived from racketeering to acquire an interest in an enterprise, subsection (b) prohibits engaging in racketeering activity to acquire or maintain an interest in or control of an enterprise. *See* Fitzpatrick, *supra,* at  7.  Under  either section  1962(a) or (b),  however,  the corporation necessarily must be the direct *or* indirect beneficiary of the pattern of racketeering activity to be both the "person" and the "enterprise." Cf. *Haroco* 747 F.2d 384 at 401-402 (7th Cir. 1984) (corporation must be beneficiary to be "person" and "enterprise" under section 1962(a)).

145.    In this case, *Schreiber* alleged that Serv-Well and Landmark (1) engaged in the predicate acts of racketeering; (2) received income from the pattern of racketeering activity; and

(3) used that income in their operations, all in violation of section 1962(a). *Schreiber* has sufficiently alleged that the corporate defendants were the beneficiaries of the pattern of racketeering activity under section 1962(a) and (b). Thus, the District Court erred in dismissing the RICO counts against the corporate defendants Serv-Well and Landmark for failure to allege a "person" separate from the "enterprise" under section 1962(a) and (b). "This result is in accord with the primary purpose of RICO, which, after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it." *Id.,* Cf. *United States v. Turkette,* 452 U.S. 576, 591 (1981) (the major purpose of RICO is to address the infiltration of legitimate business by organized crime). See *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986).

146.    The Court recognizes that the authority outside the Eighth Circuit is to the contrary. See *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 907 (3d Cir. 1991); *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840–41 (4th Cir. 1990); *Official Pubs., Inc. v. Kable News Co.,* 884 F.2d 664, 668 (2d Cir. 1989); *Yellow Bus Lines, Inc. v. Local Union 639,* 839 F.2d 782, 790 (D.C. Cir. 1988); G*arbade v. Great Divide Mining,* 831 F.2d 212, 213 (10th Cir. 1987); *Schreiber Distrib. Co. v. ServWell Furniture Co.,* 806 F.2d 1393, 1397 (9th   Cir. 1986); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 32 (1st Cir. 1986); *Haroco v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 401–02 (7th Cir. 1984).

147.    Sole proprietorship qualifies as individual (or, in appropriate circumstances, as group of individuals associated in fact) and therefore as RICO "enterprise." See *Guidry v. Bank of LaPlace*, 954 F.2d 278, 283 (5th Cir. 1992).

148.    Sole proprietorship can be "enterprise" with which its proprietor can be "associated" within meaning of provision of Racketeer Influenced and Corrupt Organizations Act making it unlawful for any person associated with enterprise engaged in interstate commerce to participate in conduct of enterprise's affairs through pattern of racketeering activity, as long as there are other people besides proprietor working in organization. See *McCullough v. Suter*, 757 F.2d 142, 143 (7th Cir. 1985) (Posner, J.)

149.    Allegations in civil complaint under this chapter that defendants were in joint real estate venture were sufficient to allege existence of enterprise. See *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060, 1064 (4th Cir. 1984).

150.    This chapter's definition of "enterprise" covered the enterprise alleged in the instant case, viz., a "group of individuals associated in fact with various corporations." See *United States v. Thevis*, 665 F.2d 616, 625-626 (5th Cir. 1982).

151.    Investors satisfied requirement for stating cause of action under Racketeer Influenced and Corrupt Organizations Act (RICO), that there be an enterprise; complaint alleged that there were three groups formed for perpetrating fraud in connection with investments in video rental business, including a group that solicited investors, another that operated business, and a third that raised capital. See *Pahmer v. Greenberg*, 926 F. Supp. 287, 299-301 (E.D.N.Y. 1996).

152.    Condominium in which plaintiffs purchased units could be "enterprise" within meaning of Racketeer Influenced and Corrupt Organizations Act, insofar as condominium was legal entity requiring plans and specifications for its creation and operation, and also represented association of unit owners. See *Bhatla v. Resort Development Corp.*, 720 F. Supp. 501, 511 & n. 12. (W.D. Pa. 1989).

153.    Complaint which alleged that Defendant and the enterprise [were distinct] was met where the Jury could reasonably have concluded that the RICO persons were a separate and distinct assortment of public officials, private individuals and corporations who used their political power to influence town's exercise of Governmental authority over the Plaintiffs' real estate development, and that the town, the alleged enterprise, was the passive instrument or victim of their racketeering activity. See *DeFalco v. Bernas*, 244 F.3d 286, 307-308 (2d Cir. 2001) (citing *United States v. Angelilli,* 660 F.2d 23, 30–35 (2d Cir. 1981), *cert. denied,* 455 U.S. 910, 945 (1982)) ("…a Governmental unit can be a RICO enterprise.").

154.    Builder of single-family homes adequately alleged enterprise requirement of civil RICO action against parties involved in sale of two lots in a subdivision allegedly suitable for development through claims of joint ownership and overlapping agency on part of persons

involved. See  *J.G. Williams, Inc. v. Regency Properties*, 672 F. Supp. 1436, 1440 (N.D. Ga. 1987)

155.    This chapter could properly be applied to the conduct of the affairs of an enterprise whose only business was the loaning of money at usurious interest rates, through the collection of unlawful debts and conspiracy to accomplish the same. See *United States v. Castellano*, 416 F. Supp. 125, 127 (E.D.N.Y. 1975).

156.    The Ninth Circuit correctly concluded that 1962(c) is not within the scope of Wharton's Rule. See *United States v. Rone,* 598 F.2d 564, 570 (9th Cir. 1979). A violation of 1962(c) does not necessarily require the participation of two persons for its commission. As the Ninth Circuit held in *United States v. Ohlson*, 552 F.2d 1347, 1349 (9th Cir. 1977), "the plain language of 1962(c)...clearly imports that a violation may be committed by an individual acting alone." Even a single individual may be considered an enterprise under the statutory definition. *See* 18 U.S.C. § 1961(4). See also, *United States v. Elliott,* 571 F.2d 880, n.18 (5th Cir. 1978). Therefore, under Wharton's Rule there is no merger of the RICO conspiracy and substantive offense. See *United States v. Hawkins*, 516 F. Supp. 1204, 1205 (M.D. Ga. 1981).

157.    The Ninth Circuit in *Rone* further considered whether Congress intended to maintain a distinction between a RICO conspiracy under 1962(d) and the RICO substantive offense of racketeering proscribed in 1962(c), and whether such an intent is evident from the language and legislative history of 1962. Section 1962 makes it unlawful for "any person" to conduct an "enterprise" affecting interstate or foreign commerce through a "pattern of racketeering activity." The definitions of "enterprise," "pattern of racketeering activity," and "racketeering activity" do not incorporate any element of agreement or concerted activity, the essential element of conspiracy. See, 18 U.S.C. § 1961(1), (4), and (5). *Id.* at 1206-1207.

158.    Moreover, there is nothing in the legislative history of the statute to suggest that Congress did not intend to create an offense of racketeering separate and apart from conspiracy. See *Ohlson*, *supra*, at 1349. In fact, inclusion in 1962 of the subsection (d) RICO conspiracy offense when a defendant could be prosecuted in any event under the general conspiracy statute, 18 U.S.C. § 371, evidences an intent on the part of Congress to create a RICO conspiracy offense

separate from the substantive racketeering offense. See, *Rone*, *supra*, at 570. See also, *United States v. Bright*, 630 F.2d 804, 813 (5th Cir. 1980) (conspiracy to violate RICO and aiding and abetting a violation of RICO are separate and distinct offenses); *U.S. v. Hawkins*, 516 F. Supp. 1204, 1206-1207 (M.D. Ga. 1981).

159.    Complaint alleging that defendants, their corporation, and another acted together in numerous schemes involving trading in wide variety of commodities on an international scale and alleging that fraud involved in connection with land purchase option was, but a particular manifestation of Defendants' global illegal activities was sufficient to establish an enterprise under this chapter. See *Lopez v. Richards*, 594 F. Supp. 488, 491-492 (S.D. Miss. 1984).

### E. Rule 9(b)

160.    Rule 9(b) provides: "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, *and* other conditions of mind of a person *may* be averred *generally*."

161.    Rule 9(b) "is designed to provide the defendant fair notice of the plaintiff's claims, and to enable the defendant to prepare a suitable defense, protect his reputation or goodwill from harm, and reduce the number of strike suits." See *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y. 1990). These concerns are even more immediate in civil RICO actions, because such suits "implicate the reputation interests of defendants accused of committing racketeering offenses." See *Newman v. L.F. Rothschild, Unterberg, Towbin,* 651 F.Supp. 160, 162 (S.D.N.Y. 1986) (citation omitted). See also, *Beauford v. Helmsley,* 740 F.Supp. 201, 213 (S.D.N.Y. 1990).

162.    To specify fraud with particularity, plaintiffs must allege specifically the circumstances of the fraud claimed, including the content of any alleged misrepresentation, and the date, place and identity of the persons making the misrepresentations. See *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990); *Divittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986); *Dymm v. Cahill,* 730 F.Supp. 1245, 1250 (S.D.N.Y.1990).

163.    Allegations that lenders mailed bank statements and letters demanding payment,

which were at least incidental to essential part of scheme, were sufficient to state use of mails element of mail fraud as predicate act under Racketeer Influenced and Corrupt Organizations Act (RICO);  borrowers alleged that at least some mailings actually misrepresented rate of interest being charged by lenders, which presumably induced borrowers to continue making payments on loans. See *Center Cadillac v. Bank Leumi Trust Co.*, 808 F. Supp. 213, 227-230 (S.D.N.Y. 1992).

164.    Mailings between would-be borrower and bank consisting of bank's request for would-be borrower's supplemental reports on business project and bank's mailing of request for payment on equipment allegedly sold to would-be borrower had sufficient connection to bank's alleged scheme to defraud borrower to establish predicate mail fraud acts underlying RICO claim. See  *Dunham v. Independence Bank of Chicago*, 629 F. Supp. 983, 988-989 (N.D. Ill. 1986).

165.    Complaint, which alleged that interest rate on note effectively exceeded twice the legal rate of interest in New York, was sufficient to state claim that creditor collected unlawful debt in violation of RICO, even though annual interest rate on note was 27% and only note calling for at least 32% interest would constitute twice the enforceable rate under state law as required for RICO violation;  complaint alleged that due to compounding of monthly interest at 2%, effective annual interest rate would exceed 32% per annum over time. See *In re Bennett*, 142 B.R. 616, 621 (Bankr. N.D.N.Y. 1992).

166.    Here, therefore, liability for an "unlawful debt" RICO violation requires proof of five elements: "[1] that a debt existed, [2] that it was unenforceable under [state's] usury laws, [3] that it was incurred in connection with the business of lending money at more than twice the legal rate, [4] that the defendant aided collection of the debt in some manner, and [5] that the Defendant acted knowingly, willfully and unlawfully." See *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986).

167.    The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity. *Id. (*citing *Agency Holding Corp. v. Malley-Duff Assocs*, 483 U.S. 143, 551 (1987)) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to

investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. See *Rotella v. Wood*, 528 U.S. 549, 557-58 (2000).

168.    Plaintiff asserting a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim predicated on mail fraud need not show as an element of its claim that it relied on the Defendant's alleged misrepresentations. See *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 648-649 (2008).

169.    Using the mail to execute *or* attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under Racketeer Influenced and Corrupt Organizations Act (RICO), even if no one relied on any misrepresentation. See *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 650 (2008).

170.    When Congress established in the Racketeer Influenced and Corrupt Organizations Act (RICO) a civil cause of action predicated on a violation of the mail fraud statute, it did not incorporate the reliance element of common-law fraud, since mail fraud was a statutory offense unknown to the common law. See *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 652 (2008).

171.    The substantive provisions of Racketeer Influenced and Corrupt Organizations Act (RICO) apply extraterritorially to the same extent that RICO's predicates do. See *Yegiazaryan v. Smagin*, 599 U.S. 533, 539 (2023).

172.    The RICO statute prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through...collection of unlawful debt." 18 U.S.C. § 1962(c). The statute defines "unlawful debt" as a debt which is "unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and which was incurred in "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Under this definition, "the prohibition on the 'collection of unlawful debt' under the statute encompasses efforts to collect on a usurious loan." See

*Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016).

173.    Thus, to prevail, Plaintiffs must prove that defendants participated in (1) the conduct (2) of an enterprise (3) through the collection of unlawful debt (4) resulting in an injury to business or property. See *Goldenstein*, 815 F.3d at 147; See also, *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015) (describing elements and requiring plaintiffs to show that the RICO violation was the but for proximate cause of their injury).

174.    Where a plaintiff claims that the collection of unlawful debt is the basis of a RICO claim, "[o]nly one act of collecting or attempting to collect unlawful debt is necessary to establish that predicate act. An actual exchange of cash need not be shown, only a single act which would tend to induce another to repay on an unlawful debt incurred in the business of lending money." See *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) (citations omitted).

175.    Clearly Congress intended that the collection of unlawful debt prong and the pattern of racketeering prong should complement and not supersede one another. In RICO cases, defendants have been charged and convicted of violating both offenses. See, e.g., *United States v. Angiulo*, 847 F.2d 956, 960 (1st Cir. 1988); *United States v. Giovanelli*, 945 F.2d 479, 486 (2d Cir. 1991); *Eufrasio*, 935 F.2d at 557–558. See also, *United States v. Aucoin*, 964 F.2d 1492, 1497 (5th Cir. 1992).

176.    To state a claim under 18 U.S.C. § 1962(a), Plaintiffs must allege that: "(1) the Defendants derived income [through the collection of an unlawful debt]; [and] (2) the income was used or invested, directly or indirectly, in the establishment or operation; (3) of an enterprise; (4) which is engaged in or the activities of which affect interstate or foreign commerce." See *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, et. al.*, 633 F.Supp.2d 214, 222 (E.D. Va. 2008) (citing *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990)). See *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 929–30 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th Cir. 2020).

177.    The Court draws the reasonable inference that the collection of unlawful debt funded the interest payments, so that the Complaint plausibly alleges facts

adequate to support Plaintiffs' allegation that the [] Defendant[s] derived income through the collection of unlawful debt, *supra.*

178.    To establish a violation of § 1962(b), Plaintiffs must allege that: "(1) the Defendants engaged in [collection of an unlawful debt]; (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce." See *Smithfield Foods*, 633 F.Supp.2d at 222 (citing 18 U.S.C. § 1962(b); *Davis v. Hudgins*, 896 F.Supp. 561, 567 (E.D. Va. 1995)). See also, *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 931 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th Cir. 2020).

179.    To establish a violation of § 1962(c), Plaintiffs must allege that the [] Defendant[s] (1) conducted the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the "enterprise engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c); Cf. *Smithfield Foods*, 633 F.Supp.2d at 222 (providing the elements for satisfying § 1962(c) claims founded on allegations of racketeering activity).

## Count IV:

## RICO § 1962(d) – Conspiracy to Violate RICO Sections 1962(a), (b) or (c)

180.    Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Plaintiffs amply allege facts in support of this claim. The Complaint contains detailed and thorough allegations related to the [] Defendants' role in the unlawful [] lending operation at the heart of the RICO claim[s]. The Complaint describes the formation of the so-called enterprise, detailed negotiations between co-conspirators, and the development and growth of the [] lending businesses over time, including subsequent related agreements. The Complaint references attached documents in support of the factual allegations it contains. Because [Count III], alleging violations of §§ 1962(a)–(c), survive the Motion to Dismiss, this claim plainly survives the Motion to Dismiss as well. See *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 933 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th

Cir. 2020).

181.    Defendant need not be in continuous business of making unlawful loans to violate RICO statute prohibiting collection of unlawful debt; only one act of collecting or attempting to collect unlawful debt is necessary to establish that predicate act. 18 U.S.C. § 1961(6). *In re Bennett*, 142 B.R. 616, n. 3 (Bankr. N.D.N.Y. 1992) Even if Plaintiff is the only person the Defendant has ever lent money to (*which he is not*) RICO still applies.

182.    It [is] conceivable that a corporation could be both "a person" and "enterprise" within meaning of Racketeer Influenced and Corrupt Organizations Act section making it unlawful for a person who has received income from pattern of racketeering activity or collection of unlawful debt in which person has participated as a principal to use or invest income in acquisition of interest in enterprise engaged in interstate or foreign commerce, even though corporation could not be both a "person" and "enterprise" within meaning of Act section making it unlawful for any person employed by or associated with an enterprise to conduct or participate in conduct of enterprise's affairs through pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(a, c). See *Off. Publications, Inc. v. Kable News Co*., 884 F.2d 664, 668 (2d Cir. 1989).

183.    A Bankruptcy Court erred by concluding that a plaintiff's claim for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) under RICO subsection prohibiting conducting enterprise's affairs required a showing of a "pattern" of collection of unlawful debt. A claim based on "unlawful collection of debt" under subsection 1962(c), as opposed to "racketeering activity," did not require proof of a pattern of such activity. The reviewing court concluded that subsection 1962(c) should be read *in pari materia* with subsection 1962(a) and (b) so as not to require proof of a pattern of collection of unlawful debt. 18 U.S.C.A. § 1962(c). See *Eyler v. 3 Vista Ct. LLC*, No. RWT 07CV2383, WL 4844962 *4 (D. Md. Aug. 26, 2008).

184.    The District Court did not distinguish the individual defendants from the corporate defendants when it dismissed the RICO counts for failure to allege a "person" separate and distinct from the "enterprise." This was error. [Brown's] allegations under section 1962(a), (b), and (c) named [Smead] as the "persons" who allegedly violated those sections, and [Smead, Inc.]

as the "enterprises" involved. The complaint did not label the individual defendants as both "persons" and "enterprises" under section 1962(a), (b), or (c). The fact that the complaint named the corporate defendants as "persons" as well as "enterprises" under section 1962(a) and (b) did not affect the sufficiency of the allegations as to the individual[s] [Smead]. The District Court erred in dismissing the RICO counts against the individual defendants based on the person-enterprise distinction. See *Schreiber Distrib. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1398 (9th Cir. 1986). In other words, Smead the "person" acted through his "enterprise" (business of lending money) to violate Section 1962.

185.    The 1995 amendment revised Section 1964(c) to provide that a civil RICO suit could not be based upon fraud in the purchase or sale of securities. This limitation does not apply to an action "against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final." *See* Private Securities Reform Act of 1995, Pub. L. No. 104-67, Title I, § 107, 109 Stat. 758 (Dec. 22, 1995). In any event, the RICO claim is predicated on unlawful debt collection and not fraud in the purchase or sale of securities. This cause[s] of action in the Complaint & FAC arose out of the same conduct, transaction, or occurrence, but is separate from the 10(b)(5) claim. The case law presented is in context of a 'pattern of racketeering' which is based upon mail and wire fraud. In other words, if the 10(b)(5) claims do not suffice then the Court should base the predicate 'pattern of racketeering' claim[s] on mail and wire fraud. However, no matter how that is sorted out, the collection of an unlawful debt stands on its own, *supra*.

186.    Last, RICO does not require any proof that a RICO Defendant *or* a RICO offense had any nexus to "organized crime." See *H.J. Inc. v. Northwestern Bell Telephone Co*., 492 U.S. 229, 243- 49 (1989). See also, *United States v. Biasucci*, 786 F.2d 504, 506-507 (2d Cir. 1986) (acquisition of interests in and control over four businesses through loansharking activities involving collection of unlawful debts); *United States v. Jacobson*, 691 F.2d 110, 112 (2d Cir. 1982) (acquisition of bakery's lease as security for usurious loan); *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974) *cert. denied*, 419 U.S. 1105 (1975) (acquisition of interest in

corporation by illegally preventing owner from paying off loan to avoid foreclosure).

187.    In simple terms, RICO condemns (1) *any* person (2) *who* (a) invests in, *or* (b) acquires or maintains an interest in, or (c) conducts or participates in the affairs of, or (d) conspires to invest in, acquire, *or* conduct the affairs of (3) *an enterprise* (4) which (a) engages in, *or* (b) whose activities affect, interstate *or* foreign commerce (5) *through* (a) *the collection of an unlawful debt*. (i.e. *usura velata*, veiled or concealed usury).

188.    All required elements are alleged in Count III & IV with 9(B) specificities needed to make a legal claim that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original Pleading & FAC, *infra*.

### F. 15(c)(1)(B) "Relate Back" Legal Standard

189.    When a plaintiff seeks to amend a complaint to state a new claim against an original defendant, however, the district court does not exercise discretion in the way it does when a new defendant is sought to be added. Instead, the court compares the original complaint with the amended complaint and decides whether the claim to be added will likely be proved by the "same kind of evidence" offered in support of the original pleading. See *Rural Fire Protection Co. v. Hepp,* 366 F.2d 355, 362 (9th Cir. 1966). In making this decision, the court considers whether the "allegations of a new theory in an amended complaint...involve[] the same transaction, occurrence, or core of operative facts involved in the original claim." See *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1259 n.29 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227 (1983). See also, *Tiller v. Atl. Coast Line R. Co*., 323 U.S. 574, 580–81 (1945) (Holding that an amended complaint that sets forth a claim arising under a different statute based on the same underlying facts relates back under Rule 15(c)); Fairness to the defendant demands that the defendant be able to anticipate claims that might follow from the facts alleged by the plaintiff. See *Percy v. San Francisco Gen. Hosp*., 841 F.2d 975, 979 (9th Cir. 1988).

190.    Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants and should not raise barriers which prevent the achievement of that end. See *Maty v. Grasselli Chem. Co*., 303 U.S. 197, 200 (1938). It is not reasonably possible to

say that petitioner's right of recovery under the original complaint and under the amended complaint were two separate and distinct causes of action. *Id.* at 199.

191.    The amendment "merely expand[s] or amplif[ies] what was alleged in support of the cause of action already asserted . . . and was not affected by the intervening lapse of time." See *Seaboard Air Line Ry.* v. *Renn*, 241 U.S. 290, 293 (1916). "The facts constituting the [harm] were the same, whichever law gave them that effect See *N.Y. Cent. R.R. v. Kinney*, 260 U.S. 340, 346 (1922) (quoting *Seaboard Air Line Ry.* v. *Koennecke*, 239 U.S. 352, 354. (1916). Cf. *Harkless v. Sweeny Ind. Sch. Dist. of Sweeny*, 554 F.2d 1353, 1359 (5th Cir. 1977) ("For eleven years plaintiffs, alleging the *same* facts, have sought the *same* relief from the *same* defendants. The requested amendments add nothing substantively new to their claim, though, their claim proven, a new form of relief — one thought to be available under § 1983 at the filing of the original complaint — becomes appropriate.").

### i. <u>Security Law, PSLRA & 9(B)</u>

192.    Although each [Act] regulate[s] different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "*the antifraud provisions*," target the same basic behavior: misrepresenting *or* concealing material facts, *supra*. (emphasis added).

193.    "Congress incorporated prohibitions from common law fraud into [F]ederal securities law." See *Jarkesy* at 12, 19-21. "Congress's decision to draw upon common law fraud created an enduring link between [F]ederal securities fraud and its common law "ancestor." See *Foster v. Wilson*, 504 F. 3d 1046, 1050 (CA9 2007). "[W]hen Congress transplants a common-law term, the old soil comes with it." See *United States v. Hansen*, 599 U. S. 762, 778 (2023). This logically must include the PSLRA. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U. S. 336, 343–344 (2005) (evaluating pleading requirements in light of the "common-law roots of the securities fraud action."); accord *Basic Inc. v. Levinson*, 485 U. S. 224, 253 (1988) (White, J., concurring in part and dissenting in part) ("In general, the case law developed in this Court with respect to §10(b) and Rule 10b–5 has been based on doctrines with which we, as [J]udges, are familiar: common-law doctrines of fraud and deceit.").

194.     "The object of this [] action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claim[s] whose causes of action are modeled on common law fraud and that provide[s] a type of remedy available only in law courts. This is a common law suit in all but name. And such suits typically must be adjudicated in Article III Courts." See *Jarkesy* slip op. at 22.

195.     Thus, [e]ven when an action "originate[s] in a newly fashioned regulatory scheme," what matters is the substance of the action, not where Congress has assigned it [*or* has not assigned it]. See *Granfinanciera S. A. v. Nordberg*, 492 U. S. 33, 52 (1989).

### ii. RICO 9(B)

196.     The Ninth Circuit requires that allegations of fraud, including those in RICO cases, must include the "who, what, when, where, and how" of the misconduct charged *See* Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003). We have applied the particularity requirements of rule 9(b) to RICO claims. See *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392-93 (quoting *Schreiber Distrib. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1400 (9th Cir. 1986)). Rule 9(b) requires that the pleader state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation. *Id.* 862 F.2d at 1401.

197.     "It is noteworthy that section 1962(c) does not require proof of extortionate activity to establish a RICO violation predicated upon the "collection of unlawful debt." See *U.S. v. Vastola*, 899 F.2d 211, 227 n.18 (3d Cir. 1990).

### iii. Usury

198.     According to Sir Edward Coke, [usury] is a contract upon a loan of money, or giving days for forbearing of money, debt, or duty, by way of loan, chevisance,[37] shifts, sales of wares, or other doings whatsoever. *See* Robert Buckley Comyn, A Treatise on the Law of Usury

---

[37] "An unlawful or usurious contract; esp., a contract intended to evade the statutes prohibiting usury." *See* Black's Law Dictionary 270 (9th ed. <u>2009</u>) *Cf.* The very next word, the now defunct *Chevron* deference. Some principles stand the test of time, while others do not.

1 (1817) (*quoting* Sir Edward Coke, The Third Part of the Institutes of the Laws of England 151, c. 70 (1644)).

199.    Usury is derived from use and money, because it is given for the use of money; usury is like burning fire.[38] *Id*. In sum, usury is a very serious matter, and thus Congress provides a remedy through RICO. (*i.e.* treble damages).

### iv. <u>California Usury Legal Standard</u>[39]

200.    Intent is relevant, however, in determining the true purpose of the transaction in question because ". . . the trier of fact must look to the substance of the transaction rather than to its form… [I]t is for the trier of the fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction. See *West Pico Furniture Co. v. Pacific Finance Loans*, 2 Cal. 3d 594, 603 (1970) (quoting *Janisse v. Winston Investment Co.*, 154 Cal. App. 2d 580, 582 (1957)); See also, *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 (Cal. 1994).

201.    "[P]laintiff predicates his right to recover treble interest upon the theory that the sale under the trust deed constituted payment of interest. In holding that the second cause of action stated a good cause of action, the court not only implied but expressly held that the sale of plaintiff's property under the trust deed and the application of the proceeds of said sale to the payment of the interest claimed to be due and owing from plaintiff to defendant constituted payment of such interest within the terms of the usury law then in force." See *Penziner v. West American Finance Co.*, 10 Cal.2d 160, 168-169, 171 (Cal. 1937). (Sale under the trust deed constituted payment of interest & defendant was liable for treble interest to plaintiff under "usury law" statute.) *In any*

---

[38] "For my part, I will wish some penal law of death to be made against those usurers, as well as against thieves or murderers; in that they deserve death much more than such men do; for these usurers destroy and devour up not only whole families, but also whole countries, and bring all folk to beggary that have to do with them." *See* Thomas Wilson, A Discourse upon Usurie 37 (1572), dedicated to Lord Leicester.

[39] California's usury proscription is also set forth in a statute, an initiative measure that has not been codified. (Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures Stats. 1919-1 (1973 ed.) p. 35].) This statute remains in full force to the extent it does not conflict with the Constitution. (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 170-178 [ 74 P.2d 252].) Although the statute states that it may be referred to as the "usury law" (Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures Stats., 1919-1, *supra,* § 5, p. 117), we use the term in its more general sense to refer to both the constitutional *and* statutory usury provisions.

*event*, 100% interest is "unlawful debt" under RICO, "where the usurious rate is at least twice the enforceable rate." *See* 18 U.S.C. § 1961(6).

202.   **Who:** Steve Smead

After recording, mail to:
Steve Smead
352 E. Harvard Blvd.
Santa Paula, CA 93060

Entry #: 00224197   B: 739 P: 253
01/26/2023 02:32 PM
Page: 1 of 2
FEE: $40.00   BY: TITLEFIRST TITLE INSURANCE AGENCY, LLC
Sierra Dickens, Millard County Recorder

*See* ECF No. 41-1 at 30.

203.   **What:** Defendant's offer[ed], which required paying off the existing deed of trust [on the Utah property in the amount of approximately $40,000] and recording the $100,000 Harper interest on the Utah deed of trust and paying Escrow fees, *supra*.

5.   At the time and place of sale specified above, the Trustee duly sold at public auction to Grantee, **STEVE SMEAD** the highest bidder therefor, the above described property for the sum price of **$220,923.20** (opening bid in favor of Steve Smead), lawful money of the United States by the Satisfaction **FULL** indebtedness then secured by said Deed of Trust.

*See* ECF No. 41-1 at 31.

**Utah Deed of Trust Figures**

| Description | Amount ($) |
|---|---|
| Total Bid Credit | $220,923.20 |
| Harper Lake Interest Debt | -$100,000.00 |
| Existing Deed of Trust | -$40,000.00 |
| Interest | -$22,923.20 |
| Total Equity Cash Out | +$60,000.00 |

204.   **When:** The Defendant [] offered a $150,000 second deed of trust for a $300,000 payoff upon the note's maturity, but Escrow rejected the terms as usurious on November 10, 2020. *See* ECF No. 69-1 at 2-4 "Ordaz Declaration" ("provided a true and correct copy of the escrow statement from November 10, 2020, as an exhibit in support of this declaration."). The Defendant

57

then proposed a $150,000 second deed of trust with 8% interest *and* an additional interest payment of $150,000 when the second deed of trust became due. *Id.*

205.     **Where:** Utah Deed of Trust Notarized in New York by Jenice Hernandez, Notary Public, State of New York, No. OLHE6359254. Recorded June 22, 2021, at 12:24 PM in New York, Entry #: 00215042. Amount: $200,000.



copies of the promissory note and trust deed.

Signed in the presence of:

Clinton Brown

STATE OF       NY

County of       NY

On this day personally appeared before me     **Clinton Brown**
to me known to be the individual, or individuals described in and who executed the within and foregoing
instrument, and acknowledged that he signed the same as his/her/their free and voluntary act and deed,
for the uses and purposes therein mentioned.
Given under my hand and official seal this     27  day of     June     ,2021

NOTARY PUBLIC

Jenice Hernandez
Notary Public State Of New York
No. 01HE6359254
Qualified in Bronx, Cert. Kings, NY Counties
Commission Expires May 22nd 2025
The UPS Store @ 82 Nassau   212.406.9010

Entry#: 00215042   B: 703 P: 385     Page 5 of 5   Millard County   Recorder

*See* ECF No. 41-1 at 36

206.     **How:** An "unlawful debt" is a debt that arises from a collection of a single usurious debt…[which] is sufficient to satisfy Section 1961(6)…provided that it was incurred in connection with "the business of lending money…at a rate usurious…where the usurious rate is at least twice the enforceable rate. 100% interest concealed within a real estate transaction[s] is usurious under California law. See *Penziner v. West American Finance Co.*, 10 Cal.2d 160, 168-169, 171 (Cal. 1937). (Sale under the trust deed constituted payment of interest & defendant was liable for treble interest to plaintiff under "usury law" statute.) *Put another way*, 100% interest is "unlawful debt" under RICO, "where the usurious rate is at least twice the enforceable rate." *See* 18 U.S.C. § 1961(6).

*[Intentionally Left Blank]*

58

### v. <u>30,000-Feet View – Transcript of Proceeding, ECF No. 66 at 1-17.</u>

207.    **THE COURT**: "And then as I understand it, another point you're making is that although at a superficial level this might just seem like any other mortgage, the point that you were making is that it's not like a mortgage because when I get a mortgage, I just apply and, you know, the bank says yes or no and they give me the money." *See* Tr. of Proceedings, ECF No. 66 at 14 (C.D. Cal. June 6, 2024).

208.    **THE COURT**: "Whereas what actually happened between you and Mr. Smead, uh, was more like an investment contract because of the nature of the relationship. There were so many conversations, so many text messages, so many emails and so many representations of Mr. Smead was looking out for your interests, was a mentor and that kind of thing…" *See* Tr. of Proceedings, ECF No. 66 at 14-15 (C.D. Cal. June 6, 2024).

209.    **PLAINTIFF:** "In *SEC v. Edwards* in 2004, they held that a fixed rate of return can be a security. [], in addition to that, what profits Mr. Smead got from my business is the hundred percent. He got all my properties. And so what -- I don't want to belabor the point here, but when you take back what has happened and you look at 30,000-foot view, which I think is what Congress, of course, there's not [going] be, [] some -- I mean, there could be emails. We haven't even explored those." *See* Tr. of Proceedings, ECF No. 66 at 16 (C.D. Cal. June 6, 2024).

210.    "You know, this is the type of thing that even in [*Howe*y] said it doesn't matter if there's, you know, a note or evidence of shares. It's the economic reality of how it's structured, and there can be no doubt in my mind that this is a security. And what I would say is that we could fix that by registering it and then figuring out the ownership interest without going down the 10(b)(5)." *See* Tr. of Proceedings, ECF No. 66 at 16 (C.D. Cal. June 6, 2024)

211.    The [RBA] and the alleged evidence therein clearly support the PSLRA standard, Rule 9B, Rule 8 and the Rule of common sense…by a preponderance of the evidence, which if proven true… means the Defendant has violated Federal security law[s]. This isn't the cart before horse here. The [RBA] plainly lays out why this is an investment contract based on what the

*Congress* set out for the term 'investment contract' to mean, as further expounded by *Howey* (and even before *Howey* in numerous District & Appellate Court decisions) and its progeny, *supra*.

### vi. *Panuwat*

212.    **Element #1: Duty of Trust, Confidence, or Confidentiality.** Under the misappropriation theory, a trader may be liable if she breached "some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information." See *United States v. O'Hagan*, 521 U.S. 642, 663 (1997) (citation omitted); *S.E.C. v. Talbot*, 530 F.3d 1085, 1096 (9th Cir. 2008) (same); See also, *Securities and Exchange Commission v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at 8 (N.D. Cal. Jan. 14, 2022).

213.    **Element #2: Possession of Nonpublic Information.** "a person commits fraud `*in connection with*' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id*. The Defendant gained access to confidential information regarding the value of the Plaintiff's properties. *Thus*, opportunity.

214.    **Element #3: Misappropriation of Information.** The Defendant used this confidential information for personal gain by taking control of the Plaintiff's properties and making decisions based on the insider information, in which ¶¶ 39-86 outline how the Defendant misappropriated the information for investment contract trading purposes, indicating wrongful taking *and* use of confidential information.

215.    **Element #4: Trading Based on Information.** Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information, *supra*. "Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no `deceptive device' and thus no § 10(b) violation . . ." *Id*. at 655. See also, *S.E.C. v. Talbot*, 530 F.3d 1085, 1091-92 (9th Cir. 2008).

216.     For a Court to hold [Smead] liable under the misappropriation theory, the [Plaintiff] must demonstrate that [Smead] knowingly misappropriated confidential, material, and nonpublic information for [investment contract] trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information. *See SEC v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990). See also, *S.E.C. v. Talbot*, 530 F.3d 1085, 1092 (9th Cir. 2008).

217.     ¶¶ 39-86 describe how the Defendant bought *or* sold securities (real estate investment contracts) based on the misappropriated information, which was significantly influenced by material nonpublic information.

218.     **Element #5: Knowledge or Recklessness.** Indeed, the Court declared that "[w]here . . . a person trading on the basis of material, nonpublic information owes a duty of loyalty and confidentiality to two entities or persons — for example, a law firm and its client — but makes disclosure to only one, the trader may still be liable under the misappropriation theory." See *O'Hagan*, 521 U.S. at 655 n. 7. The District Court misinterpreted the misappropriation theory as requiring that the duty of confidentiality be owed to the "originating source" of the information. *O'Hagan* stated quite clearly that the duty must be owed only to the "source"; we decline to read an "originating source" requirement into *O'Hagan*. See *S.E.C. v. Talbot*, 530 F.3d 1085, 1093 (9th Cir. 2008).

219.     The Defendant knowingly used insider information to gain an advantageous market position, defrauding the Plaintiff. ¶¶ 39-86 lay out in excruciating detail that the Defendant knew the information was nonpublic *and* material, *or* acted recklessly in not knowing this, thus showing intent to deceive.

220.     **Element #6: Lack of Consent.** "[T]he misappropriation theory more broadly proscribes the conversion by `insiders' *or others* of material non-public information *in connection with* the purchase *or* sale of securities…It is precisely such conversion that serves as the predicate for the [probable] conviction[s] herein." See *S.E.C. v. Talbot*, 530 F.3d 1085, 1094 (9th Cir. 2008)**.** Noting that *Carpenter* involved "fraud of the same species," Justice Ginsburg analogized to property rights…" *Id.*

221.     A company's confidential information, [the Court] recognized in *Carpenter*, qualifies as property to which the company has a right of exclusive use. The undisclosed misappropriation of such information, in violation of a fiduciary duty, the Court said in *Carpenter*, constitutes fraud akin to embezzlement — the fraudulent appropriation to one's own use of the money *or* goods entrusted to one's care by another. *Id.* (citations and quotation marks omitted). See *S.E.C. v. Talbot*, 530 F.3d 1085, 1094 (9th Cir. 2008).

222.     [A]n animating purpose of the Exchange Act…[is] to insure honest securities markets and thereby promote investor confidence. Although informational disparity is inevitable in the securities markets, investors likely would hesitate to venture their capital in a market where trading based on misappropriated non-public information is unchecked by law. An investor's informational disadvantage vis-á-vis a misappropriator with material, nonpublic information stems from contrivance, not luck; it is a disadvantage that cannot be overcome with research or skill. *O'Hagan*, 521 U.S. at 658-59, (*citing* Victor Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv. L. Rev. 322, 356 (1979)) ("If the market is thought to be systematically populated with…transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors *or* corruptly to overcome their unerodable informational advantages.")). See *S.E.C. v. Talbot*, 530 F.3d 1085, 1096 (9th Cir. 2008); *See also*, Tr. of Proceedings, ECF No. 66 at 10-12 ("Go-Getter") (C.D. Cal. June 6, 2024).

223.     "[O]ne who misappropriates confidential information and uses it in his securities trading deceives the rightful owner *or* possessor of the information, but causes economic harm to other investors." See *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008); *See also*, Barbara Bader Aldave, Misappropriation: A General Theory of Liability for Trading on Nonpublic Information, 13 Hofstra L. Rev. 101, 120-21 (1985).

224.     Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). Scienter may be established "by proving either actual knowledge or recklessness." See *Gebhart v. SEC*, 595 F.3d

1034, 1040 (9th Cir. 2010). It is a subjective inquiry that "turns on the Defendant's actual state of mind." *Id*. at 1042. Courts within this circuit disagree whether scienter requires a Defendant to actually use the material nonpublic information in carrying out the trade, *or* whether [s]he must simply be aware of it. See, e.g., *In re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1202-03 (C.D. Cal. 2008) ("Scienter…for insider trading requires that the insider actually use . . . the inside information in deciding to make the trade."); *SEC v. Moshayedi*, No. CV-12-01179, 2013 WL 12172131, at *13-14 (C.D. Cal. Sept. 23, 2013) ("[T]o show that [the Defendant] traded 'on the basis of' nonpublic, material information, the [Plaintiff] must demonstrate his awareness of possession of that information."). The Ninth Circuit has held that scienter under Section 10(b) and Rule 10b5 requires that the [Plaintiff] show actual use. See *United States v. Smith*, 155 F.3d 1051, 1070 (9th Cir. 1998). However, *Smith* was a criminal case—the Court expressly left open whether the same standard would apply to a civil proceeding. *See id*. at 1069 n.27. *Smith* also predates the 2000 promulgation of Rule 10b5-1, which states that a person purchases *or* sells a security "on the basis of" material nonpublic information "if the person making the purchase *or* sale *was aware* of the material nonpublic information when the person made the purchase *or* sale." See § 240.10b5-1(b) (emphasis added). The [Plaintiff's] claim against [Smead] satisfies either standard. See *Securities and Exchange Commission v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *6 (N.D. Cal. Jan. 14, 2022).

225.    The Ninth Circuit has similarly recognized scienter's negation of vagueness. See *United States v. Laurienti*, 611 F.3d 530, 542 (9th Cir. 2010) ("[T]he failure to disclose is illegal only if done with intent to defraud; it cannot be said that 'an ordinary person is not able to conform his or her conduct to' acting without fraudulent intent."). See *Panuwat* at *7.

226.    The [Plaintiff's] allegations fit under two underlying principles: that the misappropriation theory "reaches trading by corporate outsiders, not insiders," and that information may be material to more than one company. See *Talbot*, 530 F.3d at 1091. The first is grounded in precedent, the second in commonsense. [Smead] may dispute the number of companies to which information may be material, but, as explained above, the relevant case law

does not foreclose the possibility that the number exceeds two. See *Panuwat* at *8. In other words, one suffices too.

227.    The [Plaintiff's] theory of liability comports with the language of Section 10(b), Rule 10b-5, and Rule 10b5-1(a). [Defendant] insists that [the Court] "must interpret the securities laws and SEC rules enacted thereunder as written." [] Section 10(b) prohibits traders from using "*any* manipulative *or* deceptive device." 15 U.S.C. § 78(j)(b) (emphasis added). Rule 10b-5 [where the private cause of action lies] uses equally expansive language, prohibiting "*any* device, scheme, or artifice to defraud," "*any* untrue statement of a material fact," and "*any* act, practice, or course of business which operates *or* would operate as fraud or deceit." 17 C.F.R. § 240.10b-5 (emphasis added). Finally, Rule 10b5-1(a) provides that "manipulative and deceptive devices…include, among other things, the purchase *or* sale" of securities based on material nonpublic information about that security *or* issuer. *Id.* § 240.10b5-1(a) (emphasis added). As written, the law and regulations prohibit more conduct than is expressly stated in Rule 10b5-1(a)—and can include [Defendant's] purported actions. [Defendant's] argument that the parameters of insider trading laws will become "entirely unclear" should this case proceed as pleaded ignores two important checks on liability: materiality *and* scienter. [] Whether information about an acquisition of Company A is material to Company B (*or* Company C, D, *or* E) will depend on any number of factors, as established in *Basic* and *Talbot*. If those factors are not met, the information will not be material and the trader will not be liable. And if the information is material, the trader will not be liable unless he acted with the requisite intent to defraud. *Put another way*, the Court should use commonsense here. *Id.*

228.    An ordinary trader understands that buying *or* selling [investment contracts] with such an intent is prohibited by law. So long as the trader does not act with scienter, he will not be liable for insider trading. It is also worth noting that the Supreme Court has cautioned against dismissing claims of insider trading predicated on new *or* unusual schemes, *infra*.

229.    [The Court] do[es] not think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is usually associated with the sale or

purchase of securities. [The Court] believe[s] that section 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes *in connection with* the purchase *or* sale of securities, whether the artifices employed involve a garden type variety of fraud *or* present a unique form of deception. Novel or atypical methods *should not* provide immunity from the securities laws. See *Superintendent of Ins. v. Bankers Life & Cas. Co*., 404 U.S. 6, 10 n.7 (1971) (citing *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)).

230.    [Smead] is accused of such a scheme here. Although unique, the [Plaintiff's] theory of liability falls within the contours of the misappropriation theory and the language of the applicable law. [Brown] has sufficiently alleged that [Smead] acted with scienter, and therefore had notice that his purported actions were prohibited by law. See *Panuwat* at *8.

231.    [Smead] argues for the actual use standard, which he contends was not met because the [Plaintiff's] allegations that he "used" the information about [Harper Lake's appraisal] [] to purchase the [1st Deed of Trust] lacks the specificity required by Rule 9(b). In *Smith*, the Ninth Circuit held that "[a]ny number of types of circumstantial evidence" might indicate that a trader used the information at issue. See *United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998); See also, ¶50, ¶56 & ¶62.

232.    The Defendant did not have permission to use the confidential information in the manner he did.  The Defendant lacked consent to use any confidential information for personal gain. *See* ¶¶39-86.

233.    "This isn't the feudal age. This is the buyer and seller beware age. Where Congress provides a remedy to ineffectual state blue sky laws. But before we get there, let me put a finer point on the fact that Smead issued and sold an unregistered investment contract, *i.e.* security, to the Plaintiff in contravention of the 1933 Securities Act. Courts have found such instruments of a veritable character to be investment contracts from schemes involving cemetery plots to chinchilla breeding to earth worm farms to crypto assets and, of course, the quintessential of them all, real estate developments." *See* Tr. of Proceeding, ECF No. 66 at 8 (C.D. Cal. June 6, 2024).

234.     Smead sold an investment contract to Brown. The *Howey* Test lays out what an investment contract is under federal securities law. One, investment of money. Two, a common enterprise. Three, expectation of profits. Four, to be derived from efforts of other. *Id.*

235.     Smead issued the deeds of trust because he was interested in Brown's plans to develop the solar farm business. *Id.*

236.     Smead expected to profit from Brown's businesses. *Id.*

237.     Brown and Smead communicated extensively via email, text and phone calls between 2020 and 2023. *Id.* at 9.

238.     "Has anyone in this court, but the plaintiff spoke to their lender for over ten hours in the course of one year? Has anyone in this court, but the plaintiff exchanged 300 emails with their lender over the course of one year? And has anyone in this court besides the plaintiff, exchanged voluminous text messages with the lender over the course of one year? *Yeah, the Defendant has.*" *Id.*

239.     "If the Plaintiff's factual allegations which the Court generally must accept the factual allegations in the pleadings to be true and viewed in the light most favorably to the Plaintiff, then this is a *prima facie* case of what constitutes an investment contract under Federal securities law. Whether the Court chooses the investment contract test route or the family resemblance test route, *all* roads lead to Smead issued an unregistered security in contravention of the Securities Act of 1933." *Id.*

240.     The definition of security is virtually the same in the Acts. Although, the Acts effectuate different roles of [the] *Congress*, but lest we forget the remedial purpose of the 1933 Security Act is to prevent frauds. So to prevail on a Rule 10(B) claim, there must be a security. Thus, an illegal contract can be registered with the SEC to remediate that error." *Id.* at 9-10.

241.     "In other words, by registering the illegal investment contract with the SEC, the parties can record the investment contract in the public record subject to the public and SEC scrutiny and make the security legally registered. Registration is a powerful tool of deterrence to violations of Rule 10 b(5). This Court in finding a legal security and ordering compliance with the

1933 Securities Act, registration would allow the parties to have a chance to equitably divide the investment contract." *Id*. at 10.

242.    "If the parties cannot solve the equitable ownership issues, then as mandated in the Court-ordered time frame, then the parties can move forward with a Rule 10 B(5) claim as they may have at that time. In the alternative the defendant has taught the plaintiff how to successfully disguise an investment contract as a hum of the drum real estate transaction which is apparently exempt from federal security law oversight." *Id.*

243.    "So here's the deal. When I get order of the Court because if I can't explain in two tries to state a claim that's plausible on its face, then I respect the parties enough, including the defendant who has harmed me, to get on with it as a lesson learned. But the investing public should take notice because I'm going to do what the defendant did to me to them and profit from it. One, I'm [going to] loan money to a very driven, first time property developer, let's call him "Go Getter. Go Getter, he doesn't have real estate assets and the only way he can pay me back is to make the development successful. Then I'm [going to] write up a note, a deed of trust, and I'm [going to] lend him that property to Go Getter. And he'll set out work improving that property and he'll feed me information about that property along the way under the guise of a mentor. When he inevitably can't pay, I'll tell him hey, don't worry about paying just yet. Just keep working on the project and as a trade-off, I'll ask Go Getter to keep feeding me information about the development along the way. In the meantime, I'll rack up interest payments and late fees on the note even though I said hey, Go Getter, don't worry about paying just yet. Then at my discretion and when the market timing is right, I'll foreclose on the loan and I'll take the property that I lent Go Getter. And with a cherry on top, Go Getter will be on the hook to pay me back and/or be forced into bankruptcy. But in no event will Go Getter get the property I lent him back in his possession because in reality it was mine from the start. And because I only lend to Go Getters with my private money, I make the rules without much, if any, federal oversight. After all these are just personal loans. And if I comply with state loan laws, then I have a real chance of a very successful business model by

acquiring valuable property without a lick of effort on the backs of go getters. This is no pain, all gain at least for me." *Id*. at 10-12.

244.    "And all this because Congress didn't think that a scheme like this one claimed by the plaintiff was not in the family of investment contracts as a security or a more veritable character or even the family resemblance of a note. In reality this type of market transaction between the defendant and the plaintiff is truly a great [disservice] to [the] *Congress's* aims of promoting fair and transparent [] markets." *Id*. at 12.

245.    "Avoid frauds and substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve high standards of business ethics in the securities industry, *i.e.*, confidence in the American markets whether face-to-face or around the globe. We're talking about the real estate market here, too, *supra. Marine Bank* is not controlling here. There was another Federal agency, the FDIC that secured the money if the bank happened to commit fraud. That's also been around since 1933, and banks have extensive oversight. And the bank being sued makes sense in that case because who's [going to] sue someone that's insolvent. They wouldn't be able to collect. *Here, the private lender doled out personal loans to the ancient rule of buyer beware when the entire economic reality was not like that at all*. (emphasis added). And apparently, the *Congress's* vision that seller beware and also buyer beware doesn't apply to private, personal loans disguised as investment contracts. *Id*. at 12-13.

246.    "By the time the Plaintiff figured out that he had been duped, state common law wasn't an option. And as the Court succinctly put it in the tentative, Brown didn't pay. The Defendant had the right to take the property and that's it. [] So what this Court is essentially is saying is investors are back in the Blue Sky era *or* the Stone Age of American securities jurisprudence…in direct contravention of *Congress's* demand…when *Congress* wrote that it wanted a full *and* fair disclosure of securities in the American market. *Id*. at 13.

247.    "Last, the foundation of our Nation's [Federal] security[y] law[s] is rooted in the 1933 Securities Act. That Act is simply a disclosure law that President Roosevelt said, quote,

"Only a dishonest man would object to its principles of disclosure." And here the Defendant objects to its principles of disclosure *that only a dishonest man would*." *Id*. (emphasis added).

248.   Accordingly, [the Court must] hold that, as a matter of law, [Smead] "misappropriate[d] confidential information for securities trading purposes, in breach of a duty owed to the source of the information." See *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008). An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy *or* sell [investment contracts]. See *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Id*. See also, *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008). The information on which [Smead] traded was material as a matter of law. (Smead knew the appraisal value of Harper Lake property, *supra*. Smead deceitfully acquired the 1st Deed of Trust on the Harper Lake property, *supra*. Smead then tried to force a deed-in-lieu of foreclosure after Plaintiff cooperated with 1st Deed of Trust purchase, *supra*. Smead filed notices of default and sale when Plaintiff refused to comply with the deed-in-lieu demand, *supra*. Smead credit bid the properties, which in any event, is an unlawful collection of debt under RICO, *supra*. Irrespective of the RICO unlawful debt claim in Count III, the rest of the claims in Count I & Count II, fall within an unregistered investment contract *contra* to Federal security law[s], in addition to, *contra* to the Rule 10(b)(5) under the misappropriation theory, *supra*.

[*Intentionally Left Blank*]

### Prayer for Relief

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

1. Appointment of a temporary receiver under Rule 66 and Local Rule (L.R.) 66-1, to prevent the premature sale of the investment contract[s] (*i.e.* Property[40]);

2. Declare the Plaintiff's share in the Association as a security interest inseparable from his equitable interest in Malibu;

3. Joinder the Defendant pursuant to Rule 20 in Case No. 2:23-cv-02972-MEMF-KS (Defendants Emil Assentato, Tax Deed Enterprises, and Steve Weera Tonasut Trust); (*See* Count IV).

4. Consolidate the actions pursuant to Rule 19 in *all* related cases.

5. Award compensatory damages for the loss of value and access, along with any other damages proven at trial;

6. Such other or further relief as the Court may deem appropriate, just, and equitable pursuant to 28 U.S.C. § 2201 *or* Federal common law.

### DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial for all claims so triable.


Dated: July 28, 2024                    */s/ Clinton Brown, Self-Represented*
                                        14 University Drive
                                        Robina, QLD 4226, Australia
                                        clinton@atlasinc.solar
                                        310-487-6453


CC: All Counsel of Record (via ECF) on July 28, 2024

---

[40] *See* ECF No. 55 at 1-2 ("Active-Contract is on the Malibu property").

**Table of Authorities**

**Background:**

| Paragraph Number | Case Citation/Authority |
|---|---|
| 1 | An Act to establish the Treasury Department, Section 8, 1 Stat. 65, 67 (Sept. 2, 1789); 31 U.S.C. § 329. |
| 1 | Securities Act of 1933 (archived on December 20, 2023 at https://perma.cc/A55E-AAAJ) |
| 1 | Exchange Act of 1934 (archived on December 31, 2023 at https://perma.cc/2KZW-VL8K) |
| 1 | *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 37 S. Ct. 217, 220-221 (1917) |
| 2 | Glenn, 1 Mortgages, Deeds of Trust, and Other Security Devices as to Land at 3 (1943) |
| 2 | 1 Edward Coke, Institutes of the Laws of England, 205a (1628) |
| 3 | Maitland, The Constitutional History of England 225 (1908) |
| 3 | Story, Commentaries on Equity Jurisprudence 53 (1836) |
| 4 | *Lansing v. Goelet*, 9 Cow. 346 (N.Y. 1827) |
| 4 | *Emanuel College v. Evans*, 21 Eng. Rep. 494, 494–95 (1625) |
| 4 | *Dutchess of Hamilton v. Countess of Dirlton and Lord Cranborne*, 21 Eng. Rep. 539 (1654) |
| 4 | *Pawlett v. Attorney General*, 145 Eng. Rep. 550, 551 (1678) |
| 4 | *Casborne v. Scarfe*, 26 Eng. Rep. 377, 379 (1737) |
| 4 | Sugarman & Warrington, Land Law, Citizenship, and the Invention of "Englishness", in Early Modern Conceptions of Property 111, 120 (1995) |
| 5 | *Burgess v. Wheate*, 28 Eng. Rep. 652, 670 (1759) |
| 5 | 6 Holdsworth, A History of English Law 663 (1924) |
| 5 | *Casborne*, 26 Eng. Rep. at 379 |
| 6 | Glenn, 1 Mortgages at 402 |
| 7 | Glenn, 1 Mortgages at 397 |
| 7 | *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) |
| 8 | *Newcomb v. Bonham*, 23 Eng. Rep. 266, 267 (1681) |
| 8 | Glenn, 1 Mortgages at 403 |
| 8 | Story, Commentaries on Equity Jurisprudence at 106 |
| 9 | *Lansing v. Goelet*, 9 Cow. 346, 355, 1827 WL 2536 (N.Y. 1827) |
| 9 | Story, Commentaries on Equity Jurisprudence at 106 n.2 |
| 9 | *Moulton v. Cornish*, 138 N.Y. 133, 141 (1893) |
| 10 | *Lansing*, 9 Cow. at 353 |
| 10 | Magna Charta ¶ 26 (1215) |
| 10 | *Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 277 (1855) |
| 10 | *Resolution Trust Corp.*, 511 U.S. at 541 |
| 11 | *Lansing*, 9 Cow. at 355 |
| 11 | *Lansing*, 9 Cow. at 356 |
| 12 | Osborne, Mortgages at 661 (1970) |

| 12 | 1 Glenn Mortgages at 460 |
|----|--------------------------|
| 12 | *Clark v. Reyburn*, 75 U.S. 318, 323–24 (1868) |
| 12 | *Moulton*, 138 N.Y. at 141 |
| 12 | *Stead's Ex'rs v. Course*, 8 U.S. 403, 414 (1808) |
| 12 | *Margraff v. Cunningham's Heirs*, 57 Md. 585, 588 (1882) |
| 12 | *Loomis v. Pingree*, 43 Me. 299, 311 (Me. 1857) |
| 12 | *Martin v. Snowden*, 59 Va. 100, 118–19, 139 (1868) |
| 13 | *Bronson v. Kinzie*, 42 U.S. 311, 318 (1843) |
| 13 | *Bronson v. Kinzie*, 42 U.S. at 318–19 |
| 13 | Thomas M. Cooley, A Treatise on the Law of Taxation, Including the Law of Local Assessments, 489 (1886) |
| 13 | *Resolution Trust Corp.*, 511 U.S. at 541 |
| 15 | *Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (dissenting opinion) |

**Cases:**

| Paragraph Number | Case Citation |
|------------------|---------------|
| 16 | *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S. Ct. 120 (1943) |
| 17 | *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946) |
| 18 | *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) |
| 19 | *Slack v. Pirani*, 598 U.S. 759, 762 (2023) |
| 19 | *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) |
| 19 | *SEC v. Zandford*, 535 U.S. 813, 822 (2002) |
| 19 | *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 45 (1941) |
| 20 | *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 (1983) |
| 20 | *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) |
| 20 | *Schlemmer v. Buffalo, R. & P. R. Co.*, 205 U.S. 1, 10 (1907) |
| 21 | *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483-484 (1989) |
| 21 | *SEC v. Edwards*, 540 U.S. 389, 397 (2004) |
| 21 | *Securities and Exch. Com'n v. Crude Oil Corp.*, 93 F.2d 844, 849 (7th Cir. 1937) |
| 22 | *United States v. O'Hagan*, 521 U.S. 642, 652-653 (1997) |
| 23 | *Carpenter v. United States*, 484 U.S. 19, 26 (1987) |
| 23 | *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-1004 (1984) |
| 23 | *Dirks v. SEC*, 463 U.S. 646, 658 n. 10 (1983) |
| 23 | *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-251 (1905) |
| 24 | *United States v. Kosinski*, 976 F.3d 135, 146 (2d Cir. 2020) |
| 28 | *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) |
| 28 | *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147-48 n.5 (3d Cir. 2016) |
| 28 | *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) |
| 28 | *United States v. Aucoin*, 964 F.2d 1492, 1495-97 (5th Cir. 1992) |
| 28 | *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014) |
| 28 | *Wright v. Shepard*, 919 F.2d 665, 673 (11th Cir. 1990) |

| 29 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985) |
| 33 | *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 815 (9th Cir. 2001) |
| 34 | *Hodge v. Hodge*, 621 F.2d 590, 592 (3d Cir. 1980) (per curiam) |
| 35 | *Bell v. Hood*, 327 U.S. 678, 682 (1946) |
| 71 | *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1120 (9th Cir. 2010) |
| 86 | *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, & n. 12 (1976) |
| 86 | *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) |
| 91 | *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946) |
| 92 | *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) |
| 92 | *SEC v. Edwards*, 540 U.S. 389, 397 (2004) (supra) |
| 94 | *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1131 (9th Cir. 1991) |
| 95 | *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (supra) |
| 99 | *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1132 (9th Cir. 1991) |
| 107 | *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) |
| 108 | *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020) |
| 108 | *SEC v. Cavanagh*, 445 F.3d at 111 n.13 (supra) |
| 109 | *In re Time Warner*, 9 F.3d 259, 269 (2d Cir. 1993) |
| 115 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985) |
| 116 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985) |
| 117 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 n.7 (1985) |
| 118 | *United States v. Turkette*, 452 U.S. 576, 580 (1981) |
| 119 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985) (supra) |
| 120 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499-500 (1985) |
| 121 | *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 152 (1987) |
| 122 | *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) |
| 122 | *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147-48 n.5 (3d Cir. 2016) |
| 122 | *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) |
| 122 | *United States v. Aucoin*, 964 F.2d 1492, 1495-97 (5th Cir. 1992) |
| 122 | *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014) |
| 122 | *Wright v. Shepard*, 919 F.2d 665, 673 (11th Cir. 1990) |
| 123 | *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 481 (D. Md. 2009) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989)) |
| 125 | *Clinton Brown v. Emil Assentato, et al.*, No. 2:23-cv-02972, Transcript of Proceedings, ECF No. 49 at 14 (C.D. Cal. June 6, 2024) |
| 128 | *United States v. Weiner*, 3 F.3d 17, 23 (1st Cir. 1993) |
| 131 | *United States v. Pipkins*, 378 F.3d 1281, 1295 (11th Cir. 2004) |
| 134 | *Reves v. Ernst & Young* 494 U.S. 56, 61 (1990) (supra) |
| 135 | *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 230 (E.D. Va. 2008) |
| 135 | *Hengle v. Asner*, 433 F. Supp. 3d 825, 897 (E.D. Va. 2020) |
| 136 | *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148-149 (3d Cir. 2016) |
| 136 | *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) |
| 137 | *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) |
| 137 | *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) |
| 137 | *United States v. Robilotto*, 828 F.2d 940, 947–48 (2d Cir. 1987) |

| 137 | *United States v. Megale*, 363 F. Supp. 2d 359, 363-364 (D. Conn. 2005) |
| 138 | *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (supra) |
| 138 | *United States v. Megale*, 363 F. Supp. 2d 359, 363-364 (D. Conn. 2005) (supra) |
| 139 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495–497 (1985) |
| 139 | *Adams–Lundy v. Ass'n of Prof'l Flight Attendants*, 844 F.2d 245, 250 (5th Cir. 1988) |
| 140 | *Richards v. United States*, 369 U.S. 1, 9 (1962) |
| 140 | *United States v. Martino*, 681 F.2d 952, 954, 955-56 (5th Cir. 1982) |
| 140 | *United States v. Jacobson*, 691 F.2d 110, 112-113 (2d Cir. 1982) |
| 141 | *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) |
| 141 | *Leonard v. Shearson Lehman/Am. Express Inc.*, 687 F. Supp. 177, 181–82 (E.D. Pa. 1988) |
| 141 | *Petro–Tech, Inc. v. W. Co. of N. Am.*, 824 F.2d 1349, 1359 (3d Cir. 1987) |
| 141 | *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir. 1995) |
| 141 | *Baglio v. Baska*, 940 F. Supp. 819, 832 (W.D. Pa. 1996) |
| 142 | *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1307 (7th Cir. 1987) |
| 142 | *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1397–98 (9th Cir. 1986) |
| 143 | *Pennsylvania v. Derry Constr. Co.*, 617 F. Supp. 940, 943 (W.D. Pa. 1985) |
| 143 | *Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 747 F.2d 384, 402 (7th Cir. 1984) |
| 144 | *Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 747 F.2d 384, 401-402 (7th Cir. 1984) |
| 145 | *United States v. Turkette, 452 U.S. 576, 591 (1981)* |
| 145 | *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986) (supra) |
| 146 | *Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 907 (3d Cir. 1991) |
| 146 | *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840-41 (4th Cir. 1990) |
| 146 | *Official Pubs., Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir. 1989) |
| 146 | *Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782, 790 (D.C. Cir. 1988), *vacated on other grounds*, 492 U.S. 914 (1989) |
| 146 | *Garbade v. Great Divide Mining*, 831 F.2d 212, 213 (10th Cir. 1987) |
| 146 | *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1397 (9th Cir. 1986) |
| 146 | *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32 (1st Cir. 1986) |
| 146 | *Haroco v. Am. Nat'l Bank & Tr. Co.*, 747 F.2d 384, 401-02 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985) |
| 147 | *Guidry v. Bank of LaPlace*, 954 F.2d 278, 283 (5th Cir. 1992) |
| 148 | *McCullough v. Suter*, 757 F.2d 142, 143 (7th Cir. 1985) |
| 149 | *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060, 1064 (4th Cir. 1984) |
| 150 | *United States v. Thevis*, 665 F.2d 616, 625-26 (5th Cir. 1982) |
| 151 | *Pahmer v. Greenberg*, 926 F. Supp. 287, 299-301 (E.D.N.Y. 1996) |
| 152 | *Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501, 511 & n.12 (W.D. Pa. 1989) |
| 153 | *DeFalco v. Bernas*, 244 F.3d 286, 307-08 (2d Cir. 2001) |
| 153 | *United States v. Angelilli*, 660 F.2d 23, 30-35 (2d Cir. 1981), *cert. denied*, 455 |

| | |
|---|---|
| | U.S. 910 (1982) |
| 154 | *J.G. Williams, Inc. v. Regency Props.*, 672 F. Supp. 1436, 1440 (N.D. Ga. 1987) |
| 155 | *United States v. Castellano*, 416 F. Supp. 125, 127 (E.D.N.Y. 1975) |
| 156 | *United States v. Rone*, 598 F.2d 564, 570 (9th Cir. 1979) |
| 156 | *United States v. Ohlson*, 552 F.2d 1347, 1349 (9th Cir. 1977) |
| 156 | *United States v. Elliott*, 571 F.2d 880 n.18 (5th Cir. 1978) |
| 156 | *United States v. Hawkins*, 516 F. Supp. 1204, 1205 (M.D. Ga. 1981) |
| 157 | *United States v. Hawkins*, 516 F. Supp. 1204, 1206-07 (M.D. Ga. 1981) (supra) |
| 158 | *United States v. Ohlson*, 552 F.2d 1347, 1349 (9th Cir. 1977) (supra) |
| 158 | *United States v. Rone*, 598 F.2d 564, 570 (9th Cir. 1979) (supra) |
| 158 | *U.S. v. Hawkins*, 516 F. Supp. 1204, 1206-1207 (M.D. Ga. 1981). |
| 159 | *Lopez v. Richards*, 594 F. Supp. 488, 491-92 (S.D. Miss. 1984) |
| 161 | *O'Brien v. Price Waterhouse*, 740 F. Supp. 276, 279 (S.D.N.Y. 1990) |
| 161 | *Newman v. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 162 (SDNY 1986) |
| 161 | *Beauford v. Helmsley*, 740 F. Supp. 201, 213 (S.D.N.Y. 1990) |
| 162 | *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) |
| 162 | *Divittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) |
| 162 | *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) |
| 162 | *Dymm v. Cahill*, 730 F. Supp. 1245, 1250 (S.D.N.Y. 1990) |
| 163 | *Center Cadillac v. Bank Leumi Tr. Co.*, 808 F. Supp. 213, 227-30 (S.D.N.Y. 1992) |
| 164 | *Dunham v. Independence Bank of Chicago*, 629 F. Supp. 983, 988 (N.D. Ill. 1986) |
| 165 | *In re Bennett*, 142 B.R. 616, 621 (Bankr. N.D.N.Y. 1992) |
| 166 | *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986) |
| 167 | *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 551 (1987) |
| 167 | *Rotella v. Wood*, 528 U.S. 549, 557-58 (2000) |
| 168 | *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008) |
| 169 | *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 650 (2008) |
| 170 | *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652 (2008) |
| 171 | *Yegiazaryan v. Smagin*, 599 U.S. 533, 539 (2023) |
| 172 | *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016). |
| 173 | *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147 (3d Cir. 2016). |
| 173 | *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015) |
| 174 | *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) |
| 175 | *United States v. Angiulo*, 847 F.2d 956, 960 (1st Cir. 1988) |
| 175 | *United States v. Giovanelli*, 945 F.2d 479, 486 (2d Cir. 1991) |
| 175 | *United States v. Eufrasio*, 935 F.2d 553, 557-58 (3d Cir. 1991) |
| 175 | *United States v. Aucoin*, 964 F.2d 1492, 1497 (5th Cir. 1992) |
| 176 | *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 633 F. Supp. 2d 214, 222 (E.D. Va. 2008) |
| 176 | *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990) |
| 176 | *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 929-30 (E.D. Va. 2019), aff'd, 967 F.3d 332 (4th Cir. 2020) |
| 178 | *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (supra) |
| 178 | *Davis v. Hudgins*, 896 F. Supp. 561, 567 (E.D. Va. 1995) |

| 178 | *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 931 (E.D. Va. 2019), aff'd, 967 F.3d 332 (4th Cir. 2020) (supra) |
|---|---|
| 179 | *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (supra) |
| 180 | *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 933 (E.D. Va. 2019), aff'd, 967 F.3d 332 (4th Cir. 2020) |
| 181 | *In re Bennett*, 142 B.R. 616, n. 3 (Bankr. N.D.N.Y. 1992) |
| 182 | *Official Pubs., Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir. 1989) |
| 183 | *Eyler v. 3 Vista Ct. LLC*, No. RWT 07CV2383, 2008 WL 4844962, at *4 (D. Md. Aug. 26, 2008) |
| 184 | *Schreiber Distrib. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986) |
| 186 | *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 243-49 (1989) |
| 186 | *United States v. Biasucci*, 786 F.2d 504, 506-507 (2d Cir. 1986) |
| 186 | *United States v. Jacobson*, 691 F.2d 110, 112 (2d Cir. 1982) |
| 186 | *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974) cert. denied, 419 U.S. 1105 (1975) |
| 189 | *Rural Fire Protection Co. v. Hepp*, 366 F.2d 355, 362 (9th Cir. 1966) |
| 189 | *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n.29 (9th Cir. 1982) |
| 189 | *Tiller v. Atl. Coast Line R. Co.*, 323 U.S. 574, 580–81 (1945) |
| 189 | *Percy v. San Francisco Gen. Hosp.*, 841 F.2d 975, 979 (9th Cir. 1988) |
| 190 | *Maty v. Grasselli Chem. Co.*, 303 U.S. 197, 200 (1938) |
| 191 | *Seaboard Air Line Ry. v. Renn*, 241 U.S. 290, 293 (1916) |
| 191 | *N.Y. Cent. R.R. v. Kinney*, 260 U.S. 340, 346 (1922) |
| 191 | *Harkless v. Sweeny Ind. Sch. Dist. of Sweeny*, 554 F.2d 1353, 1359 (5th Cir. 1977) |
| 193 | *Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007) |
| 193 | *United States v. Hansen*, 599 U.S. 762, 778 (2023) |
| 193 | *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343–344 (2005) |
| 193 | *Basic Inc. v. Levinson*, 485 U.S. 224, 253 (1988) |
| 194 | *Jarkesy* slip op. at 22 |
| 195 | *Granfinanciera S. A. v. Nordberg*, 492 U.S. 33, 52 (1989) |
| 196 | *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) |
| 196 | *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392-93 (9th Cir. 1988) |
| 196 | *Schreiber Distrib. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) |
| 197 | *United States v. Vastola*, 899 F.2d 211, 227 n.18 (3d Cir. 1990) |
| 200 | *West Pico Furniture Co. v. Pacific Finance Loans*, 2 Cal. 3d 594, 603 (1970) |
| 200 | *Janisse v. Winston Investment Co.*, 154 Cal. App. 2d 580, 582 (1957) |
| 200 | *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 (Cal. 1994) |
| 201 | *Penziner v. West American Finance Co.*, 10 Cal.2d 160, 168-169, 171 (Cal. 1937) |
| 206 | Penziner v. West American Finance Co., 10 Cal.2d 160, 168-169, 171 (Cal. 1937) |
| 207 | Tr. of Proceedings, ECF No. 66 at 14 (C.D. Cal. June 6, 2024) |
| 208 | Tr. of Proceedings, ECF No. 66 at 14-15 (C.D. Cal. June 6, 2024) |
| 209 | Tr. of Proceedings, ECF No. 66 at 16 (C.D. Cal. June 6, 2024) |
| 210 | Tr. of Proceedings, ECF No. 66 at 16 (C.D. Cal. June 6, 2024) |

| 212 | *United States v. O'Hagan*, 521 U.S. 642, 663 (1997) |
| 212 | *S.E.C. v. Talbo*t, 530 F.3d 1085, 1096 (9th Cir. 2008) |
| 212 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at 8 (N.D. Cal. 2022) |
| 213 | *United States v. O'Hagan*, 521 U.S. 642, 653 (1997) |
| 215 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1091-92 (9th Cir. 2008) |
| 216 | *SEC v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990) |
| 216 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1092 (9th Cir. 2008) |
| 218 | *United States v. O'Hagan*, 521 U.S. 642, 655 n. 7 (1997) |
| 218 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1093 (9th Cir. 2008) |
| 220 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1094 (9th Cir. 2008) |
| 221 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1094 (9th Cir. 2008) |
| 222 | *United States v. O'Hagan*, 521 U.S. 658-59 (1997) |
| 222 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1096 (9th Cir. 2008) |
| 222 | Tr. of Proceedings, ECF No. 66 at 10-12 ("Go-Getter") (C.D. Cal. June 6, 2024). |
| 223 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) |
| 224 | *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976) |
| 224 | *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010) |
| 224 | *United States v. Smith*, 155 F.3d 1051, 1070 (9th Cir. 1998) |
| 224 | *SEC v. Moshayedi*, No. CV-12-01179, WL 12172131, at *13-14 (C.D. Cal. 2013) |
| 224 | *In re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1202-03 (C.D. Cal. 2008) |
| 224 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *6 (N.D. Cal. 2022) |
| 225 | *United States v. Laurienti*, 611 F.3d 530, 542 (9th Cir. 2010) |
| 225 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *7 (N.D. |
| 226 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008) |
| 227 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *8 (N.D. |
| 226 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *8 (N.D. Cal. 2022) |
| 228 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *8 (N.D. Cal. 2022) |
| 229 | *Superintendent of Ins. v. Bankers Life & Cas. Co*., 404 U.S. 6, 10 n.7 (1971) |
| 229 | *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967) |
| 230 | *SEC v. Panuwat*, No. 21-cv-06322-WHO, ECF No. 18 at *8 (N.D. Cal. 2022) |
| 231 | *United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998) |
| 233 | Tr. of Proceedings, ECF No. 66 at 8 (C.D. Cal. June 6, 2024) |
| 234 | Tr. of Proceedings, ECF No. 66 at 8 (C.D. Cal. June 6, 2024) |
| 235 | Tr. of Proceedings, ECF No. 66 at 8 (C.D. Cal. June 6, 2024) |
| 236 | Tr. of Proceedings, ECF No. 66 at 8 (C.D. Cal. June 6, 2024) |
| 237 | Tr. of Proceedings, ECF No. 66 at 9 (C.D. Cal. June 6, 2024) |
| 238 | Tr. of Proceedings, ECF No. 66 at 9 (C.D. Cal. June 6, 2024) |
| 239 | Tr. of Proceedings, ECF No. 66 at 9 (C.D. Cal. June 6, 2024) |
| 240 | Tr. of Proceedings, ECF No. 66 at 9-10 (C.D. Cal. June 6, 2024) |
| 241 | Tr. of Proceedings, ECF No. 66 at 10 (C.D. Cal. June 6, 2024) |
| 242 | Tr. of Proceedings, ECF No. 66 at 10 (C.D. Cal. June 6, 2024) |
| 243 | Tr. of Proceedings, ECF No. 66 at 10-12 (C.D. Cal. June 6, 2024) |
| 244 | Tr. of Proceedings, ECF No. 66 at 12 (C.D. Cal. June 6, 2024) |
| 245 | Tr. of Proceedings, ECF No. 66 at 12-13 (C.D. Cal. June 6, 2024) |

| 246 | Tr. of Proceedings, ECF No. 66 at 13 (C.D. Cal. June 6, 2024) |
| 247 | Tr. of Proceedings, ECF No. 66 at 13 (C.D. Cal. June 6, 2024) |
| 248 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) |
| 248 | *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988) |
| 248 | *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) |

**Referenced Documents:**

| Paragraph Number | Document |
|---|---|
| 44 | Los Angeles County Recorder. (2021, May 21). Substitution of Trustee and Full Reconveyance. Document No. 202105210190066. Property APN: 4451-001-021. |
| 44 | Varon, B. (2021, February 12). Appraisal Report: APN/Parcel ID: 4451-015-021, Malibu, CA 90265. Appraised value: $450,000. |
| 50 | Colliers International, File #: SLC210208. (2021, June 8). Appraisal Report: APN/Parcel ID(s): 8710-1. Appraised value: $240,000. |
| 50 | Millard County Recorder. (2021, June 29). ("Deeds of Trust") Trust Deed: APN/Parcel ID 8710-1. Notarized in New York by Jenice Hernandez, Notary Public, State of New York, No. OLHE6359254. Recorded at 12:24 PM, Entry #: 00215042. Amount: $200,000. |
| 55 | Pacific Valuation. (2021, December 20). Restricted Appraisal Report: APN/Parcel ID(s): 0490-091-09 and 0490-091-19. Appraised value: $1,100,000. San Bernardino County Recorder. (2022, July 19); Corporation Assignment of Deed of Trust. Document No. 2022-0251090. Property APN/Parcel ID(s): 0490-091-09 and 0490-091-19. |
| 60 | Bay Valuation Advisors, LLC. (2021). Atlas, Inc. Valuation of Common Stock (409a). Oakland, CA. Valuation Date: June 30, 2021. Report Date: September 21, 2021. Fair Market Value (FMV): $21,400,000. |
| 65 | ECF No. 22 at 3-4, 4 ("Brown Decl.") |
| 70 | Malibu La Costa Owner's Association, Articles of Incorporation, art. 4, at 5, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). |
| 70 | Malibu La Costa Owner's Association, Articles of Incorporation, art. 7, at 6, Control ID 0209709 (California Secretary of State, Sept. 13, 1946). |
| 125 | *Clinton Brown v. Emil Assentato, et al.*, No. 2:23-cv-02972, Transcript of Proceedings, ECF No. 49 at 14 (C.D. Cal. June 6, 2024) |
| 202 | ECF No. 41-1 at 30 |
| 203 | ECF No. 41-1 at 31 |
| 204 | ECF No. 69-1 at 2-4 "Ordaz Declaration" |
| 205 | ECF No. 41-1 at 36 |