Clinton Brown, *Self-Represented*
1431 Ocean Ave, Unit 413
Santa Monica, CA 90401
clinton@atlasinc.solar
310-775-7990

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON BROWN,<br><br>  Plaintiff,<br><br>v.<br><br>STEVE SMEAD,<br><br>  Defendant. | **Case No.** 2:23-cv-02938-MEMF-KS<br><br>**SECOND AMENDED COMPLAINT**<br><br>*See* ECF No. 89<br><br>**Judge**: Honorable Maame Ewusi-Mensah Frimpong<br><br>**Chief Magistrate Judge**: Karen L. Stevenson<br><br>**JURY TRIAL DEMANDED** |

Clinton Brown ("Plaintiff") for his Complaint against Steve Smead ("Defendant"), alleges as follows:

### I. NATURE OF ACTION

1. This action arises from the Defendant's violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") using income derived from the collection of unlawful debt in the operation of an enterprise affecting interstate commerce, in violation of 18 U.S.C. § 1962(a). In the alternative, Defendant is liable under 18 U.S.C. § 1962(c) for conducting the affairs of an enterprise engaged in interstate commerce through the collection of unlawful debt, both causing financial harm to Plaintiff's business and property.

### II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, a Federal law. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district or a substantial part of property that is the subject of the action is situated in this district.

## III. STANDING

3. Plaintiff has standing under 18 U.S.C. § 1964(c), having suffered injury to his business and property as a direct and proximate result of Defendant's use and investment of income derived from unlawful debt, as defined by 18 U.S.C. § 1961(6), into an enterprise engaged in or affecting interstate commerce. Plaintiff's injury is concrete, particularized, and redressable by this Court under 18 U.S.C. § 1964(c).

## IV. PARTIES

4. Plaintiff Clinton Brown resides at 1431 Ocean Avenue, Unit 413, Santa Monica, California 90401.

5. Defendant Steve Smead resides at 352 E. Harvard Blvd., Santa Paula, California 93060.

## V. FACTUAL ALLEGATIONS[1]

### A. Defendant's Private Lending Business

6. Defendant Steve Smead has operated a private real estate lending business for over 30 years, issuing loans to individuals and frequently foreclosing on properties, often demanding deeds-in-lieu of foreclosure.

7. Defendant has structured loans to evade California usury laws, utilizing states with more permissive usury statutes as a conduit for lending, even though the loans originated in California.

8. Defendant contracts and/or employs individuals and companies to facilitate his private lending business, oversee loan issuance, and enforce collection practices involving unlawful debt.

---

[1] Plaintiff does not allege fraud. These claims arise from usury and the collection and use of interest payments that allegedly exceeded legal limits. They are pled under Rule 8, not Rule 9(b), because no fraud or misrepresentation is alleged herein.

9. Defendant issued the unlawful debt loans in his individual capacity, but the Defendant relies on contracted and/or employed individuals and companies to coordinate and carry out his private real estate lending business functions.

10. Defendant does not run a "one-man show" and contracts and/or employs individuals and companies to coordinate and carry out the funding of his 'legal' loan issuance, collection, foreclosure, deed-in-lieu of foreclosure processes through and by those individuals and/or companies, while directing his 'illegal' loan issuance, collection, foreclosure, deed-in-lieu of foreclosure processes in his direct capacity through his personal/business bank account ending in 6236.

11. Defendant sent and received payments related to the issuance, servicing, and collection of unlawful debt through wire transfers, ACH payments, checks, and cashier's checks, across state lines — including at least between California and Utah — using a personal and/or business bank account ending in 6236.

12. Defendant structured his lending practices to disguise unlawful debt collection, using escrow and servicing companies to record legal portions while directing unrecorded payments into his personal/business account ending in 6236.

13. Defendant structured loan contracts in ways that made repayment impossible so he could later seize the collateral.

14. Defendant used the issuance and collection of usurious loans as a means to acquire real property from Plaintiff.

15. In sum, Defendant Smead, together with the individuals and companies he employed or contracted with, formed an association-in-fact enterprise engaged in the issuance and collection of unlawful debt, the structuring of those transactions to appear lawful, and the subsequent use and investment of income derived from such unlawful debt to acquire Plaintiff's real property through foreclosure. This enterprise operated continuously, shared a common purpose, and engaged in activities affecting interstate commerce.

B. The November 10, 2020, Loan – Harper Lake Property (California Loan)

16. On November 10, 2020, Defendant issued a $150,000 loan to Plaintiff, secured by a second deed of trust on 42829 Harper Lake Rd., Hinkley, California, a 400-acre solar property.

17. The recorded loan documents reflected an 8% annual interest rate for a term of two years, totaling $24,000 in interest.

18. In addition to the recorded terms, Defendant required Plaintiff to pay an additional $150,000 in unrecorded interest within one year, resulting in a total interest obligation of $174,000 on a $150,000 loan—an effective interest rate exceeding 108%.

19. Defendant directed Chicago Title Company to record the $150,000 in unrecorded interest, but Chicago Title refused due to concerns about the excessive interest rate. Despite this, the transaction proceeded, and Plaintiff was still required to pay the unrecorded amount outside of escrow.

20. At the time of closing on November 10, 2020, Defendant collected $690.48 in prepaid interest from Plaintiff on the recorded loan, and an additional $1,000 in prepaid interest on the unrecorded loan.

21. Following the loan's issuance, Plaintiff made monthly interest payments of $1,000 on the $150,000 recorded loan, and $1,000 per month in interest payments on the $150,000 unrecorded loan.

22. None of the interest payments made by Plaintiff were applied toward reducing the principal balance, and Plaintiff remained liable for the full $300,000.

23. After Plaintiff provided Defendant with an appraisal valuing the Harper Lake property at $1.1 million, Defendant acquired the first deed of trust and initiated foreclosure the following month.

24. In sum, Defendant Smead structured the Harper Lake loan to appear legitimate on its face while requiring unrecorded and usurious payments outside of escrow, resulting in an effective interest rate exceeding 108%. He structured the unlawful nature of the transaction by splitting the recorded and unrecorded obligations and ultimately used the resulting default as a means to acquire Plaintiff's property—valued at $1.1 million, far in excess of the original loan

amount. This transaction reflects Defendant's broader lending practices and exemplifies the unlawful debt collection scheme described herein.

### C. The June 29, 2021, Loan – Black Rock Cutoff Property (Utah Loan)

25. On June 29, 2021, Defendant issued a $200,000 loan to Plaintiff, secured by a deed of trust on 16390 S Black Rock Cutoff Rd., Fillmore, Utah, a 160-acre solar property.

26. The Black Rock Cutoff Property was appraised for $240,000 in June 2021 by Colliers International Valuation and Advisory Services.

27. Defendant directed $100,000 of interest from the prior unrecorded California loan to be recorded in Utah, exploiting Utah Code Ann. § 15-1-1(1), which permits higher interest rates than California law.

28. Defendant instructed TitleFirst Title Insurance Agency to falsely document that the $100,000 had been settled outside escrow, when in fact it had not.

29. The remaining $50,000 in unrecorded interest from the California loan remains unrecorded, with Defendant making repeated collection demands.

30. Defendant foreclosed on the Utah property after Plaintiff disclosed a confidential contract with HST, a solar company that later facilitated the Samsung Rooh LLC project. Plaintiff's property, which had been positioned for inclusion in the project, was ultimately excluded as a result of the foreclosure, which was carried out using proceeds from unlawful debt.

31. The $100,000 in interest recorded in the June 29, 2021, Utah loan originated from the unrecorded interest in the November 10, 2020, California loan. That California loan carried an effective interest rate exceeding 108%, and the $100,000 represented a portion of the additional interest that was previously withheld from recording due to concerns raised by Chicago Title about its legality under California law. Defendant subsequently directed that this amount be recorded in Utah, despite its origin from a loan issued in California.

32. In sum, Defendant Smead used funds received from the California loan to help fund and structure the June 29, 2021, Utah loan, including the recording of $100,000 in interest that had previously been excluded from the California transaction. He instructed the title company to state

that this amount had been settled outside escrow, although it had not. Defendant continued to seek payment of additional interest from the California loan and later foreclosed on Plaintiff's Utah property using the proceeds and structure of that loan. As a result of the foreclosure, Plaintiff lost the property, and a business opportunity connected to a solar energy project.

### D. Loan Collection and Enforcement Practices

33. On January 31, 2022, Plaintiff initiated a payment of $6,668.00 to Defendant Steve Smead, sent from Plaintiff's Chase Inc. account ending in 1338 to Defendant's account ending in 6236 via Standard ACH. The funds were scheduled for delivery by February 1, 2022, under transaction number 5320643625. Plaintiff included an addendum labeled "utah4months," indicating the payment was for four months of interest on the Utah loan.

34. Defendant used the same account to collect unlawful debt payments and to fund foreclosure-related expenses, including payments to foreclosure trustees, escrow companies, legal representatives, and county recorder offices involved in processing title transfers, notices of default, and foreclosure filings.

35. On August 2, 2022, Defendant threatened to file Notices of Default ("NODs") against Plaintiff's properties if additional unlawful debt payments were not received by August 5, 2022, and ultimately carried out that threat by filing the Notices of Default on August 25, 2022.

36. Between January 5, 2022, and December 18, 2022, Plaintiff and Defendant engaged in 29 phone calls totaling 644 minutes, including a 101-minute call on April 1, 2022, a 63-minute call on April 9, 2022, and a 69-minute call on December 18, 2022.

37. During these calls, Defendant pressured Plaintiff to waive his legal rights to contest foreclosure and threatened to pursue personal liability for the debt, despite the loans being secured by property. Defendant also used the calls to extract proprietary information about Plaintiff's property and business operations. These communications were marked by intimidation, coercion, and psychological manipulation, during which Defendant routinely demeaned and threatened Plaintiff with foreclosure.

38. In sum, Defendant used the same account that received loan payments to fund foreclosure-related expenses, including payments to trustees, escrow agents, attorneys, and county officials. He continued to collect payments tied to loan terms that included amounts previously unrecorded in California and threatened to initiate foreclosure proceedings unless additional payments were made. Defendant also engaged in a sustained campaign of phone calls during which he pressured Plaintiff to waive legal rights and made repeated threats of foreclosure. These communications were used to gather information about Plaintiff's business operations and were marked by intimidation and coercive tactics.

E. Defendant Used Income Collected from Unlawful Debt to Take Plaintiff's Utah and California Property.

39. Defendant collected unlawful debt from Plaintiff in the form of interest payments that exceeded twice the enforceable legal rate under California law. Rather than merely retaining these funds, Defendant used the proceeds to fund foreclosure-related expenses, including payments to escrow companies, title companies, foreclosure trustees, legal counsel, and county recorder offices. These payments were essential to completing the foreclosure process, demonstrating that Defendant used and invested proceeds from unlawful debt collection in order to acquire Plaintiff's property.

i. Utah Property

40. Defendant was aware that Plaintiff's Utah property held substantial commercial value, including a valid solar development permit and an exclusive transmission right-of-way. Defendant's refusal to accept reasonable repayment terms, combined with his decision to foreclose, indicates that his objective was not merely debt recovery, but the acquisition of a commercially valuable asset using proceeds derived from unlawful debt collection.

41. Defendant's foreclosure was not an automatic legal process; it required specific financial transactions, including payments to escrow agents, foreclosure trustees, title companies, attorneys, and county recorders. These payments were made using funds collected from the alleged

unlawful debt. Without the use of those funds, the foreclosure could not have been completed, and Plaintiff would not have lost ownership of the Utah property.

42. Defendant's use of proceeds derived from allegedly unlawful debt directly caused Plaintiff's financial injury. Plaintiff is the direct and exclusive victim of Defendant's conduct. The resulting harm is specific, quantifiable, and does not require complex apportionment among multiple parties. The wrongful foreclosure of the Utah property, carried out using proceeds from unlawfully collected interest payments, caused Plaintiff to lose both the property and a business opportunity valued at $6,135,068.21.

43. Defendant collected the alleged unlawful debt from Plaintiff in the form of excessive interest that far exceeded twice the enforceable limit under California law. Defendant did not merely retain these funds; he used the proceeds from the alleged unlawful debt collection to pay for foreclosure proceedings against Plaintiff's Utah property, including, but not limited to: Payments totaling $120.00 to Millard County Recorder between June 29, 2021, and March 7, 2023, for recording and foreclosure filing fees.

- A payment of $40.00 to Millard County Recorder on June 29, 2021, for the Trust Deed recording with TitleFirst Title Insurance Agency, LLC (Entry #00215042, B: 703, P: 381).
- A payment of $40.00 to Millard County Recorder on January 26, 2023, for foreclosure recording fees with TitleFirst Title Insurance Agency, LLC (Entry #00224197, B: 739, P: 253).
- A payment of $40.00 to Millard County Recorder on March 7, 2023, for additional foreclosure recording fees with TitleFirst Title Insurance Agency, LLC, notarized by Natalia Van Wyk, Notary Public, State of Utah (Entry #00224646, B: 740, P: 870).

ii. California Property

44. Defendant collected the alleged unlawful debt from Plaintiff in the form of excessive interest that far exceeded twice the enforceable limit under California law. Defendant

did not merely retain these funds; he used the proceeds from the alleged unlawful debt collection to pay for foreclosure proceedings against Plaintiff's California property, including, but not limited to:

- Payments totaling $1,675.20 to Peak Foreclosure Services, deposited into account ending in 4152, on or around August 25, 2022, for processing the Notice of Default and handling the foreclosure process on the California property.
- A payment of $500 to account ending in 4152, on or around August 25, 2022, for foreclosure legal fees paid to a law firm associated with Peak Foreclosure Services for processing the Notice of Default and handling the foreclosure process on the California property.

45. Payments totaling $1,079.80 to San Bernardino County between November 10, 2020, to January 31, 2023, for recording, assignment of the first deed of trust and foreclosure filing fees.

- A payment of $114.00 to San Bernardino County Recorder on January 31, 2023, to facilitate the foreclosure process (DOC# 2023-0021452).
- A payment of $104.00 to San Bernardino County Recorder on December 5, 2022, for title transfer costs related to the wrongful foreclosure (DOC# 2022-0390246).
- A payment of $110.00 to San Bernardino County Recorder on August 25, 2022, to process the Notice of Default and/or foreclosure sale (DOC# 2022-0291905).
- A payment of $110.00 to San Bernardino County Recorder on August 25, 2022, for an additional foreclosure filing (DOC# 2022-0291892).
- A payment of $32.00 to San Bernardino County Recorder on July 19, 2022, for the Corporation Assignment of Deed of Trust (DOC# 2022-0251090).

- A payment of $35.00 to San Bernardino County Recorder on November 10, 2020, for an assignment related to American Pacific Investments (DOC# 2020-0446978).
- A payment of $574.80 to San Bernardino County Recorder on November 10, 2020, for an escrow-related filing under Escrow Order No. 7102012953 (DOC# 2020-0446977).

These payments, made using proceeds derived from the alleged unlawful debt collection, were directly used to complete the foreclosure process and deprive Plaintiff of ownership of the California property.

### iii. Utah and California Property

46. Defendant, having received income derived from the collection of the alleged unlawful debt, used a portion or all of that income not merely for personal gain, but to further expand and sustain his private lending and foreclosure enterprise, including funding new predatory loan agreements and executing additional foreclosure actions.

47. Defendant's use of the alleged unlawful debt proceeds directly resulted in Plaintiff's financial injury, including the foreclosure of his Utah and California properties, which would not have occurred absent the use of unlawfully collected funds that were used for foreclosure-related expenses.

48. In sum, Defendant Steve Smead used interest payments collected from Plaintiff—at effective rates exceeding 108%—to fund and execute the foreclosure process through which he obtained Plaintiff's properties. These funds were used to pay for title transfers, escrow services, foreclosure trustee fees, legal filings, and county recording fees necessary to complete the foreclosure proceedings. The California and Utah properties had substantial commercial value and were essential to Plaintiff's solar development business. As a result of these foreclosures, Plaintiff lost ownership of both properties and suffered significant financial harm to his business and property.

### F. Plaintiff's Exclusion from the Utah Solar Farm Project

49. Plaintiff's Utah property was a critical component of several proposed solar farm projects and was the only parcel in the project area that had already received a permit for solar energy development.

50. Plaintiff's property was also the only parcel granted an exclusive transmission right-of-way, which is necessary to connect solar output to the power grid.

51. After Defendant foreclosed on Plaintiff's property using proceeds from the alleged unlawful debt, the Samsung Rooh LLC solar project continued, but Plaintiff's parcel was excluded in the final contractual agreements.

52. As a result of losing the permitted property, Plaintiff was unable to participate in the ongoing project and lost the opportunity to execute a solar energy development agreement valued at $6,135,068.21.

53. Plaintiff's exclusion from the solar farm project was the direct and foreseeable result of Defendant's alleged unlawful conduct. But for the foreclosure, Plaintiff would have retained his position in the development and received the economic benefits associated with the Samsung Rooh LLC project.

54. In sum, Defendant Smead engaged in a scheme to structure and collect unlawful debt, obtaining proceeds through excessive interest charges, coercive foreclosure threats, and unrecorded payment demands. He then reinvested those proceeds into the enterprise by funding foreclosure-related expenses, including legal fees, title recordings, and trustee costs. This use and investment of income derived from unlawful debt directly enabled the foreclosure of Plaintiff's property and caused his exclusion from a commercial solar project that continues to generate revenue for others.

### G. The Malibu Property

55. Defendant loaned $300,000 to Plaintiff on June 1, 2021, secured by real property located at 21472 Calle del Barco, Malibu, California 90265, at an interest rate of 12%.

56. Defendant imposed an additional 5% interest rate during the forbearance period, which lasted approximately from September 2021 through August 2022.

57. Defendant demanded that the $50,000 unrecord interest that remained from the California and Utah loans be recorded on the Malibu loan, but it was never recorded by Superior Loan Servicing, the loan service provider.

58. Although the additional $50,000 in unrecorded interest from the prior California and Utah loans was never officially recorded against the Malibu Property, Defendant demanded that it be tied to the Malibu loan as a condition of forbearance. Given that the Malibu Property was appraised at $450,000 in January 2021, Defendant and his agents functionally treated the entire property as collateral for both the recorded and unrecorded portions of the debt. Despite Superior Loan Servicing never formally recording the additional amount, Defendant assumed, enforced, and relied upon the property's equity as backing for the total outstanding debt, including the unrecorded amount. As a result, the effective interest rate on the Malibu loan exceeded 20%.

59. As a direct result of Defendant scheme, Plaintiff was forced to pledge the alleged unlawful interest of $50,000 directly to the Malibu property, and when Plaintiff could no longer comply with the payment demands, Defendant used the enterprise's legal foreclosure mechanisms to take Plaintiff's Malibu property.

60. In sum, Defendant Smead structured Plaintiff's loans so that the same $150,000 in unlawful interest—originally associated with the Harper Lake loan—was not only collected, but later applied across multiple properties, including the Black Rock Cutoff and Malibu properties. Defendant required that portions of the unlawful interest be incorporated into new or existing loan obligations, including the Malibu loan, even though those amounts were never formally recorded. This arrangement allowed Defendant to recycle income derived from unlawful debt into additional loan demands and foreclosure actions. As a result, Plaintiff was harmed not only by the initial collection of unlawful interest, but also by Defendant's continued use and reinvestment of those funds to initiate and complete further foreclosures, including the taking of the Malibu property.

## VI. DECLARATIONS

61. The Declarations of Erick Ordaz and Sean Chaudhuri, attached hereto as Exhibits A and B, respectively, support and corroborate the factual allegations set forth in this Second Amended Complaint and are incorporated herein by reference pursuant to Rule 10(c).

## VII. LEGAL CLAIM

### COUNT I: Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) – 18 U.S.C. § 1962(a)

### (Use of Income Derived from Unlawful Debt)

62. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

63. Defendant, having received income derived from the collection of unlawful debt in which he participated as a principal, used a portion of that income to finance foreclosure proceedings and thereby acquired Plaintiff's real property, in violation of 18 U.S.C. § 1962(a).

64. Defendant is liable for violating 18 U.S.C. § 1962(a), which prohibits any person who has received income derived, directly or indirectly, from the collection of unlawful debt from using or investing any part of that income or the proceeds of such income in the acquisition, establishment, or operation of an enterprise engaged in or affecting interstate or foreign commerce.

65. Defendant received income, directly or indirectly, from the collection of unlawful debt, as defined in 18 U.S.C. § 1961(6), because the debt violated the interest rate limitations set forth in California Constitution Article XV, Section 1.

66. Defendant used or invested a portion of that income to fund the operations of a real estate lending and foreclosure enterprise, including the acquisition of collateral interests in Plaintiff's properties and the execution of foreclosure proceedings.

67. The Defendant's enterprise operated across state lines and engaged in activities affecting interstate commerce, including transactions involving real property in California and Utah, the use of interstate wire transfers, and communications regarding multi-state foreclosure actions.

68. As a direct and proximate result of Defendant's use of income derived from the collection of unlawful debt, Plaintiff has suffered economic damages totaling $6,135,068.21, representing lost profits from the Samsung Rooh LLC solar farm project.

69. Defendant's repeated use of unlawfully collected interest payments to fund, operate, and expand a private lending and foreclosure enterprise constitutes a violation of 18 U.S.C. § 1962(a). The enterprise served as the vehicle through which Defendant reinvested unlawful proceeds to acquire Plaintiff's properties and inflict ongoing economic injury.

## COUNT II: (Alternative Claim)
## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) –
## 18 U.S.C. § 1962(c)
## (Collection of Unlawful Debt)

70. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71. Defendant is liable for violating 18 U.S.C. § 1962(c), which makes it unlawful for any person employed by or associated with an enterprise engaged in, or affecting, interstate commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt.

72. Defendant was associated with and participated in the conduct of the affairs of an enterprise, as defined in 18 U.S.C. § 1961(4), which included the use of escrow companies, title agents, foreclosure trustees, legal counsel, and other agents to facilitate lending, debt collection, and foreclosure activities across state lines

73. Defendant collected unlawful debt, as defined in 18 U.S.C. § 1961(6), because the debt carried an interest rate at least twice the enforceable legal limit under California Constitution Article XV, Section 1 and California Civil Code § 1916-3.

74. Defendant enforced and collected unlawful debt by imposing usurious loan terms, threatening foreclosure, initiating actual foreclosure proceedings, and demanding interest payments that were never formally recorded. Defendant structured these interest obligations to

appear lawful while continuing to demand payment under terms that violated applicable usury laws.

75. As a direct and proximate result of Defendant's collection of unlawful debt, Plaintiff suffered economic injury to his business and property, including the loss of the Harper Lake, Black Rock Cutoff, and Malibu properties and associated business opportunities.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Award Plaintiff economic damages for injury to his business in the amount of $6,135,068.21, representing lost profits from the Utah Solar Farm project, as a direct and proximate result of Defendant's violations of 18 U.S.C. § 1962(a) and/or § 1962(c). Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages totaling $18,405,204.63, plus post-judgment interest.

2. Award Plaintiff damages for injury to his property in the amount of $1,790,000, representing the appraised value of the Utah, Harper, and Malibu properties at the time of foreclosure, each of which was foreclosed upon as a direct and proximate result of Defendant's use and collection of unlawful debt in violation of 18 U.S.C. § 1962(a) and/or § 1962(c). Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages totaling $5,370,000, plus post-judgment interest.

3. Award Plaintiff reasonable attorneys' fees and costs incurred in bringing this action, as permitted under 18 U.S.C. § 1964(c).

4. Grant pre-judgment interest, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial for all claims so triable.

Dated: March 23, 2025                                         */s/ Clinton Brown, Self-Represented* [2]
                                                                                                      1431 Ocean Ave, Unit 413
                                                                                                      Santa Monica, CA 90401
                                                                                                      clinton@atlasinc.solar
                                                                                                      310-775-7990

CC: All Counsel of Record (via ECF) on March 23, 2025

---

[2] "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." *See* 28 U.S.C. § 1746