Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>        PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>        DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>JOINT APPENDIX OF STATEMENTS OF UNCONTROVERTED FACTS AND GENUINE DISPUTES  ON MOTION FOR SUMMARY JUDGMENT OR,  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br>DATE: 03/05/2026<br>TIME: 10:00 a.m.<br>CTRM: 8B |

TO THE CLERK OF THE COURT AND THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG, DISTRICT JUDGE:

Herewith is the Joint Appendix of Statements of Uncontroverted Facts and Genuine Disputes by Defendant Smead in support of his Motion for Summary Judgment or, in the alternative, Partial Summary Judgment.

/ / /

/ / /

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 1. On 04/21/2020 the first loan from Smead to Brown closed escrow, i.e., consummated. Smead made Brown a second-priority purchase money loan, California-licensed mortgage broker originated, for $170,000 principal, at 12.99% interest, monthly interest payments only until the loan matured in two years with a ballon payment due then.  It was secured by a vacant lot in Malibu CA, zoned for residential ("Malibu Lot") that Brown bought with the proceeds of Smead's loan and a first priority loan from seller Sarkany ("Malibu Lot"). Smead Decl. 12/30/2025 ("Smead Decl.") ¶ 3; Ex. 11-1-4 (Promissory Note). | Disputed. | 1."Smead's loan was recorded in first priority, and the Sarkany loan was recorded in second priority." Brown Decl. ¶23. | The loan's priority is irrelevant. This first loan from Smead was later consolidated with Sarkany's simultaneous purchase money loan, and was a Cal. broker-originated loan, so no usury existed, as exempt, but under 20% in any event. This loan was not foreclosed, but was later consolidated with the Sarkany loan in one new loan from Smead. |
| 2. In May 2021, Brown requested and Smead made a consolidation loan secured by the Malibu Lot. The new consolidated loan paid off both of Brown's purchase money loans from Sarkany and Smead, the consolidated loan being for $300,000 principal at 12% interest, interest only payments of $3,000 per month for a two year term to maturity, and the loan consummated (i.e., the loan "closed") on | Disputed. | 2. Disputed as to loan formation. "The May 2021 Malibu transaction was presented to me and understood by me as a new loan, not as a consolidation of prior loan obligations. The promissory note does not state that it is a consolidation loan." Brown Decl. ¶24; MSJ Ex 12 (S 013-S 014). | This loan consolidated Brown's two purchase money loans into this one. What Brown claims to understand about it or its presentation, or that the promissory note does not say "consolidated" is irrelevant. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 5/21/2021 ("Malibu Loan"). Brown was in default on payments on Smead's initial loan at the time. The escrow agent for the Malibu Loan closing was e-escrows, inc., which was paid a fee out of escrow from Brown's loan proceeds. Smead Decl. ¶¶ 4 - 6; Ex. 12-1-2 (Promissory Note); Ex. 12-3-4 (e-escrows, inc., Borrower Statement Final). ) | | | |
| 3. Smead's initial loan and the subsequent consolidated Malibu Loan were serviced by a professional loan servicer, Superior Loan Servicing, for a monthly fee paid by Smead. It had no participation or interest in the loan or its security or its payments, acting only to service the loan and keep track of payments and loan transaction items, and to communicate with the borrower as needed. Smead Decl. ¶ 7; Ex. 11-7-8 (Superior Loan Servicing Borrower Statement of Account, 4/7/2021). | Undisputed. | | |
| 4. Brown defaulted on the Malibu Loan, in arrears beginning with a late first payment, making only late interest-only payments for those due July 2021 – Nov. 2021, and no payments thereafter. | Disputed. | 4. Disputed as to the term default. "I defaulted in August 2022 when the Notice of Default was filed against the property." Brown Decl. ¶25 | Irrelevant dispute, as he "disputes" the term "default" but not the fact of default. And when default occurred is not relevant to the claim that unlawful interest was collected. A |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| Brown did not cure the default, and did not pay off the loan. He was also in default on the property tax payments. Smead Decl. ¶ 8; Ex. 13 (ledger payment history on initial and then the consolidated Malibu Loan period 2020 to 2023). | | | loan default occurs when a payment due is unmade, and that is not disputed. Loan default occurred as stated and was not cured. A "Notice of Default" is not the "default" itself, but gives notice of it. That Loan was long in default is not disputed. |
| 5. Regarding the Malibu Loan, on Smead's instruction due to Brown's default, the foreclosure trustee, Superior Loan Servicing, by Asset Default Management, Inc., as Agent for Trustee, performed and completed a foreclosure sale process. Smead's credit-bid of $372,338.14 (what was owed to me for the Malibu Loan) being the high-bid, the trustee issued to Smead a Trustee's Deed Upon Sale making him the owner of the Malibu Lot as of 01/04/2023. Smead Decl. ¶ 9; Ex. 14-2-3 (Trustee's Deed Upon Sale dated 1/4/2023). | Disputed. | 5. Disputed as to amount owed. "The amount Defendant claims due did not include the unrecorded $50,000 interest amount Defendant demanded in connection with the Malibu loan. Defendant later sold the Malibu property in March 2025 for $550,000." Brown Decl. ¶26 | The foreclosure was based on the amount due on the one consolidate loan, the written loan, by its terms, and did not involve this supposed "$50,000". And what Smead sold it for two years after he acquired it at the foreclosure sale for his full credit-bid is likewise irrelevant. And the subsequent sales price Brown asserts lacks foundation, and is irrelevant. |
| 6. In mid-September 2020, Smead considered making a loan to Brown as a second priority purchase money loan for desert land in the Hinkley/Harper Lake Area of San Bernardino that Brown hoped to | Disputed. | 6. Disputed as to characterization of the transaction and the conditions of funding. "On or about September 15, 2020, during a telephone call, Defendant and I discussed the Harper Lake loan, and Defendant required that I | The wire by Smead into escrow to lend to Brown if a loan to Brown was later consummated is not disputed. This is a spurious and irrelevant dispute. This is Smead money that would |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| develop into a solar-power generating field, so Smead wired funds of $150,000 to Chicago Title to hold in trust for a potential loan. Smead Decl. ¶ 16. | | agree to pay an additional $150,000 in interest as a condition of funding. On September 16, 2020, Mr. Smead wired $150,000 to the Harper Lake escrow from his Bank of Sierra account ending in 6236." Brown Decl. ¶¶15-16; Exhibit A at 15 (S 862) | later be loaned through escrow on the Hinkley Loan, and does not deal with the subject of Brown's spurious dispute, itself lacking documentary or other evidentiary support. |
| 7. Then, between mid-September 2020 and November 5, 2020, Brown made several proposals for me to fund his solar development business, sending me several written loan proposals, and a proposal to buy stock or lend against stock he said he owned in "Atlas, Inc.", all of which I rejected. Smead Decl. ¶¶ 11-15: (on 9/24/2020) Ex. 43-1-4 (proposed "Loan Agreement, dated Sept. 24, 2020" of loan to Atlas Dev. Group, LLP); (on 11/2/2020) Ex. 42-1-3 (proposed Guaranty of proposed loan to Atlas Dev. Group, LLC; (on 11/3/2020) Ex. 16-1-21 (email Brown to Smead of 11/3/2020, and attached proposed loan documents for a new loan against the Malibu Lot); (on 11/5/2020) Ex. 59-1-8 (11/4/2020 proposed note and guaranty for new loan on Malibu Lot, signed by Brown). | | 7. Disputed as to characterization of the November 3, 2020, email and the purpose of the proposed Malibu documents. "After Chicago Title refused to record the interest demanded in connection with the Harper Lake loan, Defendant sought to have the $150,000 secured by a different property. I proposed securing that amount against the Malibu property, but Defendant rejected that approach because it would have resulted in a third deed of trust, and Defendant was already the second deed of trust holder at that time." Brown Decl. ¶27. | This does not dispute the subject of the FACT, but admits that Smead rejected Brown's various written loan proposals set forth in the FACT. |
| 8. In November 2020, Smead made Brown a | Disputed. | 8. Disputed as to loan terms. "In addition to the | The loan terms were written. This |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| second-priority purchase money loan for raw, undeveloped, land in the Hinkley/Harper Lake area ("Hinkley Lot"). Smead lent $150,000 principal, at 8% interest, secured by the Hinkley Lot ("Hinkley Loan"). The Hinkley Loan promissory note provided for interest only payments of $1,000 per month beginning Jan. 1, 2021 and maturing on Dec. 1 2022. The Hinkley Loan consummated, i.e., closed, on 11/10/2020, through escrow Chicago Title Company, chosen by the seller of the Hinkley Lot, American Pacific Investments, LLC, which held a first-priority security interest ("AmPac"). AmPac and Brown had chosen the escrow company and Smead agreed for convenience sake and escrow was paid its fee from Brown's loan funds. There were no other terms or conditions for the Hinkley Loan than those set forth in writing on the Note, Deed of Trust, and as reflected on the Final Buyer's Statement from escrow. And Smead bought a lender's title insurance policy. Smead Decl. ¶¶ 16-20; Ex. 15-1 ("Note"); Ex. 15-4-7 | | recorded terms, Defendant required that I agree to pay an additional $150,000 in interest over the course of one year in connection with the $150,000 Harper Lake loan, such that the total interest obligation exceeded the principal amount of the loan at the outset of the repayment period." Brown Decl. ¶28 | does not dispute the subject of the FACT This is a specious dispute, not germane to the FACT. And no evidence exists that Brown paid any of this supposed "additional interest" mentioned here. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| ("Deed of Trust"); Ex. 15-2-3 (Final Buyer's Statement). | | | |
| 9. Brown defaulted on the Hinkley Loan immediately, not making any of the required interest-only monthly payments due for Jan 1 2021 through April 1, 2021. Then, On April 28, 2021, an entity named "Atlas LLC" paid those four payments then overdue, a total of $4,000 interest only payments. Brown made no more payments on the Hinkley Loan after that due for April 1, 2021. However, Brown did not cure the default, and did not pay off the loan. Smead Decl. ¶¶ 21 & 22; Ex. 19 (Ledger of Hinkley Loan Payments); Ex. 75 (Smead Bank Statement 04/30/2021 (redacted). | Disputed. | 9. Disputed as to payment history and characterization of default. "Defendant did not always require monthly payments and at times told me that I did not need to pay immediately. After those periods, Defendant charged me amounts he described to me as forbearance charges. On April 28, 2021, I paid $4,000 by ACH through The Atlas LLC. On June 25, 2021, I made an additional $4,000 payment. I understood these payments to include amounts related to obligations that were not recorded on the Harper Lake loan.." Brown Decl. ¶ 29; Exhibit A at 30 (S 877), 36 (S 883) | This does not dispute the subject of the FACT. Furthermore, even if Brown paid $4,000 more on June 25, 2021, it did not cure the loan default, as far more loan payments were overdue. And, the loan terms were written and enforced as written. |
| 10. In mid-April of 2021, Brown asked Smead to make a refinance loan on property he owned in Utah, which was raw, undeveloped land ("Utah Lot"). Smead Decl. ¶ 29. | Disputed. | 10. Disputed as to timing. "I did not request a Utah loan until June 2021, after receiving a professional appraisal valuing the property at approximately $240,000." Brown Decl. ¶30. | The alleged "timing" of Brown inquiry does not create a dispute about the subject of the FACT that Brown requested the loan, nor a dispute about Smead's reasoning. Here, Brown admits requesting the Utah loan on the Utah Lot. As to the "appraisal" Brown says he obtained, it is of no relevance to this FACT. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 11. Smead told Brown he did not want to make the loan against the Utah Lot as too risky, because of Brown's history of loan defaults on the Malibu Loan and the Hinkley Loan, which even then were uncured defaults, with none of the properties generating any revenue to fund loan payments, and the Utah Lot not supporting the refinance loan as worth only $50,000 when Brown was requesting a new loan for $100,000 cash to Brown. Smead Decl. ¶ 30. | Disputed. | 11. Disputed as to value. "I did not request a Utah loan until June 2021, after receiving a professional appraisal valuing the property at approximately$240,000." Brown Decl. ¶30 | The alleged "value" does not create a dispute of this FACT. Nor does it create a dispute about Smead's reasoning as set forth in the FACT. Rather, Brown had been chronically in default on the Hinkley Loan, from the beginning. FACT 9. And chronic default on the Malibu Loan (consolidate) and the initial loan from Smead consolidated into it. FACT 1; FACT 2. |
| 12. To induce Smead to make a loan on the Utah Lot, Brown proposed to pay Smead a risk-based bonus, a risk-based origination fee, to help compensate for the risk in the loan transaction, in addition to the new money lent, that he would owe Smead, proposing that the bonus, or origination fee, would be $100,000, in addition to the $100,000 of cash money paid through escrow Smead would lend. Smead agreed to make the loan on these terms, which would be for a stated principal amount of $200,000, at the rate of 10% interest. Smead Decl. ¶ 32. | Disputed. | 12. Disputed as to lending terms. "I did not propose or agree to pay Defendant any risk-based bonus or risk-based origination fee in connection with the Utah loan. Defendant directed that $100,000 associated with the Harper Lake transaction be included in and recorded with the Utah loan." Brown Decl. ¶31 | Whether or not Brown proposed the $100,000 to be put on the promissory note above cash out of escrow does not create a dispute of the FACT. And, the "dispute" is spurious and not grounded in evidence. Brown provides no evidence that Smead could force a "demand" to include the Utah loan money Brown says was from the "unwritten terms" of the Hinkley loan. Rather, the Hinkley loan was made in Nov. 2020 and the Utah loan was made in June 2021, seven months later. Brown offers no |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | evidence to support that Smead could require Brown to get a loan from him for the Utah loan. |
| 13. Brown instructed the Utah escrow as follows: "$100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000". Smead Decl. ¶ 32; Ex 1-5-7 (email from Brown to Jeremy Gale of escrow dated June 18, 2021). | Disputed. | 13. Disputed as to who directed the escrow instruction. "On or around the opening of the Utah escrow, Defendant instructed me by telephone to send the email to escrow stating that $100,000 had already been allocated to him and that the remaining funds to be sent would be $100,000." Brown Decl. ¶32 | Brown does not dispute that he sent the email to escrow. Claiming that Smead "instructed" his to send the email creates no dispute. |
| 14. On June 30, 2021, Smead made the loan to Brown, secured by the Utah Lot, receiving a promissory note for $200,000 at 10% interest, interest only payments monthly beginning August 1, 2021, and a ballon payment due in two years. The $200,000 stated as principal was for the $100,000 of bonus, or origination fee, owed to Smead for making the loan, plus $100,000 of the cash money disbursed through escrow to Brown ("Utah Loan"). The Utah Loan consummated, i.e., closed, on June 30, 2021. The settlement statement for the Utah Loan, approved by Brown and Smead, read, on page 2, under | Disputed. | 14. Disputed as to lending terms and disbursement. "I did not agree that $100,000 of the Utah loan principal represented a bonus or origination fee, and I did not receive $100,000 paid to me outside of escrow." Brown Decl. ¶ 33 | Brown signed the Utah promissory note for $200,000. What he "thought" about the characterization of the $100,000 obligation above-cash of $100,000 does not create a dispute. The $100,000 "paid outside of close" was a joint characterization in the signed escrow instructions. The additional money was lent, as money owed by Brown under the promissory note, and Brown agreed in the promissory note that he owed it. If he thought he should receive an additional $100,000, still, that is not "usurious interest from California loans", |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| "Miscellaneous" as follows: "Loan Funds paid outside of close to Clinton Brown $100,000". Brown paid escrow fees from the loan funds and Smead bought a lender's title policy. Smead Decl. ¶¶ 33 & 34;  Ex. 2-1 ((promissory note called "Trust Deed Note"); Ex. 2-7-9 (Settlement Statement). | | | but would be a breach of the promissory note not receiving another $100,000. Rather, the $100,000 of the promissory note amount that was not cash through escrow represented the obligation Brown agreed to pay for the Utah loan on the Utah Lot for getting cash of $100,000, the other $100,000 of the $200,000 promissory note as a charge to him he was borrowing as owed and unpaid to Smead for a finance charge, however described,  for Smead making the loan. |
| 15. In September 2021, Brown proposed that Smead invest in his businesses by stock purchases or stock-secured new lending, and connected with proposed changes in the existing, defaulted loans. Smead declined. Smead Decl. ¶ 48; Ex. 53 (email Brown to Smead 09/16/2021). | Disputed. | 15. Disputed as to characterization of the September 16, 2021 email. "In my September 16, 2021 email, I asked Defendant to confirm his records regarding monthly payments on the Harper Lake loan and stated: 'I believe I owe you since May 2020 for Harper @$1,000 a month. Is that what your record shows? Please confirm or let me know if I'm wrong.' I did not propose changes to the existing loans." Brown Decl. ¶ 34 | The email reads what it does, and what Brown thinks he meant, his characterization in dispute, about what he wrote does not create a dispute. |
| 16. Brown defaulted on the Utah Loan, not making the payment due on March 1, 2022, and made no payments thereafter. | Disputed. | 16. Disputed as to the date of default. "The Notice of Default on the Utah property was recorded in August | Irrelevant dispute, as he "disputes" the term "default" but not the fact of default. And when default occurred is |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| Brown paid a total of $11,669 in interest only payments on the Utah Loan. Brown did not cure the default, and did not pay off the loan. Smead Decl. ¶ 35; Ex. 74 (ledger of payments on Utah Loan, Bates S 451). | | 2022." Brown Decl. ¶ 35. | not relevant to the claim that unlawful interest was collected. A loan default occurs when a payment due is unmade, and that is not disputed. Loan default occurred as stated and was not cured. A "Notice of Default" is not the "default" itself, but gives notice of it. That the loan was in default is not disputed, nor would it create a dispute |
| 17. In July 2022, Smead bought the first priority purchase money loan Brown had taken from the seller of the Hinkley Lot, American Pacific Investments, LLC ("AmPac"), when it was in default, so as to avoid its foreclosure that would eliminate Smead's security interest for the Hinkley Loan, paying $370,203.00. Smead paid the escrow fee. Smead Decl. ¶ 24; Ex. 17 ((composite) Corporation Assignment of Deed of Trust 17-1-3; Ex 17-4 Escrow Closing Statement). | Disputed. | 17. Disputed as to default and amount. "No Notice of Default was recorded in connection with my loan from American Pacific Investments, LLC. After I provided Defendant with an appraisal valuing the Harper Lake property at approximately $1.1 million, he contacted me to discuss the acquisition of the first deed of trust on the Harper Lake property." Brown Decl. ¶¶36-37; Exhibit A at 58 (S 905). | Irrelevant dispute. That the AmPac first priority loan had not recorded a "Notice of Default" is irrelevant, as loan is in default when payment is not timely made, not because a "Notice of Default" records. While irrelevant, the AmPac loan was in default, it was in default. Smead bought the AmPac first priority loan for both the principal and the unpaid interest that was overdue, i.e., in default. Whether or what was "discussed" between Brown and Smead about the AmPac loan is irrelevant, as is whether Brown had provided an appraisal to Smead. Rather, |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | Smead foreclosed on the second priority loan that Smead had made. FACT 19. |
| 18. As of 08/23/2022: Brown's interest rates, by Brown's calculation, on the several loans Smead had made to him were at the rate of 17% interest, as Brown wrote to Smead. Smead Decl. ¶ 25; Exh 60 (email Brown to Smead, August 23, 2022 at 12:51 a.m.). | Disputed. | 18. Disputed as to characterization of the email. "In the email I sent on August 23, 2022, which is neither Bates-stamped nor readable but has been filed earlier in this case, I was referring to the statement that Superior Loan Servicing had sent me stating that the interest rate was 17%; I was not referring to the unrecorded $50,000 portion of the Malibu loan, nor was I performing an independent calculation of the Malibu loan's interest rate. Brown Decl. ¶38 | The email reads what it does, and what Brown thinks he meant, his characterization in dispute, about what he wrote does not create a dispute. It is an admission by Brown to Smead pertaining to the loans that by Brown's calculation he was paying 17% interest. However, the Malibu Loan was for 12.99%, and the Hinkley Loan for 8% and the Utah Loan for 10%, as the promissory notes state. |
| 19. On Smead's instruction due to Brown's default, the foreclosure trustee, Peak Foreclosure Services, Inc., performed and completed a foreclosure sale process based on Smead's second priority Hinkley Loan. Smead's credit-bid of $175,909.68 (what was owed on second priority Hinkley Loan) being the high-bid, the trustee issued to Smead a Trustee's Deed Upon Sale making me the owner of the Hinkley Lot on | Undisputed. | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 01/31/2023. Smead Decl. ¶ 26; Ex. 20 (Trustee's Deed Upon Sale dated 1/30/2023). | | | |
| 20. On Smead's instruction, due to Brown's default on the Utah Loan, the foreclosure trustee, commenced and completed a foreclosure sale, and Smead's credit-bid of the amount due on it being the high-bid of $220,923.20, issued a Trustee's Deed Upon Sale making me the owner of the Utah Lot as of March 8, 2023. Smead Decl. ¶ 36; Ex. 9-1-2 (Trustee's Deed, dated 03/08/2023). | Undisputed. | | |
| 21. Under Brown's ownership, none of the security properties for the loans generated revenue nor income to Brown during the duration of the Malibu Loan, Hinkley Loan or Utah Loan.  Nor at the time of the foreclosures did Brown have any contracts entered for any of the three Lots that would generate revenue or income to him or for the use of the lots. Smead Decl. ¶¶ 10, 40 (Malibu Lot); ¶¶ 23, 28 & 41 (Hinkley Lot);  ¶¶ 38 & 42 (Utah Lot). Brown Depo. at: 29:13-30:8; 31:7-13; 32:19-33:25; 156:7-10; 157:23-158:1; 158:25-159:2; 173:10-22. | Disputed. | 21. Disputed as to characterization of contracts. "Brown's property was also the only property in the proposed project that was granted a transmission right-of-way from Millard County, Utah, to connect to the grid. A right-of-way to connect to the grid is vital to the success of any solar project. Chaudhuri Decl. ¶ 7; "Utah was the only property in the proposed solar project that had both a solar development permit and a transmission right-of-way." Brown Decl. ¶39 | Brown does not dispute the FACT itself, that no contracts existed that generated any revenue. Rather, his "dispute" evidence is that there existed a "permit" from the County, and a right of way as to one lot, the Utah Lot. A right of way and a county permit are not revenue generating contracts and Brown presents no evidence that those did. revenue. Note that there was only a "proposed" solar project. Not a revenue generating activity. Further the Chaudhuri declaration attached as an |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | exhibit to the Second Amended Complaint [Doc. 90], filed 03/23/2025, alleged in its ¶ 61 as incorporated by reference, the Chaudhuri declaration being Doc. 90-2, filed 03/23/2025, was denied on the alleged facts, in Smead's Answer at ¶ 61 to the Second Amended Complaint [Doc. 95], filed 04/07/2025 ("Answer"). And Plaintiff does not proffer the Chaudhuri declaration as evidence in opposition to the Summary Judgment Motion. Nor if it is allowed to be considered, does not give any facts that any contracts generating revenue existed as to the Utah Lot. And no evidence is offered in dispute that either the Hinkley Lot nor the Malibu Lot generated any income. So, the FACT is not properly disputed. |
| 22. Under Smead's ownership, the Hinkley Lot and the Utah Lot have generated no revenue to Smead since he became the owner by foreclosure. No contracts or leases | Undisputed. | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| have been offered to Smead for development or use of the properties, nor did anyone claim to Smead that they had an existing contract right for the property when he foreclosed, and he has entered no contracts or leases for these raw and undeveloped land which are the properties. Smead eventually sold the Malibu Lot, in 2025. Smead Decl. ¶¶ 10, 40 (Malibu Lot); ¶¶ 23, 28 & 41 (Hinkley Lot);  ¶¶ 38 & 42 (Utah Lot). | | | |
| 23. During the loans, Brown paid nothing on principal owed and made only the following interest payments: On the Malibu Loan, Brown paid interest of $15,000 total; on the Hinkley Loan, Brown paid interest of $4,500 total; on the Utah Loan, Brown paid interest of $ 11,669 total. Smead Decl. ¶ 43. A: (Malibu), B: (Hinkley), and C. (Utah). | Disputed. | 23.Disputed as to amounts. Defendant's bank statements reflect payments that differ from the amounts he claims for the Malibu, Hinkley, and Utah loans. Exhibit A at 30 (S 877), 36 (S 883). | Brown does not offer evidence to contradict the amount of interest paid on the written loans, and the exhibits pp. A 30 and A 36 are not properly authenticated, and not admissible for the purpose used for the dispute, under F.R.E. 901(a). Further, Brown provides nothing on which loan the payments referenced applied to, to contradict Smead's statements and his loan ledgers attached as exhibits. "Different from the amounts" is not a material dispute, as Brown does not claim that payments were not applied to the loans as evidenced in Smead's |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | declaration and exhibits of loan ledgers. Nor does any discrepancy bear on a material dispute, which is whether any unlawful debt was collected, i.e, at double the state usury rate. The dispute is not properly made and is immaterial. |
| 24. Smead as owner estimates that at the time of the foreclosure sales, these were the values of the lots: Malibu Lot: $425,000; Hinkley Lot: $475,000; Utah Lot: $50,000. Smead Decl. ¶ 43. A: (Malibu), B: (Hinkley), and C. (Utah). | Disputed. | 24. Disputed as to values for Harper Lake & Utah. "I sent Defendant appraisals by email for the Malibu, Harper Lake, and Utah properties showing values of approximately $425,000, $1,100,000, and $240,000, respectively." Brown Decl. ¶ 40. | This does not dispute the FACT, as it is about values as opined by the owner at the time of foreclosure. And it is an irrelevant dispute, in any event. Smead as owner at time of foreclosure may opine admissibly on the values of what he owns. Brown was not the owner then. His appraisals that he obtained are not admissible evidence on values of the lots at any time, as they are not authenticated from the authors, nor have declarations been submitted to show that the authors were qualified to render the appraisals they did. What Brown believed the values of the properties were when he owned them is not relevant, and not admissible. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 25. All of Smead's transactions and loans connected with Brown and the security properties were in Smead's own name and in his own right as an individual, with no shared ownership or right in any of them in any other person or entity. No person, no individual, nor entity, was involved with receiving payments or proceeds on these loans to Brown, as these were individual loans from Smead to Brown. Smead made these loans as his alone, and no person, individual, or entity had any ownership or rights in the loans, the payments on the loans, or the real property securities foreclosed upon. Smead Decl. ¶ 47; Facts, supra, 1, 2, 8, & 14. | Disputed. | 25. Disputed as to the entity receiving payments and the rights to payments on the loans. Payments were received through a bank account titled "Steve Smead DBA Smead D&S Rentals," is used for Defendant's lending business and other business activities, not solely by Defendant in an individual capacity. Ex. A at 1–74; ECF No. 119 at 6 | No dispute is created. Smead was the promissee of the promissory notes, and had a right to receive payments. Further, Smead is named on the bank statements showing payments received, and a "d.b.a." on the account does not change that. Further, Brown offers no evidence that any other person than Smead received payments, nor that anyone but Smead had a right to payments. Further, the Ex. A and ECF cited do not evidence that anyone other than Smead was the lender, nor had a right to loan payments, nor received loan payments. |
| 26. The escrow companies used to consummate the origination of the Malibu Loan, the Hinkley Loan and the Utah Loan were paid a fee for their services by Brown out of the loan proceeds. I paid nothing to them. And none of them had any other involvement in the loans. These escrow companies were not involved loan servicing, nor enforcement, nor foreclosure, and never had any interest nor rights in the | Undisputed. | | |

| Undisputed Fact | Status | Opposition | Reply | |
|---|---|---|---|---|
| loans, nor loan payments, nor the security properties, either pre- or post-foreclosure. Each was merely paid a fee for service to accomplish its discreet task. When Smead sold the Malibu Lot in 2025, he shared payment of the escrow fees with the buyer. Smead Decl. ¶ 44; escrow closing statements showing fees paid: Malibu Loan, Exh. 12-3-4; Hinkley Loan, Exh. 15-2-3; Utah Loan, Exh. 2-7-9; the AmPac first priority loan on the Hinkley Lot, Ex. 17-1-3. | | | | |
| 27. Regarding the foreclosure trustees: The fees and costs that the foreclosure trustees' charged Smead for the foreclosure processes as to the Malibu Loan, the Hinkley Loan, and the Utah Loan. These foreclosure fees and costs were then added to the indebtedness foreclosed on. None of the trustees had any other involvement in the loans than to be named in the deed of trust as trustee, or to become a substituted trustee, and then to perform the statutory requirements for the trustee's foreclosure sales. These foreclosure trustees were not involved | Undisputed. | | | |

| Undisputed Fact | Status | Opposition | Reply | |
|---|---|---|---|---|
| loan origination, except to be named as a trustee in the deed of trust, nor in servicing, and never did any of them interests, nor rights, in the loans, nor in loan payments, nor in the security properties, either pre- or post- foreclosure. Each was merely paid a fee for service to accomplish its discreet task. Smead Decl. ¶ 45. | | | | |
| 28. Regarding the Title Insurance Companies. Smead lenders' policies of title insurance for each of the three loans, Malibu Loan, Hinkley Loan, and Utah Loan, paying a price certain based on the loan amount stated on the promissory notes. None of the title insurance companies had any involvement or rights in the loans or security property, from origination through servicing and foreclosure, as Smead made no claim under the policies. The title insurers' were paid nothing but the policy premium at the time each of the three loans originated, and never received any payment or property interest in the loan or the security property at any time. Smead Decl. ¶ 46. | Undisputed. | | | |
| 29. On the Utah Loan, the rate of interest Brown | Disputed. | 29. Disputed as to interest rate calculation. | This does not create a dispute about the effective | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| actually paid before foreclosure was 7.4% if counted only as to the $100,000 cash through escrow lent, and only 3.7% if counted against the $200,000 that included the risk-premium origination fee. Smead Decl. ¶ 39. | | "I paid interest calculated on a $200,000 principal amount, not solely on the $100,000 disbursed through escrow in Utah." Brown Decl. ¶41 | interest rate on either the cash lent, nor on the $200,000 stated amount of the promissory note. Nor does it create a dispute about whether unlawful interest (double the state usury rate) was paid/collected. |

## DEFENDANT SMEAD'S CONCLUSIONS OF LAW

| Conclusions of Law | Relevant Facts |
|---|---|
| Plaintiff cannot prove that Defendant collected unlawful debt from Plaintiff in violation of 18 U.S.C. § 1962(a), as 18 U.S.C. § 1961(6) defines "unlawful debt" to be double or more of the applicable state or federal usury limitation. | Facts 1, 2, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 19, 20, 23. |
| Plaintiff cannot prove that Defendant collected unlawful debt from Plaintiff in violation of 18 U.S.C. § 1962(c), as 18 U.S.C. § 1961(6) defines "unlawful debt" to be double or more of the applicable state or federal usury limitation. | Facts 1, 2, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 19, 20, 23. |
| Plaintiff cannot prove that Defendant violated 18 U.S.C. § 1962(c), as he was not part of an enterprise of associated-in-fact persons who through a pattern of racketeering activity (predicate acts) caused injury to Plaintiff's business or property by unlawful conduct. | Facts 3, 25, 26, 27, 28. |
| Plaintiff cannot prove that Defendant violated 18 U.S.C. § 1962 against him. | Facts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 18, 19, 20, 23, 25, 26, 27, 28. |
| Plaintiff cannot prove that Defendant caused him to suffer money damages | Facts 5, 17, 19, 20, 21, 22, 23, 24. |

| | |
|---|---|
| compensable under 18 U.S.C. §§ 1962 and 1964. | |
| Plaintiff cannot prove that he is entitled to any civil remedy against Defendant, under 18 U.S.C. § 1964. | Facts 5, 17, 19, 20, 21, 22, 23, 24. |

Date: Jan. 22, 2026                    Respectfully Submitted,

/s/ *Fred Hickman*

Fred Hickman
fredhickman@gmail.com
Attorney for: Defendant Steve Smead

1

**CERTIFICATE OF SERVICE**

2

**SMEAD V. BROWN, U.S.D.C. CENT. DIST. CAL., WESTERN DIV. CASE NO.  2:23-cv-02938-MEMF(KSx)**

3

4

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the city of Santa Ana, California; my business address is 17602 17th St., Suite 102-206, Tustin, CA  92780.

5

6

On Jan. 22, 2026, I served a copy of the following documents entitled:

7

JOINT APPENDIX OF STATEMENTS OF UNCONTROVERTED FACTS AND GENUINE DISPUTES BY ON MOTION FOR SUMMARY JUDGMENT OR,  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

8

9

on the interested parties in this case as follows:

10

ALL PERSONS ENTITLED TO NOTICE WERE SERVED ELECTRONICALLY VIA THE COURT'S CM/ECF SYSTEM.

11

12

13

14

15

16

I hereby certify that I am a member of the Bar of this Court, the United States District Court, Central District of California. This certificate of service is executed at Santa Ana California on Jan. 22, 2026.

17

| FRED HICKMAN | /s/ Fred Hickman |
|---|---|
| (Type or Print Name) | (Signature of Declarant) |

18

19

20

21

22

23

24

25

26

27

28