Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>    PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>    DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>DECLARATION OF FRED HICKMAN IN AUTHENTICATION OF DEPOSITION EXCERPTS OF CLINTON BROWN DEPOSITION OF DEC. 4, 2025, I.S.O. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>DATE: 03/05/2026<br>TIME: 10:00 a.m.<br>CTRM: 8B |

I, Fred Hickman, declare as follows.

 1.  I am a member of the bar of this court and of the bar of the courts of the State of California.

 2.  On December 4, 2025, under Notice of Deposition of Clinton Brown, Plaintiff, I took the deposition of Plaintiff Clinton Brown by remote/audio/visual manner, transcribed by a Certified Shorthand Reporter, a court reporter, authorized

to administer to take, record in written format, and to transcribe from shorthand, that testimony under oath in the State of California. The remote/audio/visual deposition was done by remote at the request of Plaintiff.

3.  Attached hereto are true and correct copies of certain pages of the certified deposition transcript of Clinton Brown, of Dec. 4, 2025, unsigned by Brown but certified by the court reporter Mary P. Randle, CSR No. 10312,  as oath administered to the witness, Clinton Brown, and certified as taken down by her in shorthand and thereafter transcribed into typewriting under her direction and supervision. The certification is at p. 286.

4.    Attached hereto are true and correct copies of the face page, opening swearing in of the witness, and certain testimony of the witness, along with the certification of the court reporter, which are pages 1-2, 9-10, 28-33, 155-159, 172-173 and 267-268, and 286 (certification).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed on Dec. 31, 2025, in the State of California.

DATE: Dec. 31, 2025                    _Fred Hickman_____

                                       Fred Hickman

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

Case No.: 2:23-cv-02938-MEMF(KSx)


CLINTON BROWN,

            Plaintiff,

v.

STEVE SMEAD,

            Defendants.

_____




VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

CLINTON BYRON BROWN

Thursday, December 4, 2025

10:01 a.m.


Taken remotely via Zoom



REPORTED BY:
Mary P. Randle
CSR No. 10312

1

1    APPEARANCES:

2    (Appearances via videoconference.)

3

4    For Plaintiff:

5         CLINTON BROWN (IN PRO SE)
          1431 Ocean Avenue
6         Unit 413
          Santa Monica, California 90401
7         310-775-7990
          brown_clinton@msn.com
8
     For Defendant:
9
          FRED HICKMAN, ESQ.
10        17602 17th Street
          Suite 102-206
11        Tustin, California 92780
          714-315-1565
12        fredhickman@gmail.com

13   Also Present:

14        Jonathan Paulino, Videographer
          Matthew Laurence, Exhibit Concierge
15        Steve Smead (Joined at 10:12 a.m.)

16

17

18

19

20

21

22

23

24

25

2

```
 1                    TAKEN REMOTELY VIA ZOOM

 2                   THURSDAY, DECEMBER 4, 2025

 3                         10:01 A.M.

 4

 5            THE VIDEOGRAPHER:  Good morning.  This is the

 6      video deposition of Clinton Brown, taken remotely on

 7      Thursday, December 4th, in the year 2025, in the

 8      matter of Clinton Brown versus Steve Smead, Case Number

 9      2:23-cv-02938-MEMF.  This case is being heard in the

10      United States District Court, Central District of

11      California, Western Division.

12            My name is Jonathan Paulino, legal videographer

13      contracted through Dean Jones Legal Videos, Inc., of

14      Los Angeles and Santa Ana, California.  Because we're

15      not in person, the videographer will have to interrupt

16      proceedings if the deponent drifts out of frame or

17      should any connectivity issues with Zoom occur.

18            This deposition is commencing at 10:01 a.m.

19      Would all present please identify themselves, beginning

20      with the deponent.

21            THE WITNESS:  Clinton Brown, Pro Se.

22            MR. HICKMAN:  Fred Hickman, attorney for

23      Defendant Smead.

24            THE VIDEOGRAPHER:  Would the court reporter

25      please administer the oath.
```

9

1        THE COURT REPORTER:  For the record, my name is

2   Mary Randle.  I am a State of California Certified

3   Shorthand Reporter.  My CSR license number is 10312.

4

5                CLINTON BYRON BROWN,

6       having been first duly sworn, was examined and

7                 testified as follows:

8

9                    EXAMINATION

10  BY MR. HICKMAN:

11      Q    **Good morning, Mr. Brown.**

12      A    Good morning.

13           Before we begin, I -- can I make my objections,

14  please, for the record?

15           MR. HICKMAN:  Yes.  Please do.

16           THE WITNESS:  For the record, Plaintiff objects

17  under Rule 30(c)(2) to the use of any document not

18  produced in discovery and reserves all rights under

19  Rule 32(a), Rule 32(b), and Rule 37(c)(1).

20  BY MR. HICKMAN:

21      Q    **Your deposition is being taken under the notice**

22  **since you are the plaintiff.  Have you been deposed**

23  **before?**

24      A    No.

25      Q    **Have you been sued before in any court of law?**

```
 1      A    Not specifically to the Easy Winter land, but a
 2   contract, yes.
 3      Q    What contract did HST have regarding the -- the
 4   project in Utah with Samsung for the Easy Winter
 5   property?
 6      A    It was -- it wasn't specifically to that
 7   property.  It was for any property.
 8      Q    Did -- was it HST that paid you compensation on
 9   the Easy Winter property lease?
10      A    Yes.
11      Q    Did Easy Winter pay you any compensation for
12   arranging a solar lease?
13      A    Yes.
14      Q    Did Samsung pay you any compensation for
15   arranging a solar lease?
16      A    No.
17      Q    Are you licensed as a real estate broker in the
18   state of Utah?
19      A    No.
20      Q    Is the involvement you had with the Easy Winter
21   solar lease something that requires a real estate
22   broker's license in the --
23      A    No.
24      Q    -- state of Utah to be lawful activity?
25      A    No.
```

28

1    Q    How do you know?

2    A    Because I know.

3    Q    Did you investigate?

4    A    Yes.

5    Q    What affiliation have you had with Atlas Real

6  Estate Investments, Incorporated, a California

7  corporation?

8    A    That's my company.

9    Q    Does it still operate?

10    A    It was -- no.

11    Q    Were you the sole shareholder?

12    A    Yes.

13    Q    What involvement -- what -- what affiliation

14  have you had with Harper Lake SPV, LLC?

15    A    It was a LLC.

16    Q    What business did it do?

17    A    Solar -- a solar farm.

18    Q    How were you involved with Harper Lake SPV,

19  LLC?

20    A    It was the LLC for the solar farm.

21    Q    What solar farm?

22    A    A solar farm at Harper Lake.

23    Q    What property at Harper Lake?

24    A    It's called Harper Lake.

25    Q    Is it in the area of Hinkley?

```
 1      A     Yes.
 2      Q     Is that land you owned that you obtained a loan
 3   from Steve Smead for?
 4      A     One of the lenders, yes.
 5      Q     Did Harper Lake SPV, LLC, obtain any revenue?
 6      A     No.
 7      Q     No revenue ever?
 8      A     No.
 9      Q     What assets did Harper Lake SPV, LLC, have at
10   any time?
11      A     None.
12      Q     Did you incorporate Harper Lake SPV, LLC?
13      A     I don't believe I did.  I don't know if it was
14   a -- I think it was an LLC.
15      Q     Yes.  Did you establish Harper Lake SPV, LLC?
16      A     From what I recall, yes.
17      Q     When?
18      A     I don't know.
19      Q     Five years ago?
20      A     If you want to show me the LLC, I'll tell you,
21   but I don't know.
22      Q     Within the last five years?
23      A     It's on the public record.
24      Q     Were you the sole member of the Harper Lake
25   SPV, LLC?
```

30

```
 1      A    From what I recall, yes.

 2      Q    And you were the manager?

 3      A    From what I recall, yes.

 4      Q    When was the last activity of Harper Lake SPV,

 5  LLC?

 6      A    I don't know.  I don't think it's in existence.

 7      Q    Did it -- did Harper Lake SPV, LLC, ever enter

 8  into any contracts for any purpose?

 9      A    Not that I'm aware.

10      Q    Did Harper Lake SPV, LLC, ever develop any

11  solar farm at the Hinkley Harper Lake property you

12  owned?

13      A    No.

14      Q    Why did you establish Harper Lake SPV, LLC?

15      A    I don't recall.

16      Q    Is it connected to your ownership of property

17  at Hinkley Harper Lake?

18      A    Probably, yeah.

19      Q    Who would know?

20      A    Well, I don't remember.  I don't know -- I

21  don't remember when it was -- if you have the LLC

22  documents, I'll look at it.  It's public record.  But I

23  don't have it, so I can't tell you.

24      Q    What was the entity's purpose?

25      A    Well, I believe what it says on the State of
```

```
 1    California is that -- whatever it says about the --
 2    whatever their -- I don't know what it says, but it was
 3    for a solar farm.  I mean, that's -- I've already asked
 4    and answered that.
 5         Q    What does the "SPV" in the title stand for?
 6         A    I don't know.
 7         Q    Did you pick the name?
 8         A    I'm guessing.
 9         Q    Don't guess.  Who picked the name for Harper
10    Lake SPV, LLC?
11         A    Couldn't tell you.
12         Q    Someone else other than you?
13         A    No.  I don't recall what it means, "SPV."  I --
14    I chose it, but this was years ago.  I don't know.
15         Q    How many years ago did you choose that name for
16    Harper Lake SPV, LLC?
17         A    I don't know.  It must have been, like, 2020 or
18    something.
19         Q    Do you have any affiliation with Millard,
20    M-I-L-L-A-R-D, County Solar Farm SPV, LLC?
21         A    Yeah.  That was -- yes.
22         Q    What?
23         A    Oh, then "SPV" means special purpose vehicle.
24    That's what that means.
25         Q    What affiliation do you have with Millard
```

32

1    County Solar Farm SPV, if any?

2        A    That was -- I created that.

3        Q    When?

4        A    I don't recall what date.

5        Q    Is there --

6        A    These are public records.  If you provide them,

7    I can tell you the date.

8        Q    Is it a Utah limited liability company?

9        A    I don't know.

10        Q    Is it California limited liability company?

11        A    It was probably California because -- yeah.

12        Q    Why do you say probably California rather than

13    Utah?

14        A    Because I put all the LLCs as home based in

15    California.

16        Q    Did Millard County Solar Farm SPV ever have any

17    assets?

18        A    No.

19        Q    Were you the sole member?

20        A    Yes.

21        Q    Were you the manager?

22        A    If that's what the document says.

23        Q    Did -- did Millard County Solar Farm SPV, LLC,

24    ever enter any contracts?

25        A    Not that I recall.

```
 1        A    None.
 2        Q    To your knowledge, are there any other solar
 3   installations in Millard County than what's been
 4   described -- are there any solar installations in
 5   Millard County?
 6        A    I don't know.
 7        Q    Is there any solar power being generated in
 8   Millard County?
 9        A    I don't know.
10             MR. HICKMAN:  I need a short break.  Five
11   minutes.  Is that all right?
12             THE WITNESS:  Sure.
13             MR. HICKMAN:  Okay.
14             THE VIDEOGRAPHER:  Video deposition is going
15   off the record at 2:15 p.m.
16             (Recess taken from 2:15 p.m. until 2:21 p.m.)
17             THE VIDEOGRAPHER:  Video deposition is
18   returning to record at 2:21 p.m.
19   BY MR. HICKMAN:
20        Q    Regarding the Utah property at the -- say the
21   day before Steve foreclosed on it, do you have an
22   opinion on its value?
23        A    No.
24        Q    In your opinion, as owner of the Utah property
25   for a time, did its value change between the time of the
```

1  appraisal for $240,000 and the time of the foreclosure?

2      A    I can't speculate.

3      Q    On the Harper Lake loan from Steve to you, with

4  the Harper Lake property generating no revenue, how --

5  how would -- how would you service the debt?

6      A    I don't understand the question.

7      Q    How would you pay the Harper Lake loan to --

8  owed to Steve if the property -- as the property

9  generated no revenue?

10     A    From my company.

11     Q    What company?

12     A    From working.  I was -- I already stated this

13  before.  I was self-employed at the time as a real

14  estate broker.

15     Q    To the extent you serviced any debt on the

16  Harper Lake property, was it from the other borrowed

17  money from other lenders?

18     A    No.

19     Q    When you took the Utah property loan from

20  Steve, how did you anticipate servicing your debt to

21  him?

22     A    My real estate business.

23     Q    You failed to make most interest payments on

24  the Utah property.  Did your businesses not generate any

25  revenue to pay your Utah property loan?

156

1   A    That misstates the whole scenario.  I don't

2   understand the question.

3   **Q    Why did you fail to make interest payments on**

4   **the Utah property loan?**

5   A    Because the interest rates were unlawful.

6   **Q    So, did you take the Utah property loan**

7   **believing at the time it was an unlawful loan?**

8   A    I don't recall.

9   **Q    You just -- you've just testified that you --**

10  **you defaulted on the Utah loan because it was an**

11  **unlawful loan.  When did you determine that, in your**

12  **opinion, the Utah loan was an unlawful loan?**

13  A    I don't recall.

14  **Q    You made a total of four interest-only payments**

15  **on the Utah loan.  Did you decide after the fifth**

16  **monthly payment was due that the Utah loan was unlawful?**

17  A    I don't recall.

18  **Q    Why did you make any payments on the Utah loan**

19  **when it was an unlawful loan in your opinion?**

20  A    I didn't say that I -- that's not what I said.

21  I said that -- we're talking about -- I'm talking about

22  now, looking back.  I'm not talking about that time.

23  **Q    The Utah property, as it generated no revenue,**

24  **you -- you didn't make payments, you defaulted.  Is that**

25  **because your other business ventures failed?**

1    A    No.

2    Q    You weren't paid a salary at the time you -- by

3    any entity that employed you at the time you had the

4    Utah property loan from Steve, correct?

5    A    That's not correct.

6    Q    What were your sources of -- of earnings at the

7    time you had taken out Steve's loan on the Utah

8    property?

9    A    Real estate.

10    Q    But you weren't paying any of the -- you

11    weren't -- after a few payments, you made no payments on

12    the Utah property debt.  Why?

13    A    The interest rate was too high.

14    Q    Did you ask Steve at any -- any time to set

15    aside his Utah loan to remake it into a loan you thought

16    was proper?

17    A    I don't -- I don't recall.

18    Q    So you never asked Steve to change the terms of

19    the Utah loan, correct?

20    A    No.  I don't -- I don't know.  I don't -- I

21    don't recall.

22    Q    Did you ever ask Steve to change the terms of

23    the -- the Harper Lake loan?

24    A    I don't recall.

25    Q    The Malibu property you owned generated no

1    revenue, correct?

2        A    Correct.

3        Q    And how did you intend to pay its monthly

4    payments?

5        A    My real estate business.

6        Q    When you went into default on the Harper Lake

7    loans, were your real estate businesses not generating

8    sufficient revenue to service all the debt you had?

9        A    I don't recall.

10       Q    Did you default on the Harper Lake written

11   terms loan debt to Steve because you couldn't make the

12   Harper Lake property pay?

13       A    I don't recall.

14       Q    Did you decide the Harper Lake property was --

15   was not going to be a profitable venture, so you did not

16   prevent the foreclosure of it?

17       A    Okay.  What's the question?

18            MR. HICKMAN:  Can you read the question,

19   please.

20            (Record read as follows:

21            "Q    Did you decide the Harper Lake

22        property was -- was not going to be a

23        profitable venture, so you did not prevent the

24        foreclosure of it?")

25            THE WITNESS:  I -- I still don't understand

159

```
1        Q    It's what you did.  It's attached.  It's filed.
2   It's your document, your Second Amended Complaint, your
3   attachment.
4        A    He signed it.
5        Q    Why?
6        A    He signed it.
7        Q    Why did you do it?  Why did you put that --
8        A    I'm not going to disclose why I did that.
9   That's work product.
10       Q    Joke.
11            What does Sean Chaudhuri have to do with the
12  Utah property transaction, the Utah property loan from
13  Steve?
14       A    He has nothing to do with liability.
15       Q    What basis does he have for any knowledge of
16  what your speculated damages are related to the Utah
17  property?
18       A    I can't speak for him.
19       Q    What damages have you suffered from the Utah --
20  loss of the Utah property to foreclosure?
21       A    That's in the Complaint.
22       Q    How have you calculated your money damages for
23  your loss of the Utah property to foreclosure?
24       A    We've already went over this.  I've already --
25  you already asked this -- I don't -- three ways from
```

172

```
 1   Sunday.  And I've already told you, what's in the
 2   Complaint, what the damages are.  That's -- it's very --
 3   it's laid out, like, line by line.  If you want to go
 4   through it, go ahead.  But I can't sit here off the top
 5   of my head and ask -- and answer all these questions.
 6   And you want to put me in all these traps.  So that's
 7   what I'm talking about.  And it's getting real annoying.
 8        Q    What's --
 9        A    But I'm not going to snap.  So --
10        Q    What's the basis for your claim for damages on
11   the loss of the Utah property when you had no contract
12   signed and no revenue?
13        A    You'll have to ask him.
14        Q    I'm asking you.
15        A    I'm asking -- I'm telling you that it's in the
16   Complaint.  And then it -- and in the declaration.  So
17   ask them.
18        Q    I'm asking you for the factual basis because
19   you had no revenue and no contracts.  So, what's your
20   basis for claiming any money damage?
21        A    I'm not giving you my legal theory.  That's for
22   sure.
23        Q    What do you know about HST Solar Fields,
24   Incorporated?
25        A    I don't know.
```

1      A      Yes, I do.

2      Q      **You could be here to see my face, but you**

3  **wanted to do audio by remote.  And that's okay.**

4          **Under "Proposed Terms."**

5      A      I don't understand where you're talking about.

6      Q      **It's on bold, "Proposed Terms."**

7      A      "Proposed terms."  Okay.  What?

8      Q      **So, here you propose -- what are you proposing**

9  **in this paragraph entitled, "Proposed Terms"?**

10      A      I don't know.  I'll read it to you.  "Proposed

11  terms, $150,000 secured by second mortgage on 42829

12  Harper Lake Road due as balloon payment

13  September 2021, $150,000 total for first year" --

14          THE COURT REPORTER:  Mr. Brown, way too fast.

15          THE WITNESS:  Oh, sorry.

16          I don't know.  It says what it says.

17  BY MR. HICKMAN:

18      Q      **What does it mean where you wrote $150,000**

19  **total for the first year production paid either in**

20  **monthly installments starting in October, 2021, or a**

21  **lump sum in September '22 -- 2022?**

22      A      This would be -- this would be about the

23  $150,000 that was ultimately the unlawful interest.  But

24  this would be the $150,000 that I proposed to pay as

25  solar farm revenue, but Mr. Smead didn't want that.  He

1    wanted unlawful interest.

2        Q    So, the first year production is a reference to

3    revenue from the solar installations you anticipated at

4    the Harper Lake property?

5        A    That's what it appears to say.

6        Q    What did you mean when you wrote it?

7        A    What does it say?

8        Q    What did you mean?

9        A    That's what I meant, what I wrote.

10       Q    What more did you mean?

11       A    I didn't mean anything more than what I wrote.

12       Q    So you've written here that he might get

13   $150,000 from production from the Harper Lake property,

14   correct?

15       A    That's your words, not mine.  I wrote on -- I

16   wrote what I wrote on that.

17       Q    There was never any production from the Harper

18   Lake property to pay $150,000, correct?

19       A    Not at that time.

20       Q    There never was, correct?

21       A    Well, eventually, no, there wasn't.

22       Q    So --

23       A    But we are talking about September 14th,

24   2020.  That's what we're talking about.  You're talking

25   about this email, not the future or the past or

```
 1                          DECLARATION

 2

 3

 4          I herby declare I am the deponent in the within

 5     matter; that I have read the foregoing deposition and

 6     know the contents thereof; and I declare that the same

 7     is true of my knowledge except as to the matters which

 8     are therein stated upon my information or belief, and as

 9     to those matters, I believe it to be true.

10          I declare under the penalties of perjury of the

11     State of California that the foregoing is true and

12     correct.

13          Executed on the _____ day of _____, _____, at

14     _____, _____.
       (City)                  (State)

15

16

17                         _____

18                         CLINTON BYRON BROWN

19

20

21

22

23

24

25
```

284

```
 1  STATE OF CALIFORNIA          )
                                 )
 2  COUNTY OF SAN DIEGO          )

 3

 4        I, Mary P. Randle, Certified Shorthand

 5  Reporter in and for the State of California,

 6  Certificate No. 10312, do hereby certify:

 7        That prior to being examined, the witness named

 8  in the foregoing deposition was by me first duly sworn

 9  to testify to the truth, the whole truth, and nothing

10  but the truth;

11         That said deposition was taken remotely before

12  me at the time and place therein set forth and was taken

13  down by me in shorthand and thereafter transcribed into

14  typewriting under my direction and supervision;

15        I further certify that I am neither counsel for,

16  nor related to, any party to said action, nor in any way

17  interested in the outcome thereof.

18        In witness whereof, I have hereunto subscribed my
    name.
19

20  Dated: December 15, 2025

21

22

23  _Mary Randle, CSR#10312_
    MARY P. RANDLE
24  CSR No. 10312

25
```

286