Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CLINTON BROWN,

               PLAINTIFF,

VS.

STEVE SMEAD,

               DEFENDANTS.

Case No.: 2:23-cv-02938-MEMF(KSx)

JOINT BRIEF INTEGRATED MEMORANDUM OF POINTS & AUTHORITIES OF MOVING AND OPPOSING RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
[RULE 56]

DATE: 03/05/2026
TIME: 10:00 A.M.
CTRM: 8B

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii.

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v.

JOINT MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . 1

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION AND SUMMARY  (MOVANT/DEFENDANT) . . . . . . . . . . 1

INTRODUTION AND SUMMARY (PLAINTIFF'S OPPOSITION) . . . . . . . . .  2

REPLY TO PLAINTIFF'S INTRODUCTION/SUMMARY OPPOSITION . . . . . 4

STATEMENT OF FACTS (DEFENDANT/MOVANT) . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS (PLAINTIFF'S OPPOSITION) . . . . . . . . . . . . . . .  8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

[SECTION I BY MOVANT/DEFENDANT]. . . . . . . . . . . . . . . . . . . . . . . . . .  10

I.    RICO SECTION 1962 WAS NOT VIOLATED—
      NEITHER (a) NOR (c) WERE VIOLATED—NO "UNLAWFUL
      DEBT" (INTEREST RATE DOUBLE A STATE LAW USURY
      LIMITATION—NO "COLLECTION OF UNLAWFUL DEBT". . . . . . . 10

   A. Timing Of The Hinkley Loan (Nov. 2020) And The Utah  (June 2021)
      Show That No California "Usury" Was "Put" On The Utah Loan. . . . . . . 10

   B. California: No Usury Placed On California Loans—No Unlawful
      Debt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   C. Utah Loan: No Usury Law Or Finance Limitations For Loans
      Of The Type. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   D. RICO, 18 U.S.C. § 1962(c) Was Not Violated, As No "Collection
      of Unlawful Debt" Occurred Nor  Existed. . . . . . . . . . . . . . . . . . . . . .  16

ARGUMENT (PLAINTIFF'S OPPOSITION). . . . . . . . . . . . . . . . . . . . . . . . .  17

      I.    **Legal Standard**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A. **Defendant Has Not Met His Initial Rule 56 Burden as to
         18 U.S.C. §  1961(6)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      i.    **Malibu Loan**: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      ii.   **Harper Lake & Utah Loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      B. **In The Alternative, The Record Establishes Genuine Disputes of
         Material Fact as to Unlawful Debt**. . . . . . . . . . . . . . . . . . . . . . . . . 22

REPLY BY MOVANT/DEFENDANT ON SECTION I ARGUMENT . . . . . . .  23

1. *No Admissions in the Answer to the Second Amended Complaint Establish Plaintiff's Case.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2. *No Usury from California Existed To Be Put Seven Months Later On the Utah Loan.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3. *If the Consolidated Malibu Loan Was 2% Usurious, That Was Not Double the California Limit of 10%, So Not "Unlawful Debt".* . . . . . . . . 25

4. *RICO Specifies "State" Law Relating To Usury For Calculation, Not A "Federal" Standard Or A State Other Than Where The Loan Is Made And Secured And Enforced. So, Only Utah Law Applies To The Utah Loan As Its Promissory Note Was Made Payable In Utah And Its Security Property Was In Utah, So There Is No Basis To Apply California Usury Law To The Utah Transaction.* . . . . . . . . . . . . . 25

5. *The Facts Show There Is No Connection Between the Earlier Hinkley Loan and the Utah Loan Seven Months Later.* . . . . . . . . . . . . . . . . . 27

[SECTION II ARGUMENT BY MOVANT/DEFENDANT] . . . . . . . . . . . . . . . 27

II. NO VIOLATION OF RICO, 18 U.S.C. § 1962(c) or § 1962(a) OR OTHERWISE EXISTS, FOR ANY ONE OF NUMEROUS REASONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. The Statute Is Not Violated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. There Is No Violative Unlawful Conduct Of Any Kind, No Causation, No Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. No Scheme To Defraud Involving Misrepresentations Existed. . . . . . . . . . 29

D. No Enterprise--Smead Himself Alone Cannot Be The Enterprise, And These Three Discrete Loans Were His Alone, He, Using Only Ordinary, Unconnected Service Providers. . . . . . . . . . . . . . . . . . . . . . . . 29

E. Without an "Enterprise" and "Associated-in-Fact", Defendant's Using Service Provider's Conduct on Discrete, Unconnected Loans, Does Not Satisfy The Elements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

F. No Racketeering Pattern Of "Predicate Acts" Exists. . . . . . . . . . . . . . . . . 31

G. No Racketeering Activity, No Indictable Predicate Acts, Under 18 U.S.C. § 1961(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

H. No Effect On Interstate Commerce Exists. . . . . . . . . . . . . . . . . . . . . . . . 32

I. Harm To Business And Property Did Not Occur, As No RICO Liability Exists And Plaintiff's Loss Of Property To Foreclosure Was A Result Of His Loan Defaults. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

(BY PLAINTIFF / IN OPPOSITION ARGUMENT II.). . . . . . . . . . . . . . . . . . . . . 33

**III.    Defendant's "No RICO Violation" Argument Fails As A Matter of Law**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    **A.    Defendant Has Not Carried Its Initial Burden to Negate the Elements of Liability Under 18 U.S.C. § 1962(a).** . . . . . . . . . . . . . 33

    **B.    Defendant Has Not Negated the Elements of Liability Under 18 U.S.C. § 1962(c).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    **C .    Defendant Has Not Carried Its Initial Burden to Negate Plaintiff's Standing Under 18 U.S.C. § 1964(c)** . . . . . . . . . . . . . . 35

    **D. Defendant Has Not Carried Its Initial Burden to Negate Both But-For and Proximate Causation of Plaintiff's Injury.** . . . . . . . . . 36

REPLY TO OPPOSITION, SECTION II, BY DEFENDANT/MOVANT . . . . . . . 37

    6.    *There Was No Enterprise of Associated Persons*. . . . . . . . . . . . . . . . . . . 37

    7.    *"Proximate Cause" Of Harm Has Been Negated, As Brown's Loss Of The Lots Was Due To His Failure To Pay Even Modest Amounts On The Interest Only Loans*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    8.    *The Interstate Commerce Is Not Sufficient For RICO's Application*. . . . . 38

    9.    *Additional Discovery, or Awaiting a Ruling from the Magistrate Judge Is Not Needed*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION (MOVANT/DEFENDANT). . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION (PLAINTIFF'S) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

REPLY TO PLAINTIFF'S CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TABLE OF AUTHORITIES

**Federal Cases of Movant/Defendant Smead**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).............22, 26

*Beck v. Prupis* (11th Cir. 1998) 162 F3d 1090....................................................28

*Berg v. First State Ins. Co.*, 915 F.2d 460 (9th Cir. 1990). ........................................11, 29

*Boyle v. United States*, 556 U.S. 938 (2009) ....................................................30

*Durante Bros. and Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239 (2d Cir.1985*) cert.
  denied,* 473 U.S. 906 (1986)....................................................11, 16

*H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ....................................31

*Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648 (9th Cir. 2019) ....................29, 36, 38

*Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258 (1992) ....................11, 29

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005)....28

*Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931 (2025)....................................32

*Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025)....................................22, 26, 35

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)....................................31

*Rae v. Union Bank*, 725 F.2d 478 (9th Cir. 1984)....................................30

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ....................................30

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ....................................31

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992)....................................31

*United States v. Bagnariol*, 665 F.3d 877 (9thCir. 1981), *cert. denied sub nom. Walgren
  v. U.S.*, 456 U.S. 962 ....................................32

*United States v. Benny*, 786 F.2d 1410, 1416 (1986) ....................................37

*United States v. Christensen*, 801 F.3d 970 (9th Cir.), *opinion amended and superseded
  on denial of reh'g*, 828 F.3d 763 (9th Cir. 2015). ....................................30

*United States v. Rone*, 598, F.2d 564 ( 9th Cir. 1979), *cert denied sub nom. Little v. U.S.*,
  445 U.S. 946 ....................................32

*Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008)....................................30

*Wilcox v. First Interstate Bank*, 815 F.2d 522 (9th Cir. 1987)....................................31

### Federal Cases of Opponent/Plaintiff Brown

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ................................................ 17

*American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988)....................... 34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 22

*Caminetti v. United States*, 242 U.S. 470 (1917). ................................................. 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..................................................... 17

*Dillon v. BMO Harris Bank*, N.A., 16 F. Supp. 3d 605 (M.D.N.C. 2014)....................... 33

*Goldenstein v. Repossessors Inc.*, 815 F.3d 142 (3d Cir. 2016); ................................. 33

*Gonzales v. Raich*, 545 U.S. 1 (2005).............................................................. 19

*Hamilton v. Rathbone,* 175 U. S. 414 (1899). ..................................................... 18

*High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990)..17

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ...................... 36, 37

*In re Dominguez*, 995 F.2d 883 (9th Cir. 1993), *as amended on denial of reh'g* (July 8,
    1993). ................................................................................................. 19

*In Re Lara*, 731 F.2d 1455 (9th Cir. 1984) ....................................................... 20

*In re Moon*, No. 23-60006 *slip op.* at *4 (9th Cir. Apr. 16, 2024) ............................ 19

*Jones v. L.A. Central Plaza*, No. 22-55489, at *6 (9th Cir. 2023) .............................. 33

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982)................................................ 23

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) ......................................... 18

*Lew v. Kona Hospital* 754 F.2d 1420 (9th Cir. 1985); ............................................. 3

*McElyea v. Babbitt*, 833 F.2d 196 (9th Cir. 1987); ................................................ 3

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002). ................................ 36, 38

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000)................... 17

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012). .............. 2, 35

*Runnels v. Rosendale*, 499 F.2d 733 (9th Cir. 1974)............................................... 3

*Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)......... 33

*Schroeder v. McDonald* 55 F.3d 454 (9th Cir. 1995); .............................................. 3

*United States v.   Wilmer*, 799 F.2d 495 (9th Cir. 1986). ....................................... 34

*United States v. Aucoin*, 964 F.2d 1492 (5 th Cir. 1992) ................................................... 33

*United States v. Benny*, 786 F.2d 1410 (9th Cir. 1986)..................................................... 34

*United States v. Oreto*, 37 F.3d 739 (1 st Cir. 1994)......................................................... 33

*United States v. Ramirez-Rodriquez*, 552 F.2d 883 (9th Cir. 1977)................................. 10

*United States v. Robertson*, 514 U.S. 669 (1995).............................................................. 33

*United States v. Robertson*, 514 U.S. 669 (1999).............................................................. 33

**State Cases**

*Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 463 (1983) (Utah Supreme Court) ........ 14, 15

*Biesinger v. Behunin,* Utah, 584 P.2d 801, 803 (1978). ..................................................... 14

*Capital Stack UT LLC v. Reddy*, 575 P.3d 1192, 1196 (2025) ............................. 12, 13, 14

*Carlson v. Hamilton,* 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958)............................... 14

*DCM Partners v. Smith*, 228 Cal.App.3d 729, 737-738, 278 Cal.Rptr. 778, 783 (1991) 11, 19

*Froid v. Fox,* 132 Cal. App.3d 832, 840, 183 Cal.Rptr. 461, 465 (1982). ........................ 20

*Robinson v. Murphy,* 96 Cal. App.3d 763, 769-70, 158 Cal.Rptr. 246, 250 (1979)........ 20

*Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) .................................... 14

*State v. Chapman*, 2014 UT App 255, ¶ 2 n.2, 338 P.3d 230 ............................................ 13

*Strike*, (incomplete citation) 92 Cal. App. 3d at 744 ......................................................... 19

*WRI Opportunity Loans*, (incomplete citation) 65 Cal. App. 4th at 212.......................... 19

**Federal Statutes**

11 U.S.C. § 363(k).............................................................................................................. 35

18 U.S.C. § 1961(1)............................................................................................................ 31

18 U.S.C. § 1961(4)..................................................................................................... 3, 30, 39

18 U.S.C. § 1961(5)............................................................................................................ 31

18 U.S.C. § 1961(6)......................................................................................................passim

18 U.S.C. § 1962 ...........................................................................................................passim

18 U.S.C. § 1962(a)............................................................................................................ 33

18 U.S.C. § 1962(c)......................................................................................................passim

18 U.S.C. § 1964(c) ................................................................................................ 3, 35, 37

18 U.S.C. § 1965(a); ...................................................................................................... 22

28 U.S.C. § 1746 ............................................................................................................. 3

Pub. L. 91–452, title IX, §904, Oct. 15, 1970, 84 Stat. 947 ......................................... 2


**Federal Regulations**

12 C.F.R. § 1026.2 (12) ................................................................................................ 15


**Rules**

Rule 56 ..................................................................................................................passim

Rule 56(c) .............................................................................................................. 3, 8, 18

Rule 56(d) ...................................................................................................................... 39

to Rule 1 ......................................................................................................................... 39

**State Statutes**

*Cal. Civil Code* § 1916 .................................................................................................. 20

*Cal. Civil Code* § 1916.1 .............................................................................................. 11

*Cal. Civil Code* § 1916.1; 3 ......................................................................................... 19

*Utah Code* § 70C-7-106 ............................................................................................... 13

*Utah Code* § 70C-1-302 (4) ......................................................................................... 15

*Utah Code* § 15-1-1 ...................................................................................... 1, 12, 16, 22

*Utah Code* § 70C-1-202(2)(a) ..................................................................................... 15

*Utah Code* § 70C-1-301 ............................................................................................... 15

*Utah Code* § 76-6-520 .................................................................................................. 22


**Treatises**

10A C. Wright, A. Miller and M. Kane, Federal Practice and Procedure S 2727 (3rd ed.
     1998) ...................................................................................................................... 17

Restatement (Second) of Torts § 633 (1977) ................................................................ 36

Restatement (Second) of Torts § 653 (1977) ...................................................................... 36

Stevenson, Karen L., Judge, U.S. Chief Magistrate Judge, Central Dist. Cal. and James E.

Fitzgerald; *Federal Civil Procedure Before Trial* (2025 The Rutter Group), § 14:295, p.

120 ..................................................................................................................................... 28

### Other Authorities

John A. Pearce II & Ilya A. Lipin, *Special Purpose Vehicles in Bankruptcy Litigation*, 40

Hofstra L. Rev. 178, 179 n.4 (2011) ............................................................................... 36

Ninth Circuit Model Civil Jury Instructions section 8, Civil RICO ..................... 28, 30, 31

JOINT BRIEF--MEMORANDUM OF POINTS AND AUTHORITIES

INTRODUCTION AND SUMMARY (MOVANT/DEFENDANT)

Defendant Smead did not violate RICO in his dealings with Brown. There was no "enterprise", nor racketeering, nor predicate acts; nor "collection of unlawful debt", not even "unlawful debt". So no claim exists under 18 U.S.C. § 1962 (a) or (c), on which the Second Amended Complaint [Doc. 90] filed 03/24/2025 is based. "Unlawful debt" "means . . . "where the usurious rate is at least twice the enforceable rate". 18 U.S.C. § 1961(6). None was charged nor collected any of the three loans, not on the two California loans, nor on the Utah loan. The California loans were at 12% (consolidated purchase money loan Malibu from broker originated initial loan) and 8% (Hinkley/Harper Lake). The Utah Loan promissory note stated 10% rate for this business loan on raw, vacant land. For such a loan, Utah has no usury limitation nor finance limitation, no statutory cap. Rather, Utah Code § 15-1-1- allows any interest rate on such a loan. So, even with the "risk-based" addition of $100,000 to the cash loan of $100,000, no part of the $200,000 loan of principal was usurious. By RICO's definition of 1961(6), there was no "unlawful debt" and no "unlawful debt" was collected.

Notably, the Utah Loan was made seven months after the Hinkley Loan. The Hinkley Loan being the California loan that Plaintiff alleges to have had imposed as a secret, unwritten term, a $150,000 usurious term, despite the Hinkley Loan being written for $150,000 at 8% interest under the promissory note. Brown came begging to Smead six months later for the Utah Loan to buy raw Utah land for Brown's speculative purposes. Brown did not have to request that loan. Smead had no right to make Brown take this new loan. And this, when Brown was badly in default on his Malibu Loan and his Hinkley Loan—having made no payments at all on the Hinkley Loan, the first four loan payments already missed. So Smead, understandably, declined to take Brown's offer of terms of $100,000 cash at 10%, where the land for security was worth only $50,000. So Brown proposed that he borrow and put on the Utah promissory note an extra $100,000 to be owed and paid to Smead for the high-risk loan origination Brown

proposed, for a promissory note for principal of $200,000 at 10%. Smead decided to accept that risk, on those terms, and so the Utah Loan was made in June 2021. That was months after the Hinkley Loan of November 2020. No "usury" from California was "put on" the Utah Loan. So, the Second Amended Complaint fails for this and a host of other reasons addressed within.

## INTRODUCTION AND SUMMARY (PLAINTIFF'S OPPOSITION)

Usurious lenders ordinarily go to great lengths to conceal unlawful interest to avoid formal documentation or public recording. Defendant did the opposite. He required Plaintiff to execute and record security instruments that capitalized six-figure unlawful interest, making the alleged illegality visible in the public land records. Ordinarily, usurious lenders require unlawful interest to be paid in cash or through informal transfers that leave little documentary trail. Defendant did the opposite. He required Plaintiff to make the payments to Defendant's sole-proprietorship lending bank account, creating indisputable documentary evidence of the collection of unlawful debt. Ordinarily, the "use" of unlawful debt is concealed and difficult to prove. Here, Defendant used the recorded unlawful debt itself as consideration to credit-bid[1] Plaintiff's property. Defendant's collection and use of recorded unlawful debt across multiple states is precisely the type of unlawful debt claim Congress intended civil RICO to reach—a statute that must be "liberally construed to effectuate its remedial purposes." See Pub. L. 91–452, title IX, §904, Oct. 15, 1970, 84 Stat. 947. On this record, a reasonable jury could find Defendant liable for injury to Plaintiff's business or property.

But Defendant has not met his threshold burden under Rule 56 to negate an essential element of Plaintiff's RICO claims or to show that Plaintiff lacks evidence to carry his burden at trial. The motion therefore fails without the Court even reaching

---

[1] At foreclosure a lender may "bid for the property *using the debt it is owed* to offset the purchase price, a practice known as "credit-bidding."" *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 643 (2012). (emphasis added).

Plaintiff's evidence. In any event, Plaintiff's Second Amended Complaint, ECF No. 90, is verified under penalty of perjury pursuant to 28 U.S.C. § 1746 and constitutes admissible summary judgment evidence to the extent it is based on personal knowledge. The verified SAC independently establishes genuine disputes of material fact as to unlawful debt, enterprise, and causation, and precludes judgment as a matter of law.[2] Defendant Smead was engaged in the business of lending money to borrowers, including Plaintiff, through a sole-proprietorship lending enterprise. Plaintiff owned property, Defendant collected unlawful interest, and Defendant used that unlawful interest to credit-bid Plaintiff's property.

In sum, Defendant's motion fails at the threshold. He does not negate unlawful debt under 18 U.S.C § 1961(6) or enterprise under 18 U.S.C. § 1961(4), among other elements including interstate commerce, 18 U.S.C. § 1964(c), 18 U.S.C. § 1962(a) and (c), and instead relies on disputed facts, mislabeled interest, and self-serving characterizations of his own conduct.[3] In the unlikely event Defendant did meet his threshold burden, Plaintiff's verified complaint, Defendant's admissions, and the documentary record establish genuine disputes of material fact as to whether Defendant

---

[2] Plaintiff served Interrogatories, Set No. 2 (Nos. 10, 11, 12, and 19) seeking evidence bearing directly on whether Defendant collected unlawful debt under 18 U.S.C. § 1961(6) and whether Defendant operated an enterprise under 18 U.S.C. § 1961(4)— the very elements Defendant must negate or show are unsupported by sufficient evidence—in order to obtain summary judgment. Those requests are the subject of a pending motion to compel. *See* ECF Nos. 110, 110-1; Brown Decl. ¶¶45-46. In any event, a verified complaint may be treated as an affidavit to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify. *See Runnels v. Rosendale*, 499 F.2d 733, 734 n. 1 (9th Cir. 1974); *Lew v. Kona Hospital* 754 F.2d 1420, 1424 (9th Cir. 1985); *McElyea v. Babbitt*, 833 F.2d 196, 198, n. 1 (9th Cir. 1987); ([A] plaintiff's verified complaint satisfies the personal knowledge requirement where the "allegations were not based purely on…belief." *See Schroeder v. McDonald* 55 F.3d 454, 460 (9th Cir. 1995); *Cf.* Second Amended Complaint ("SAC"), ECF No. 90 at 16, n. 2. Even assuming *arguendo* Defendant has met his initial Rule 56(c) burden, Defendant cannot show the absence of a genuine dispute of material fact. Plaintiff's verified complaint— sworn under penalty of perjury pursuant to 28 U.S.C. § 1746—constitutes competent summary judgment evidence and independently establishes genuine disputes of material fact sufficient to preclude judgment as a matter of law.

[3] Defendant's motion is built on narrative and character attacks rather than admissible evidence, which is not a substitute for meeting his burden under Rule 56(c). In other words, Defendant's motion improperly inverts the Rule 56 framework by attacking credibility and drawing competing inferences before satisfying the antecedent requirement of negating an essential element or showing the absence of evidence.

collected unlawful debt and operated a sole-proprietorship lending enterprise that violated 18 U.S.C. § 1962(a) and (c).

## REPLY TO PLAINTIFF'S INTRODUCTION/SUMMARY OPPOSITION

Defendant has negated one or more elements of the claims, and shows absence of evidence from Plaintiff, and no genuine material dispute has been created. No "unlawful debt" and its "collection" exist. The "secret, unwritten "usury" is not sufficiently shown to create a triable issue.

## STATEMENT OF FACTS (DEFENDANT/MOVANT)

On 04/21/2020, Smead made Brown a two-year second-priority purchase money loan secured by a vacant Malibu residential lot ("Malibu Lot"), 12.99% interest rate, as a Cal. real estate mortgage broker originated loan. Brown defaulted on Smead's initial loan and the first priority loan from seller Sarkany, and requested Smead to make the Malibu Loan to consolidate the two. So, on 05/21/2021, Smead made a two-year loan consolidating both purchase money notes into one owed to him, secured by the Malibu Lot at a reduced interest rate of 12% ("Malibu Loan"). Joint Statements of Uncontroverted Facts and Genuine Disputes ("FACT") ## 1-3. Immediately, Brown defaulted on the Malibu Loan, with chronic late payments and none after that due for 11/01/2021, eventually resulting in foreclosure on 01/04/2023. FACT ## 4 & 5.

In 2020, between September and November 10, Smead considered making one loan to Brown. It was a purchase money second-priority loan for $150,000 for a raw, undeveloped, desert land in San Bernardino County's Hinkley/Harper Lake area ("Hinkley Lot") that Brown hoped to buy from American Pacific Investments, LLC ("AmPac") to develop into a solar-power generating field ("solar field"). *Smead wired funds to the anticipated escrow in mid-September*. Thereafter, Brown commenced a welter of additional proposals for Smead to make additional loans and transactions to

invest in or lend money to Brown's entities, Atlas Inc. and Atlas Development Group, LLC, and to himself personally. FACT ## 6 & 7.

On 11/10/2020, Smead made to Brown a second-priority purchase money loan for $150,000, at a fixed interest rate of 8%, interest only payments until maturity in two years, secured by the Hinkley Lot (the "Hinkley Loan"). There were no other terms or conditions to the loan than as written in the promissory note and deed of trust from Brown as borrower to Smead as lender. Smead took his security interest subject to Brown's seller-carry-back purchase money loan from seller AmPac, first priority. Chicago Title was the escrow, was paid a fee from Brown's loan funds. Smead bought a lender's title policy from Chicago Title. FACT # 8.

Brown immediately defaulted on the Hinkley Loan, making no payments due for Jan. 1 through April 1, 2021. Then, on April 28, 2021, his entity "Atlas LLC" made a payment of those payments in arrears, total payments of only $4,000, his only payments on the loan. But Brown made no more payments thereafter. FACT #9.

In mid-April of 2021, Brown asked Smead to make a refinance loan on property Brown owned in Utah, which was raw, undeveloped land ("Utah Lot"). Smead said no, he would not lend the $100,000 Brown requested because it was too risky a loan and because Brown was in default on both existing loans, the Malibu Loan and the Hinkley Loan, and because the Utah Lot was worth only perhaps $50,000, so there was insufficient security, and no revenue being generated to make loan payments. FACT ## 10 & 11.

To induce Smead to make this risky loan on the Utah Lot to him as a defaulting borrower on other loans, Brown proposed to pay Smead a risk-based bonus, a risk-based origination fee, to help compensate for the risk in the loan transaction, in addition to the new money lent, that he would owe to Smead and pay to Smead, proposing that the bonus, or origination fee, would be $100,000, in addition to the $100,000 of cash money paid through escrow Smead would lend, and together made "principal" borrowed under the promissory note. Smead agreed to make the loan on these terms proposed by Brown,

which would be for a stated principal amount of $200,000, at the rate of 10% interest, as Brown proposed. FACT #12.

Escrow for the Utah loan opened in June 2021. Brown wrote the instructions to escrow by email, and Brown and Smead approved of the draft loan settlement statement. On June 30, 2021, the loan closed, with Brown giving a promissory note payable in Utah and a deed of trust securing it on the Utah Lot, in Utah. The promissory note stated principal of $200,000, and stated the interest rate at 10%, interest only payments until maturity in two years. This principal was comprised of $100,000 of the risk-based bonus or origination fee Brown agreed to pay, and $100,000 for new money lent through escrow. Brown's loan funds paid the escrow fee and Smead bought a lender's title policy. The promissory note was made payable in Fillmore, Utah, and the real property security under the deed of trust was in Millard County, Utah. FACT ## 13 & 14.

In September 2021, with the Hinkley Loan and Malibu Loan both long in default, Brown proposed this to Smead: that Smead invest in Brown's businesses by stock purchases or stock-secured new lending, and connected with proposed changes in the existing defaulted loans, which were proposed by Brown to be re-written. FACT # 15.

In March 2022, Brown went into default and remained so on the Utah Loan, failing to make the payment due March 1, 2022, nor any payments thereafter. Brown paid a total of $11,669 in interest only payments on the Utah Loan. Brown did not cure the default, and did not pay off the loan. FACT # 16

In July of 2022, Brown was also in default on the AmPac loan for Hinkley. Smead bought it to avoid its foreclosure that would eliminate his second-priority security interest, paying to AmPac the amount due from Brown, $370,302.00 and taking an assignment of its note and deed of trust. FACT # 17.

In August 2022, when Smead informed Brown that the foreclosure processes would start, Brown complained in email to Smead that his interest rates from Smead were "17%", in an angry email. FACT # 18.

The Hinkley Loan on which Brown claims the unwritten term of "usury" was imposed for $150,000 was made in Nov. 2020, and allegedly "put" on the Utah Loan. (Second Amended Complaint [Doc. 90] ¶¶ 16-18, 27). Brown's only and last payment of interest on the Hinkley Loan was $4,000 in April 2021. FACT #9. But the Utah Loan was not made until more than seven months later, in June 2021. FACT #14. And Brown's only payments on the Utah Loan totaled $11,669. So, there were no "payments" of the alleged usury from the Hinkley Loan made of the $100,000 risk-premium on the Utah Loan. FACT #16. Rather, on the Utah Loan, the rate of interest Brown actually paid before foreclosure was 7.4% if counted only as to the $100,000 cash through escrow lent, and only 3.7% if counted against the $200,000 that included the risk-premium origination fee. FACT #29. The Utah Loan being negotiated and made seven months after the Hinkley Loan show that no "usury" was "put" on the Utah Loan, as Smead did not want to make the Utah Loan, as Brown initially proposed it, and only agreed to make it in June 2021 after the "risk-premium" or risk-based origination fee for the risky loan was negotiated to be added to the proposed loan amount on the Utah Loan. FACT ## 10-14.

In 2023, Brown's three property securities were foreclosed upon, and as to each, Smead became the owner by Trustee's Deeds, as his bids of what was owed to him, credit-bids, was the high bid at each of the three trustee's auctions, as of these dates: 01/04/2023, the Malibu Loan and Lot; 01/31/2023 ($372,338.14 credit-bid purchase price); the Hinkley Loan and Lot on the second priority loan ($175,909.68, with more than $370,000 still owed Smead on the first he bought from AmPac); and, finally, on 03/08/2023, the Utah Loan and Lot ($220,923.20 credit-bid purchase price). FACT ## 5, 19 and 20.

None of the security properties, not the Malibu Lot, not the Hinkley Lot, nor the Utah Lot, generated any revenue or income to Brown during his ownership of them, nor to Smead during his ownership of them. There were never any contractual rights or payments by anyone for the use of those lots at any time, to the present. The Hinkley Lot

and the Utah Lot are still owned by Smead, since the foreclosure sales. Smead sold the Malibu Lot in 2025. FACT ## 21, 22.

In making and enforcing the loans, Smead made the loans in his own name, and no other person had any rights or interests in the loans. Smead lent his own money in his own name. Smead paid certain service providers and title insurers fixed charges. All the service providers were independent, and performed only a narrow function, all operating independently: one loan servicer on the Malibu Loan, escrow closing agents on the loans to Brown paid by Brown, foreclosure trustees fees advanced by Smead but paid by Brown in the credit-bid at foreclosure, and title insurers for lenders' title insurance policies that Smead paid. FACT:  # 1 & Ex. 11-1-4; #  2 & Ex. 12-1-2; #8 & Ex. 15-1; #14 & Ex. 2-1; and, FACT ## 24 – 27.

During the entire life of the three loans, Brown made interest-only payments of a total sum of $31,169 ($15,000 Malibu Loan; $4,500 Hinkley Loan; $11,669 Utah Loan). FACT # 23.   The lot values when foreclosed were: Malibu Lot, $425,000; Hinkley Lot, $475,000; Utah Lot, $50,000. FACT #24. At the time of the foreclosure sales, Brown owed Smead a total of not less than $1,139,373.92 (the credit-bid amounts, plus the first priority AmPac Loan Smead bought prior to foreclosure sale on the second-priority Hinkley Loan. The money owed at foreclosure minus the value of the lots at foreclosure made for a loss to Smead by early 2023 of not less than $189,373.92. Smead lost money on these loans. FACT ## 5, 17, 19, 20.

STATEMENT OF FACTS (PLAINTIFF'S OPPOSITION)[4]

Defendant Steve Smead has operated a private lending business in California for decades. See ECF No. 90 ("Answer") ¶¶ 5–6. Loan funds originate from transactions

---

[4] Defendant has not met his initial burden under Rule 56(c). Defendant relies primarily on his own declaration and selective excerpts of Plaintiff's deposition, offers no evidence from the depositions of Gale, Ordaz, or Chaudhuri, and transmitted an unsigned declaration on January 1, 2026, not made under penalty of perjury. See Brown Decl. ¶¶18-22. Therefore, Plaintiff is not required to present his case as a trial on the papers at summary judgment, nor carry Defendant's initial burden under Rule 56. In other words, Plaintiff limits this Statement of Facts to material facts necessary to demonstrate the existence of a genuine dispute of material fact and to defeat summary judgment, in the event the Court determines that Defendant has met his initial burden under Rule 56, and does not present a full statement of the case.

through Steve Smead DBA Smead D&S Rentals' business bank account located in California. See Exhibit A at 1-74. The record reflects that on September 14, 2020, Plaintiff proposed terms under which $150,000 would be secured by a second deed of trust, and an additional $150,000 would be payable on a contingent basis upon solar production. See Exhibit B at 2; Brown Decl. ¶¶ 47–49. On or about September 15, 2020, during a telephone call, Defendant and Plaintiff discussed the Harper Lake loan, and Defendant required that Plaintiff agree to pay an additional $150,000 in interest as a condition of funding the loan. See Brown Decl. ¶5. On September 16, 2020, Defendant wired $150,000 to the Harper Lake escrow from his Bank of Sierra account ending in 6236. See Brown Decl. ¶6; Exhibit A at 15 (S 862). The Plaintiff was not a California licensed real estate broker until October 28, 2020. See Brown Decl. ¶7. Chicago Title refused to record the 100 percent interest rate. See Brown Decl. ¶50; MSJ Ex. 16 at 21 (S 650). After Chicago Title refused to record the interest demanded in connection with the Harper Lake loan, Defendant sought to have the $150,000 secured by a different property. Plaintiff proposed securing that amount against the Malibu property, but Defendant rejected that approach because it would have resulted in a third deed of trust, and Defendant was already the second deed of trust holder. Id; Brown Decl. ¶27. On multiple occasions, during telephone calls, Defendant demanded that the $150,000 be secured by real property. See Brown Decl. ¶53. In response, on April 7, 2021, Plaintiff emailed Defendant proposing that the $150,000 be recorded against the Utah property. See Exhibit C; Brown Decl. ¶¶ 51, 54. On around the time the loan commenced, Defendant directed that $100,000 associated with the Harper Lake transaction be included in and recorded with the Utah loan. See Brown Decl. ¶17. Defendant demanded that a $50,000 obligation associated with the prior California and Utah loans be tied to the Malibu loan, but that amount was not recorded by Superior Loan Servicing. See Brown Decl. ¶14.5

---

[5] "It is the exclusive function of the jury to weigh the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts...Circumstantial and testimonial evidence are

ARGUMENT

[SECTION I BY MOVANT/DEFENDANT]

I.      RICO SECTION 1962 WAS NOT VIOLATED--NEITHER (a) NOR (c) WERE
        VIOLATED—NO "UNLAWFUL DEBT" (INTEREST RATE DOUBLE A
        STATE LAW USURY LIMITATION--NO "COLLECTION OF UNLAWFUL
        DEBT".

        A. Timing Of The Hinkley Loan (Nov. 2020) And The Utah Loan (June 2021) Show
        That No California "Usury" Was "Put" On The Utah Loan.

        The timing of the Hinkley Loan and the Utah Loan, and the negotiation for the
Utah Loan that Smead did not want to make, speaks volumes. The Hinkley Loan was
made seven months before the Utah Loan. So, that alleged "unwritten" loan term for the
Hinkley Loan to pay "usury" under California law of $150,000 did not exist and is only
as a fabricated pre-text for litigation by Plaintiff, a disappointed would-be solar field
developer and land speculator. The timing and terms of the Utah Loan, negotiated and
consummated seven months after the Hinkley Loan, with the risk-based origination fee
for the under-secured Utah Loan, shows it was a separate deal. Brown was not required to
make the Utah Loan. Brown asked for the Utah Loan a full six months after the Hinkley
Loan, in April 2021, when the Hinkley Loan was in default with NO payments made, and
in default of the Malibu Loan as well. So this Plaintiff-borrower was a very high risk,
with a very bad payment history, and with a security property that would not support the
requested loan in Utah. Thus, a risk-based premium to make the loan, in essence, a loan
of the risk-based origination fee, plus case of $100,000, at stated 10%, was entirely
proper under Utah Law, the loan being requested by Brown for his speculative business
purposes. This was not usurious and entirely proper under Utah law, and was no violation
of California usury law.

---

indistinguishable insofar as the jury fact-finding function is concerned, and circumstantial evidence can
be used to prove any fact." See *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977)
(quoting *United States v. Nelson*, 419 F.2d 1237, 1239-41 (9th Cir. 1969)).

Plaintiff must prove that these was collection of "unlawful debt" within the meaning of RICO, a multi-prong requirement: [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with the "business of lending money ... at a [usurious] rate," ... [3] the usurious rate was **at least twice the enforceable rate** ... [4] as a result of the above confluence of factors, it was injured in its business or property. *Durante Bros. and Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239, 248 (2d Cir.1985*) cert. denied,* 473 U.S. 906 (1986) (emphasis added).

"RICO is concerned with evils far more significant than the simple practice of usury." *Durante Bros. supra*, 755 F.2d at 248. A civil plaintiff must also establish that the defendant's violation is both the factual and proximate cause of the plaintiff's injury. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 266 n.11 (1992) ("The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required."). A plaintiff must establish actual injury to his business or property to sustain a claim. *Berg v. First State Ins. Co.*, 915 F.2d 460, 463-64 (9th Cir. 1990).

B. <u>California: No Usury Placed On California Loans—No Unlawful Debt.</u>

California's usury limitation is 10% where there is no exception in statute. Likewise, the Hinkley Loan was for 8%, under the state usury limit.

Loan 1 Malibu. Initial loan. A real estate secured loan on vacant land located in Malibu, California. Brokered by a licensed California real estate broker representing Plaintiff, this was exempt from usury limitations by *Cal. Civil Code* § 1916.1 (inapplicability of interest rate restrictions to secured real estate loans made by licensed real estate brokers).   Here, the initial Malibu loan at 12.99% was broker-originated, so was exempt from the usury limit of 10%, under Cal. *Civil Code* § 1916.1.

"Malibu Loan" (consolidated). For the consolidation loan at 12%, the Malibu Loan was a consolidation of the brokered-purchase money loans, so it kept its character and was likewise exempt from the usury limit. *DCM Partners v. Smith*, 228 Cal.App.3d 729, 737-738, 278 Cal.Rptr. 778, 783 (1991) (holding that modifying the note on a purchase

money real estate loan post-default keeps the original usury exemption, even if no broker is involved in the modification agreement.). Even if this were not so, if there was no usury exemption applicable for the consolidated Malibu Loan, then the usury would have been 2% of the 12%. That is not "double" the California's usury limit of 10%, but only 1/5th of that. Double the applicable state usury limit is the minimum threshold for a RICO defined "unlawful debt". 18 U.S.C. § 1961(6), and that would be a 20% rate under California law to qualify as a potential violation of RICO.

Loan 2 Hinkley/Harper Lake ("Hinkley Loan"). The Hinkley Loan was a real estate secured loan on vacant land in San Bernardino County, and was at a stated fixed rate of 8 % per annum, within the California usury law limit of 10%.

The Malibu Loan and the Hinkley Loan were made and secured by real estate in California. With the California usury limit, where no exceptions, at 10%, neither the Malibu Loan nor the Hinkley Loan were double the state usury rate of 10%, which would be a 20% threshold to serve as a basis for a RICO violation.

C. Utah Loan: No Usury Law Or Finance Limitations For Loans Of The Type.

The Utah Loan was lawful and not usurious under Utah law, which governs this Utah Loan, as the promissory note was made payable in Fillmore Utah,  secured on land in Millard County, Utah and the escrow closed and funds were paid from the escrow in Utah. *Capital Stack UT LLC v. Reddy*, 575 P.3d 1192, 1196 (2025) (Utah Court of Appeals). The Trust Deed States: "16. This Trust Deed Shall be construed according to the laws of the State of Utah." FACT # 14, Exh. 2-2-6 (Ex 2 p. -6), and the Trust Deed Note states: "This note is secured by a Trust Deed of even date herewith".  The promissory note was made expressly in "Fillmore, Utah" and the land that secures it is in Millard County, Utah.

Utah Code § 15-1-1(1) & (2): allows any rate of interest expressly stated in a promissory note. The statute provides:

(1) The parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract, including a contract for services, a

loan or forbearance of any money, goods, or services, or a claim for breach of contract.

(2) Unless the parties to a lawful written, verbal, or implied contract expressly specify a different rate of interest, the legal rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract is 10% per annum.

"The Utah Legislature has made clear that '[t]he parties to a lawful written . . . contract may agree upon *any* rate of interest for the contract, including a contract for . . . a loan." *Capital Stack, supra*, 575 P.3d at 1196. (citing Utah Code § 15-1-1 (1)).

The Utah Department of Financial Instructions on Interest Rates on its public website states: "Utah Law does not specify an interest rate ceiling, but does have an unconscionability provision (Section 70C-7-106 of the Utah Code). Rates are determined by the market . . . ." It adds, "The table below illustrates the differences in monthly payment and total interest paid if $2,000 is borrowed at rates which are available in Utah: . . . (illustrations . . . Annual Percentage Rate . . . 120%". (Request for Judicial Notice No. 1, 12/31/2025; Exh. 1; web page: https://dfi.utah.gov/general-information/consumer-tips/interest-rates/[12/30/2025 2:56:28 PM].

Articulating Utah's law of no usury or finance limits as recently as 2025 is *Capital Stack, supra,* 575 P.3d at 1196. The *Capital Stack UT* decision provides the rule, holding that as there was no usury limit on the written business loan secured by real estate, a 146.44% interest rate, and as it was not unconscionable, noting that, "[s]uch high interest rates and short repayment terms are common for hard money loans like this one.

In footnote 1, p. 1196, the decision observed: " 'Hard money loans are most commonly used in connection with real estate transactions and offer an alternative to conventional loans when financing is difficult to obtain." *State v. Chapman*, 2014 UT App 255, ¶ 2 n.2, 338 P.3d 230 (cleaned up). They "carry much higher interest rates than conventional loans." Id. (cleaned up).' "

*Capital Stack, supra,* at p. 1196, holds: "But Utah law 'enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party.' *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) (cleaned up). Thus, 'even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable.' Champagne, 2006 UT App 321, ¶ 33 (cleaned up)."

The Utah Supreme Court, *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 463 (1983) (Utah Supreme Court) holds that a commercial real property secured loan with a risk-premium amounting to finance charges of 58% was lawful under Utah law. With no usury limit for a business real estate secured loan, the only test is that of "unconscionability." In *Bekins*, the loans at issue were "principally secured by trust deeds on the real property." *Id.* at p. 460.

The *Bekins* decision explains (quotation):

> With a few exceptions, it is still axiomatic in contract law that "[p]ersons dealing at arm's length are entitled to contract    on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." *Biesinger v. Behunin,* Utah, 584 P.2d 801, 803 (1978). Parties "should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." *Carlson v. Hamilton,* 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958). Although courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable. Of course, this general principle has its limits. An established exception is that if a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result.

*Bekins*, *supra*, at p. 459.

Likewise, Utah does not have limit on finance charges for loans such as Plaintiff's Utah Loan. "[U]nlike consumer loans there is no statutory limit on the amount that may be charged as a finance charge." *Id*. at p. 461.

As in *Bekins*, Plaintiff's Utah Loan is business loan between experienced business people. So the only test under Utah law to challenge the Utah Loan terms was for Plaintiff to file a suit in Utah challenging the secured loan as unconscionable. *Bekins, supra*, at pp 462 & 463. But even if there had been an adjudication under Utah law that the Utah loan was "unconscionable", either for procedural or substantive unconscionability, that would not be based on "usury."

The *Bekins* decision, at p. 463, notes: "Acquisition of high risk capital almost always requires the payment of a premium. It is not sound legal policy to establish rules so strict as to unnecessarily dampen legitimate and desirable business activity." And, holds that, "the notes should be enforced as written". *Id*. at p. 465.

By express exclusion, the Utah Consumer Credit law with its usury limitations does not apply to Brown's Utah Loan. That law exempts commercial loans and those not secured by dwellings of a consumer. Utah Code § 70C-1-202(2)(a): "This title does not apply to any of the following: (1) an extension of credit: (i) primarily for business, commercial, or agricultural purposes; . . ." The Utah Consumer Credit Code, § 70C-1-302 (4) excludes from the definition of "Creditor" one who makes a real estate secured loan on vacant land for business purposes. Utah's statute § 70C-1-301 provides that the definitions of federal regulation Z apply to its consumer credit law. Regulation by its terms and definition does not apply to the Utah Loan. Regulation Z, 12 C.F.R. § 1026.2 (12) provides that "Consumer credit means credit offered or extended to a consumer primarily for personal, family, or household purposes." And Regulation Z definition of "Consumer" excludes Plaintiff on this loan: "Consumer means a cardholder or natural person to whom consumer credit is offered or extended." This Utah Loan was not "consumer credit". (The definition includes also only a natural person financing a

dwelling, who has a loan rescission right under Regulation Z). Also, though this issued does not need to be reached, Utah's consumer credit law applies only to residents of Utah, which Plaintiff was not.

The Utah Loan interest rate was 10%, on principal of $200,000, as stated in the promissory note. $100,000 of this was new money, and $100,000 owed immediately to Smead, both as principal, as lent to Brown for a risk-based or bonus form making this risky loan. Utah law applies, as the promissory note was made to be paid in Utah, and secured by Utah real estate, raw, undeveloped land for a business purpose loan. Utah law has no usury limit or "finance" limit, where the promissory note states a specific rate, as it did here. And on this non-consumer loan for raw land, Utah has no usury limit or "finance limit" and does not treat as interest the "bonus" paid to obtain the risky business purpose real estate secured loan—that too is principal, because it is money owed by Brown's agreement and promissory note to Smead for making a very risky Utah loan. So, no "double" the state usury rate was charged for the Utah Loan. And none of this was "carried over" from the Hinkley Loan in California, made seven months earlier.

In sum, the RICO definition and test for "unlawful debt" is for "double" the state usury law limit. And, here, there is no Utah state usury law limit for this loan. Usury exists only where defined by statute. And, here, the Utah Code § 15-1-1 expressly excludes this Utah Loan from any usury limitation, and controlling Utah case law shows that the Utah Loan has no usury limit for this loan.

D. RICO, 18 U.S.C. § 1962(c) Was Not Violated, As No "Collection of Unlawful Debt" Occurred Nor Existed.

The four-factor test for liability for collecting an "unlawful debt" in violation of RICO is not met. These are the factors not met, as the test is specified in *Durante Bros. supra*, 755 F.2d at 248: (1) No loan was *unenforceable* because of usury law. (2) The loans were *not at a usurious rate*. (3) If a usurious rate existed it was *not "at least twice the enforceable rate*. (4) Plaintiff *was not injured in business or property by a confluence of factors*.

Here, no violation occurred, RICO's "unlawful debt" test is not met, so Plaintiff has no RICO claim against Smead. Plaintiff was injured by his own choices: the lack of income sufficient to pay the interest only loans; choosing not to pay the loan; failing to pay off the loans; failing to sell the properties before foreclosures; failing to develop the properties to generate any revenue to service the debt. Plaintiff meets none of the factors, and Defendant has shown on the evidence that he is entitled to dismissal of the RICO claims as all turns on alleged collection of unlawful debt.

## ARGUMENT (PLAINTIFF'S OPPOSITION)

### I. **Legal Standard**

A moving party without the ultimate burden of persuasion at trial -usually, but not always, a defendant -has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *See* 10A C. Wright, A. Miller and M. Kane, Federal Practice and Procedure S 2727 (3rd ed. 1998). In order to carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. *See id.* The analytic framework is provided by *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "Thus, under *Adickes* and *Celotex*, a moving party without the ultimate burden of persuasion at trial may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

A.    **Defendant Has Not Met His Initial Rule 56 Burden as to 18 U.S.C. § 1961(6)**

Defendant bears the initial burden under Rule 56(c) to negate an essential element of Plaintiff's RICO claims or to demonstrate the absence of evidence supporting that element.

As to unlawful debt under 18 U.S.C. § 1961(6), Defendant does neither.

""unlawful debt" means a debt (A) incurred or contracted…which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection…with the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate[.]" See 18 U.S.C. § 1961(6).[6]

Defendant does not negate that the loans at issue were incurred in the business of lending money.  See ECF No. 95 ("Answer") at ¶¶ 5-6; PUDF Nos. 1-2. Nor can he show that Plaintiff does not have enough evidence to prove that Defendant is not in the business of lending money. Id.; Exhibit A at 1-74; ECF No. 119 at 6. ("Mr. Smead and his wife used [this bank account] for all their business purposes"). But Plaintiff is not required to produce evidence when the Defendant has failed to carry his initial burden.[7] Nor does he eliminate genuine disputes as to whether the effective interest charged exceeded the lawful limit. Compare Brown Decl. ¶17 & Smead Decl. ¶31. Instead, Defendant relies on disputed characterizations of interest as "risk" fee "bonus" fee or

---

[6] The well-established approach to statutory construction begins with the actual language of the provision, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). When the "plain meaning" is clear on its face, "the sole function of the courts is to enforce it according to its terms." *See Caminetti v. United States*, 242 U.S. 470, 485 (1917). Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion. *See Hamilton v. Rathbone*, 175 U. S. 414, 421 (1899). Here, Congress expressly defined "unlawful debt" in § 1961(6). That definition is unambiguous. Defendant's effort to recast or narrow that definition does not create ambiguity and cannot invite judicial interpretation where Congress has plainly spoken.

[7] In fact, Defendant does not even mention "the business of lending money" in his Opening Brief, further demonstrating his failure to negate or show.

"origination fees" and on unilateral interest-rate calculations that assume facts Plaintiff directly disputes under oath. See Smead Decl. ¶¶ 31, 39 (asserting, based on Defendant's assumptions, that Plaintiff paid an effective interest rate of approximately 3.7%). However, interest is not determined by characterization or narrative, but by objective numerical inputs. The record contains the actual payment amounts and timing necessary to calculate the effective interest rate. Defendant does not perform that calculation based on the full record and therefore fails to meet his initial burden under Rule 56.[8]

### i.    **Malibu Loan**:

For example, it is undisputed that the "consolidated" Malibu Loan carried an interest rate of 12%. See DUDF No. 2. On its face, that is a 1) a loan; *id*. 2) the rate is 2 percent above the statutory maximum of 10 percent.[9] *See Cal. Civil Code* § 1916.1; 3) the loan and interest was absolutely repayable by the borrower. See Smead Decl. ¶43 ("credit-bid of $372,338.14 in January 2023"); 4) Defendant collected and received interest payments. *Id*. That is *California* law, not *Federal* law. Plaintiff's cause of action arises under Federal law.[10] In any event, crediting Defendant's own evidence of the

---

[8] Defendant fails to even cite the legal standard for usury (or summary judgment for that matter), let alone any California usury cases to either negate or show that Defendant is entitled to judgment *as a matter of law*. "'California's usury law imposes virtually strict liability on lenders." Under California law, "[t]he essential elements of . . . usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." *WRI Opportunity Loans*, 65 Cal. App. 4th at 212. Intent, in the context of usury, is satisfied by the intent to accept payment in excess of the legal rate; a conscious intent to evade the law is not required. *Id*. Intent in regard to usury is a question of fact. *Id*. If a loan is found to be usurious, the lender may not collect interest. *Strike*, 92 Cal. App. 3d at 744."' *See In re Dominguez*, 995 F.2d 883, 886 (9th Cir. 1993), *as amended on denial of reh'g* (July 8, 1993).

[9] Recognizing the facial usury problem with the Malibu loan, Defendant recharacterizes the transaction as a "consolidation" loan. That relabeling does not alter the substance of the transaction or cure its usurious nature, *infra*. "For the consolidation loan at 12%, the Malibu Loan was a consolidation of the brokered-purchase money loans, so it kept its character and was likewise exempt from the usury limit. *DCM Partners v. Smith*, 228 Cal.App.3d 729, 737-738, 278 Cal.Rptr. 778, 783 (1991)." That case involved a credit sale. This case does not. *See In re Moon*, No. 23-60006 *slip op*. at *4 (9th Cir. Apr. 16, 2024) (mem.) (nonbinding but persuasive authority explaining the scope of California's broker exemption). In any event, the exemption Defendant invokes does not apply to the purported Malibu "consolidation" loan.

[10] Congress did not condition 18 U.S.C. § 1961(6) on whether a particular state adopts a permissive or restrictive regulatory regime. As the Supreme Court has recognized, state law cannot be invoked to override or nullify a congressional policy choice embodied in a Federal statute. *See Gonzales v. Raich*, 545 U.S. 1, 29 (2005). Section 1961(6) supplies a uniform Federal definition of "unlawful debt,"

credit-bid amount of $372,338.14 in January 2023 (Smead Decl. ¶43), the Plaintiff's last credited payment in November 2021 (DUDF No. 4) establishes an effective annualized rate exceeding 21%, creating a genuine dispute of material fact as to the true interest charged.[11] Thus, as stated above with Defendant's own facts the Malibu Loan was usurious under California law on its face at 12 percent interest. See *Cal. Civil Code* § 1916. Although Plaintiff was a real estate broker at the time of that loan[12], under California law, a broker is not acting in his licensed capacity unless he receives compensation for acting on behalf of someone else. *See Froid v. Fox,* 132 Cal. App.3d 832, 840, 183 Cal.Rptr. 461, 465 (1982). A broker who realizes a profit from participating in a real estate transaction on his own behalf does not act for "compensation." *See id.* at 841, 183 Cal. Rptr. at 466; *Robinson v. Murphy,* 96 Cal. App.3d 763, 769-70, 158 Cal.Rptr. 246, 250 (1979); *See also*, *In Re Lara*, 731 F.2d 1455, 1464 (9th Cir. 1984).[13] That said, Defendant demanded that the $50,000 unrecord interest that remained from the California and Utah loans be recorded on the Malibu loan, but it was never recorded by Superior Loan Servicing, the loan service provider. *See* Brown Decl. ¶14. Defendant eventually collected that demand when he sold the property in March 2025 for $550,000.[14] *See* Brown Decl. ¶15; Smead Decl. ¶¶40, 44; Assuming

---

referencing state law only to determine unenforceability as to principal *or* interest. The inquiry therefore does not turn on whether Utah is more permissive than California, but on whether the debt enforced included amounts unenforceable as principal *or* interest—which it did under California and Utah law.

[11] Under California law, usury is determined by the substance of the transaction at inception, and a loan that is usurious cannot be cured by later charges or recharacterization. Charges imposed for the use or detention of money—including bonuses, default interest, penalties, or other fees—are treated as interest regardless of label. Where a loan is usurious, all additional compensation exacted in connection with that loan is likewise usurious, *supra*. Cf. *In re Moon*, No. 23-60006 *slip op.* at *3-4 (9th Cir. Apr. 16, 2024) (mem.) ("Even though the Settlement Agreement *lowered* the original loan's interest rate from 11.30% to 11.05%, it is still a "contract of interest" for usury purposes." (emphasis added).

[12] Plaintiff was not acting as a California real estate broker in connection with the Harper Lake loan at the time escrow commenced or the loan terms were finalized, and the claimed broker exception does not apply to real estate agents, just as it does not apply to attorneys, even though attorneys may perform all broker functions under California law. Even if Plaintiff was the exception does not apply, *supra*.

[13] Defendant's own evidence shows that Plaintiff did not receive any compensation from the 2021 Malibu loan. *See* MSJ Ex.12 at 1-2; Brown Decl. ¶57.

[14] Defendant could have sought a deficiency judgment to enforce the Malibu Loan debt but instead elected to sell the property to collect. Defendant now affirmatively seeks a common-law setoff against Plaintiff's claims based on property Defendant has retained and remains in possession of. *See* Answer at 13 (Third Affirmative Defense). Defendant thus seeks the benefit of the property's value—

*arguendo* that Defendant satisfied his initial Rule 56 burden, genuine disputes of material fact nonetheless permit a reasonable jury to find for Plaintiff that the Malibu Loan was unlawful debt under 18 U.S.C. § 1961(6) on this summary judgment record.

### ii.    Harper Lake & Utah Loans

The material facts for the Harper Lake & Utah loans have been laid out in the statement of facts in detail, supra. The issue is whether, under California law, that the unrecorded amounts on the Harper Lake loan[15] was (1) the transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. The transaction may properly be characterized as a forbearance, and Defendant's characterization of the timing of the recording of the $100,000 from the Harper Lake transaction as "notable" is immaterial under either a forbearance or loan framework. Given that Plaintiff was in forbearance with Defendant's permission, it is reasonable to infer that Defendant likewise granted forbearance as to the $150,000 until it was recorded in June 2021 on the Utah loan. *See* Brown Decl. ¶29. The interest exceeded the statutory minimum because it constituted interest held as part of a loan or forbearance in connection with the Harper Lake transaction that was or exceeded 100 percent interest. See Brown Decl. ¶¶5, 50. It was absolutely repayable. See Brown Decl. ¶¶53-54, 55; Smead Decl. 39. ("Unpaid interest accrued for 19 months for the period July 1, 2021 to March 1, 2023"). Smead collected

---

[15] Defendant does not address that most loans are not recorded and an unrecorded loan is still valid. While citation is unnecessary to resolve that point here, the governing test remains the same. To the extent Defendant alludes to documents prepared by Plaintiff stating "0 percent interest" due within one year, Plaintiff has testified under oath in his deposition—an excerpt of which Defendant did not include—that those documents reflected the $150,000 in interest tied to the Harper Lake loan, which explains the "0 percent" notation. *See* Brown Decl. ¶58. In any event, Defendant has failed to negate or show that the Harper Lake and Utah loans were not usurious under California law or that the rate does not constitute unlawful debt under federal law, *infra*.

specifically the Harper Lake property—while simultaneously attempting to offset Plaintiff's claims arising from the same transaction.

interest. Id. Even assuming, arguendo, that Utah law applied, the loan would still be usurious.[16]

Because Defendant has failed to negate the existence of unlawful debt as defined by 18 U.S.C. § 1961(6), or to demonstrate the absence of evidence supporting Plaintiff's claims, Defendant's motion fails at the threshold and summary judgment must be denied.

B.    **In The Alternative, The Record Establishes Genuine Disputes of Material Fact as to Unlawful Debt**

"The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (citing *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 158-159 (1970)). Here, the record by a preponderance of the evidence[17] establishes Genuine Disputes of Material Fact as to Unlawful Debt. It would be unreasonable for a jury to conclude that Defendant imposed a $100,000 "fee" on a $100,000 loan, recorded the obligation as $200,000 in principal, and collected interest on the full $200,000, whether the transaction is characterized as independent or originated from the Harper Lake property, as just one example.

Thus, the record contains evidence that Defendant charged and collected interest exceeding lawful limits, including amounts not reflected in recorded loan instruments and payments required outside of escrow. *See* Brown Decl. ¶¶5, 14, 17, 27, 28; Smead Decl.

---

[16] Defendant's "choice-of-laws" argument is unavailing. Civil RICO liability does not turn on the application of a single state's substantive law, and reliance on state-law choice-of-law principles would improperly reintroduce the very jurisdictional fragmentation RICO was designed to avoid. As the Supreme Court recently explained, "[r]elying on state law would also create choice-of-law questions," particularly because "many RICO enterprises transcend the boundaries of a single jurisdiction." *See Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 611 (2025) (citing 18 U.S.C. § 1965(a); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987)). In any event, Defendant's argument fails on its own terms. Utah law, like California law, prohibits interest rates exceeding 10%, and therefore does not authorize the conduct at issue. *See* Utah Code § 15-1-1 & § 76-6-520. Moreover, the record reflects that Defendant operates his lending business from California, that loan proceeds originated from California, and that interest payments were made to Defendant in California. *See* PUDF 30-32; Exhibit A at 1-74. California and Utah, like Congress, has a substantial public interest in preventing the use of interstate lending structures to evade its usury laws, and Defendant cannot avoid scrutiny under Federal RICO by invoking state-law formalities inconsistent with the economic reality of his lending operation. *See id.*

[17] "In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)**.**

¶¶ 31, 32, 34, 39; Exhibit B & C. "There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law." *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982). RICO is a federal statute. Therefore, Defendant's common-law defenses fail as a matter of law and cannot preclude liability under a federal statute. In other words, a private contract cannot override a federal statute enacted by Congress. Here, there is admissible evidence that the loan was usurious under California and Utah law and because it was twice the usurious rate it therefore triggered unlawful debt under the federal RICO statute.

In sum, the record reflects that Defendant required Plaintiff to pay six-figure interest obligations, that portions of that interest were unrecorded or rolled into subsequent loans, and Defendant used that debt to credit-bid Plaintiff's properties. Whether those amounts constitute interest for purposes of 18 U.S.C. § 1961(6) turns on the substance of the transaction, not Defendant's labels. At minimum, these facts create genuine disputes of material fact that Defendant cannot resolve at summary judgment assuming *arguendo* that Defendant initially carried his threshold Rule 56 burden, which he did not.[18]

REPLY BY MOVANT/DEFENDANT ON SECTION I ARGUMENT

1.    *No Admissions in the Answer to the Second Amended Complaint Establish Plaintiff's Case*.

Plaintiff incorrectly argues that his very Second Amended Complaint [Doc. 90] ("2nd AC") establishes his case to preclude summary judgment. However, Defendant's Answer [Doc. 95] denies the allegations of facts that Plaintiff must prove in his case, with very detailed and particular denials where these were possible. The Answer admits

---

[18] Defendants attempt to frame this case as one about Plaintiff's nonpayment, but that characterization is misplaced. As explained *infra*, Plaintiff's claims arise from Defendant's conduct in collecting interest at rates exceeding state and federal law, not from Plaintiff's payment history. Even if Plaintiff had paid all debts in full, Plaintiff would still state a claim based on Defendant's collection of unlawful debt.

nothing for Plaintiff to defeat summary judgment. Plaintiff points to no admission of Defendant in the pleadings that can carry the day for Plaintiff.

2.    *No Usury from California Existed To Be Put Seven Months Later On the Utah Loan.*

Plaintiff's primary factual and legal points are based on his declaration alone—no documents--there is not one email, or document, or bit of evidence that mentions what Plaintiff now claims. He claims that Smead charged $150,000 in "unwritten" and "unlawful" interest in violation of California usury law, allegedly by agreement as a condition to making the second priority purchase money loan to Brown for the Hinkley Loan secured by the lot in Hinkley, in the Harper Lake area. ("Hinkley Loan). But the very timing of the loan in Utah on the Utah Lot shows this is not credible.

It was seven months after the Hinkley Loan that Defendant made the Utah Loan. Seven months. And there are no facts to show that Defendant had any power to make Plaintiff take the Utah loan.

When Plaintiff was long in default on the Malibu Loan and the Hinkley Loan, he sought the Utah Loan. The Utah Loan by its promissory note was made and secured in Utah on Utah land. Smead had every reason to consider the proposed Utah Loan a risky one. In his view, the Utah Lot was worth only $50,000. But Brown wanted new money of $100,000. Given the history of loan defaults on the California loans, Smead required that the promissory note be written to include a risk-premium of $100,000 in principal, in addition to the $100,000 new money. And the Utah note was for 10%. This Utah law allows on commercial real property secured loans. Utah has no usury or financing limits in its law on such loans. So Brown and Smead agreed to the loan on those terms.

The evidence shows that between September of 2020 and the consummation of the Hinkley loan, Brown made many proposals for Smead to make other loans to him or to his entity, Atlas LLC. Brown wrote up proposed loan documents, a loan agreement, guarantees, proposed promissory notes, proposed deeds of trust in this period and offered them to Smead, but he rejected them. Rather, Smead made the Hinkley Loan on only the

written terms in the promissory note and deed of trust. There was no "secret" $150,000 as a condition of the Hinkley loan, floating around out there, and with no "next deal" such a term would be tied to. The record shows that Brown writes a lot of email and documents to send to or exchange with Smead. Never once did Brown discuss or mention in any way in any of the evidence that Smead asked for, nor Brown agreed to owe a secret $150,000 to get the $150,000 Hinkley Loan. This position did not come to Brown to assert until his First Amended Complaint in this case failed. So Brown decided to get creative, and make up this story.

The Utah Loan stands alone, made seven months after the Hinkley Loan. There is no basis in credible evidence nor reason to suppose that it included $100,000 of "usury" from California. This is the sole point in Brown's position that RICO was violated by "collection of unlawful debt", but that is defined by RICO as double the applicable state usury rate. And Utah has no usury or finance charge limitation on such loans as this. Thus, summary judgment is properly granted.

3.    *If the Consolidated Malibu Loan Was 2% Usurious, That Was Not Double the California Limit of 10%, So Not "Unlawful Debt".*

Brown argues that the Malibu Loan, at 12%, was usurious. With the California usury statute at 10% where there is no applicable exception. So, at worst, this loan, if it did not have the exemption of a consolidation of the 12.99% purchase money loans, had only was 2% of usury.  That is not "double" California's rate, which at 10% for usury means that only an interest rate of 20% would be "unlawful debt" if collected, under RICO.

4.    *RICO Specifies "State" Law Relating To Usury For Calculation, Not A "Federal" Standard Or A State Other Than Where The Loan Is Made And Secured And Enforced. So, Only Utah Law Applies To The Utah Loan As Its Promissory Note Was Made Payable In Utah And Its Security Property Was In Utah, So There Is No Basis To Apply California Usury Law To The Utah Transaction.*

Brown argues that the Utah lending law should not be applied to the Utah made and payable promissory note secured by Utah land. However, 18 U.S.C. § 1961(6) defines specifically in reference to that of a State law (or federal law) thus:

"unlawful debt" as: "a debt (A) . . . to be: which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious    under State or Federal law, where the usurious rate is at least twice the enforceable rate."

The only applicable state law on the Utah Loan is that of Utah, as the promissory not was made payable there and the security property was there. There is no basis to apply California law to the Utah Loan. And there is no applicable federal usury law alleged by Brown that applies. It is state law, Utah law, and the charges and rate was not "at least twice the enforceable rate", as Utah law specifically exempts such loans from its usury statute, and imposes no limits finance limits. The only limit Utah regards, on a case by case basis, comes from a claim to change loan terms based on "unconscionability" of terms. But no "unconscionability" was raised, and adjudicated in Utah or anywhere on the terms of the Utah loan. So a risk-premium of $100,000 on top of new money for this loan is lawful, and not "double" the applicable Utah law.

No basis exists to apply California's usury law to the written terms of the Utah Loan. Choice of law principles do not allow that kind of cherry-picking, especially on a commercial loan made in Utah between business people. Brown misuses federal authorities at fn. 16, regarding RICO and choice of law: *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 611 (2025), as it did not deal with RICO usury or state law pertaining to it. Rather it dealt with the definition of "enterprise", and declining to incorporate state-law on it with the complex interactions in a multi-state enterprise of persons. Likewise, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) did not deal with the applicable state usury law under RICO. Neither case brought in choice-of-law and declined to apply state law on questions of usury under RICO.

/ / /

Then in footnote 16, Plaintiff makes the false assertion that Utah's cap at 10% on consumer loans applies to this loan. The opening brief made established that Utah law has no usury statute applicable to limit interest on such a loan.

5.    *The Facts Show There Is No Connection Between the Earlier Hinkley Loan and the Utah Loan Seven Months Later*.

Plaintiff argues that the record shows his dispute, based solely on his declaration, with not a scrap of a document as evidence about these written loans. But the seven month gap between the California Hinkley Loan and the Utah Loan show that there is no connection to the alleged "$150,000" usury on the Hinkley Loan getting packed onto the much later Utah Loan. Brown's own alleged and declared facts the unbelievability. He says the Hinkley usury was $150,000. But the Utah Loan has an amount owed of $100,000 over the new cash. He makes this up because the risk-premium required by Smead was $100,000. The other $50,000 of usury supposedly demanded on Hinkley is just floating around out there? No credible explanation in facts is proffered why if this were so that Smead would not have made it $150,000 extra on the Utah Loan.

Plaintiff argues that "a private contract cannot override a federal statute." Smead takes no such position. Rather, Smead's showing demonstrates that Utah law on the Utah Loan was the test under RICO, because RICO specifies in the definition of unlawful debt that "State" law applies to determine whether double the usury limit of that State exists on the loan collected.

[SECTION II ARGUMENT BY MOVANT/DEFENDANT]

II.    NO VIOLATION OF RICO, 18 U.S.C. § 1962(c) or § 1962(a) OR
       OTHERWISE EXISTS, FOR ANY ONE OF NUMEROUS REASONS.

A.    The Statute Is Not Violated.

"To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.  See *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361

(9th Cir. 2005) (quoting Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996))." (From Ninth Circuit Model Civil Jury Instructions section 8, Civil RICO ("8, Civil RICO Jury Instr. 9th Cir."). These tests are not met.

Furthermore, RICO "requires proof of a 'scheme to defraud' involving misrepresentations reasonably calculated to *deceive persons of ordinary prudence and comprehension*. [*Beck v. Prupis* (11th Cir. 1998) 162 F3d 1090, 1096; . . . ]." Stevenson, Karen L., Judge, U.S. Chief Magistrate Judge, Central Dist. Cal. and James E. Fitzgerald; *Federal Civil Procedure Before Trial* (2025 The Rutter Group), § 14:295, p. 120.

Here, these were three written loans, documented, and enforced in the ordinary course, involving no misrepresentations by Smead and no "scheme to defraud". The loans and enforcement were according to their written terms, and it was Plaintiff who came asking for the loans, and not Smead making misrepresentations with a scheme to defraud Brown.  Who himself is a licensed California real estate broker, not a person or mere "ordinary prudence and comprehension" to be deceived, but rather, a sophisticated borrower, business man and speculator attempting to develop solar fields on the raw lands he picked to buy with borrowed money.

Smead has already established in Section I., supra, that there was no "collection of an unlawful debt". There is no other basis to support this claim, as there is nothing else in the "predicate act" list that applies, all of it being criminal under federal law, and no such allegation in the Second Amended Complaint, nor appearing on the facts. FACTS 1-29.

Brown alleges that "usury" under California law was paid and placed on the Utah Loan. But Brown made only four interest only payments on the written terms of his $150,000 Hinkley Loan, a total of $4,000. And he paid only $11,669 of interest payments on his Utah Loan. So, the payments of interest on the written terms on Hinkley at 8% could not be "invested" in a scheme of racketeering activity under Section 1962(a), as not double-the state usury rate. Nor were the partial interest-only payments on the written loan terms for the Malibu Loan of 12% usurious of "invested" in another loan, whether

the Hinkley Loan or the Utah Loan. Rather, the Malibu Lot was not sold by Smead in 2025, and the Hinkley and Utah lots are still owned by Smead, so no money (none of it being "unlawful debt", in any event) from Brown's small payments were "invested" in an enterprise with a pattern of racketeering activity. These were three discrete, and non-performing loans, all by Smead himself, owed to Smead himself, and Smead hiring only one loan servicer who collected monthly payments for a fee (Malibu Loan—Superior Loan Servicing), the escrow companies who closed the loans for a fee, the three foreclosure trustees for a fee, to enforce the Deeds of Trust, as required under state law. The 18 U.S.C. § 1962(a) or (c) fails.

B. <u>There Is No Violative Unlawful Conduct Of Any Kind, No Causation, No Liability.</u>

Plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury. *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019). "Defendant's unlawful conduct that is a **violation** of the statute must be both the factual and proximate cause of the plaintiff's injury. *Holmes v. Sec. Investor Protection Corp*., 503 U.S. 258, 266 n.11 (1992) ("The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required."). No claim exists of injury to business or property exists, otherwise. *Berg, supra,* 915 F.2d 460 at 463-64 (9th Cir. 1990).

C. <u>No Scheme To Defraud Involving Misrepresentations Existed</u>.

These were plain written loans and no misrepresentations for a scheme to defraud exist, but merely enforced in the ordinary course for long-standing failure to make even interest only payments. FACT ##1-28.

D. <u>No Enterprise--Smead Himself Alone Cannot Be The Enterprise, And These Three Discrete Loans Were His Alone, He, Using Only Ordinary, Unconnected Service Providers</u>.

"For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.

1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise)." From 8, Civil RICO Jury Instr. 9th Cir. Here, Smead acted on his own account and no other persons had rights or were involved in making or enforcing the loans, except for ordinary service providers who were unconnected to him or to each other. FACTS 1-28.

     E.  <u>Without an "Enterprise" and "Associated-in-Fact", Defendant's Using Service Provider's Conduct on Discrete, Unconnected Loans, Does Not Satisfy The Elements</u>.

"A defendant is not liable under § 1962(c) unless the defendant has participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that accountants hired to perform audit of a cooperative's records did not participate in "operation or management" of the cooperative's affairs by failing to inform the cooperative's board of directors that the cooperative was arguably insolvent). In determining whether the conduct element has been satisfied, relevant questions include whether the defendant "occup[ies] a position in the 'chain of command,'" "knowingly implement[s] [the enterprise's] decisions," or is "indispensable to achievement of the enterprise's goal." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (attorney's performance of services did not satisfy conduct element)." From 8, Civil RICO Jury Instr. 9th Cir.

RICO associates-in-fact must have had "some knowledge of the nature of the enterprise . . . to avoid an unjust association of the defendant[s] with the crimes of others . . . ." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 828 F.3d 763 (9th Cir. 2015).

An "enterprise" is any person or "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "It is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Here, the persons or entities involved in ordinary services for commercial lending operation, escrows, a loan servicer, foreclosure trustees, title policy issuers, did not have conduct that violated RICO, as all performed ordinary lending-related operations on discrete loans that were unconnected. FACT ##25-28.

For an "enterprise" and participation, the "various associates" must, but here, did not, "function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007). No such thing exists here.

F.   No Racketeering Pattern Of "Predicate Acts" Exists.

"A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation, but may not be sufficient. See *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous." *Id.*; *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992). From 8, Civil RICO Jury Instr. 9th Cir.  Here, there were no predicate acts at all. FACT ## 1-28.

G.   No Racketeering Activity, No Indictable Predicate Acts, Under 18 U.S.C. § 1961(1).

"To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) (noting that "racketeering activity' consists of no more and no less than commission of a predicate act").   Predicate acts must be proved by a preponderance of the evidence. See *Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987)." From 8, Civil RICO Jury Instr. 9th Cir.

Predicate acts are listed and defined in Section 1961(1), as "racketeering activity". None of them exist here. Plaintiff argues "wire" or "mail fraud", but the loans were plain on their faces, money lent, terms set, loans enforced, and there was no "fraud" by "wire" or by "mail", as money was lent and money was paid. None of the loans involved, "unlawful debt" as defined in Section 1961(6), but that is not one of the "predicate acts"

under Section 1961 (1) in any event. There was no "wire fraud" or "mail fraud". FACT ##1-28.

H.  No Effect On Interstate Commerce Exists.

Under Section 1962, to invoke it, there must be an enterprise involved in the racketeering activity that engages in or has an effect on interstate commerce. *United States v. Rone*, 598, F.2d 564, 573( 9th Cir. 1979), *cert denied sub nom. Little v. U.S.*, 445 U.S. 946. The effect on the interstate commerce must be shown by Plaintiff. *United States v. Bagnariol*, 665 F.3d 877, 892 (9thCir. 1981), *cert. denied sub nom. Walgren v. U.S.*, 456 U.S. 962. Here, the two loans in California were unconnected to interstate commerce. And the Utah Loan, made and payable and secured in Utah was unconnected to interstate commerce. An effect on interstate commerce did not occur. FACT ##1-28.

I.  Harm To Business And Property Did Not Occur, As No RICO Liability Exists And Plaintiff's Loss Of Property To Foreclosure Was A Result Of His Loan Defaults.

The cause of Plaintiff's "harm" was not the result of violation of Section 1962. So "harm" to Plaintiff's business or property that arose from the circumstances does not create liability. *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 939 (2025).  His loss of property to foreclosure, and with it the hopes of business in solar fields were a result of the ordinary enforcement of the loan agreements as to the Malibu Loan, the Hinkley Loan and the Utah Loan. FACT ## 1-28.

None of these three lots generated any revenue to Brown and none had any contracts that would generate revenue at the time of the foreclosures, nor afterwards under Smead's ownership post-foreclosure. Smead finally sold the Malibu Lot in 2025. FACT ## 21, 22. Brown has not been harmed in business or property under RICO.

/ / /

/ / /

/ / /

/ / /

(BY PLAINTIFF OPPOSITION TO SECTION II )

## II. Defendant's "No RICO Violation" Argument Fails As A Matter of Law.[19]

### A.  Defendant Has Not Carried Its Initial Burden to Negate the Elements of Liability Under 18 U.S.C. § 1962(a).

Defendant's motion fails independently because it does not address—let alone negate—the use or investment element of 18 U.S.C. § 1962(a)[20], the absence of any person–enterprise distinctness requirement under subsection (a)[21] or the undisputed interstate nature of six-figure transfers[22] central to the verified second amended complaint. Thus, Defendant has not carried his initial Rule 56 burden as to 18 U.S.C. §1962(a), and summary judgment must be denied on that claim alone.

---

[19] Collection of an unlawful debt may trigger RICO criminal and civil liability in either of two ways. First, each of the substantive RICO offenses is predicated on either "a pattern of racketeering activity" *or* upon the "collection of an unlawful debt." Collection of unlawful debt appears to be the only instance in which the commission of a single predicate offense will support a RICO prosecution or cause of action. No proof of pattern seems to be necessary. *See United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020); *Goldenstein v. Repossessors Inc*., 815 F.3d 142, 147–48 n.5 (3d Cir. 2016); *United States v. Oreto*, 37 F.3d 739, 751 (1 st Cir. 1994); *United States v. Aucoin*, 964 F.2d 1492, 1495–497 (5 th Cir. 1992) (quoting dicta in *H.J., Inc*., 492 U.S. at 232 (1989)); *Dillon v. BMO Harris Bank*, N.A., 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014). In other words, the collection of unlawful debt constitutes a predicate act in and of itself. The statute does not require proof of a pattern of racketeering acts for claims based on the collection of unlawful debt. Even if a pattern were required, the record reflects the collection of multiple debts arising from multiple loans. Thus, Defendant's argument fails as a matter of law.

[20] *See United States v. Robertson*, 514 U.S. 669, 672 (1999) (holding that § 1962(a) is violated by investing the proceeds of unlawful activity in a gold mine). Here, Defendant collected and used unlawful debt to credit-bid property. *See* Fn. 1. Any alleged pleading deficiencies are therefore immaterial at this stage because Defendant admits, and Plaintiff has introduced Rule 56 evidence establishing an "investment injury." Even if the Complaint were imperfectly pleaded, the evidentiary showing at summary judgment overcomes any such defect. *See Jones v. L.A. Central Plaza*, No. 22-55489, at *6 (9th Cir. 2023) (a district court may not retroactively apply *Iqbal* at summary judgment and must evaluate standing under Rule 56). Because Defendant has not addressed the "investment injury" requirement of 18 U.S.C. § 1962(a), Defendant has failed to negate that element or demonstrate the absence of evidence. Defendant therefore cannot raise a pleading deficiency for the first time at summary judgment that was not asserted under Rule 12.

[21] Unlike a case in which a corporation is charged under 18 U.S.C. § 1962(c), "where a corporation engages in racketeering activities and is the direct or indirect beneficiary of the pattern of racketeering activity, it *can be both the 'person' and the 'enterprise' under section 1962(a)*." *See Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1396, 1398 (9th Cir. 1986). Here, Defendant can be the "person" and "enterprise" under Ninth Circuit law and most, if not all, Circuits. (citation omitted).

[22] *See United States v. Robertson*, 514 U.S. 669, 671–72 (1995) (holding RICO's interstate-commerce element satisfied where a sole proprietorship enterprise engaged in interstate transactions, without requiring proof of substantial effects).

B. **Defendant Has Not Negated the Elements of Liability Under 18 U.S.C. §1962(c).**

Answer ¶6, Defendant admits that he has made loans only to individuals by funding real estate secured loans over the past several decades to individuals only.[23] Defendant's admission stated that the bank account ending in 6236 was an account "Mr. Smead and his wife used for all their business purposes." *See* ECF No. 119 at 6. (transcript of October 30, 2025 telephonic hearing)[24]; PUDF No. 43. Defendant's bank statement titled "Steve Smead DBA D&S Rentals" *See* PUDF No. 31. The enterprise here is Defendant's lending sole proprietorship. The Ninth Circuit has expressly held that a sole proprietorship constitutes a RICO enterprise when it is not a 'one-man show,' but instead employs or works with other individuals in conducting its affairs. *See United States v. Benny*, 786 F.2d 1410, 1415–17 (9th Cir. 1986). As Benny explains, a sole proprietorship becomes an enterprise when it is 'formally or practically separable from the individual,' including where it uses employees, agents, or associates. *Id.* Defendant's lending operation was not a one-man show: he and his wife used the business bank account jointly for "all their business purposes" and he regularly engaged trustees, escrow officers, title companies, and loan servicers to originate, administer, and collect his loans, including through foreclosure and the credit-bids. *See* DUDF No. 26-29. Under *Benny*, this constitutes a RICO enterprise. Smead's lending operation was a hub-and-spoke, not a one-man show. Under *Benny*, that is a RICO enterprise. *See also*, Fn. 19.

/ / /

---

[23] Judicial admissions are "formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

[24] Attorney's statement during oral argument constitutes judicial admission. *See United States v. Wilmer*, 799 F.2d 495, 502 (9th Cir. 1986).

**C.    Defendant Has Not Carried Its Initial Burden to Negate Plaintiff's Standing Under 18 U.S.C. § 1964(c).[25]**

Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue." As the Supreme Court has recently explained, "[a] plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more." *See Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025). Here, Plaintiff was injured in his property by Defendant's collection of unlawful debt and Defendant's use of that unlawful debt to acquire Plaintiff's property through credit-bidding. *See* Brown Decl. ¶¶11, 13. The evidence shows that Plaintiff owned the properties, paid interest to Defendant, and that Defendant acquired the properties through credit-bidding.[26] *Medical Marijuana* clarifies that § 1964(c) requires only concrete harm to business or property, and where such harm flows directly from a defendant's conduct, RICO standing is satisfied. Here, Defendant credit-bid Plaintiff's property at foreclosure, resulting in loss of ownership and  business opportunities, which constitutes compensable property damage under 18 U.S.C. § 1964(c).

---

[25] Defendant's opening brief does not address 18 U.S.C. § 1964(c) at all. To the extent Defendant implicitly alludes to standing or conflates Article III standing with RICO's distinct statutory standing requirement, Defendant fails to negate either. Defendant identifies no absence of injury to Plaintiff's business or property, no lack of proximate cause, and no defect in Plaintiff's statutory standing under 18 U.S.C. § 1964(c). Defendant's assertion that Plaintiff's injuries resulted from Plaintiff's failure to pay misses the point. Even if Plaintiff had paid the loans in full, Plaintiff would still have a cause of action under 18 U.S.C. § 1964(c) because Defendant caused injury to Plaintiff's business and property through the collection of unlawful debt. Loss of property is quintessential harm that courts address. Here it is undisputed that Defendant credit-bid Plaintiff's property and that resulted Plaintiff's loss of property. *See* Smead Decl. ¶¶ 9, 26, 36, 43, 45.

[26] This is not a remote-injury case. Defendant's conduct directly caused Plaintiff's loss. Unlike the attenuated, multi-actor causal chain discussed in *Medical Marijuana, Inc. v. Horn*, Plaintiff alleges a direct and immediate relationship between Defendant's conduct and Plaintiff's injury. Defendant collected unlawful debt and then used that debt to acquire Plaintiff's property through credit-bidding. The asserted injury—the loss of Plaintiff's property—flows directly from Defendant's conduct, without intervening actors or discretionary decisions, and does not require the Court to move "beyond the first step." Nor does Defendant's invocation of an attempted bankruptcy sever causation. Even if Plaintiff had filed for bankruptcy, Defendant could still have acquired the property by credit-bidding pursuant to 11 U.S.C. § 363(k). *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 643–49 (2012). Plaintiff's injury therefore flows from Defendant's collection and use of unlawful debt—not from the absence of bankruptcy relief.

### D.  Defendant Has Not Carried Its Initial Burden to Negate Both But-For and Proximate Causation of Plaintiff's Injury.[27]

In Civil RICO "a plaintiff must prove that the defendant's unlawful conduct was not only a "but for" cause of his injury but also the "proximate cause" of the injury, as that concept has been understood at common law. *See Holmes v. Securities Investor Protection Corp*., 503 U.S. 258, 268 (1992). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.; See Harmoni Int'l Spice, Inc. v. Hume,* 914 F.3d 648, 651 (9th Cir. 2019).

"If [Plaintiff] can prove that it lost sales as a direct result of the defendants' predicate acts of [collection and use of unlawful debt], the proximate cause element of its RICO claim will be satisfied. *See, e.g*., Restatement (Second) of Torts § 633 (1977)"; *Id.* at 653. Here, Plaintiff is the direct victim from Defendant's collection and use of unlawful debt, the amount of the damages is easily determined by the admitted credit-bidding and there is no risk for multiple recoveries. *See Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1169 (9th Cir. 2002). In other words, Plaintiff has evidence that the Defendant is the "but for" cause of his injury but also the "proximate cause" of the injury, *supra*.

Defendant's contention that the foreclosure constitutes an intervening act breaking the chain of causation is unavailing. The foreclosure did not operate independently of the collection of the unlawful debt; it was the mechanism by which Defendant enforced and collected the unlawful debt. Defendant used the unlawful debt itself to credit bid at the foreclosure sale, directly causing Plaintiff's loss of property, equity and solar business opportunities. Because the injury flowed immediately and directly from Defendant's

---

[27] Defendant relies on deposition testimony confirming that Plaintiff's entities were structured as special purpose vehicles ("SPVs"). That testimony is legally irrelevant. As explained in the finance literature and recognized by courts, "SPVs are essentially robot firms that have no employees, make no substantive economic decisions, have no physical location, and cannot go bankrupt." *See* John A. Pearce II & Ilya A. Lipin, *Special Purpose Vehicles in Bankruptcy Litigation*, 40 Hofstra L. Rev. 178, 179 n.4 (2011). The absence of employees, operations, or revenue is therefore inherent to the SPV form and does not negate the existence, use, or collection of unlawful debt, nor does it satisfy Defendant's burden under Rule 56(c) to demonstrate the absence of a genuine dispute of material fact. Available at https://www.hofstralawreview.org/wp-content/uploads/2013/02/40-1-Pearce-Lipin-Hofstra-Law-Review.pdf.

collection of unlawful debt and the use of unlawful debt, the required proximate cause under 18 U.S.C. § 1964(c) is satisfied. *See Holmes v. SIPC*, 503 U.S. 258, 268 (1992).

Defendant admits that Plaintiff paid interest on the loans, *supra*. Defendant further admits that the property was foreclosed upon using credit-bids, *supra*. These admissions establish economic injury as a matter of law under 18 U.S.C. § 1964(c). *See also, Brown Decl. ¶56.*

REPLY TO OPPOSITION, SECTION II, BY DEFENDANT/MOVANT

6. *There Was No Enterprise of Associated Persons.*

At pages 32-33, Plaintiff argues that Defendant's account showed an enterprise involving other persons in on the scheme. But he has not proffered evidence of other persons involved in the scheme of "collection of unlawful debt". The foreclosure trustees, escrow persons for loan origination, title companies, all were paid for their services and unconnected to the alleged RICO violation, as Smead's evidence shows. These independent service providers, customary in loan administration, were not involved in an "enterprise" with Smead. Plaintiff misuses *United States v. Benny*, 786 F.2d 1410, 1416 (1986) as there the defendant convicted of criminal racketeering had associated himself as a sole proprietor with his corporate entity to undertake the extensive criminal RICO violations in a pattern, and involving other persons in the very organization and enterprise.

7. *"Proximate Cause" Of Harm Has Been Negated, As Brown's Loss Of The Lots Was Due To His Failure To Pay Even Modest Amounts On The Interest Only Loans.*

Brown asserts that Smead has not negated the element of "unlawful debt collection" as injury to business or property with proximate causation by the unlawful conduct. However, it was Brown's failure to pay much at all on his loans that resulted in the eventual foreclosures. Brown's business was not harmed, as the evidence shows he had no contracts that would produce revenue and no revenue, no business income at all pertaining to these lots of raw land. Smead has negated this element. *Holmes v. Securities Investor Protection Corp*., 503 U.S. 258, 276 (1992) is inapposite, as it held that "the

alleged conspiracy to manipulate did not proximately cause the injury claimed." *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 654 (9th Cir. 2019) is inapposite as a pleading case, reversing merely to allow leave to amend a RICO claim. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) is inapposite as it was a standing case regarding whether employees had it regarding unlawful suppression of wages.

Smead has demonstrated that the prong of economic injury arising from proximate cause is not met. Plaintiff has no injury, as the Utah Loan was lawful, not a violation of RICO, and his loss of these three non-income producing security properties was the result of Plaintiff's failure to pay even a modest amount of the interest due on the three loans foreclosed.

8. *The Interstate Commerce Is Not Sufficient For RICO's Application.*

The making of the Utah Loan is not sufficient to satisfy RICO's requirement that interstate commerce be used to perpetrate the alleged violation. Smead deposited loan money with the escrow located in Utah. When the transaction consummated, Brown had a right to the funds in the Utah escrow. Brown could have left those funds there in Utah. Brown chose how he wanted to receive those funds, and Brown chose to have them wired to him. That both Brown and Smead were California residents. The loan was a Utah loan and made funds available in Utah. Brown chose what to do with the funds. Thus, no sufficient interstate commerce exists that was part of the Utah loan transaction. It was done entirely in Utah. Therefore, RICO does not apply. However, even assuming the minimal commerce nexus, the claims fail on unlawful debt, on enterprise, and on causation.

9. *Additional Discovery, or Awaiting a Ruling from the Magistrate Judge Is Not Needed.*

The few items of discovery subject to the motion pending with the Magistrate Judge are not material, as to the few interrogatories involved. Nor on the response to the Requests for Admission, as if the Objections are overruled, then a fact based denial of the requested admission would be forthcoming. Plaintiff does not describe why any potential

response of the minimal dispute would make a difference. Such cannot be essential as the case turns on loan documents, testimony of the parties, and documents presented already. Nor, has a proper request for a continuance of the motion for summary judgment been made.

CONCLUSION (MOVANT/DEFENDANT)

Accordingly, summary judgment against Plaintiff's Second Amended Complaint should be granted to Defendant Smead. Alternatively summary adjudication of the various claims and issues should be granted to Defendant Smead.

Date: Jan. 1, 2026                     Respectfully Submitted,

                              /s/ Fred Hickman
                              _____
                              Fred Hickman
                              fredhickman@gmail.com
                              Attorney for: Defendant Steve Smead

CONCLUSION (PLAINTIFF'S)

Because Defendant has failed either to produce evidence negating an essential element of Plaintiff's claim or, after suitable discovery, to demonstrate that Plaintiff lacks sufficient evidence to carry its ultimate burden of persuasion at trial, the Motion for Summary Judgment must be denied. In the alternative, the record contains genuine disputes of material fact concerning whether Defendant collected unlawful debt within the meaning of 18 U.S.C. § 1961(6) and whether Defendant operated a sole proprietorship lending enterprise under 18 U.S.C. § 1961(4).[28]

/ / /

_____

[28] In the alternative, Plaintiff submits a declaration pursuant to Rule 56(d) because Defendant failed to provide complete responses to interrogatories Plaintiff was entitled to receive. *See* ECF No. 110 & 110-1; Brown Decl. ¶¶45-46. Those discovery responses bear directly on the statutory elements of Plaintiff's RICO claims, including the existence of "unlawful debt" under 18 U.S.C. § 1961(6) and an "enterprise" under 18 U.S.C. § 1961(4). The absence of this discovery is not attributable to Plaintiff. The Court therefore retains discretion under Rule 56(d) and Rule 56(e) to deny or defer summary judgment or permit additional discovery on the record once the motion to compel is decided by the Chief Magistrate Judge. In any event, Plaintiff is committed to Rule 1.

Respectfully submitted,

Dated: January 16, 2026

*/s/ Clinton Brown, Pro Se*
1431 Ocean Ave, Unit 413
Santa Monica, CA 90401
brown_clinton@msn.com
310-775-7990

CC: All Counsel of Record (via email) on January 16, 2026

REPLY TO PLAINTIFF'S CONCLUSION

No "collection of unlawful debt" under Section 1961(6) or under Section 1962 exists, and there is no Section 1962(c) enterprise distinct from Smead. For the foregoing reasons, and based on the record, the motion for summary judgment should be granted.

Date: January 22, 2026

Respectfully Submitted,
*/s/ Fred Hickman*
Fred Hickman
fredhickman@gmail.com
Attorney for: Defendant Steve Smead