Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CLINTON BROWN,

                    PLAINTIFF,

VS.

STEVE SMEAD,

                    DEFENDANTS.

Case No.: 2:23-cv-02938-MEMF(KSx)

JOINT INTEGRATED BRIEF OF MEMORANDUM OF POINTS & AUTHORITIES RE DEFENDANT SMEAD'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT AND PLAINTIFF OPPOSITION THERETO

[RULE 56]

[Hon. MAAME EWUSI-MENSAH FRIMPONG, District Judge]

DATE: 06/25/2026
TIME: 10:00 A.M.
CTRM: 8B

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION AND SUMMARY (MOVANT/DEFENDANT) . . . . . . . . . . . . . . . . . . . 1

PLAINTIFF'S OBJECTIONS AND OPPOSITION BRIEFING FOR DENIAL OF MOTION. . 2

DEFENDANT'S REPLY TO PLAINTIFF'S OBJECTIONS AND OPPOSITION BRIEFING FOR DENIAL OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.  Hearing Date Setting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.  Meet and Confer LR 7-3 Compliance Occurred—But If Failed The Motion Ought to Be Heard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.  Lack of Genuine Dispute Established And The Complaint Cannot Create One. . . . . 5

    4.  The Second Amended Complaint Is Not Verified, as Not Subscribed and Executed Under the Specific Requirements of 28 U.S.C. § 1746. . . . . . . . . . . . . . . . . . .7

    5.  The Second Amended Complaint Does Not Create A Genuine Dispute. . . . . . . . . . 7

    6.  Rule 56 Forbids **Creation** Of A Genuinely Disputed Fact At The Hearing Under Rule 43(c), As A Matter of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS (BY MOVANT) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

[NO STATEMENT OF FACTS SUBMITTED BY OPPONENT/PLAINTIFF. See p. 2]. . . . . 12

ARGUMENT (BY MOVANT / NONE BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

[SECTION I. BY MOVANT/DEFENDANT]

I.      RICO WAS NOT VIOLATED—NEITHER (a) NOR (c) OF SECTION 1962 WERE VIOLATED—NO "UNLAWFUL DEBT" (INTEREST RATE DOUBLE A STATE LAW USURY LIMITATION—NO "COLLECTION OF UNLAWFUL DEBT". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

  A.  Timing Of The Hinkley Loan (Nov. 2020) And The Utah Loan (June 2021) Show That The Loans Were Unconnected And No California "Usury" Exists Nor Was "Put" On The Utah Loan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  B.  California: No Usury Placed On California Loans—No Unlawful Debt. . ... . . . . . . . . . . 13

  C.  Utah Law Applies to the Utah Loan Under California Choice of Law Rules. . . . . . . . . 14

  D.  Utah Loan: No Usury Law Or Finance Limitations For Loans Of This Type-- Commercial, Raw Land and Written Interest Term--So Loan Is Legal and Enforceable Under Utah Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  E.  Section 1962(c) Was Not Violated--No "Collection of Unlawful Debt" Existed. . . . . . 20

  F.  No "Income" From A RICO Violation Existed And None Was Used To Acquire Plaintiff's Business or Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

[NO ARGUMENT ON SECTION I. BY OPPONENT/PLAINTIFF, BUT SEE P. 2 FOR STATEMENT OF PLAINTIFF'S GLOBAL POSITION.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

[SECTION II. BY MOVANT/DEFENDANT]

II.      NO VIOLATION OF RICO 18 U.S.C. § 1962(c) or § 1962(a) EXISTS FOR ANY OF NUMEROUS REASONS AS ELEMENTS NEGATED.  [BY DEFENDANT/MOVANT]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 21

A.  There Is No Violative Unlawful Conduct Of Any Kind, No Causation, No Liability. . . 22

B.  No Scheme To Defraud Involving Misrepresentations Existed. . . . . . . . . . . . . . . . . .  23

C.  No Enterprise--Smead Himself Alone Cannot Be The Enterprise, And These Three Discrete Loans Were His Alone, He, Using Only Ordinary, Unconnected Service Providers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 23

D.  No "Enterprise" Nor "Associated-in-Fact" Conduct Occurred. . . . . . . . . . . . . . . . . . 23

E.  No Racketeering Pattern Of "Predicate Acts" Exists. . . . . . . . . . . . . . . . . . . . . . . . . . 24

F.  No Racketeering Activity, No Indictable Predicate Acts, Under 18 U.S.C. § 1961(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

G.  No Effect On Interstate Commerce Exists. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

H.  Harm To Business And Property Did Not Occur By RICO Violation, As Plaintiff's Loss Of Properties To Foreclosure Resulted From His Loan Defaults. . . . . . . . . . . . . 25

[NO ARGUMENT ON SECTION II. BY OPPONENT/PLAINTIFF, BUT SEE P. 2 FOR STATEMENT OF PLAINTIFF'S GLOBAL OPPOSITION.] . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION (MOVANT/DEFENDANT). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

[NO CONCLUSION SUBMITTED BY OPPONENT/PLAINTIFF, BUT SEE P. 2 FOR STATEMENT OF PLAINTIFF'S GLOBAL OPPOSITION.] . . . . . . . . . . . . . . . . . . . . . . . . . 26

TABLE OF AUTHORITIES

**Federal Cases of Movant/Defendant Smead**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970)................................................................3, 6

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 251 (1986) ........................................................7

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 (9th Cir. 2002).....................................3, 6

*Berg v. First State Ins. Co.*, 915 F.2d 460, 463-64 (9th Cir. 1990). ........................................13, 22

*Boyle v. United States*, 556 U.S. 938, 946 (2009) ........................................................................24

*Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, (1986). ...........................................................2*

*Durante Bros. and Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239, 248 (2d Cir.1985*) cert. denied,* 473 U.S. 906

   (1986) ................................................................................................................................13

*H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989)...........................................................24

*Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019)......................................22

*Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 266 n.11 (1992) ...........................13, 22

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) .......................................21

*Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) ....................................................................25

*Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) .....................................................24

*Oft Exploration, Inc. v. Williford Energy Corp. (In re Oft Exploration, Inc.*), 1997 U.S. Dist. LEXIS 4715, at *7

   (N.D.Cal. 04/11/1997, Henderson, J.) ..........................................................................16

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1049 (9th Cir. 2020).................................................7

*Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) ................................................................23

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).....................................................................23

*Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) .....................................................4, 7

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) ..................................................24

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992). ......................................................24

*Shannon-Vail Five, Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001)....................................14

*Thompson v. Mahre*, 110 F.3d 716 (9th Cir. 1997) ......................................................................8

*United States v. Bagnariol*, 665 F.3d 877, 892 (9thCir. 1981), *cert. denied sub nom. Walgren v. U.S.*,

456 U.S. 962.................................................................................................................25

*United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.), opinion amended and superseded on denial of reh'g, 828 F.3d 763 (9th Cir. 2015). ........................................................................................................................23

*United States v. Rone*, 598 F.2d 564, 573( 9th Cir. 1979), *cert denied sub nom. Little v. U.S.*, 445 U.S. 946. ...........25

*Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) ........................................................................23

*Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987) ........................................................24

## Federal Cases of Opponent/Plaintiff Brown

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970)...........................................................................3

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 (9th Cir. 2002)........................................3

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986) ..................................................................2, 3, 5

*Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) ...........................................................3, 5, 7

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ..............................3

*Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ........................................................................4

*Taylor Thomson v. Persistence Techs. BVI Pte Ltd.*, No. 2:23-cv-04669-MEMF-MAR, ECF No. 161 at 1 n.1 (C.D. Cal. Feb. 19, 2026) ........................................................................................................................3

*Thompson v. Mahre*, 110 F.3d 716, 720 (9th Cir. 1997) ..........................................................................4

## State Cases

*Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 463 (1983) (Utah Supreme Court) ....................................................18, 19

*Capital Stack UT LLC v. Reddy*, 575 P.3d 1192, 1196 (2025) (Utah Court of Appeals). ...........................................17

*DCM Partners v. Smith*, 228 Cal.App.3d 729, 737-738 (1991)......................................................................14

*Henderson v. Superior Court*, 77 Cal. App. 3d 583, 592 (1978)..................................................................15

*Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) ...............................................................18

*State v. Chapman*, 2014 UT App 255, ¶ 2 n.2, 338 P.3d 230 ....................................................................17

*Ury v. Jewelers Acceptance Corp.*, 227 Cal. App. 2d 11 (1964). ...............................................................15

## Federal Statutes

18 U.S.C. § 1961 ...................................................................................................................passim

18 U.S.C. § 1961(1)...........................................................................................................iii, 24

18 U.S.C. § 1961(4)...............................................................................................................23

18 U.S.C. § 1961(5)................................................................................................................24

18 U.S.C. § 1961(6).............................................................................................................1, 24

18 U.S.C. § 1962 ...................................................................................................................12

18 U.S.C. § 1962 (a) ...............................................................................................ii, 1, 21, 22

18 U.S.C. § 1962 (c) .............................................................................................1, 20, 21, 23

18. U.S.C. § 1964(c) ..............................................................................................................25

28 U.S.C. § 1746 ....................................................................................................................7

## Federal Rules of Civil Procedure

Local Rule 7-3 ........................................................................................................................5

Rule 5(d)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 7 ......................................................................................................................................5

Rule 10(c) ...............................................................................................................................4

Rule 43(c) ............................................................................................................................4, 8

Rule 56 .............................................................................................................................passim

Rule 56(c) ...............................................................................................................................6

Rule 56(e) ...............................................................................................................................6

Rule 83(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Treatises

8, Civil RICO Jury Instr. 9th Cir. ....................................................................................23, 24

Restatement of the Law Second, Conflict of Laws § 187...................................................15

Stevenson, Karen L., Judge, U.S. Chief Magistrate Judge, Central Dist. Cal. and James E. Fitzgerald; *Federal Civil Procedure Before Trial* (2025 The Rutter Group), § 14:295, p. 120. .......................................................21

## Regulations

12 C.F.R. § 1026.2 (12)........................................................................................................19

**State Statutes**

*Cal. Civil Code* § 1646 ................................................................................................................15

*Cal. Civil Code* § 1916.1 ............................................................................................................14

*Cal. Code Civ. Pro*c. § 726........................................................................................................16

*Utah Code* § 15-1-1 ........................................................................................................1, 17, 20

Utah Code § 57-1-20 ...................................................................................................................16

Utah Code § 70C-1-202(2)(a)......................................................................................................19

Utah Code § 70C-1-301...............................................................................................................19

Utah Code, § 70C-1-302 (4)........................................................................................................19

Utah Code § 70C-7-106................................................................................................................17

MEMORANDUM OF POINTS AND AUTHORITIES

INTRODUCTION AND SUMMARY (MOVANT/DEFENDANT)

Defendant Smead did not violate RICO in his dealings with Brown. There was no "collection of unlawful debt", nor was there any "unlawful debt" charged (as "double the applicable state usury rate). Nor was there an "enterprise", nor racketeering, nor predicate acts. Nor was any unlawful income obtained, nor any used to acquire Brown's business or property. Nor did Brown sustain any damages for a RICO violation, as his damages were from loan default, he barely paying any interest and no principal. So no claim exists under 18 U.S.C. § 1962 (a) or 18 U.S.C. § 1962 (c) on which the Second Amended Complaint [Doc. 90] filed 03/24/2025 is based.

"Unlawful debt" "means . . . "where the usurious rate is at least twice the enforceable rate". 18 U.S.C. § 1961(6).  None was charged nor collected any of the three loans, not on the two California loans, nor on the Utah loan. The California loans were at 8% (Hinkley/Harper Lake) and 12% (consolidated purchase money loan Malibu from broker originated initial loan). The Utah Loan promissory note, a Trust Deed Note, stated a 10% rate for this business loan, secured by the Trust Deed on the raw, vacant land in Utah. For such a loan, Utah has no usury limitation nor finance limitation, no statutory cap. Rather, Utah Code § 15-1-1  allows any interest rate on such a loan.  So, even with the "risk-based" addition of $100,000 to the cash loan of $100,000, no part of the $200,000 loan of principal was usurious, nor improper as a principal addition for as a risk-premium or finance charge under Utah law.  Notably, under California Choice of Law Rules, the Utah lending law applies to the Utah Loan and the California usury rules do not.  Thus, by RICO's definition of § 1961(6), there was no "unlawful debt", no "double the applicable state usury rate, and no "unlawful debt" was collected. Furthermore, no income violative of RICO existed to be used to "take property or business" from Plaintiff, and was not taken, nor so used.

Notably, the Utah Loan was made seven months after the Hinkley Loan. The Hinkley Loan is the California loan that Plaintiff alleges to have had imposed on it in November 2020 when made a supposed secret, unwritten term, allegedly a $150,000 usurious term. This, despite the Hinkley Loan being written for $150,000 principal at 8% interest on the promissory note. Brown came begging to Smead six months later for the Utah Loan to refinance and leverage the raw Utah land for Brown's

speculative purposes. Brown did not have to request that loan. Smead had no right to make Brown take this new loan. Already Brown was badly in default on the California Loans (Malibu Loan and Hinkley Loan)—having made no payments at all on the Hinkley Loan, the first four loan payments already missed when he solicited the Utah Loan. So Smead, understandably, declined to take Brown's offer of terms of $100,000 cash at 10%, where the land for security was worth only $50,000. So Brown proposed that he borrow and put on the Utah promissory note an extra $100,000 as principal to be owed to Smead for the high-risk loan origination Brown proposed, for a promissory note for principal of $200,000 at 10%. Smead decided to accept that risk, on those terms, and so the Utah Loan was made in June 2021. That was seven months after the Hinkley Loan. No "usury" from California was "put on" the Utah Loan. Further, the Utah Loan as written is legal under Utah Law, and California usury law does not apply to that Utah Loan, under California's Choice of Law principles—which respect the Utah lending law on these facts. Thus, summary judgment is proper under Rule 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

**PLAINTIFF'S OBJECTIONS AND OPPOSITION BRIEFING FOR DENIAL OF MOTION**. (From Clinton Brown by email on May 7, 2026, set forth *verbatim*).

"I received Defendant's Motion for Summary Judgment on April 23, 2026, and have reviewed the materials. As the non-moving party, Plaintiff submits this email as his legal response, dated May 7, 2026.[1]

"The motion is procedurally defective on two independent grounds, either of which is sufficient to deny it.

"First, no hearing date has been reserved with the CRD that is compliant with the Court's Civil Standing Order. See Civil Standing Order § IX(D) ("Parties must reserve a hearing date for motions for summary judgment at least seventy-five (75) days in advance."). The hearing is set for June 25, 2026. Seventy-five days prior to that date was April 11, 2026. The date was reserved on April 17, 2026 — sixty-nine days before the hearing, not seventy-five. This Court has strictly

---

[1] Plaintiff's position is that Defendant has not served a procedurally proper Motion for Summary Judgment and has not made the Rule 56 showing necessary to shift the burden to the non-moving party. This email is therefore submitted to state, for the record, Plaintiff's legal position regarding Defendant's motion. Should Defendant decline to include it in his MSJ filing, Plaintiff reserves the right to file it directly with the Clerk. See Rule 5(d)(4).

JOINT INTEGRATED POINTS & AUTHORIES RE MOTION FOR SUMMARY JUDGMENT
*BROWN VS. SMEAD 23-cv-02938*

2

enforced the 75-day reservation requirement. See *Taylor Thomson v. Persistence Techs. BVI Pte Ltd.*, No. 2:23-cv-04669-MEMF-MAR, ECF No. 161 at 1 n.1 (C.D. Cal. Feb. 19, 2026). ("Because Plaintiff sought to reserve a MSJ hearing on November 6, 2025 for January 8, 2026—seventy-three days in advance—Plaintiff's request was in violation of the Civil Standing Order."). The CRD's confirmation of the reservation does not modify or waive the Civil Standing Order's requirement.

"Second, as the moving party, Defendant failed to meet and confer as ordered by the Court. See ECF No. 176, n.5. No meet and confer occurred prior to service of Defendant's Motion for Summary Judgment, contrary to the Court's directive.

"Procedural defects aside, the motion fails on its own terms. Defendant has not met his initial burden. Defendant answered the complaint and the case proceeded through discovery. Defendant's motion attacks the legal sufficiency of Plaintiff's claims rather than the evidentiary record. Because Defendant has failed to identify specific portions of the record demonstrating the absence of a genuine dispute, he has not met his initial burden. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). To prevail on summary judgment, the moving party must demonstrate either that an essential element of Plaintiff's claim cannot be established, or that there is an absence of evidence to support it. *Id*.; *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 159 (1970). Counsel's argument alone cannot satisfy that burden, as legal argument is not evidence. See *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 593 n.4 (9th Cir. 2002). Even where a movant submits an affidavit, the burden does not shift unless the movant has foreclosed the possibility of a genuine dispute. *Adickes*, 398 U.S. at 159 & n. 20. Because Defendant has failed to negate an essential element of Plaintiff's claim or demonstrate an absence of evidence to support it, the burden has not shifted to the non-moving party. The nonmoving party may defeat the motion for summary judgment without producing anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. Nissan Fire at 1102-1103. The Court must independently analyze whether the moving party has met his initial burden regardless of the form of Plaintiff's response. See *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

/ / /

"Even if the Court reaches the merits, the verified complaint and two declarations attached to it create a genuine dispute of material fact defeating summary judgment. The verified complaint, sworn under penalty of perjury, may be treated as an affidavit for purposes of Rule 56 to the extent it is based on personal knowledge. See *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). A copy of a written instrument attached as an exhibit to a pleading is part of the pleading for all purposes. See Rule 10(c).

"If the Court does not deny the motion on one or both procedural grounds and issues a tentative ruling on June 24, 2026, concluding that Defendant has met his initial burden, Plaintiff will appear at the June 25, 2026, hearing and direct the Court to a genuine dispute of material fact already contained in the record, and, if necessary and permitted by the Court, provide sworn testimony. See Rule 43(c); *Thompson v. Mahre*, 110 F.3d 716, 720 (9th Cir. 1997).

"In sum, even accepting Mr. Smead's version of the facts as true, he cannot prevail as a matter of law under Rule 56."

**DEFENDANT'S REPLY TO PLAINTIFF'S OBJECTIONS AND OPPOSITION BRIEFING**

1. <u>Hearing Date Setting</u>. The hearing date was set in the Order granting the motion to amend the scheduling order, and its reservation confirmed by the Courtroom Clerk. The Court's Order of April 6, ECF No. 176, p. 9, set this date of June 25 for the last day to hear the motion, and that it had to be renewed and refiled by May 14, 2026. The April 6 order exceeded the 75-day reservation time under the Standing Order. Then, Defendant, in an abundance of caution, emailed the Courtroom Clerk on April 16 and requested confirmation or reservation of the date of June 25. The Clerk replied on April 17 confirming the reservation for that date. If the Order of April 6 (ECF No. 176) was not itself the setting of the date, then this should be deemed substantial compliance with the reservation rule. The whole point of Defendant's motion filed in February that culminated in the Order of April 6 was to reset a date for the MSJ hearing to permit a renewed motion by refiling. So, the objection that Defendant did not requested a hearing date 75 days before June 25 is not meritorious. If Defendant is mistaken on this point, then Defendant requests that the Court hear the Motion on June 25 in any event, as there is no prejudice to Plaintiff. Rather, Defendant's motion to amend the scheduling order was solely to seek permission to refile the MSJ with a new hearing date to be put on calendar.

2. <u>Meet and Confer LR 7-3 Compliance Occurred—But If Failed The Motion Ought to Be Heard</u>. Compliance with Local Rule 7-3 occurred (Hickman Declaration dated May 11, 2026 ¶ 2, supporting Notice of Motion's Statement of Compliance). On Feb. 17, 2026, Hickman and Brown spoke in an express LR 7-3 meet/confer the intention to file a motion to amend the scheduling order to permit a renewal and refiling of the Motion for Summary Judgment; and Plaintiff stated his opposition. He vigorously opposed that motion filed in February. Interim written communications regarding the intended renewal of the motion occurred. Hickman sent Brown part of the electronic copies of the motion materials under the early briefing schedule on April 17, and sent the rest on April 23. Then there was a final meet and confer with Brown by phone on April 23, after Brown sent his opposition to incorporate. The Order of April 6, 2026, ECF No. 176, n. 5, over Plaintiff's strenuous opposition, granted Defendant permission to refile a Motion for Summary Judgment, and did not order a new LR 7-3 "meet and confer," but helpfully to Plaintiff suggested it if helpful to Plaintiff's in new evidentiary material he might submit; and it invited a stipulation for change of date, if necessary. Thus, both letter and spirit of LR 7-3 has been met. LR 7-3 calls for a declaration that such meet and confer has occurred, but failure to include it does not require denial of the motion.

Finally, Rule 56 does not require pre-filing meet and confer. Rule 7 does not do so. Under Rule 83(a)(1), no change to the Rules is allowed by local rules. "District courts may promulgate their own local rules so long as those rules comport with the Federal Rules of Civil Procedure.  This court determines de novo whether there is a conflict between a local rule and a Federal Rule." *Heinemann v. Satterberg*, 731 F.3d 914, 916 (2013) (held: the district court's local rule 7 could not "deem" consent from lack of opposition in order to grant summary judgment, as in conflict with Rule 56 (but upheld summary judgment on the other merits). Altogether, the objection under LR 7-3 is unsound.

3. <u>Lack of Genuine Dispute Established And The Complaint Cannot Create One</u>. Plaintiff submits no evidence to argue that a genuine disputes, nor claim negated.  Rather, Defendant meets his initial burden, and demonstrates that no genuine dispute exists. Plaintiff cites *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). It upheld summary judgment, reversing the Court of Appeal for holding that movant had to "negate" with evidence the alleged cause of harm, as the movant was not required to support its motion with that negation. *Id*. at p. 319. Further, *Celotex* forbids use of pleadings under

Rule 56, as evidence, stating: "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ." *Id*. at p. 324. The Supreme Court explained: "The last two sentences of Rule 56(e) were added, as this Court indicated in *Adickes*, to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings." *Id*. at p. 325. Here, there were no admissions of facts in Defendant's Answer to create a genuine dispute. (Answer to Second Amended Complaint, Doc. 95, filed 04/07/25). Brown points to none. Then, Brown cites to *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1107 (9th Cir.)(upheld one summary judgment and reversed another). In upholding the one, it states:  "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. . . .  If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id*. at p. 1103 (citations omitted). Here, as Movant has carried its burden of production, Brown must, but fails to, produce evidence to create a genuine issue of material fact.

Plaintiff overstates the holding of *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 159 (1970). *Adickes* dealt with civil rights and the presence or not of a policeman in the Kress store, and held that, "Respondent here did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served." *Id*., p. 157. But here, Movant's evidence carries his burden.

Plaintiff cites *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 593 n.4 (9th Cir. 2002): "Counsel's argument alone cannot satisfy that burden, as legal argument is not evidence." Right. Brown is his own counsel, and his argument is not evidence. The decision states, at note 4: "Barcamerica cannot prevail on this appeal from a grant of summary judgment by replacing unfavorable deposition testimony with the arguments of its lawyer; the arguments and statements of counsel 'are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.' " *Id*. (internal citation omitted).

/ / /

Plaintiff cites *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013), but the case supports Defendant. *Heinemann* hold: a district court's local rule 7 could not "deem" consent from lack of opposition to grant summary judgment, as in conflict with Rule 56. *Id*. at p. 916. Then, the Court went on to uphold Defendant's summary judgment on the merits. *Id*. at p. 918.

4. The Second Amended Complaint Is Not Verified, as Not Subscribed and Executed Under the Specific Requirements of 28 U.S.C. § 1746.  Plaintiff argues that his Second Amended Complaint [Doc. 90] ("SAC") is evidence. False. Section 746 is very specific, and requires that it be "subscribed by him, as true under penalty of perjury, and dated, in substantially the following form"; the declaration that it is "true and correct" must be followed by: "Executed on (date). (Signature)" under either form (1) or (2). The SAC does not comply. Its page 16 puts part of the declaration language in a footnote in quote marks. It does not bear the mandatory 'Executed on" for a date, and it does not bear the signature of Plaintiff, *i.e.*, it is not "subscribed by" Plaintiff. Rather, at the top of the page 16 has a "/s/ typewritten name and capacity: "/s/ Clinton Brown, Self-Represented." So, the requirements of Section 1746 are not met. Thus, even the parts that might seem to be stated from personal knowledge cannot be used as evidence.

5. The Second Amended Complaint Does Not Create A Genuine Dispute.  Plaintiff's citation to *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) is unavailing, and supports Defendant. It requires a verified complaint that shows itself to be based on personal knowledge of admissible evidence for use in summary judgment. The SAC does not do that, even if the Court regards it as verified.  Here, the SAC's allegations make it impossible to determine what is based on hearsay, or speculation ,versus personal knowledge of admissible evidence. So, its allegations cannot be used to create a genuine dispute. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 251 (1986) ("decided on documentary evidence"). Rather, evidence must be presented; assertions in legal briefing do not create a genuine dispute to prevent summary judgment. *Oracle Am., Inc. v. Hewlett Packard Enter. Co*., 971 F.3d 1042, 1049 (9th Cir. 2020) (holding: "Oracle cites no evidence or authority supporting these assertions, which are insufficient to preclude summary judgment. . . . '[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda.' ") (internal citation omitted).

Plaintiff also claims credit for the two declarations of third persons, Ordaz and Chaudhuri, attached to his SAC (SAC ¶ 61). Those are not based on Plaintiff's personal knowledge. Nor were they admitted by Defendant's Answer to the SAC, but denied expressly (Answer to SAC, ¶ 61, Doc. 95 filed 04/07/2025). Nor are these declarations of Ordaz and Chaudhuri submitted in connection with the opposition. The Ordaz declaration (Doc. 90-1 filed 03/23/2025) makes statements that do not demonstrate personal knowledge of alleged usurious charges, so it cannot create a genuine dispute, even if considered. The Chaudhuri declaration, Doc. 90-2 filed 03/23/2025 likewise speaks in speculative terms about potential, but not actual, damages, without reference to grounding in personal knowledge as to income that might have been produced for a solar contract, as demonstrated at its ¶ 8, reading, "Brown did not receive an executed contract for the Utah Project because the property is in ongoing Federal litigation over disputed ownership." These declarations are not admissible evidence to create a genuine dispute.

6. Rule 56 Forbids **Creation** Of A Genuinely Disputed Fact At The Hearing Under Rule 43(c), As A Matter of Law. Plaintiff cannot use his "oral testimony" at the hearing to attempt to create a genuine dispute as to a material fact. Plaintiff's own cited case authority stands against him: *Thompson v. Mahre*, 110 F.3d 716 (9th Cir. 1997) "[O]rdinarily there is no such thing as an evidentiary hearing, or findings of fact, on a summary judgment motion." *Id*. p. 719. It holds:"Oral testimony cannot, [under Rule 56], lead to a finding on a genuinely disputed fact, but only a determination as to which facts are not genuinely disputed." *Id*. p. 720. Rule 56 does not allow "oral testimony" at hearing to create a "genuine dispute." Rather, its section (c)(1) states evidence is required to create a genuine dispute, all to be documentary evidence submitted in opposition. Thus, Brown cannot use oral testimony at the hearing to create a genuine dispute of material fact.

STATEMENT OF FACTS (BY MOVANT)

On 04/21/2020, Smead made Brown a two-year second-priority purchase money loan secured by a vacant Malibu residential lot ("Malibu Lot"), 12.99% interest rate, as a Cal. real estate mortgage broker originated loan. Brown defaulted on Smead's initial loan and the other purchase money loan from seller Sarkany, and requested Smead to make the Malibu Loan to consolidate the two. So, on 05/21/2021, Smead made a two-year loan consolidating both purchase money notes into one owed to

him, secured by the Malibu Lot at a reduced interest rate of 12% ("Malibu Loan"). Joint Statements of Uncontroverted Facts and Genuine Disputes ("FACT") ## 1-2. Immediately, Brown defaulted on the Malibu Loan, with chronic late payments and none after that due for 11/01/2021, eventually resulting in foreclosure on 01/04/2023. FACT ## 4 & 5.

In 2020, between September and November 10, Smead considered making one loan to Brown. It was a purchase money second-priority loan for $150,000 for raw, undeveloped, desert land in San Bernardino County's Hinkley/Harper Lake area ("Hinkley Lot") that Brown would buy from American Pacific Investments, LLC ("AmPac") to develop into a solar-power generating field ("solar field"). *Smead wired funds to the anticipated escrow in mid-September*. Thereafter, Brown commenced a welter of additional proposals for Smead to make additional loans and transactions to invest in or lend money to Brown's entities, Atlas Inc. and Atlas Development Group, LLC, and to himself personally. FACT ## 6 & 7.

On 11/10/2020, Smead made the Hinkley Loan to Brown, a second-priority purchase money loan for $150,000, at a fixed interest rate of 8%, interest only payments until maturity in two years, secured by the Hinkley Lot. There were no other terms or conditions to the loan than as written in the promissory note and deed of trust from Brown as borrower to Smead as lender. Smead took his security interest subject to the seller-carry-back purchase money loan from AmPac, a first priority. Chicago Title as the escrow was paid a fee from Brown's loan funds. Smead bought a lender's title policy from Chicago Title. FACT # 8.

Brown immediately defaulted on the Hinkley Loan, making no payments due for Jan. 1-April 1, 2021. Then, on April 28, 2021, his entity "Atlas LLC" his payment in arrears, total payments of only $4,000, his only payments on that loan. He made no more payments thereafter. FACT #9.

In mid-April of 2021, Brown asked Smead to make a new loan that would be a refinance loan on property Brown owned in Utah, which was raw, undeveloped land ("Utah Lot"). Smead said no, he would not lend the $100,000 Brown requested because it was too risky a loan. This, because (1) Brown was in default on both existing loans, the Malibu Loan and the Hinkley Loan, (2) the Utah Lot was worth only perhaps $50,000, so there was insufficient security, and (3) no revenue being generated by Brown to make loan payments. FACT ## 10 & 11.

To induce Smead to make this risky loan on the Utah Lot. Brown proposed to agreed to "borrow", i.e., add and owe Smead a risk-based bonus, a risk-based origination fee, to compensate for the risk in the loan transaction. This, in addition to the new money lent. Brown proposed the bonus, or origination fee, to be $100,000 of principal, in addition to the $100,000 of new cash money paid through escrow together making "principal" borrowed under the promissory note to be $200,000. Smead agreed to make the loan on these terms proposed by Brown, to be for a stated principal amount of $200,000, at the written rate of 10% interest, as Brown proposed. FACT #12.

Escrow for the Utah Loan opened in June 2021. Brown wrote and sent the instructions to escrow by email, and Brown and Smead approved of the draft loan settlement statement. On June 30, 2021, the loan closed, with Brown giving a promissory note payable in Utah and a deed of trust securing it on the Utah Lot, in Utah. The promissory note stated principal of $200,000, and stated the interest rate at 10%, interest only payments until maturity in two years. This principal was comprised of $100,000 of the risk-based bonus or origination fee reflected as principal that Brown agreed to pay, and $100,000 for new money lent through escrow. Brown's loan funds paid the escrow fee and Smead bought a lender's title policy. The promissory note was made payable in Fillmore, Utah, and the real property security under the deed of trust was in Millard County, Utah. FACT ## 13-16.

Then, in September 2021in long-default of all three loans, Brown proposed this to Smead: that Smead invest in Brown's businesses by stock purchases or stock-secured new lending, and connected with proposed changes in the existing defaulted loans, which were proposed by Brown to be re-written. FACT # 17.

In March 2022, Brown went into default and remained so on the Utah Loan, failing to make the payment due March 1, 2022, nor any payments thereafter. Brown paid a total of $11,669 in interest only payments on the Utah Loan. Brown did not cure the default, and did not pay off the loan. FACT # 18.

In July of 2022, Brown was also in default on the AmPac loan for Hinkley. Smead bought it to avoid its foreclosure that would eliminate his second-priority security interest, paying to AmPac the amount Brown owed it, $370,302.00, to buy its loan and taking an assignment of its note and deed of trust. FACT # 19.

In August 2022, when Smead informed Brown that the foreclosure processes would start, Brown complained in email to Smead that his interest rates from Smead were "17%", in an angry email. FACT # 20.  Presumably, this was Brown's erroneous and over-stated calculation because the promissory notes had a one time late-charge fee of the late interest-only payments.

The Hinkley Loan on which Brown claims the unwritten term of "usury" was imposed for $150,000 was made in Nov. 2020, and allegedly "put" on the Utah Loan. (Second Amended Complaint [Doc. 90] ¶¶ 16-18 & 27). Brown's only and last payment of interest on the Hinkley Loan was $4,000 in April 2021. FACT #9. But the Utah Loan was not made until more than seven months later, in June 2021. FACT ##14-16. And Brown's only payments on the Utah Loan totaled $11,669. So, there were no "payments" of the alleged usury from the Hinkley Loan made of the $100,000 risk-premium principal on the Utah Loan. FACT #18. Rather, on the Utah Loan, the rate of interest Brown actually paid before foreclosure was 7.4% if counted only as to the $100,000 cash through escrow lent, and only 3.7% if counted against the $200,000 that included the risk-premium origination fee. FACT ## 25 & 31. The Utah Loan being negotiated and made seven months after the Hinkley Loan show that no "usury" was "put" on the Utah Loan, as Smead did not want to make the Utah Loan, as Brown initially proposed it. Smead only agreed to make it in June 2021 after the "risk-premium" or risk-based origination fee for the risky loan was negotiated to be added as principal to the proposed loan amount on the Utah Loan. FACT ## 10-16 & 19.

In 2023, Brown's three property securities were foreclosed upon under the deeds of trust. As to each, Smead became the owner by Trustee's Deeds, as his bids of what was owed to him, credit-bids, was the high bid at each of the three trustee's auctions, as of these dates: 01/04/2023, the Malibu Loan and Lot; 01/31/2023 ($372,338.14 credit-bid purchase price); the Hinkley Loan and Lot on the second priority loan ($175,909.68, with more than $370,000 still owed Smead on the first he bought from AmPac); and, finally, on 03/08/2023, the Utah Loan and Lot ($220,923.20 credit-bid purchase price). FACT ## 5, 21 and 22.

None of the security properties--Malibu Lot, Hinkley Lot, nor the Utah Lot--generated any revenue or income to Brown during his ownership of them, nor to Smead during his ownership of them. There were never any contractual rights or payments by anyone for the use of those lots at any

time, to the present. The Hinkley Lot and the Utah Lot are still owned by Smead, since the foreclosure sales. Smead sold the Malibu Lot in 2025. FACT ## 23 & 24.

In making and enforcing the loans, Smead made the loans in his own name. No other person had any rights or interests in the loans. Smead lent his own money in his own name. Smead paid certain service providers and title insurers fixed charges. All the service providers were independent, and performed only a narrow function, all operating independently: one loan servicer on the Malibu Loan, escrow closing agents on the loans to Brown paid by Brown, foreclosure trustees fees advanced by Smead but paid by Brown in the credit-bid at foreclosure, and title insurers for lenders' title insurance policies that Smead paid. FACT:  # 1 & Ex. 11-1-4; #  2 & Ex. 12-1-2; #8 & Ex. 15-1; #14 & Ex. 2-1; and, FACT ## 27–30.

During the entire life of the three loans, Brown made interest-only payments of a total sum of $31,169 ($15,000 Malibu Loan; $4,500 Hinkley Loan; $11,669 Utah Loan). FACT # 25. The lot values when foreclosed and Smead became the owner were: Malibu Lot, $425,000; Hinkley Lot, $475,000; Utah Lot, $50,000. FACT #26. At the time of the foreclosure sales, Brown owed Smead a total of not less than $1,139,373.92 (the credit-bid amounts, plus the first priority AmPac Loan Smead bought prior to foreclosure sale on the second-priority Hinkley Loan. The money owed at foreclosure minus the value of the lots at foreclosure made for a loss to Smead by early 2023 of not less than $189,373.92. Smead lost money on these loans. FACT ## 5, 19, 21, 22.

[NO STATEMENT OF FACT BY PLAINTIFF]

ARGUMENT (BY MOVANT / NONE BY PLAINTIFF)

I.    RICO WAS NOT VIOLATED—NEITHER (a) NOR (c) OF SECTION 1962 WERE VIOLATED—NO "UNLAWFUL DEBT" (INTEREST RATE DOUBLE A STATE LAW USURY LIMITATION)—NO "COLLECTION OF UNLAWFUL DEBT".

A. <u>Timing Of The Hinkley Loan (Nov. 2020) And The Utah Loan (June 2021)</u>
<u>Show That The Loans Were Unconnected, And No California "Usury" Exists,</u>
<u>Nor Was "Put" On The Utah Loan.</u>

The timing of the Hinkley Loan and the Utah Loan, and the negotiation for the Utah Loan that Smead did not want to make, speaks volumes. The Hinkley Loan was made <u>seven months before</u> the Utah Loan. Rather, the alleged "unwritten" loan term for the Hinkley Loan to pay "usury" under California law of $150,000 did not exist and never occurred. It is only as a fabricated pre-text for

litigation by Plaintiff--a disappointed and failed would-be solar field developer and land speculator. The timing and terms of the Utah Loan, negotiated and consummated seven months after the Hinkley Loan, with the risk-based origination fee for the under-secured Utah Loan, shows it was a separate deal. Brown was not required to make the Utah Loan. Brown first asked for the Utah Loan in April 2021 a full five months after the Hinkley Loan of Nov. 2020. And this request was when the Hinkley Loan was in default with NO monthly payments having been made at that time; and when in long-default also of the Malibu Loan as well. So this Plaintiff-borrower was a very high risk, with a very bad payment history, and with a security property that would not support the requested loan in Utah. Thus, a risk-based premium to make the loan, in essence, a loan of the risk-based origination fee of added principal, plus new cash of $100,000, at stated 10%, was entirely proper under Utah Law, the loan being requested by Brown for his speculative business purposes against raw land. This was not usurious and entirely proper under Utah law. California usury law was not violated, as inapplicable.

Plaintiff must prove collection of "unlawful debt" within the meaning of RICO, a multi-prong requirement: [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with the "business of lending money ... at a [usurious] rate," ... [3] the usurious rate was at least twice the enforceable rate ... [4] as a result of the above confluence of factors, it was injured in its business or property. *Durante Bros. and Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239, 248 (2d Cir.1985*) cert. denied,* 473 U.S. 906 (1986).

"RICO is concerned with evils far more significant than the simple practice of usury." *Durante Bros. supra*, 755 F.2d at 248. A civil plaintiff must also establish that the defendant's violation is both the factual and proximate cause of the plaintiff's injury. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 266 n.11 (1992) ("The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required."). A plaintiff must establish actual injury to his business or property to sustain a claim. *Berg v. First State Ins. Co.*, 915 F.2d 460, 463-64 (9th Cir. 1990). None of these tests is met.

B. <u>California: No Usury Placed On California Loans—No Unlawful Debt.</u>

California's usury limitation is 10% where there is no exception in statute. Here, the Hinkley Loan was for 8%, under the state usury limit.

Loan 1 Malibu. Initial loan. A real estate secured loan on vacant land located in Malibu, California. Brokered by a licensed California real estate broker representing Plaintiff, this was exempt from usury limitations by *Cal. Civil Code* § 1916.1 (inapplicability of interest rate restrictions to secured real estate loans made by licensed real estate brokers).   Here, the initial Malibu loan at 12.99% was broker-originated, so exempt from the usury limit of 10%. Cal. *Civil Code* § 1916.1.

"Malibu Loan" (consolidated). This loan at 12%, the Malibu Loan was a consolidation of the brokered-purchase money loans, so it kept its character and was likewise exempt from the usury limit. *DCM Partners v. Smith*, 228 Cal.App.3d 729, 737-738 (1991) (holding that modifying the note on a purchase money real estate loan post-default keeps the original usury exemption, even if no broker is involved in the modification agreement.). Even if this were not so, if there was no usury exemption applicable for the consolidated Malibu Loan, then the usury would have been 2% of the 12%. That is not "double" the California's usury limit of 10%, but only 1/5th of that. Double the applicable state usury limit is the minimum threshold for a RICO defined "unlawful debt". 18 U.S.C. § 1961(6), and that would be a 20% rate under California law to be a potential violation of RICO.

Loan 2 Hinkley/Harper Lake ("Hinkley Loan"). The Hinkley Loan was a real estate secured loan on vacant land in San Bernardino County, and was at a stated fixed rate of 8 % per annum, under the California usury law limit of 10%.

The Malibu Loan and the Hinkley Loan were made and secured by real estate in California. With the California usury limit, where no exceptions, at 10%, neither the Malibu Loan nor the Hinkley Loan were double the state usury rate of 10%, which would be a 20% threshold to serve as a basis for a RICO violation. There is no documentary evidence, only Brown's self-serving fabrication in an anticipated declaration, to support the existence of this "unwritten, secret $150,000 usury supposedly "put" on the Hinkley Loan. No such thing occurred. FACT## 6 - 8, 10, 11-16, 20, 25.

C.   Utah Law Applies to the Utah Loan Under California Choice of Law Rules.

The Choice of Law rule of this forum state is used to determine whether Utah of California Law applies to Utah Trust Deed Note and Trust Deed. *Shannon-Vail Five, Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) ("To determine the law governing a contract, California courts look to the relevant statute and, for further guidance, to the choice-of-law principles outlined in the

Restatement.") (citing *Henderson v. Superior Court*, 77 Cal. App. 3d 583, 592 (1978). "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." *Cal. Civ. Code* § 1646. "Section 187 of the Restatement provides that the" law of the state chosen by the parties" will govern. Parties can indicate this choice either through an express provision in the contract or by reference to legal doctrines that are peculiar to the law of a particular state and that thereby indicate the parties' preferred choice of law. Restatement § 187, cmt. a." *Shannon-Vail*, 270 F.3d at 1210-1211 (held, p. 1214: California's usury law inapplicable to the Nevada law loan, though Nevada "has no usury statute, the rate of interest on the loans is permitted under Nevada law.").

Here, the parties chose Utah law. The commercial Trust Deed Note (promissory note) was made expressly in Fillmore, Utah, and the Trust Deed to secure it with the Utah Lot specifies that Utah law governs. It was performed there, as the money was lent in Utah, through a Utah escrow, with the security of the Utah Lot under the Trust Deed conveyed to the Utah Trustee, recorded in Utah, and then enforced in Utah by the foreclosure sale. (FACT #14-16). The Utah Loan's express term and connection to Utah cause Utah law to govern, without regard to the California residence of Brown and Smead.

In *Ury v. Jewelers Acceptance Corp.*, 227 Cal. App. 2d 11, 18 (1964), the Court upheld a choice of law of New York in a loan contract with California borrowers, with an interest rate that was not usurious under New York law, but would have been if California usury law applied. It states:

> [W]e apply the rule of validation of contracts, and hold that the contractual provision amounts to a selection by the parties that the laws of New York shall govern the contract. Parties naturally expect that the obligations of a contract will be fulfilled.

> We are aided in this construction of the clause in the contract by the presumption against the existence of usury in a contract which has been stated in California cases. (Citations omitted). It has been held that a contract is to be construed so as to make it valid even though foreign law must be applied in order to reach this result.

*Id*. at p. 18. Further, observed and stated in the *Ury* decision:

/ / /

In general, the courts have treated commercial loan transactions in a special manner and have enforced contracts which are valid in the state of making and performance although they are usurious in the state of the forum, where all or even some of the factors given above are present.

*Id*. at p. 19. *Ury* itself dealt with a loans that were not secured by real estate in another state, which makes its holding are the more applicable, as this Utah Loan is made, documented, secured, recorded and enforced in Utah under its law. Thus, California respects this Utah Loan under Utah law, which makes it legal and proper and non-usurious.

This is a secured transaction on Utah real estate with an express choice in the Trust Deed of Utah law, as it had to be for enforcement of the Trust Deed Note and Trust Deed against the Utah security property. Notably, where the security of a real estate loan is in another state, "California's "one form of action" rule does not apply in this case because the property involved is located outside of California". *Oft Exploration, Inc. v. Williford Energy Corp. (In re Oft Exploration, Inc*.), 1997 U.S. Dist. LEXIS 4715, at *7 (N.D. Cal. 04/11/1997, Henderson, J.)  (One form of action rule under Cal. Code Civ. Proc. § 726 re action on promissory note or foreclosure).

That Utah lending and real property lending law properly governs is underscored by the effect of the Trust Deed, which conveyed title to the Utah Lot to the Utah trustee, as Utah law provides that all the right, title and interest of the Borrower in the security property, "shall inure to the trustee as security for the obligation or obligations for which the trust property is conveyed as if acquired before execution of the trust deed." Utah Code § 57-1-20 (Transfers in trust of real property—Purposes—Effect). Thus, Utah lending law applies to affirm the legality of the Utah Loan on its terms, as not being "double" the lawful rate of the applicable state's usury limit, as the Utah law does not have a usury limit for such loans as this commercial loan on raw land. And California's Choice of Law Rule confirms and respects and enforces this choice of Utah law.

D.   Utah Loan: No Usury Law Or Finance Limitations For Loans Of This Type--Commercial, Raw Land and Written Interest Term--So Loan Is Legal and Enforceable Under Utah Law.

The Utah Loan was lawful and not usurious under Utah law, which governs this Utah Loan, as the promissory note was made payable in Fillmore Utah,  secured on land in Millard County, Utah and the escrow closed and funds were paid from the escrow in Utah. *Capital Stack UT LLC v. Reddy*,

575 P.3d 1192, 1196 (2025) (Utah Court of Appeals). The Trust Deed States: "16. This Trust Deed Shall be construed according to the laws of the State of Utah." FACT # 14, Exh. 2-2-6 (Ex 2 p. -6). The Trust Deed Note states: "This note is secured by a Trust Deed of even date herewith".  The promissory note was made expressly in "Fillmore, Utah", the securing land in Millard County, Utah.

Utah Code § 15-1-1(1) & (2): allows any rate of interest expressly stated in a promissory note. The statute is set forth in the footnote.[2] "The Utah Legislature has made clear that '[t]he parties to a lawful written . . . contract may agree upon *any* rate of interest for the contract, including a contract for . . . a loan." *Capital Stack, supra*, 575 P.3d at 1196. (citing Utah Code § 15-1-1 (1)).

The Utah Department of Financial Instructions on Interest Rates on its public website states: "Utah Law does not specify an interest rate ceiling, but does have an unconscionability provision (Section 70C-7-106 of the Utah Code). Rates are determined by the market . . . ." It adds, "The table below illustrates the differences in monthly payment and total interest paid if $2,000 is borrowed at rates which are available in Utah: . . . (illustrations . . . Annual Percentage Rate . . . 120%". (Request for Judicial Notice No. 1, 12/31/2025; Exh. 1; web page: https://dfi.utah.gov/general-information/consumer-tips/interest-rates/[12/30/2025 2:56:28 PM].

Articulating Utah's law of no usury or finance limits as recently as 2025 is *Capital Stack, supra,* 575 P.3d at 1196. The *Capital Stack UT* decision provides the rule, holding that as there was no usury limit on the written business loan secured by real estate, a 146.44% interest rate, and as it was not unconscionable, noting that, "[s]uch high interest rates and short repayment terms are common for hard money loans like this one.

In footnote 1, p. 1196, the decision observed: " 'Hard money loans are most commonly used in connection with real estate transactions and offer an alternative to conventional loans when financing is difficult to obtain." *State v. Chapman*, 2014 UT App 255, ¶ 2 n.2, 338 P.3d 230 (cleaned up). They "carry much higher interest rates than conventional loans." Id. (cleaned up).' "

---

[2] Utah Code § 15-1-1. "(1) The parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract.

"(2) Unless the parties to a lawful written, verbal, or implied contract expressly specify a different rate of interest, the legal rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract is 10% per annum."

*Capital Stack, supra,* at p. 1196,  holds: "But Utah law 'enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party.*' Ryan v. Dan's Food Stores, Inc*., 972 P.2d 395, 402 (Utah 1998) (cleaned up). Thus, 'even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable.' Champagne, 2006 UT App 321, ¶ 33 (cleaned up)."

The Utah Supreme Court, *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 463 (1983) (Utah Supreme Court) holds that a commercial real property secured loan with a risk-premium amounting to finance charges of 58% was lawful under Utah law. With no usury limit for a business real estate secured loan, the only test is that of "unconscionability." In *Bekins*, the loans at issue were "principally secured by trust deeds on the real property." *Id*. at p. 460. *Bekins* explains:

With a few exceptions, it is still axiomatic in contract law that "[p]ersons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." *Biesinger v. Behunin,* Utah, 584 P.2d 801, 803 (1978). Parties "should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." *Carlson v. Hamilton,* 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958). Although courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable. Of course, this general principle has its limits. An established exception is that if a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result.

*Bekins*, *supra*, at p. 459.

Nor does Utah limit finance charges for such as Plaintiff's Utah Loan. "[U]nlike consumer loans there is no statutory limit on the amount that may be charged as a finance charge." *Id*. at p. 461.

As in *Bekins*, Plaintiff's Utah Loan is business loan between experienced business people. So the only test under Utah law to challenge the Utah Loan terms was for Plaintiff to file a suit in Utah challenging the secured loan as unconscionable. *Bekins, supra*, at pp 462 & 463. But even if there had

been an adjudication under Utah law that the Utah loan was "unconscionable", either for procedural or substantive unconscionability, that would not be based on "usury."

The *Bekins* decision, at p. 463, notes: "Acquisition of high risk capital almost always requires the payment of a premium. It is not sound legal policy to establish rules so strict as to unnecessarily dampen legitimate and desirable business activity." And, holds that, "the notes should be enforced as written". *Id*. at p. 465.

By express exclusion, the Utah Consumer Credit law with its usury limitations does not apply to Brown's Utah Loan. That law exempts commercial loans and those not secured by dwellings of a consumer. Utah Code § 70C-1-202(2)(a): "This title does not apply to any of the following: (1) an extension of credit: (i) primarily for business, commercial, or agricultural purposes; . . ." The Utah Consumer Credit Code, § 70C-1-302 (4) excludes from the definition of "Creditor" one who makes a real estate secured loan on vacant land for business purposes. Utah's statute § 70C-1-301 provides that the definitions of federal regulation Z apply to its consumer credit law. Regulation by its terms and definition does not apply to the Utah Loan. Regulation Z, 12 C.F.R. § 1026.2 (12) provides that "Consumer credit means credit offered or extended to a consumer primarily for personal, family, or household purposes." And Regulation Z definition of "Consumer" excludes Plaintiff on this loan: "Consumer means a cardholder or natural person to whom consumer credit is offered or extended." This Utah Loan was not "consumer credit". (The definition includes also only a natural person financing a dwelling, who has a loan rescission right under Regulation Z). Also, though this issued does not need to be reached, Utah's consumer credit law applies only to residents of Utah, which Plaintiff was not.

The Utah Loan interest rate was 10%, stated in writing on the Trust Deed Note, on stated principal of $200,000: $100,000 of this was new money paid through the Utah escrow, plus $100,000 owed immediately to Smead on loan consummation, as principal, as lent to Brown for a risk-based or bonus form making this risky loan. Utah law has no usury limit or "finance" limit, where the promissory note states a specific rate, as it did here. And on this non-consumer loan for raw land, Utah has no usury limit or "finance limit" and does not treat as interest the "bonus" paid to obtain the risky business purpose real estate secured loan. That, too, is principal, because it is money owed by

Brown's agreement and promissory note to Smead for making a very risky Utah loan. So, no "double" the state usury rate was charged for the Utah Loan. And none of this was "carried over" from the Hinkley Loan in California, made seven months earlier.

In sum, the RICO definition and test for "unlawful debt" is for "double" the state usury law limit. And, here, there is no Utah state usury law limit for this loan.  Usury exists only where defined by statute. And, here, the Utah Code § 15-1-1 expressly excludes this Utah Loan from any usury limitation, and controlling Utah case law shows that the Utah Loan has no usury limit for this loan, and that the loan is legally enforceable.

E.  Section § 1962(c) Was Not Violated--No "Collection of Unlawful Debt" Existed.

The four-factor test for liability for collecting an "unlawful debt" in violation of RICO is not met. These are the factors not met, as the test is specified in *Durante Bros. supra*, 755 F.2d at 248: (1) No loan was *unenforceable* because of usury law. (2) The loans were *not at a usurious rate*. (3) If a usurious rate existed it was *not "at least twice the enforceable rate*. (4) Plaintiff *was not injured in business or property by a confluence of factors*.

Here, no violation occurred, RICO's "unlawful debt" test is not met, so Plaintiff has no RICO claim against Smead. Plaintiff was injured by his own choices: the lack of income sufficient to pay the interest only loans; choosing not to pay the loans; failing to pay off the loans; failing to sell the properties before foreclosures; failing to develop the properties to generate any revenue to service the debt; failure to challenge the Utah Loan for "unconscionable terms" for a Court to possibly "rewrite the loan"; and failure to restructure in bankruptcy Ch. 11. Plaintiff meets none of the required elements, and Defendant has shown on the evidence that he is entitled to dismissal of the RICO claims, as all turns on alleged collection of unlawful debt.

F.  No "Income" From A RICO Violation Existed And None Was Used To Acquire Plaintiff's Business or Property.

Smead did not receive income from Brown that violated RICO on these loans . Barely any interest was paid on either the Hinkley Loan or the Utah Loan, and no principal on any loan—interest only payments to maturity under the notes' terms. Hence, no unlawful income was used to acquire business or property of Brown. Rather, Brown's default was followed by the lawful enforcement of

the three loans under their respective deeds of trust, ending in foreclosure of the three security properties—that is why he lost the properties. Further, whether any of the three vacant and raw land lots were also the "business" of Brown, there was no "business" occurring, as he had no contracts for income or development of any of the sites. FACT ## 18, 23 – 25 & 31. Thus, RICO was not violated by use of "unlawful" income to acquire Plaintiff's business or property.

[NO RESPONSE MADE BY PLAINTIFF]

II.    NO VIOLATION OF RICO 18 U.S.C. § 1962(c) or § 1962(a) EXISTS, FOR ANY ONE OF NUMEROUS REASONS AS ELEMENTS NEGATED.  [BY DEFENDANT/MOVANT]

"To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.  See *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996))." (From Ninth Circuit Model Civil Jury Instructions section 8, Civil RICO ("8, Civil RICO Jury Instr. 9th Cir."). Furthermore, RICO "requires proof of a 'scheme to defraud' involving misrepresentations reasonably calculated to *deceive persons of ordinary prudence and comprehension*. [*Beck v. Prupis* (11th Cir. 1998) 162 F3d 1090, 1096; . . . ]." Stevenson, Karen L., Judge, U.S. Chief Magistrate Judge, Central Dist. Cal. and James E. Fitzgerald; *Federal Civil Procedure Before Trial* (2025 The Rutter Group), § 14:295, p. 120. These tests are not met.

Here, these were three written loans, documented, and enforced in the ordinary course, involving no misrepresentations by Smead and no "scheme to defraud". The loans and enforcement were according to their written terms, and it was Plaintiff who came asking for the loans, and not Smead making misrepresentations with a scheme to defraud Brown.  Brown himself was a sophisticated business-borrower and would-be developer, a licensed California real estate broker, using several corporate entities for his business purposes. He was not a person or mere "ordinary prudence and comprehension" to be deceived, but rather, a sophisticated borrower, business man and speculator attempting to develop solar fields on the raw lands he picked to buy with borrowed money or that he refinanced.

/ / /

JOINT INTEGRATED POINTS & AUTHORIES RE MOTION FOR SUMMARY JUDGMENT
*BROWN VS. SMEAD 23-cv-02938*

21

Smead has already established in Section I., supra, that there was no "collection of an unlawful debt". There is no other basis to support this claim, as there is nothing else in the "predicate act" list that applies, all of it being criminal under federal law, and no such allegation in the Second Amended Complaint, nor appearing on the facts nor in evidence. FACT## 1-30.

Brown alleges that "usury" under California law was paid and placed on the Utah Loan. But Brown made only four interest only payments on the written terms of his $150,000 Hinkley Loan, a total of $4,000. And he paid only $11,669 of interest payments on his Utah Loan. So, payments of interest on the written terms on Hinkley at 8% could not be "invested" in a scheme of racketeering activity under Section 1962(a), as not double-the state usury rate. Nor were the partial interest-only payments on the written loan terms for the Malibu Loan of 12% usurious to be "invested" in another loan, whether the Hinkley Loan or the Utah Loan. Rather, the Malibu Lot was not sold by Smead until 2025, and the Hinkley and Utah lots foreclosed in 2023 are still owned by Smead. So, no money (none of it being "unlawful debt", in any event) from Brown's small payments were "invested" in an enterprise with a pattern of racketeering activity. These were three discrete, and defaulted loans, all lent alone by Smead and owed to Smead alone. Smead hiring only as necessary independent entities necessary to consummate and enforce the loans: only one loan servicer who collected monthly payments for a fee (Malibu Loan—Superior Loan Servicing), three escrow companies closed the loans for a fee, and he paid three foreclosure trustees a fee, their use required under state law. The Section § 1962(a) or (c) claims fail.

   A.   There Is No Violative Unlawful Conduct Of Any Kind, No Causation, No Liability.

Plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury. *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019). "Defendant's unlawful conduct that is a **violation** of the statute must be both the factual and proximate cause of the plaintiff's injury. *Holmes v. Sec. Investor Protection Corp*., 503 U.S. 258, 266 n.11 (1992) ("The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required."). No claim exists of injury to business or property exists, otherwise. *Berg, supra,* 915 F.2d 460 at 463-64 (9th Cir. 1990). This did not exist. FACT ## 1-30. The element is negated.

/ / /

B.  No Scheme To Defraud Involving Misrepresentations Existed.

These were plain written loans and no misrepresentations for a scheme to defraud exist, but merely enforced in the ordinary course for long-standing failure to make even interest only payments on lawful loans in both California and Utah. FACT ##1-31. The element is negated.

C.  No Enterprise--Smead Alone Cannot Be The Enterprise, And These Three Discrete Loans Were His Alone, Using Only Unconnected Service Providers.

"For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise)." From 8, Civil RICO Jury Instr. 9th Cir. Here, Smead acted on his own, and no other persons had rights or were involved in making or enforcing the loans, except for ordinary service providers who were unconnected to him or to each other. FACTS 1-30. Element negated.

D.  No "Enterprise" Nor "Associated-in-Fact" Conduct Occurred.

"A defendant is not liable under § 1962(c) unless the defendant has participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that accountants hired to perform audit of a cooperative's records did not participate in "operation or management" of the cooperative's affairs by failing to inform the cooperative's board of directors that the cooperative was arguably insolvent). In determining whether the conduct element has been satisfied, relevant questions include whether the defendant "occup[ies] a position in the 'chain of command,'" "knowingly implement[s] [the enterprise's] decisions," or is "indispensable to achievement of the enterprise's goal." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (attorney's performance of services did not satisfy conduct element)." From 8, Civil RICO Jury Instr. 9th Cir.  Here, no such thing exists.

RICO associates-in-fact must have had "some knowledge of the nature of the enterprise . . . to avoid an unjust association of the defendant[s] with the crimes of others . . . ." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 828 F.3d 763 (9th Cir. 2015). An "enterprise" is any person or "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "It is apparent that an association-in-fact enterprise

must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). This element is negated.

Here, the persons or entities involved in ordinary services for commercial lending operation, escrows, a loan servicer, foreclosure trustees, title policy issuers, did not have conduct that violated RICO, as all performed ordinary lending-related operations on discrete loans that were unconnected. FACT ##25-28.  For an "enterprise" and participation, the "various associates" must, but here, did not, "function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007). No such thing exists here.

E.   No Racketeering Pattern Of "Predicate Acts" Exists.

"A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation, but may not be sufficient. See *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous." *Id.*; *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992). From 8, Civil RICO Jury Instr. 9th Cir.  Here, there were no predicate acts at all. FACT ## 1-30.

F.   No Racketeering Activity, No Indictable Predicate Acts, Under 18 U.S.C. § 1961(1).

"To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) (noting that "racketeering activity' consists of no more and no less than commission of a predicate act").   Predicate acts must be proved by a preponderance of the evidence. See *Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987)." From 8, Civil RICO Jury Instr. 9th Cir.

Predicate acts are listed and defined in Section 1961(1), as "racketeering activity". None of them exist here. Plaintiff argues "wire" or "mail fraud", but the loans were plain on their faces, money lent, terms set, loans enforced, and there was no "fraud" by "wire" or by "mail", as money was lent and money was paid. None of the loans involved, "unlawful debt" as defined in Section 1961(6), but that is not one of the "predicate acts" under Section 1961(1) in any event. There was no "wire fraud" or "mail fraud". FACT ##1-30. The elements are negated.

G. <u>No Effect On Interstate Commerce Exists.</u>

Under Section 1962, there must be an enterprise involved in the racketeering activity that engages in or effects interstate commerce. *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert denied sub nom. Little v. U.S.*, 445 U.S. 946. Plaintiff must show an effect on interstate commerce. *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir. 1981), *cert. denied sub nom. Walgren v. U.S.*, 456 U.S. 962. Here, the two loans in California were unconnected to interstate commerce. And the Utah Loan, made in Utah, escrowed in Utah, security of Utah land conveyed to the trustee in Utah, recorded and enforced by foreclosure in Utah, was unconnected to interstate commerce. An effect on interstate commerce did not occur. FACT ##1-30.

H. <u>Harm To Business And Property Did Not Occur By RICO Violation, As Plaintiff's Loss Of Properties To Foreclosure Resulted From His Loan Defaults.</u>

The cause of Plaintiff's "harm" was not the result of violation of RICO. As it does no compensable harm or damages arises and RICO damages are not awardable. So, Section 1964(c) does not allow suit for that harm. Containing a good summary of the proposition is the opinion of *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 604-605 & 612 (2025). It summarizes key case law in these words: "*Sedima* holds that "the compensable *injury* necessarily is the *harm* caused by predicate acts sufficiently related to constitute a pattern." . . . . Tracking *Sedima*, Anza is replete with language about the plaintiff 's harms. . . . ("The cause of *Ideal*'s asserted harms, however, is a set of actions . . . entirely distinct from the alleged RICO violation"). The same is true of *Hemi Group*, which reiterates that "in the RICO context, the focus is on the directness of the relationship between the conduct and the *harm*." *Id.,* 604 U.S. at 604-605 (citations omitted). Further, it summarizes and states: "First and foremost is RICO's direct-relationship requirement. Time and again, we have reiterated that §1964(c)'s "by reason of " language demands "some direct relation between the injury asserted and the injurious conduct alleged" . . . . The key word is "direct"; foreseeability does not cut it. . . . Rather, whenever the plaintiff 's theory of causation requires moving "well beyond the first step," it "cannot meet RICO's direct relationship requirement." *Id*., 604 U.S. at 612 (citations omitted).   So any "harm" to Plaintiff's business or property that arose from the circumstances here does not create

/ / /

RICO liability. His loss of property to foreclosure, and with it the hopes of business in solar fields, were a result of the ordinary enforcement of the loan agreements. FACT ## 1-30.

None of these three lots generated any revenue to Brown and none had any contracts that would generate revenue at the time of the foreclosures, nor afterwards under Smead's ownership post-foreclosure. Smead finally sold the Malibu Lot in 2025. FACT ## 23, 24. Brown has not been harmed in business or property under RICO. This element is negated.

[NO RESPONSE MADE BY PLAINTIFF]

CONCLUSION BY DEFENDANT/MOVANT

Movant Defendant has met the requirements of Rule 56 and *Celotex* for summary judgment. Plaintiff has not successfully countered it with evidence nor argument. Accordingly, summary judgment should be granted, or, in the alternative, partial summary judgment.

Date: May 13, 2026                    Respectfully Submitted,

                                      /s/ *Fred Hickman*
                                      _____
                                      Fred Hickman
                                      fredhickman@gmail.com
                                      Attorney for: Defendant Steve Smead

[NO CONCLUSION SUBMITTED BY OPPONENT/PLAINTIFF, BUT SEE P. 2 FOR STATEMENT OF PLAINTIFF'S GLOBAL OPPOSITION.]