Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>                    PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>                    DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>JOINT APPENDIX OF EVIDENCE I.S.O. DEFENDANT SMEAD'S MOTION FOR SUMMARY JUDGMENT OR,  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br>[Hon. MAAME EWUSI-MENSAH FRIMPONG, District Judge]<br><br>DATE: 06/25/2026<br>TIME: 10:00 a.m.<br>CTRM: 8B |

TO THE CLERK OF THE COURT AND TO THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG, DISTRICT JUDGE, AND TO PLAINTIFF, IN PRO SE:

PLEASE TAKE NOTICE:

Herewith is the Joint Appendix of Evidence pertaining to Defendant Steve Smead's Motion for Summary Judgment, or, in the alternative, Partial Summary Judgment.

/ / /

<u>DECLARATIONS AND REQUEST FOR JUDICIAL NOTICE</u>

1. DECLARATION OF STEVE SMEAD I.S.O. MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, DATED DEC. 31, 2025

2. DECLARATION OF FRED HICKMAN IN AUTHENTICATION OF DEPOSITION EXCERPTS OF CLINTON BROWN DEPOSITION OF DEC. 4, 2025, I.S.O. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT DATED DEC. 31, 2025

3. REQUEST FOR JUDICIAL NOTICE I.S.O. DEFENDANT SMEAD'S MOTION FOR SUMMARY JUDGMENT OR,  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, DATED DEC. 31, 2025

<u>EXHIBIT LIST</u>

Ex. 1-5-7 email Brown to Jeremy Gale dated June 18, 2021)

Ex. 2 Utah Trust Deed Note dated  "of even date" with Trust Deed (Exh 9-1-2)

Ex. 2-7-9 Utah Settlement Statement, June 30, 2021, TitleFirst Utah

Ex. 9-1-2 Utah Trustee's Deed, dated 03/08/2023

Ex. 11-1-4 Promissory Note Malibu dated 03/16/2020 (Malibu Initial Loan).

Ex. 11- 7-8 Superior Loan Servicing Borrower Statement of Account, 4/7/2021 (Malibu initial loan).

Ex. 12-1-2 Promissory Note (Malibu Loan, consolidation) dated 05/15/2021

Ex. 12-3-4  e-escrows, inc., Borrower Statement Final dated 05/24/2021 Malibu consolidated loan

Ex. 13        Malibu loans payment history ledger period 2020 to 2023

Exh. 14-2-3 Trustee's Deed Upon Sale dated 01/04/2023 Malibu Lot

Ex. 15-1 promissory Note, dated 09/21/2020 Hinkley Loan

Ex. 15-2-3 escrow Final Buyer's Statement dated 11/10/2020 - Date / 11/11/2020 Chicago Title Company, Hinkley Loan

Ex. 15-4-7 Deed of Trust dated 09/21/2020 Hinkley Loan

Ex. 16-1-21 email Brown to Smead 11/3/2020 attached proposed loan documents re Malibu dated 11/5/2020

Ex 17-1-3 Corporation Assignment of Deed of Trust dated 06/13/2022 (AmPac Hinkley first priority loan)

Ex 17-4 Exact Escrow Closing Statement, dated 07/20/2022 (purchase AmPac Hinkley loan)

Ex. 19 Ledger payment history Hinkley Loan, dated 2021-2023.

Ex 20 Hinkley Trustee's Deed Upon Sale dated 1/30/2023.

Ex. 42-1-3 proposed Guaranty of proposed loan to Atlas Dev. Group, LLC dated on 11/3/2020

Ex. 43-1-4 proposed Loan Agreement, dated Sept. 24, 2020 of loan to Atlas Dev. Group, LLP

Ex. 53 (composite) emails Brown to Smead dated 09/16/2021 and 09/28/2021

Ex. 54 Brown and Smead email chain dated 06/09/2022 and 06/11/2022

Ex. 55-1-3 email chain Brown and Smead dated Aug. 7 & 5 & 3, 2022.

Ex. 59-1-8 proposed 11/4/2020 promissory note and guaranty on Malibu Lot, signed by Brown).

Ex. 60 email Brown to Smead Aug. 23, 2022, 12:51 a.m.

Ex. 74 Payment Ledger Utah Loan, Bates S 451.

Ex. 75 Smead Bank Statement 04/30/2021 (redacted) Bates # S 877 (redacted)

/ / /

JOINT APPENDIX OF EVIDENCE

*BROWN VS. SMEAD 23-cv-02938*

Date: May 13, 2026

Respectfully Submitted,
/s/ *Fred Hickman*

Fred Hickman
fredhickman@gmail.com
Attorney for: Defendant Steve Smead

Fred Hickman (#124406)

fredhickman@gmail.com

17602 17th St Ste 102-206

Tustin CA 92780

714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>            PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>            DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>DECLARATION OF STEVE SMEAD I.S.O. MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>DATE: 03/05/2026<br>TIME: 10:00 A.M.<br>CTRM: 8B |

I, Steve Smead, declare as follows:

1.    I am the defendant in this action. I make this declaration from personal knowledge and from refreshing my memory by review of the documents and records of mine as to my loans and dealings with Brown on the subjects described herein, and on the documents produced by Brown during the course of this litigation. If called to testify I would be able to testify competently hereon.

[Malibu Loan: Origination, Default, Foreclosure]

2.    In early April 2020, I saw a solicitation by Clinton Brown ("Brown") for a loan, listed on the public website of a California mortgage broker, Mr.

Andrew Dioli, doing business as American Private Money Group, CA Dept. of Real Estate License #01909075, FMC Lending Company, and requested information. The loan broker, Mr. Dioli, emailed me information. I reviewed the proposed Malibu loan, for a purchase money loan, second priority, that Brown would buy with the loan, to be secured by the vacant lot zoned residential with the property address of Assessors' Parcel No. 4451-015-021, Malibu, CA 90265 ("Malibu Lot"). The proposed loan was for the balance of the purchase price for Brown to buy the Malibu Lot from Vincent Sarkany. The loan I was to make was a second priority loan, behind Mr. Sarkany's. In considering whether to make the loan, I reviewed Brown's loan application, provided by the broker, the Uniform Residential Loan Application, signed and dated 4-4-2020 by Brown, stating his monthly income from Atlas Development Group, LLC was $11,000.00 monthly, and that his net worth was $205,375. I reviewed the appraisal of the Malibu Lot provided by Brown's broker. Thereafter I had direct communication with Brown by email regarding whether I would make the loan. I decided to make the loan, as Brown's income and assets appeared to be sufficient to service the obligation and the loan amount compared to the value of the Malibu Lot seemed sufficient.

3.      The terms of my loan for the Malibu Lot to Brown were $170,000 principal at 12.99% interest, interest only for two years and maturing with a balloon payment due in two years, and documented by a "Promissory Note Secured by Deed of Trust", dated 3/16/2020, made by Brown to me, and secured by a Deed of Trust of even date. It was a second priority loan for purchase money to Brown, behind the first priority loan of Mr. Sarkany, the seller. Attached hereto as Ex. 11-1-4 is a true and correct copy of the Promissory Note Secured by Deed of Trust, dated March 16, 2020 that Brown made to me, on this first loan that closed escrow on 04/21/2020.

/ / /

DECLARATION SMEAD I.S.O. MOTION SUMMARY JUDGMENT

*BROWN VS. SMEAD 23-cv-02938*

2

4.      Brown's loan from Sarkany came due for a balloon payment, Brown informed me. And Brown asked me to make a refinance loan that would consolidate the balance due on Sarkany's loan and my loan, into a "consolidated loan", so that he would have just one loan secured by the Malibu Lot. I agreed to make that consolidated loan to Brown, at the lower rate of 12%, reduced from 12.99% on the initial loan. He had already been in default of my initial loan on Malibu, running behind in payments until the new consolidated loan I made, as described below. Brown and I agreed to use "e-escrows, inc." to be the escrow to consummate the consolidated loan, as Brown and Sarkany had chosen them for the initial purchase money loan transaction.

5.      At the time Brown requested a consolidation loan from me to be secured by the Malibu Lot, Brown's payments in the last several months had been irregular, and some loan payments and late fees were due from him on the initial loan at the time I agreed to make the consolidated loan. These missed payments were caught up on the initial loan from me in the consolidated loan, described below, and as reflected in the final settlement statement from the escrow company upon consummation of the consolidated loan. (Attached as Ex. 12-3-4 is a true and correct copy of escrow closing statement on the consolidated loan to Brown, by escrow agent e-escrows, inc., the Borrower Statement Final, print date 05/24/2021 for closing date 05/21/2021).

6.      On May 21, 2021 my consolidated loan to Brown secured by the Malibu Lot was consummated, with the closing of escrow. The loan was documented by a "Note Secured by a Deed of Trust, dated 5-14-21, the "Malibu Note", and a Deed of Trust of even date. (Attached hereto is a true and correct copies of the Malibu Note (Exh. 12:1-2). The Malibu Note terms were for a 12% interest, interest payments only of $3,000 per month, and a balloon of all due on 6/1/2023(the "Malibu Loan").  (Attached as Ex. 12-3-4 is a true and correct copy of escrow closing statement on the consolidated loan to Brown, by escrow agent e-

escrows, inc., the Borrower Statement Final, print date 05/24/2021 for closing date 05/21/2021).

7.    Superior Loan Servicing was the loan servicer for the consolidated Malibu Loan, as it was for my initial loan to Brown for the purchase money. It was a professional loan servicer that I paid a monthly fee for servicing the loan. It had no participation or interest in the loan or its security or its payments, acting only to service the loan and keep track of payments and loan transaction items, and to communicate with the borrower as needed.  As an illustration of what the servicer does, attached as Ex. 11-7-8 is a true and correct copy of the Superior Loan Servicing Borrower Statement of Account on the initial Malibu loan from me to Brown, statement dated 4/7/2021).

8.    Brown defaulted on the consolidated Malibu Loan, immediately, being late and partial with the very first interest only payment due, that due on 7/1/21, making only a partial payment on it 7/20/21. And he never once became current on the payments. Ex. 13 attached hereto is a true and correct copy of the history of payments of Malibu Loan, it is a ledger payment history on initial and then the consolidated Malibu Loan period 2020 to 2023 that I personally kept that accurately reflects the payments made by Brown on the Malibu Loan and the initial loan on the Malibu Lot before that consolidated loan.  His payments were typically short, partial and sporadic. His last payment on the Malibu Loan was that due for November of 2021, and that made only in April 2022. He did not cure the payments default at any time. He did not pay off the Malibu Loan. He defaulted by failing to pay property taxes as they came due, a loan default under the deed of trust, as I learned in 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number.

9.    Regarding the Malibu Loan, due to the long-standing default, I instructed the foreclosure trustee, Superior Loan Servicing, by Asset Default Management, Inc., as Agent for Trustee, to commence the foreclosure process. I

authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me under the Malibu Loan at the time of the trustee's sale, which was $372,338.14 on the auction sale date, 1/4/2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. Then the trustee issued a Trustee's Deed Upon Sale ("Malibu TDUS"), dated 1/4/2023, and it was recorded. (Exh. 14-2-3 is a true and correct copy of Malibu TDUS). The Malibu TDUS made me the owner of the Malibu Lot. The Malibu Loan was fully satisfied by the foreclosure. No other amounts were due to me on or in connection with the Malibu Loan or the Malibu Lot, all debt related to it being satisfied by the Malibu TDUS.

10.     The Malibu Lot, as a vacant lot in zoned residential, never generated any revenue to Brown, that he mentioned to me. Nor while I owned it did it ever generate any revenue to me. Over two years later, I sold the Malibu Lot, in March of 2025.

[September thru November 2020--Brown Proposed Loans and Deals Rejected]

11.     In September through November 5, 2020, Brown made several proposals for me to fund his solar development business, sending me several written loan proposals and proposed loan documents he had drafted, and a proposal to buy stock or lend against stock he said he owned in "Atlas, Inc.", all of which I rejected. Mixed in with these proposals was to borrow more money from me. He sought several different loans in this time frame. One for "Atlas Development Group, LLC", which he proposed would be secured by another deed of trust encumbering the Malibu Lot; another one for himself personally, which would also encumber the Malibu Lot. I rejected all of these proposed loans, transactions and documentation. True and correct copies of these rejected proposals and documents from Brown are attached hereto as: (on 9/24/2020) Ex. 43-1-4 (proposed "Loan Agreement, dated Sept. 24, 2020" of loan to Atlas Dev. Group, LLP); (on 11/2/2020) Ex. 42-1-3 (proposed Guaranty of proposed loan to Atlas Dev. Group,

LLC; (on 11/3/2020) Ex. 16-1-21 (email Brown to Smead of 11/3/2020, and attached proposed loan documents for a new loan against the Malibu Lot); (on 11/5/2020) Ex. 59-1-8 (11/4/2020 proposed note and guaranty for new loan on Malibu Lot, signed by Brown). More detail on some of these rejected proposals follows.

12.     In late Sept. Brown emailed me a proposed "Loan Agreement, dated Sept. 24, 2020, for a loan he proposed that I make to "Atlas Development Group, LLC, for a proposed $150,000 for "funding" of a second priority deed of trust on his hoped for purchase of a property in the Hinkley/Harper Lake, San Bernardino County ("Hinkley Lot"), a true and correct copy of which is attached as Ex. 43-1-4. It proposed a 2-year, no- interest loan, the balance due on 9/24/2022. It appeared to me that he had created and drafted this proposed Loan Agreement himself, as it looked odd to me. And it was not acceptable to me.

13.     On or about November 2, 2020, Brown sent to me his proposed "Guaranty" of his for the "extension of credit" of $150,000 under the proposed Loan Agreement of Sept. 24, 2020, a true and correct copy of which is attached as Ex. 42-1-3. This was a purported guarantee for the loan he proposed that I make to "Atlas Development Group, LLC", the Ex. 43, above.

14.     On November 3, 2020, Brown emailed to me his newly proposed loan documents. Attached as Ex. 16-1-21 is a true and correct copy of Brown's email to me that attached the documents, dated 11/3/2020 and a true and correct copy of the documents attached. In these documents and email, attached as Ex. 16, Brown proposed that I make an additional loan secured by the Malibu Lot. I had already lent on the Malibu lot, in the Malibu Loan. These documents he emailed to me that date included a "Deed of Trust" from Brown as borrower to me as lender, naming the "trustee" as "Brown Realty Group", including a separate "Guarany" by Brown himself, purporting to guaranty his own new proposed loan from me to him. The email also included a "Secured Promissory Note dated

11/3/2020 for $150,000 from Brown to me, with a one-year period of "no interest", the proposed loan maturing in one year.

15.    On or about November 5, 2020, Brown emailed to me a proposed "Secured Promissory Note", and "Guaranty Agreement, both dated 11/4/2020, and both with Brown's signature dated November 5, 2020, true and correct copies of which are attached hereto as Ex. 59-1-8. In these proposed loan documents, which I rejected, Brown proposed a new loan from me that would be secured by the Malibu Lot, proposing to be the maker to me of this note for $150,000 principal for one year at no interest, due in full on 11/2/22022, and if principal then due was unpaid, to accrue interest at the rate of 10% and a proposed personal guaranty by himself of his proposed promissory note. (Ex. 59 is a true and correct copy of these two documents, the "Secured Promissory Note" and the "Guaranty Agreement" both dated 11/4/2020).

[Hinkley/Harper Lake Loan: Origination, Default, Foreclosure]

16.    In September 2020 Brown requested one loan that I was willing to make. It was to fund a second priority purchase money loan for land in the Hinkley/Harper Lake area, a piece of vacant, raw, undeveloped land ("Hinkley Lot"). He hoped to build a solar power generating facility on it, and proposed to buy it from American Pacific Investments, Inc., which itself would make a "seller carry-back loan," ("AmPac"). AmPac would have the first priority security on its purchase money loan, and I would have a second priority loan, secured against the Hinkley Lot. So, on September 16, 2020, I wired $150,000 potential funds to the potential escrow agent, Chicago Titled, my bank records show, to hold pending Brown's purchase deal with AmPac, for purchase money for the Hinkley property, if he bought it. As Brown described and documented the proposed Hinkley Lot purchase and loan to me, as I considered the purchase money loan, it was vacant, raw, undeveloped, desert land. It generated no income at the time. However, in the September through November 2020 time-frame, before I made the loan to help him

buy the land, he represented to me that the Hinkley Lot would generate a large cash flow over time a solar power generating field, and that it would be sufficient to service all debt for it.

17.    In making a purchase money loan on the Hinkley Lot, But I required that the promissory note and the deed of trust be standard-form ones, in a form provided by Chicago Title Company, and as I wanted to assure myself of enforceability, and to obtain a lender's title policy from Chicago Title Company, as well. The transactional documents that Brown had been generating and emailing to me were strangely done, and so I would not use any document he generated to make this purchase money loan for the Hinkley Lot.

18.    The escrow company for Brown's purchase of the land and the loan from AmPac and the loan from me would be "Chicago Title Company". AmPac and Brown selected the escrow company, and I agreed to their selection for efficiency's sake.

19.    Brown proposed these loan terms, and I accepted his proposal. The loan terms were these: I would lend $150,000 at the rate of 8% from November 10, 2020, $1,000 per month beginning on January 1, 2021, which was an interest only loan, to mature and be payable in full on Dec. 1, 2022. I lent the $150,000 principal on those terms. The loan was documented by a promissory note, a "Note (Installment – Interest Included)" dated September 21, 2020 ("Hinkley Note", and a Short Form Deed of Trust and Assignment of Rents of even date ("Deed of Trust". (Attached hereto are true and correct copies of the Hinkley Note and the recorded Deed of Trust (Exh. 15:1 ("Note (Installment – Interest Included), 15:4-7 (Deed of Trust). Together, the Hinkley Note and Deed of Trust are referred to as the "Hinkley Loan," and the security property as the "Hinkley Lot." The Hinkley Note and Deed of Trust were done on standard forms provided to me by Chicago Title Company. There were no other terms or conditions or charges for the Hinkley Loan than those stated in the Hinkley Note and Deed of Trust. This is reflected on

the escrow agent's (Chicago Title Company) Final Buyer's Statement, the settlement statement for the Hinkley Loan and purchase of the Hinkley Lot, a true and correct copy of which is attached as Ex. 15:2-3, Settlement Date 11/10/2020).

20.     The Hinkley Loan and Brown's purchase of the Hinkley Lot closed, i.e., consummated on November 10, 2020. (Exh. 15:2-3). It shows that Brown paid $498,000 for the purchase, with seller taking back a note for $348,000 and my loan amount being $150,000. The statement settlement statement, Exh. 15:2-3, reflects that Brown made no down payment, borrowing 100% of his purchase price, as he also informed me at that time.

21.     I kept track of the Hinkley Loan payments from Brown, as I did not need an independent loan servicer for it. His payments were to be made to me directly, starting on January 1, 2021. However, he immediately defaulted on the Hinkley loan not making any payments for that due on the first of each of January, February, March and April. He did not make those payments until he had an entity called "Atlas LLC" send an electronic payment of $4,000 on April 28, 2021, as my bank record shows. He made no more payments at all on the Hinkley Note. Attached hereto are true and correct copies of the following: Ex. 19 is a ledger that I kept in the ordinary course of business to reflect loan payments I received from Brown; Ex. 75, is my bank statement dated 4/30/2021 Bates # S 877 (redacted) that reflects the Atlas LLC electronic deposit for the payments on behalf of Brown, referenced above. He remained in default on all payments due for May 1, 2021 and thereafter. He never cured the default. He did not pay off the Hinkley Note.

22.     Brown also defaulted on the Hinkley Loan by failing to pay property taxes, as I checked on the tax status for the Hinkley Lot in June 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number. This tax default was also a loan default under the deed of trust. I asked him to pay the defaulted property taxes, but he declined to do so, ///

and sent me an email telling me that he would not do so. Attached as Exh. 54 is an email chain between Brown and me dated June 9 and June 11, 2022.

23.    During Brown's default on the Hinkley Loan, he represented that it would eventually generate revenue from his intended solar development on the site, the Hinkley Lot. However, no such development or revenue ever occurred related to or arising from the Hinkley Lot. He made these same representations, of income in the future, or his prospective sale of the Hinkley Lot, or liquidation of other security properties, but none came to pass, ever, no revenue, no sales, no projects built to generate revenue. Brown and I exchanged email about, at true and correct copy of which is attached as Ex. 55-1-3, email chain dated Aug 7 & 5 & 3, 2022.

[Purchase of First-Priority Loan from AmPac on Hinkley/Harper Lake]

24.    Brown also defaulted on AmPac's first priority loan secured by the Hinkley Lot, as I learned from its personnel during the course of the Hinkley Loan, and that it might do a foreclosure sale. If AmPac went to foreclosure sale on its higher priority loan, then that would eliminate the my security interest in the Hinkley Lot on my Hinkley Loan. So to avoid losing that security interest to AmPac, I bought AmPac's loan on Hinkley. The terms of my purchase of the AmPac first priority loan was the total due from Brown to it, approximately $370,350.00. I used Exact Escrow at AmPac's request to buy its loan. My loan purchase consummated on with assignment of its promissory note to me and the Corporation Assignment of Deed of Trust on July 19, 2022. (A composite, attached as Exh. 17-1-3 is a true and correct recorded copy of that Assignment and of the Final Settlement Statement on the purchase). The Final Settlement Statement shows that Brown made no payments to AmPac on his purchase money promissory note to it for any payments due from and after 10/10/2021 ("Interest on Principal Balance at 8% from 10/10/2021 to 07/22/2022 of $21,808.00") Now, as of

7/19/2022, Brown now owed me approximately $534,808 on the two promissory notes secured by the Hinkley Lot ($369,808 on the first to AmPac, and approximately $150,000 unpaid principal and $15,000 unpaid interest on my second priority Hinkley Loan, plus tax defaults uncured, not included in this figure). Brown made no payments to me on the first priority loan after I bought it from AmPac, no cure of default nor loan payoff occurred.

[Foreclosure on Hinkley Loan, the Second-Priority Loan]

25.    With the default uncured on my second priority loan, I instructed the trustee to commence the foreclosure sale process. On August 23, 2022, after Brown learned that I was proceeding with formal foreclosure proceedings, Brown emailed me asserting and complaining that his cumulative interest rates on the loans are 17%, in an angry email. Ex. 60 (email from Brown to Smead Aug. 23, 2022, 12:51 a.m.)

26.    On the Hinkley Loan, I authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me at that time on my second priority loan,  The full indebtedness on the second priority loan was at the time of foreclosure:175,909.68, unpaid principal of $150,000, and plus interest at the stated promissory note rate of 8%, plus late fees and foreclosure costs advanced to the trustee. The foreclosure sale on the Hinkley Loan (second priority) occurred on or about 01/31/2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. The trustee thereafter issued a Trustee's Deed Upon Sale ("Hinkley TDUS") dated 01/30/2023 stating the purchase price from me of the unpaid debt, and it was recorded. (Exh. 20 is a true and correct copy of the recorded Hinkley TDUS dated 01/30/2023, recorded 1/31/2023). It made me the owner of the Hinkley property. The Hinkley Loan was fully satisfied by the foreclosure. No other amounts were due to me on the Hinkley Loan than that set forth in the Hinley TDUS.

/ / /

27.     I still own the Hinkley property. I describe in detail my opinion of its value below, but it is worth less than the total indebtedness owed to me at the time of the foreclosure sale.

28.     The Hinkley property never generated any revenue to Brown, that he mentioned to me. At all times since I was the lender it was a raw land, undeveloped, unimproved, and in a desert area. Since I became the owner of the Hinkley property, it has remained in its raw, unimproved state, and it has not generated any revenue to me. I have never received any proposals for its leasing or its sale or for any use of it. There were no existing leases, or uses, or contracts of any sort pertaining to the Hinkley property that have ever been brought to my attention upon my becoming its owner.

[Utah Loan: Origination, Default, Foreclosure]

29.     In April 2021, Brown by phone asked me to make a refinance loan on property he owned in Millard County, Utah that was raw, undeveloped, and unimproved land ("Utah Lot"). He assured me that he would be able to develop a solar farm (solar panels generating electricity connected to a power grid), and that would generate a lot of revenue for him so that he would be able to service his proposed debt. He asked me to lend $100,000 for the refinance. He said or emailed to me in this time-frame, through early June 2021, that this would pay off a small existing encumbrance to the person who had sold him the land for $50,000, and would provide fresh cash to him for other commercial property acquisition for a solar farm elsewhere.

30.     I told Brown in April, by phone, that given his history of payment defaults and poor payment history on both the Hinkley Loan and the Malibu Loan, and his lack of any revenue on anything, that I did not want to make the loan, as too risky, and would not make it. Then, on April 28, 2021, he paid in a lump sum four months of defaulted payments on the Hinkley Loan. But then he re-defaulted on the Hinkley Loan, not making the payment due for due May 1, 2021. With his

tax defaults on both the Hinkley Lot and the Malibu Lot, and with his being in chronic and current default on the both the Hinkley Loan and the Malibu Loan, this was a highly risky proposed loan for the refinance of the Utah Lot. Further, the raw land of the Utah Lot that he paid $50,000 for would not prudently support a loan for double-that, a "refinance" loan of $100,000, as the loan would at inception be under-secured by 100%, in my view, then. And the Utah Lot had no presently known prospect to me of generating any revenue to fund payments on a new loan. I told him of these issues and reservations as the reason I would not make this new loan he proposed.

31.    Brown responded to my declining to make the new loan by proposing that he borrow from me on a promise to pay in the future an additional sum, over and above the new cash, for the risk, a risk fee, or a bonus, or a loan origination fee in the amount of $100,000. He proposed that this risk, bonus, or origination fee of $100,000 he would owe me on top of the new case loan amount that he would pay either when his anticipated solar farm generated enough revenue to pay off the origination fee and the loan of new money, or if he sold the property after developing it as a solar farm. He proposed that I would fund the loan with $100,000 cash into escrow, and that the risk- or bonus- or origination fee, which he would owe to me, i.e., borrow it too, would be added as principal to the new loan I would make, so that the loan would be for $200,000, at the stated rate on a promissory note of 10% on the entire sum, i.e., the origination fee he would pay to me at some point in the future of $100,000, and the new cash through escrow of $100,000. On those proposed terms, I agreed in early June 2021, to make this very risky loan. In retrospect, I should not have done this loan due to his history of loan defaults, even with the added incentive Brown offered for making this loan.

32.    Brown told me that he would tell the escrow in Utah for the new loan how to describe the $200,000 loan on the settlement statement. Then, on June 18, 2021, Brown emailed to the escrow officer, Jeremy Gale of TitleFirst Utah,

copying me on the email, stating that, and I quote: "The deed of trust terms will be $200,000 @ 10 percent interest and a 2 year balloon payment . . . . $100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000. The remaining funds from that will be sent to me." Attached hereto as Ex. 1-7-9 is a true and correct copy of this email dated June 18, 2021, from Brown to Jeremy Gale and copied to me.

33.    Documenting the loan, the escrow officer then prepared the loan documents according to Brown's request, and Brown signed a "Trust Deed Note" for $200,000 made by Brown to me at the stated interest rate of 10%, monthly interest only payments of $1,667 beginning August 1st 2021 until its maturity on August 1, 2023, when all would be due and payable. The Trust Deed Note states: "This note is secured by a Trust Deed of even date herewith." The Trust Deed is dated 22nd day of June 2021. (Attached hereto are true and correct copies of the Trust Deed Note (Exh. 2-1) and a recorded copy of the Trust Deed, recorded 06/29/2021 (Exh. 2-2 to 2-6). The loan consummated on June 29, 2021 (recording date of Trust Deed). This loan is called the "Utah Loan" and security property the "Utah Lot".

34.    The Settlement Statement for the Loan, approved by the signatures of both Brown and myself, includes the statement that: "Loan Funds paid outside of close to Clinton Brown $100,000.00" and describes a total loan amount of $200,000. (Attached as Ex. 2-7-9 is a true and correct copy of the Settlement Statement, Settlement Date of June 30, 2021). Given that Brown was a licensed real estate broker, as he told me, I trusted Brown to describe properly to escrow the loan documentation on this risk- or bonus- or origination fee, and I understood him to do so in his email of June 18, 2021, and on the Settlement Statement and in the Trust Deed Note.

/ / /

35.     Brown defaulted on the Utah Loan beginning with the third payment due, that of Oct. 1, 2021. He made no payment again until that of 02/01/2022, when he paid up for the loan payments due through January. Then on 03/01/2022, he made the payment on the February installment. He made no loan payments thereafter. And he paid no property taxes, defaulting on those too, a loan default under the deed of trust. I learned of the tax default in 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number. Brown's total payments and the dates on the Utah Loan are set forth in Exh. 74, a true and correct copy of the loan payment ledger prepared by me at the time the loan payments were made. The total payments he made were $11,669.00. Brown never cured the Utah Loan default and never paid off the Utah Loan.

36.     Because of the long-standing default, I instructed the trustee to commence the private trustee sale process authorized under the Trust Deed. I authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me at that time on my second priority loan, i.e., that documented by the Utah Loan. The full indebtedness on the Utah loan at the time of foreclosure was: $220,923.20, the sum of all unpaid principal, unpaid interest at the stated promissory note rate of 10%, plus late fees and foreclosure costs advanced to the trustee.  The foreclosure sale on the Utah Loan occurred on or about March 8, 2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. The trustee thereafter issued a Trustee's Deed ("Utah TDUS"), dated March 8, 2023, stating that the property was sold at the auction with a high bid of the credit, a credit-bid, of $220,923.20. (Exh. 9:1-2 is a true and correct copy of the recorded Utah TDUS). It made me the owner of the Utah security property. The Utah Loan was fully satisfied by the foreclosure. No other amounts were due to me on the Utah Loan than that set forth in the Utah TDUS.
/ / /

37.    I still own the Utah property. The land has no use, except for foraging of cattle in the period of December to February. But, it cannot be leased for even this, as the land is unfenced. It would have to be fenced at significant cost to graze any livestock there, and the annual payments for any lease for cattle foraging would be very low, it taking many years for such a foraging lease to recover the cost of fencing. It presently has no other potential use. I learned these things from the Utah title officer, Jeremy Gale, of TitleFirst Utah, who was the escrow agent and foreclosure trustee for the Utah Loan, and who says he owns the adjoining lot of similar size, where his sole use of the land is for this winter-time cattle grazing.

38.    The Utah property never generated any revenue to Brown, that he mentioned to me. At all times since I was the lender it was a raw land, undeveloped, unimproved, and in a desert area. Since I became the owner of the Utah property, it has remained in its raw, unimproved state, and it has not generated any revenue to me. I have never received any proposals for its leasing or its sale or for any use of it. There were no existing leases, or uses, or contracts of any sort pertaining to the Utah property that have ever been brought to my attention upon my becoming its owner.

[Analysis Of Utah Loan Payments]

39.    Utah Loan. This is my analysis of payments made and the effective interest rate that Brown paid on the Utah Loan. Brown made seven payments totaling $11,669 of interest. He made no other payments. Unpaid interest accrued for 19 months for the period July 1, 2021 to March 1, 2023. On the $100,000 cash advanced through escrow, if only interest were charged on that, then 10% interest on $100,000 would be a monthly amount of $833.32 during the life of the Utah Loan. Averaging his interest payments out over the 19 months when interest was due, until foreclosure, his payments amount to an average of $614 per month.  That rate would be an interest rate of approximately 7.4% on $100,000. This does not include calculation for the interest due on the $100,000 risk-based, bonus or

origination fee that Brown owed me in making the loan and that he chose to borrow in the Utah Loan and against the Utah Lot. If the $200,000 principal amount stated on the Utah Note is used to calculate the interest he paid during the time he owed the loan to me, then the effective interest rate he paid would be 3.7%. Thus, Brown paid an effective interest rate less than 10% interest during the life of the loan on the $100,000 cash advanced in the loan.

[Property And Business Re Security Properties Foreclosed Upon]

40.    Malibu Loan and Lot. The security property for the Malibu Loan was a vacant lot, and generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Malibu Lot.  To my knowledge it generated no income while Brown owed the vacant lot, and generated no income during the time I owned the vacant lot, as no person contacted me to say they had or were paying for any rights to the vacant lot, and I did not lease out the vacant lot while I owned it after the foreclosure sale. I eventually sold the Malibu Lot in March 2025.

41.    Hinkley Loan and Lot. The security property for the Hinkley Loan was raw, undeveloped, unimproved desert land. It generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Hinkley Lot, as Brown informed me of nothing that generated any revenue for him.  To my knowledge it generated no income while Brown owed the vacant lot. It generated no income during the time I owned the land after foreclosure, as no person contacted me to say they had or were paying for any rights to the land. No person has contacted me to propose any contract to generate income for the land. The land has never generated income during my time of ownership. I have not entered any contracts for any development, or leases, or anything that would generate revenue from the land, as any development is not cost-effective. It remains raw, unperforming land with no prospect of generating income to me now.

42. Utah Loan and Lot. The security property for the Utah Loan was raw, undeveloped, unimproved desert land. It generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Hinkley Lot, as Brown informed me of nothing that generated any revenue for him. To my knowledge it generated no income while Brown owed the vacant lot. He forwarded to me a letter of intent by a third party for a purchase or lease, but Brown informed me and sent to me a notice of the cancellation of that potential agreement. It generated no income during the time I owned the land after foreclosure, as no person contacted me to say they had or were paying for any rights to the land. No person has contacted me to propose any contract to generate income for the land. The land has never generated income during my time of ownership. I have not entered any contracts for any development, or leases, or anything that would generate revenue from the land. It remains raw land, generating no income, at this time, with no prospects of generating net income that have come to may attention, and I continue to own the land at this time, with its only use as forage for cattle during December thru February, if fenced at considerable cost.

43. Property Values and Interest Paid by Brown.

A: Malibu Lot. When I became owner of the Malibu Lot on foreclosure, the tax assessor valued the property at $350,000, I saw on its web-site, and in my opinion its value was approximately $425,000, based on my review of web-based data sources. Brown had paid only $15,000 in interest on the Malibu Loan (consolidated) of $300,000 principal, from my review of the ledger, Exhibit 13 (authenticated above). The Malibu TDUS was issued to me for the credit-bid of $372,338.14 in January 2023.

B: Hinkley Lot. When I became owner of the HinkleyLot on foreclosure, the tax assessor valued the property at $406,368, I saw on its web-site, and in my opinion its value was approximately $475,000, though Brown paid to seller AmPac

(on borrowed money) $498,000. There were no comparable values to get an estimate for potential value in web-based sources I reviewed. Brown had paid only $4,500 in interest on the Hinkley Loan of $150,000 principal. The Hinkley TDUS was issued to me for the credit-bid of $175,902.68 in January 2023, which was based on my Hinkley Loan (a second-priority behind AmPac's loan). However, at that time, given that I was also the owner of the AmPac loan on the Hinkley Lot, itself with a balance due to me of over $370,000, the total owed to me at the time of foreclosure on both loans exceeded $546,000.

C:      Utah Lot. When I became owner of the Utah Lot on foreclosure, the tax assessor valued the property at $42,240, I saw on its web-site, and in my opinion its value may have been $50,000, based on my review of web-based data sources. Brown had paid only $11,669 in interest on the Utah Loan of $200,000 principal. The Utah TDUS was issued to me for the credit-bid of $220,923.20 in March 2023.

[No Enterprise Regarding Brown Loans]

44.      Escrows for Loan Closing/Consummation. The escrow for consummation of each of the three loans, the Malibu Loan, the Hinkley Loan, and the Utah Loan, was done by an escrow companies. Each escrow company charged a certain fee to Brown from the loan proceeds as reflected on the final closing statements. The escrow company final settlement statements for the three loans are attached hereto are true and correct copy of final settlement statements for each of the three loans showing these escrow charges to Brown, as follows, which have I have authenticated in the declaration where the exhibits is first mentioned:  Malibu Loan, Exh. 12-3-4; Hinkley Loan, Exh. 15-2-3; Utah Loan, Exh. 2-7-9; and my purchase of the AmPac first priority loan on the Hinkley Lot, Ex. 17-1-3 (on the AmPac first-priority loan purchase I paid the escrow fee—but did not foreclose on this loan).  I paid nothing to the escrow companies involved in loan originations. Rather, the escrow companies were paid by Brown from the loan proceeds, as

reflected on the settlement statements. The escrow companies had no involvement with the loans, and no involvement of any kind with the servicing of the loans, nor involvement with any payments on the loans, nor any rights in the security properties foreclosed upon, nor any rights in the foreclosed security properties, nor any proceeds from my subsequent sale of the Malibu Lot after I became the owner upon its foreclosure against Brown. The escrow companies did nothing regarding these loans to Brown from me except to consummate the escrows, and received no payment or promises of payment except what was charged at the time of the loan closing as set forth on the settlement statements. When I sold the Malibu Lot in March 2025, I shared payment of the escrow charges to close the sale as a fee for the escrow service.

45.     Foreclosure Trustees. The foreclosures under the deeds of trust for the loan defaults were done by trustees, foreclosures of the Malibu Loan, the Hinkley Loan, and the Utah Loan. I paid the fees and costs to each trustee for the service from the trustees for the foreclosure process, prior to the foreclosure sales, and then included those fees and costs I had advanced to the trustee in the total amount of loan indebtedness under the respective notes and deeds of trust, for the credit-bid on each of the three foreclosures. True and correct copies of the recorded trustee's deeds upon sale are attached hereto, as authenticated above where the respective foreclosures are discussed: the TDUS on Malibu Loan and Lot, Ex. 14-2-3; the TDUS on the Hinkley Loan and Lot, Ex. 20; and the TDUS Utah Loan and Lot, Ex. 9. I paid nothing to the foreclosure trustees named in the deeds of trust, who went on to be the foreclosure trustee's at the time of the foreclosure sales, except for my advance to them of the fees and costs for service as trustee in the process, as stated above. The foreclosure trustees had no other involvement and no payments or profits or rights in the loans, nor proceeds from the loans, nor payments of any other kind, nor profits of any kind, nor rights of any kind in the loans or in the real property securities foreclosed upon. The foreclosure trustees did

nothing regarding these loans to Brown from me except to process the foreclosures. They received nothing except their payment from me of fees and costs for the service of acting as foreclosure trustees, as described above.

46. Title Insurance Companies. I bought a lender's policy of title insurance for each of the three loans, Malibu Loan, Hinkley Loan, and Utah Loan for a price certain based on the loan amount stated on the promissory notes. And none of them had any other involvement in the loans, except as the policy of title insurance gave them rights if I were to make a claim and receive coverage under the title policy. These title insurance escrow companies were not involved in loan origination, (except to issue a lender's title policy), nor in servicing, nor in enforcement, nor in the foreclosure process, and never had any interest nor rights in the loans, nor loan payments, nor the security properties, either pre- or post-foreclosure. . The title insurers' were paid nothing but the policy premium at the time each of the three loans originated, and never received any payment or property interest in the loan or the security property at any time.

47. No Other Persons / No "Enterprise". No person, no individual, nor entity, was involved with receiving payments or proceeds on these loans to Brown, as these were individual loans from me to Brown. I made these loans as my business alone, and no person, individual, or entity had any ownership or rights in the loans, the payments on the loans, or the real property securities foreclosed upon.

I declare under penalty of perjury under the laws of the United States of America that this declaration is true and correct and that this declaration is executed in the State of California.

Date: Dec. 31, 2025

_____
STEVE SMEAD

Fred Hickman (#124406)

fredhickman@gmail.com

17602 17th St Ste 102-206

Tustin CA 92780

714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>               PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>               DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>DECLARATION OF FRED HICKMAN IN AUTHENTICATION OF DEPOSITION EXCERPTS OF CLINTON BROWN DEPOSITION OF DEC. 4, 2025, I.S.O. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>DATE: 03/05/2026<br>TIME: 10:00 a.m.<br>CTRM: 8B |

I, Fred Hickman, declare as follows.

   1.  I am a member of the bar of this court and of the bar of the courts of the State of California.

   2.  On December 4, 2025, under Notice of Deposition of Clinton Brown, Plaintiff, I took the deposition of Plaintiff Clinton Brown by remote/audio/visual manner, transcribed by a Certified Shorthand Reporter, a court reporter, authorized

DECLARATION OF HICKMAN 12/31/2025 AUTHENTICATING BROWN DEPO TRANSCRIPT PAGES
*BROWN VS. SMEAD 23-cv-02938*

1

to administer to take, record in written format, and to transcribe from shorthand, that testimony under oath in the State of California. The remote/audio/visual deposition was done by remote at the request of Plaintiff.

3. Attached hereto are true and correct copies of certain pages of the certified deposition transcript of Clinton Brown, of Dec. 4, 2025, unsigned by Brown but certified by the court reporter Mary P. Randle, CSR No. 10312, as oath administered to the witness, Clinton Brown, and certified as taken down by her in shorthand and thereafter transcribed into typewriting under her direction and supervision. The certification is at p. 286.

4. Attached hereto are true and correct copies of the face page, opening swearing in of the witness, and certain testimony of the witness, along with the certification of the court reporter, which are pages 1-2, 9-10, 28-33, 155-159, 172-173 and 267-268, and 286 (certification).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed on Dec. 31, 2025, in the State of California.

DATE: Dec. 31, 2025                     _Fred Hickman_____

                                        Fred Hickman

DECLARATION OF HICKMAN 12/31/2025 AUTHENTICATING BROWN DEPO TRANSCRIPT PAGES
*BROWN VS. SMEAD 23-cv-02938*

2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

Case No.: 2:23-cv-02938-MEMF(KSx)

CLINTON BROWN,

      Plaintiff,

v.

STEVE SMEAD,

      Defendants.

_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

CLINTON BYRON BROWN

Thursday, December 4, 2025

10:01 a.m.

Taken remotely via Zoom

REPORTED BY:
Mary P. Randle
CSR No. 10312

1

APPEARANCES:

(Appearances via videoconference.)


For Plaintiff:

       CLINTON BROWN (IN PRO SE)
       1431 Ocean Avenue
       Unit 413
       Santa Monica, California 90401
       310-775-7990
       brown_clinton@msn.com

For Defendant:

       FRED HICKMAN, ESQ.
       17602 17th Street
       Suite 102-206
       Tustin, California 92780
       714-315-1565
       fredhickman@gmail.com

Also Present:

       Jonathan Paulino, Videographer
       Matthew Laurence, Exhibit Concierge
       Steve Smead (Joined at 10:12 a.m.)

2

TAKEN REMOTELY VIA ZOOM

THURSDAY, DECEMBER 4, 2025

10:01 A.M.

THE VIDEOGRAPHER:  Good morning.  This is the video deposition of Clinton Brown, taken remotely on Thursday, December 4th, in the year 2025, in the matter of Clinton Brown versus Steve Smead, Case Number 2:23-cv-02938-MEMF.  This case is being heard in the United States District Court, Central District of California, Western Division.

My name is Jonathan Paulino, legal videographer contracted through Dean Jones Legal Videos, Inc., of Los Angeles and Santa Ana, California.  Because we're not in person, the videographer will have to interrupt proceedings if the deponent drifts out of frame or should any connectivity issues with Zoom occur.

This deposition is commencing at 10:01 a.m. Would all present please identify themselves, beginning with the deponent.

THE WITNESS:  Clinton Brown, Pro Se.

MR. HICKMAN:  Fred Hickman, attorney for Defendant Smead.

THE VIDEOGRAPHER:  Would the court reporter please administer the oath.

THE COURT REPORTER:  For the record, my name is Mary Randle.  I am a State of California Certified Shorthand Reporter.  My CSR license number is 10312.

CLINTON BYRON BROWN,

having been first duly sworn, was examined and

testified as follows:

EXAMINATION

BY MR. HICKMAN:

**Q    Good morning, Mr. Brown.**

A    Good morning.

Before we begin, I -- can I make my objections, please, for the record?

MR. HICKMAN:  Yes.  Please do.

THE WITNESS:  For the record, Plaintiff objects under Rule 30(c)(2) to the use of any document not produced in discovery and reserves all rights under Rule 32(a), Rule 32(b), and Rule 37(c)(1).

BY MR. HICKMAN:

**Q    Your deposition is being taken under the notice since you are the plaintiff.  Have you been deposed before?**

A    No.

**Q    Have you been sued before in any court of law?**

10

A   Not specifically to the Easy Winter land, but a contract, yes.

Q   **What contract did HST have regarding the -- the project in Utah with Samsung for the Easy Winter property?**

A   It was -- it wasn't specifically to that property.  It was for any property.

Q   **Did -- was it HST that paid you compensation on the Easy Winter property lease?**

A   Yes.

Q   **Did Easy Winter pay you any compensation for arranging a solar lease?**

A   Yes.

Q   **Did Samsung pay you any compensation for arranging a solar lease?**

A   No.

Q   **Are you licensed as a real estate broker in the state of Utah?**

A   No.

Q   **Is the involvement you had with the Easy Winter solar lease something that requires a real estate broker's license in the --**

A   No.

Q   **-- state of Utah to be lawful activity?**

A   No.

28

Q    How do you know?

A    Because I know.

Q    Did you investigate?

A    Yes.

Q    What affiliation have you had with Atlas Real Estate Investments, Incorporated, a California corporation?

A    That's my company.

Q    Does it still operate?

A    It was -- no.

Q    Were you the sole shareholder?

A    Yes.

Q    What involvement -- what -- what affiliation have you had with Harper Lake SPV, LLC?

A    It was a LLC.

Q    What business did it do?

A    Solar -- a solar farm.

Q    How were you involved with Harper Lake SPV, LLC?

A    It was the LLC for the solar farm.

Q    What solar farm?

A    A solar farm at Harper Lake.

Q    What property at Harper Lake?

A    It's called Harper Lake.

Q    Is it in the area of Hinkley?

29

A    Yes.

Q    Is that land you owned that you obtained a loan from Steve Smead for?

A    One of the lenders, yes.

Q    Did Harper Lake SPV, LLC, obtain any revenue?

A    No.

Q    No revenue ever?

A    No.

Q    What assets did Harper Lake SPV, LLC, have at any time?

A    None.

Q    Did you incorporate Harper Lake SPV, LLC?

A    I don't believe I did.  I don't know if it was a -- I think it was an LLC.

Q    Yes.  Did you establish Harper Lake SPV, LLC?

A    From what I recall, yes.

Q    When?

A    I don't know.

Q    Five years ago?

A    If you want to show me the LLC, I'll tell you, but I don't know.

Q    Within the last five years?

A    It's on the public record.

Q    Were you the sole member of the Harper Lake SPV, LLC?

30

A    From what I recall, yes.

**Q    And you were the manager?**

A    From what I recall, yes.

**Q    When was the last activity of Harper Lake SPV, LLC?**

A    I don't know.  I don't think it's in existence.

**Q    Did it -- did Harper Lake SPV, LLC, ever enter into any contracts for any purpose?**

A    Not that I'm aware.

**Q    Did Harper Lake SPV, LLC, ever develop any solar farm at the Hinkley Harper Lake property you owned?**

A    No.

**Q    Why did you establish Harper Lake SPV, LLC?**

A    I don't recall.

**Q    Is it connected to your ownership of property at Hinkley Harper Lake?**

A    Probably, yeah.

**Q    Who would know?**

A    Well, I don't remember.  I don't know -- I don't remember when it was -- if you have the LLC documents, I'll look at it.  It's public record.  But I don't have it, so I can't tell you.

**Q    What was the entity's purpose?**

A    Well, I believe what it says on the State of

31

California is that -- whatever it says about the -- whatever their -- I don't know what it says, but it was for a solar farm.  I mean, that's -- I've already asked and answered that.

Q    What does the "SPV" in the title stand for?

A    I don't know.

Q    Did you pick the name?

A    I'm guessing.

Q    Don't guess.  Who picked the name for Harper Lake SPV, LLC?

A    Couldn't tell you.

Q    Someone else other than you?

A    No.  I don't recall what it means, "SPV."  I -- I chose it, but this was years ago.  I don't know.

Q    How many years ago did you choose that name for Harper Lake SPV, LLC?

A    I don't know.  It must have been, like, 2020 or something.

Q    Do you have any affiliation with Millard, M-I-L-L-A-R-D, County Solar Farm SPV, LLC?

A    Yeah.  That was -- yes.

Q    What?

A    Oh, then "SPV" means special purpose vehicle.  That's what that means.

Q    What affiliation do you have with Millard

32

County Solar Farm SPV, if any?

A    That was -- I created that.

Q    When?

A    I don't recall what date.

Q    Is there --

A    These are public records.  If you provide them, I can tell you the date.

Q    Is it a Utah limited liability company?

A    I don't know.

Q    Is it California limited liability company?

A    It was probably California because -- yeah.

Q    Why do you say probably California rather than Utah?

A    Because I put all the LLCs as home based in California.

Q    Did Millard County Solar Farm SPV ever have any assets?

A    No.

Q    Were you the sole member?

A    Yes.

Q    Were you the manager?

A    If that's what the document says.

Q    Did -- did Millard County Solar Farm SPV, LLC, ever enter any contracts?

A    Not that I recall.

33

A    None.

Q    To your knowledge, are there any other solar installations in Millard County than what's been described -- are there any solar installations in Millard County?

A    I don't know.

Q    Is there any solar power being generated in Millard County?

A    I don't know.

MR. HICKMAN:  I need a short break.  Five minutes.  Is that all right?

THE WITNESS:  Sure.

MR. HICKMAN:  Okay.

THE VIDEOGRAPHER:  Video deposition is going off the record at 2:15 p.m.

(Recess taken from 2:15 p.m. until 2:21 p.m.)

THE VIDEOGRAPHER:  Video deposition is returning to record at 2:21 p.m.

BY MR. HICKMAN:

Q    Regarding the Utah property at the -- say the day before Steve foreclosed on it, do you have an opinion on its value?

A    No.

Q    In your opinion, as owner of the Utah property for a time, did its value change between the time of the

155

appraisal for $240,000 and the time of the foreclosure?

A    I can't speculate.

Q    On the Harper Lake loan from Steve to you, with the Harper Lake property generating no revenue, how -- how would -- how would you service the debt?

A    I don't understand the question.

Q    How would you pay the Harper Lake loan to -- owed to Steve if the property -- as the property generated no revenue?

A    From my company.

Q    What company?

A    From working.  I was -- I already stated this before.  I was self-employed at the time as a real estate broker.

Q    To the extent you serviced any debt on the Harper Lake property, was it from the other borrowed money from other lenders?

A    No.

Q    When you took the Utah property loan from Steve, how did you anticipate servicing your debt to him?

A    My real estate business.

Q    You failed to make most interest payments on the Utah property.  Did your businesses not generate any revenue to pay your Utah property loan?

156

A    That misstates the whole scenario.  I don't understand the question.

Q    **Why did you fail to make interest payments on the Utah property loan?**

A    Because the interest rates were unlawful.

Q    **So, did you take the Utah property loan believing at the time it was an unlawful loan?**

A    I don't recall.

Q    **You just -- you've just testified that you -- you defaulted on the Utah loan because it was an unlawful loan.  When did you determine that, in your opinion, the Utah loan was an unlawful loan?**

A    I don't recall.

Q    **You made a total of four interest-only payments on the Utah loan.  Did you decide after the fifth monthly payment was due that the Utah loan was unlawful?**

A    I don't recall.

Q    **Why did you make any payments on the Utah loan when it was an unlawful loan in your opinion?**

A    I didn't say that I -- that's not what I said. I said that -- we're talking about -- I'm talking about now, looking back.  I'm not talking about that time.

Q    **The Utah property, as it generated no revenue, you -- you didn't make payments, you defaulted.  Is that because your other business ventures failed?**

157

A    No.

Q    You weren't paid a salary at the time you -- by any entity that employed you at the time you had the Utah property loan from Steve, correct?

A    That's not correct.

Q    What were your sources of -- of earnings at the time you had taken out Steve's loan on the Utah property?

A    Real estate.

Q    But you weren't paying any of the -- you weren't -- after a few payments, you made no payments on the Utah property debt.  Why?

A    The interest rate was too high.

Q    Did you ask Steve at any -- any time to set aside his Utah loan to remake it into a loan you thought was proper?

A    I don't -- I don't recall.

Q    So you never asked Steve to change the terms of the Utah loan, correct?

A    No.  I don't -- I don't know.  I don't -- I don't recall.

Q    Did you ever ask Steve to change the terms of the -- the Harper Lake loan?

A    I don't recall.

Q    The Malibu property you owned generated no

158

revenue, correct?

A     Correct.

Q     And how did you intend to pay its monthly payments?

A     My real estate business.

Q     When you went into default on the Harper Lake loans, were your real estate businesses not generating sufficient revenue to service all the debt you had?

A     I don't recall.

Q     Did you default on the Harper Lake written terms loan debt to Steve because you couldn't make the Harper Lake property pay?

A     I don't recall.

Q     Did you decide the Harper Lake property was -- was not going to be a profitable venture, so you did not prevent the foreclosure of it?

A     Okay.  What's the question?

MR. HICKMAN:  Can you read the question, please.

(Record read as follows:

"Q     Did you decide the Harper Lake property was -- was not going to be a profitable venture, so you did not prevent the foreclosure of it?")

THE WITNESS:  I -- I still don't understand

159

Q    It's what you did.  It's attached.  It's filed.
It's your document, your Second Amended Complaint, your
attachment.

A    He signed it.

Q    Why?

A    He signed it.

Q    Why did you do it?  Why did you put that --

A    I'm not going to disclose why I did that.
That's work product.

Q    Joke.

What does Sean Chaudhuri have to do with the
Utah property transaction, the Utah property loan from
Steve?

A    He has nothing to do with liability.

Q    What basis does he have for any knowledge of
what your speculated damages are related to the Utah
property?

A    I can't speak for him.

Q    What damages have you suffered from the Utah --
loss of the Utah property to foreclosure?

A    That's in the Complaint.

Q    How have you calculated your money damages for
your loss of the Utah property to foreclosure?

A    We've already went over this.  I've already --
you already asked this -- I don't -- three ways from

172

Sunday.  And I've already told you, what's in the Complaint, what the damages are.  That's -- it's very -- it's laid out, like, line by line.  If you want to go through it, go ahead.  But I can't sit here off the top of my head and ask -- and answer all these questions.  And you want to put me in all these traps.  So that's what I'm talking about.  And it's getting real annoying.

Q    What's --

A    But I'm not going to snap.  So --

**Q    What's the basis for your claim for damages on the loss of the Utah property when you had no contract signed and no revenue?**

A    You'll have to ask him.

**Q    I'm asking you.**

A    I'm asking -- I'm telling you that it's in the Complaint.  And then it -- and in the declaration.  So ask them.

**Q    I'm asking you for the factual basis because you had no revenue and no contracts.  So, what's your basis for claiming any money damage?**

A    I'm not giving you my legal theory.  That's for sure.

**Q    What do you know about HST Solar Fields, Incorporated?**

A    I don't know.

A    Yes, I do.

Q    You could be here to see my face, but you wanted to do audio by remote.  And that's okay.

Under "Proposed Terms."

A    I don't understand where you're talking about.

Q    It's on bold, "Proposed Terms."

A    "Proposed terms."  Okay.  What?

Q    So, here you propose -- what are you proposing in this paragraph entitled, "Proposed Terms"?

A    I don't know.  I'll read it to you.  "Proposed terms, $150,000 secured by second mortgage on 42829 Harper Lake Road due as balloon payment September 2021, $150,000 total for first year" --

THE COURT REPORTER:  Mr. Brown, way too fast.

THE WITNESS:  Oh, sorry.

I don't know.  It says what it says.

BY MR. HICKMAN:

Q    What does it mean where you wrote $150,000 total for the first year production paid either in monthly installments starting in October, 2021, or a lump sum in September '22 -- 2022?

A    This would be -- this would be about the $150,000 that was ultimately the unlawful interest.  But this would be the $150,000 that I proposed to pay as solar farm revenue, but Mr. Smead didn't want that.  He

267

wanted unlawful interest.

**Q    So, the first year production is a reference to revenue from the solar installations you anticipated at the Harper Lake property?**

A    That's what it appears to say.

**Q    What did you mean when you wrote it?**

A    What does it say?

**Q    What did you mean?**

A    That's what I meant, what I wrote.

**Q    What more did you mean?**

A    I didn't mean anything more than what I wrote.

**Q    So you've written here that he might get $150,000 from production from the Harper Lake property, correct?**

A    That's your words, not mine.  I wrote on -- I wrote what I wrote on that.

**Q    There was never any production from the Harper Lake property to pay $150,000, correct?**

A    Not at that time.

**Q    There never was, correct?**

A    Well, eventually, no, there wasn't.

**Q    So --**

A    But we are talking about September 14th, 2020.  That's what we're talking about.  You're talking about this email, not the future or the past or

268

DECLARATION

I herby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof; and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of _____, ____, at _____, _____.
(City)                  (State)


_____
CLINTON BYRON BROWN

284

STATE OF CALIFORNIA        )
                          )
COUNTY OF SAN DIEGO        )


        I, Mary P. Randle, Certified Shorthand Reporter in and for the State of California, Certificate No. 10312, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That said deposition was taken remotely before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

        I further certify that I am neither counsel for, nor related to, any party to said action, nor in any way interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed my name.

Dated: December 15, 2025


*Mary Randle, CSR#10312*
MARY P. RANDLE
CSR No. 10312

Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>                    PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>                    DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>REQUEST FOR JUDICIAL NOTICE I.S.O. DEFENDANT SMEAD'S MOTION FOR SUMMARY JUDGMENT OR,  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>DATE: 03/05/2026<br>TIME: 10:00 a.m.<br>CTRM: 8B |

TO THE CLERK OF THE COURT AND TO THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG, DISTRICT JUDGE, AND TO PLAINTIFF, IN PRO SE:

PLEASE TAKE NOTICE:

Defendant Steve Smead, under Federal Rules of Evidence, Rule 201 (b)(2), moves and requests that the Court take judicial notice of the following facts, information,  and document(s) submitted in support of the Motion for Summary Judgment, or, in the alternative, Partial Summary Judgment. The list of

REQUEST JUDICIAL NOTICE I.S.O. MOTION SUMMARY JUDGMENT; DECLARATION HICKMAN
*BROWN VS. SMEAD 23-cv-02938*

1

document(s) and contents of which judicial notice is requested is set forth herein and attached hereto, in support, as the document(s) and facts is not subject to reasonable dispute because if can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

1.  Request No. 1. (website printout) State of Utah, Utah Department of Financial Institutions, Interest Rates, URL https://dfi.utah.gov/general-information/consumer-tips/interest rates/[12/30/2025 2:56:28 PM]. A true and correct copy of which is attached hereto as Exhibit 1.

Grounds for Request No. 1, Exhibit 1. It is the publicly available information from the website of the State of Utah, Utah Department of Financial Institutions, Interest Rates, web site URL specified above. Attorney for Defendant obtained this website printout of information on December 30, 2025, from the specified URL. It is information made publicly available by a government entity in the United States, the State of Utah, including data therein, and is properly judicially noticed as on and from its public website. *Daniels-Hall v. Nat'l. Educ. Ass'n.*, 629 F.3d 992, 998-999 (9th Cir. 2010) (took judicial notice of certain web sites of two school districts, stating, "It is appropriate to take judicial notice of this information, as it was made publicly available by government entities (the school districts) . . . ."); *In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008) (taking judicial notice of drug labels taken from the FDA's website); County of *Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a Department of Health and Human Services web site).

Date: Dec. 31, 2025                    Respectfully Submitted,
                                       /s/ *Fred Hickman*
                                       _____
                                       Fred Hickman
                                       fredhickman@gmail.com
                                       Attorney for: Defendant Steve Smead



Go

Utah law does not specify an interest rate ceiling, but does have an "unconscionability" provision (Section 70C-7-106 of the Utah Code).  Rates are determined by the market; in other words, competition and demand determine the interest rate.  Generally, the worse an applicant's credit rating, the higher the interest rate charged, however some types of loans such as payday loans, post dated check loans, or "car title loans" tend to have very high interest rates whether the borrower's credit is good or bad.  If you have reasonably good credit, you are nearly always better off avoiding lenders who offer loans to people with bad credit.

In order for consumers to have a standard basis for comparing rates, the federal Truth in Lending Law (Regulation Z) requires disclosure of the interest rate charged as an Annual Percentage Rate (APR). We recommend that you make use of the information available to you and compare rates available to you prior to applying for a loan.



The table below illustrates the differences in monthly payments and total interest paid if $2,000 is borrowed at rates which are available in Utah:

| $2,000 for 24 months | | | | |
|---|---|---|---|---|
| **Annual Percentage Rate** | **7%** | **14%** | **36%** | **120%** |
| **Monthly Payments** | **89.55** | **96.03** | **118.09** | **222.60** |
| **Total Interest Paid Over 2 Years** | **149.20** | **304.72** | **834.16** | **3,342.40** |



General Information

Application Status

Consumer Tips

Accelerated Payment Programs

Auto Loan Tips

Co-maker, Co-signer, or Guarantor

Credit Cards

Credit Reports

Exh. 1, RJN

- Debt-To-Income Ratio
- Fraud Alert
- Go Direct
- Interest Rates
- Mortgage Loan Tips
- Pitfalls of Checking Accounts

Department

Publications

- PDF File Access Note

---

## Recent News





### Location

324 South State Street, Suite 201

Salt Lake City, Utah 84111

---

### Postal Address

FINANCIAL INSTITUTIONS

P.O. Box 146800

Salt Lake City, Utah 84114-6800

### Office Hours

**Monday thru Friday**   8:00am to 5:00pm

### Contact Info

**Phone:**   (801) 538 - 8830

**Fax:**   (801) 538 - 8894

**Email:**   dfi@utah.gov



### Feedback

We want to hear from you! Let us know how we can continue to make this website a helpful resource.

Tell Us

Utah.gov Home

- Utah.gov Terms of Use
- Utah.gov Privacy Policy
- Translate Utah.gov

Copyright © 2025 State of Utah - All rights reserved.

From:        "Clinton Brown" <clinton@brownrealtygrp.com>
Subject:     Escrow for Refinance
Date:        Wed, June 9, 2021 6:05 pm
To:          "jeremy@titlefirstutah.com" <jeremy@titlefirstutah.com>

Jermey,

Hope you are well. I will be refinancing APN 8710-1  and can you please facilitate that? I will be paying off the 1st and adding a new 1st for $200,000.

The lender's contact information is:

Steve Smead
Stsmead@gmail.com
(805) 200-7411

Do you need a contract or can we just write the escrow instructions? This is a private lender and I'm hoping that we can expedite this process, if possible, because I'm using the proceeds from my refinance to close on another property.

Thank you,
Clinton
--



**Clinton Brown**
**Broker & Developer**
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*

    
Bad  Subpa  Just  Good  Great

Click to rate your experience with Brown Realty Group

**Attachments:**

| untitled-[1] | |
| --- | --- |
| Size: | 1.6 k |
| Type: | text/plain |

EXH 1-1

Utah Note

## TRUST DEED NOTE

DO NOT DESTROY THIS NOTE:  WHEN PAID, THIS NOTE, WITH TRUST DEED SECURING SAME, MUST BE SURRENDERED TO TRUSTEE FOR CANCELLATION.  BEFORE RECONVEYANCE WILL BE MADE.

$200,000.00                                                                                        Fillmore, UTAH

FOR VALUE RECEIVED, the undersigned, jointly and severally, promise to pay to the order of

STEVE SMEAD, BENEFICIARY

TWO HUNDRED, THOUSAND DOLLARS AND 00/100 ($200,000.00)

together with interest rate of 10 % per cent per annum beginning July 1, 2021 on the unpaid principal.

$1,667.00 Interest only payment, per Month beginning August 1st 2021 and the 1st of each and every month thereafter, until August 1st , 2023 at which time all principal and interest is due and payable.

Buyer to make  all payments directly to Steve Smead (Beneficiary)

Along with 1.73 ACFT of Underground Water evidenced by Water Right No. 71-5613 as filed in the Office of the State Engineer.

DUE ON SALE: IF ANY OF THE ABOVE PROPERTY IS SOLD, CONVEYED OR OTHERWISE IS TRANSFERRED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BENEIFICIARIES, THE UNPAID BALANCE AND ALL ACCRUED INTEREST SHALL BE IMMEDIATELY DUE AND PAYABLE.

1. $150.00 late fee assessed after 10 days.

2. No prepayment penalty assessed for early payment.

3. A charge of $50.00 shall be assessed for any payment returned by Buyers Bank.

If default occurs in the payment of said installments of principal and interest or part thereof, or in the performance of any agreement contained in the Trust Deed securing this note, the holder thereof, at its option and without notice or demand, may declare the entire principal balance and accrued interest due and payable.

If this note is collected by an attorney after default in the payment of principal or interest, either with or without suit, the undersigned, jointly and severally, agree to pay all costs and expenses of collection including a reasonable attorney's fee.

The makers, sureties, guarantors and endorsers hereof severally waive presentment for payment, demand and notice of dishonor and nonpayment of this note, and consent to any and all extensions of time, renewals, waivers or modifications that may be granted by the holder hereof with respect to the payment or other provisions of this note, and to the release of any security, or any part thereof, with or without substitution.

This note is secured by a Trust Deed of even date herewith.

CLINTON BROWN                                    Approved By: STEVE SMEAD

EXH 2-1

SMEAD PRODUCTION 9/18/25                              S 180

Entry #: 00215042   B: 703 P: 381
06/29/2021 12:24 PM
Page: 1 of 5
FEE: $40.00   BY: TITLEFIRST TITLE INSURANCE AGENCY, LL(
Sierra Dickens, Millard County  Recorder

## TRUST DEED

THIS TRUST DEED, made this 22nd day of June, 2021 between Clinton Brown as Trustor(s), whose address is 16821 Edgar St. Pacific Palisade, CA 90272. TITLE FIRST TITLE INSURANCE AGENCY, LLC, a Utah Corporation as Trustee, and **STEVE SMEAD** of Santa Paula, State of California, as BENEFICIARY; WITNESSETH:  That Trustor CONVEYS AND WARRANTS TO TRUSTEE IN  TRUST, WITH POWER OF SALE, the following described property, situated in Millard county, State of Utah:

The Southwest quarter of Section 16, Township 25 South, Range 9 West, Salt Lake Base and Meridian.

Together with A Private easement for ingress and egress for roadway and utility purposes across the following land.

State of Utah, County of Millard
The Eastern 33 feet of the Northern 700 feet of Section 21, Township 25 South, Range 9 West.

The above easement is to be an appurtenant to and for access to the Grantee's land and all future owners of any land located within the boundary of: South half Section 16, Township 25 South, Range 9 West, Salt Lake Base and Meridian.

Tax Parcel Number 8710-1

Along with 1.73 ACFT of underground water as evidenced by Water Right No. 71-5613 as filed in the office of the State Engineer.

IF ANY OF THE ABOVE PROPERTY IS SOLD, CONVEYED OR OTHERWISE IS TRANSFERRED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BENEIFICIARIES, THE UNPAID BALANCE AND ALL ACCRUED INTEREST SHALL BE IMMEDIATELY DUE AND PAYABLE.

TOGETHER with all buildings, fixtures, and improvements thereon and all water rights, rights of way, easements, rents, issues, profits, income, tenements, hereditaments, franchises, privileges and appurtenances thereunto belonging, now or hereafter used or enjoyed with said property, or any part thereof, SUBJECT, HOWEVER, to the right, power, and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues, and profits;

FOR THE PURPOSE OF SECURING (1) Payment of the indebtedness evidenced by a promissory note of even date herewith, in the principle sum of $200,000.00 made by Trustor, payable to the Beneficiary or order at the times, in the manner and with interest as therein set forth, and with the final payment due, August 1, 2023 and any extensions and/or renewals or modifications thereof; (2) the performance of each agreement of Trustor herein contained; (3) the payment of all sums which shall hereafter be advanced by the Beneficiary to the Trustor by way of additional loan or loans, and to secure any and all indebtedness of any kind whatsoever from the Trustor to the Beneficiary hereafter expended or advanced by Beneficiary under or pursuant to the terms hereof, together with interest thereon as herein provided.  PROVIDED, HOWEVER, that the making of such further loans, advances or expenditures shall be optional with the Beneficiary and PROVIDED FURTHER that it is the express intention of the parties to this Trust Deed that it shall stand as continuing security until all such further loans, advances and expenditures together with interest thereon, have been paid in full.

A.   TO PROTECT THE SECURITY OF THIS TRUST DEED, TRUSTOR AGREES:

1.   To keep the buildings upon the above described real property continuously occupied and used, and not to permit the same to become vacant, and keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon;  to comply with all laws, covenants and restrictions affecting said property; not to commit or permit waste thereof; not to commit, suffer or permit any act thereupon said property in violation of law.  To cultivate, irrigate, fertilize, fumigate, prune, and do all other acts which from the character of said property may be reasonably necessary, the specific enumerations herein not excluding the general, and in the event the above described property is used for agricultural purposes, the Trustor will use all manure produced by stock selection, seed selection, crop rotation, weed control, fertilizing the soil, drainage, prevention of erosion and

EXH 2-2

SMEAD PRODUCTION 9/18/25                    S 181

pasture maintenance in accordance with good husbandry and the most approved methods of agricultural development. The Beneficiary may recover as damages for any breach of this covenant the amount it would cost to put the property in the condition called for herein. Proof of impairment of security shall be unnecessary in any suit or proceeding under this paragraph. If the loan secured hereby or any part thereof is being obtained for the purpose of financing construction of improvements on said property, Trustor further agrees:

(a) To commence construction promptly and to pursue same with reasonable diligence to completion in accordance with plans and specifications satisfactory to Beneficiary and

(b) To allow Beneficiary to inspect said property at all times during construction. Trustee, upon presentation to it of an affidavit signed by Beneficiary, setting forth facts showing a default by Trustor under this numbered paragraph, is authorized to accept as true and conclusive all facts and statements therein, and to act thereon hereunder.

2.    To keep the buildings and improvements now and/or hereafter upon the said premises unceasingly insured against loss by fire or other hazards in such amount and form as may be required by the Beneficiary in a Company or Companies selected by the Trustor subject disapproval by the Beneficiary, the insurance to be payable in case of loss to the Beneficiary as its interest may appear, all renewal policies to be delivered to the Beneficiary at least ten days prior to the expiration of the policy or policies renewed and in the event of the failure of the Trustor to so deliver a renewal policy, then the Beneficiary may renew or procure all required insurance upon said property and the Trustor agrees to pay all premiums therefore. All insurance policies covering any structure upon said premises, regardless of amount, shall be payable as aforesaid and delivered to the Beneficiary. In the event of loss, Trustor shall give immediate notice to Beneficiary who may make proof of loss. The amount collected under any fire and other insurance policy may be applied by the Beneficiary upon any indebtedness secured hereby and in such order as Beneficiary may determine, or, at option of Beneficiary, the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or any act done pursuant to such notice.

3.    To deliver to, pay for and maintain with Beneficiary until the indebtedness secured hereby is paid in full, such evidence of title as Beneficiary may require, including abstracts of title or policies of title insurance and any extensions or renewals thereof or supplements thereto.

4.    To appear in and defend any action or proceeding purporting to affect the security hereof, the title to said property, or the rights or powers of Beneficiary or Trustee; and should Beneficiary or Trustee elect to also appear in or defend any such action or proceeding, to pay all costs and expenses, including cost of evidence of title and attorney's fees incurred by Beneficiary a reasonable sum incurred by Beneficiary or Trustee, or incurred or advanced by the Beneficiary and/or Trustee in connection with any such action or proceeding in which the Beneficiary and/or Trustee may be joined as a party defendant or receives notice of such action, proceeding or claim asserted in such action or proceeding or proposed action or proceeding. Trustor covenants that the Trustor has a valid and unencumbered title in fee simple to the property described herein and has the right to convey the same and warrants and will defend said title unto the Trustee and Beneficiary against the claims and demands of all person whomsoever.

5.    To pay when all taxes and assessments affecting said property, including all assessments upon water company stock and all rents, assessments and charges for water, appurtenant to or used in connection with said property; to pay, when due, all encumbrances, charges, and liens with interest, on said property or any part thereof, which at any time appear to be prior or superior hereto; to pay all costs, fees and expenses of this Trust.

6.    Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; commence, appear in and defend any action or proceeding purporting to affect the security hereof or the rights and powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and in exercising any such powers, incur any liability,

Entry#: 00215042   B: 703 P: 382    Page 2 of 5   Millard County  Recorder

**EXH 2-3**

SMEAD PRODUCTION 9/18/25                    S 182

expend whatever amounts in its absolute discretion it may deem necessary therefore, including costs of evidence of title, employ counsel, and pay his reasonable fees.

7.  To pay immediately and without demand all sums expended hereunder by Beneficiary or Trustee, with interest from date of expenditure at the rate of ten per cent (10%) per annum until paid, and the repayment thereof shall be secured hereby.

8.  In addition to the payments due in accordance with the terms of the note secured hereby, the Trustor shall, at the option and demand of the Beneficiary, pay each year to the Beneficiary, in equal monthly installments, the estimated amount of the annual taxes, assessments insurance premiums, maintenance and other charges upon the property, such sums to be held in trust by the Beneficiary for Trustor's use and benefit for the payment by the Beneficiary of any such items when due. The estimate shall be made by the Beneficiary. If the Beneficiary shall fail to make such estimate, the amount of the preceding annual taxes, assessments, insurance premiums, maintenance and other charges as the case may be, shall be deemed to be the estimate for that year. If, however, the payment made hereunder shall not be sufficient to pay such charges when the same shall be due, the Trustor shall pay the Beneficiary any amount necessary to make up the deficiency on or before the date when the same shall become due.

B.  IT IS MUTUALLY AGREED THAT:

1.  If the Trustor permits any deficiency in the amount of the aggregate monthly, or other periodic payments, provided for herein or in the note secured hereby, or any failure to pay any advancements or payments made by the Trustee and/or Beneficiary to protect and preserve the lien hereof or property described herein, such deficiency or failure shall constitute an event of default under this Deed of Trust and, if not cured within 15 days Trustor promises and agrees to pay a "late charge", and that any such "late charge" shall constitute an additional item secured by this Deed of Trust. PROVIDED HOWEVER, that Trustor shall not become liable to pay total interest and "late charge" in excess of the highest legal rate permissible by contract under the laws of the State of Utah.

2.  The fixtures and equipment described herein and/or affixed to and used and enjoyed in connection with the real property herein or any part thereof constitute permanent fixtures thereof and that such fixtures and equipment will not be severed and removed from said real property without the written consent of the Beneficiary and written reconveyance thereof by the Trustee and shall be deemed part of the realty.

3.  Should said property or any part thereof be taken or damaged by reason of any public improvement or condemnation proceeding, or damaged by fire, or earthquake, or in any other manner, Beneficiary shall be entitled to all compensation, awards, and other payments or relief therefor, and shall be entitled at its option to commence, appear in and prosecute in its own name, any action or proceedings, or to make any compromise or settlement, in connection with such taking or damage. All such compensation, awards, damages, rights of action and proceeds, including the proceeds of any policies of fire and other insurance affecting said property, are hereby assigned to Beneficiary, who may, after deducting therefrom all its expenses, including attorney's fees, apply the same on any indebtedness secured hereby. Trustor agrees to execute such further assignments of any compensation, award, damages, and rights of action and proceeds as Beneficiary or Trustee may require.

4.  At any time and from time to time upon written request of Beneficiary, payment of its fees and presentation of this Trust Deed and the note for endorsement (in case of full reconveyance for cancellation and retention), without affecting the liability of any person for the payment of the indebtedness secured hereby, Trustee may (a) consent to the making of any map or plat of said property; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Trust Deed or the lien of charge thereof; (d) reconvey, without warranty, all or any part of said property. The grantee in any reconveyance may be described as "the person or persons entitled thereto," and the recitals therein of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustor agrees to pay Trustee's fees for any of the services mentioned in this paragraph.

5.  As additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, and hereby constitutes and appoints Beneficiary attorney in fact during the continuance of this Trust, with or without taking possession of the property affected hereby to collect the rents, issues, and profits of said property, (reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues, and profits, as they become due and payable. Upon any such default.) Beneficiary may, at any time without notice, by agent or by receiver, to be

<div align="right">EXH 2-4</div>

Entry#: 00215042   B: 703 P: 383    Page 3 of 5   Millard County  Recorder

SMEAD PRODUCTION 9/18/25                          S 183

appointed by court, Trustor hereby consenting to the appointment of Beneficiary as such receiver and without regard to any security for the indebtedness hereby secured, enter upon and take possession of said property, or any part thereof, and in its own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. Nothing contained herein, nor the exercise of the right by Beneficiary to collect, shall be, or be construed to be, an affirmation by Beneficiary of any tenancy, lease or option, or an assumption of liability under or a subordination of the lien or charge of this Trust Deed to any such tenancy, lease or option.

6.    The entering upon and taking possession of said property, the collection of such rents, issues and profits, or the proceeds of fire and other insurance policies, or compensation or awards for any taking or damage of said property, and the application or release thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

7.    The discontinuance or failure on the part of Beneficiary promptly to enforce any right hereunder shall not operate as a waiver of such right and the waiver by Beneficiary of any default shall not constitute a waiver of any other or subsequent default.

8.    In the event of the passage, after the date of this Trust Deed, of any law of the State of Utah, directing from the value of land for the purpose of taxation any lien thereon, or taxing such lien or the owner or holder of the same, or changing in any way the laws for the taxation of Trust Deeds or debts secured by Trust Deeds for state or local purposes, or the manner of the collection of any such taxes, so as to affect this Trust Deed, the Beneficiary or the Assignee of this Trust Deed and of the debt which it secures, shall have the right to give 30 days written notice to the owner of said land requiring the payment of the debt secured hereby, and it is hereby agreed that if such notice be given, the said debt shall become due, payable and collectable at the expiration of the said 30 days.

9.    Time is of the essence hereof. Upon default by Trustor in the payment of any indebtedness secured hereby or in the performance of any agreement hereunder, all sums secured hereby shall immediately become due and payable at the option of Beneficiary. In the event of such default, Beneficiary may execute or cause Trustee to execute a written notice of default and of election to cause said property to be sold to satisfy the obligations hereof, and Trustee shall file such notice for record in each county wherein said property or some part of parcel thereof is situated. Beneficiary also shall deposit with Trustee, the note and all documents evidencing expenditures secured hereby.

10.    After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of default and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property on the date and at the time and place designated in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine subject to any statutory right of Trustor to direct the order in which such property, if consisting of several known lots of parcels, shall be sold, at public auction to the highest bidder, the purchase price payable in lawful money of the United States, at the time of sale. The person conducting the sale may, for any cause he deems expedient, postpone the sale from time to time until it shall be completed and, in every case, notice of postponement shall be given by public declaration thereof by such person at the time and place last appointed for the sale, provided, if the sale is postponed for longer than one day beyond the day designated in the notice of sale, notice thereof shall be given in the same manner as the original notice of sale. Trustee shall execute and deliver to the purchaser its Deed conveying said property so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any manners or facts shall be conclusive proof of the truthfulness thereof. Any person including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of sale to payment of (1) the costs and expenses of exercising the power of sale and of the sale, including the payment of the Trustee's and attorney's fees; (2) cost of any evidence of title procured in connection with such sale and revenue stamps on Trustee's Deed; (3) all sums expended under the terms hereof, not then repaid, with accrued interest as herein provided from date of expenditure (4) all other sums then secured hereby; and (5) the remainder, if any, to the person or persons legally entitled thereto, or the Trustee, in its discretion, may deposit the balance of such proceeds with the county Clerk of the county in which the sale took place.

11.    Upon the occurrence of any default hereunder, Beneficiary shall have the option to declare all sums secured hereby immediately due and payable and foreclose this Trust Deed in the manner provided by law for the

**EXH 2-5**

Entry#: 00215042   B: 703 P: 384    Page 4 of 5   Millard County Recorder

SMEAD PRODUCTION 9/18/25                          S 184

foreclosure of mortgages on real property and Trustor agrees to pay Beneficiary or Trustee, whichever may be the Plaintiff in said foreclosure suit, the cost of said suit and a reasonable sum for attorney's fees, whether Beneficiary or Trustee shall have paid for procuring an abstract or other deed and also a reasonable fee for Trustee. All moneys herein agree to be paid shall be secured hereby.

12. In the event suit is instituted to effect foreclosure of this Trust Deed the Trustee and/or Beneficiary shall as a matter of right and without regard to the sufficiency of the security or of waste or danger of misapplication of any of the property of the Trustor, be entitled forthwith to have a receiver appointed of all the property described in this Trust Deed, and the Trustor hereby expressly consents to the appointment of a receiver by any court of competent jurisdiction and expressly stipulates and agrees that such receiver may remain in possession of the property until the final determination of such suit or proceedings. Trustor hereby expressly consents to the appointment of Beneficiary as such receiver.

13. Beneficiary may appoint a successor Trustee at any time by filing for record in the office of the County Recorder of each county in which said property or some part thereof is situated, a substitution of Trustee. From the time the substitution is filed for record, the new Trustee shall succeed to all the powers, duties, authority and title of the Trustee named herein or of any successor Trustee. Each such substitution shall be executed and acknowledged, and notice thereof shall be given and proof thereof made as provided by law

14. This Trust Deed shall apply to, inure to the benefit of, and bind all parties hereto, their heirs, legatees, devisees, administrators, executors, successors, and assigns. All obligations of Trustor hereunder are joint and several. The term "Beneficiary" shall mean the owner and holder, including any pledgee, of the note secured hereby. In this Trust Deed, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

15. Trustee accepts this Trust when this Trust Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Trust Deed or of any action or proceeding in which Trustor, Beneficiary, or Trustee shall be a party unless brought by Trustee.

16. This Trust Deed shall be construed according to the laws of the State of Utah.

17. The undersigned Trustor requests that a copy of any notice of default and of any notice of sale hereunder be mailed to him at the address hereinbefore set forth.

18. The Trustor acknowledges that full disclosure has been made of the terms of the loan and the finance charge as required by Federal and State law and acknowledges receipt of a copy of such disclosure statements together with copies of the promissory note and trust deed.

Signed in the presence of:

_____

Clinton Brown

STATE OF _____ NY _____ )
                                        ) SS.
County of _____ NY _____ )

On this day personally appeared before me    Clinton Brown
to me known to be the individual, or individuals described in and who executed the within and foregoing instrument, and acknowledged that he signed the same as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned.
Given under my hand and official seal this _____ day of _____ June _____, 2021 _____

_____
NOTARY PUBLIC

Jenice Hernandez
Notary Public State Of New York
No. 01HE6359254
Qualified in Bronx, Cert. Kings, NY Counties
Commission Expires May 22nd 2025
The UPS Store @ 82 Nassau  212.406.9010

EXH 2-6

Entry#: 00215042  B: 703 P: 385    Page 5 of 5  Millard County  Recorder

American Land Title Association

ALTA Settlement Statement - Borrower/Buyer
Adopted 05-01-2015

**TitleFirst Title Insurance Agency, LLC**
**ALTA Universal ID 1023307**
**190 N 100 E PO Box 849**
**Beaver, UT  84713**

| | |
|---|---|
| File No./Escrow No.: | 21064364 |
| Print Date & Time: | June 22, 2021 at 11:45·AM |
| Officer/Escrow Officer: | |
| Settlement Location: | |
| | |
| Property Address: | APN 8710-1 |
| | Fillmore, UT 84631 |
| | |
| Borrower: | Clinton Brown |
| Lender: | STEVE SMEAD |
| Settlement Date: | June 30, 2021 |
| Disbursement Date: | June 30, 2021 |

| Description | | Borrower/Buyer Debit | Borrower/Buyer Credit |
|---|---|---|---|
| **Financial** | | | |
| Loan Amount | | | $ 200,000.00 |
| **Prorations/Adjustments** | | | |
| **Loan Charges to STEVE SMEAD** | | | |
| **Other Loan Charges** | | | |
| Closing Fee | to TitleFirst Title Insurance Agency, LLC | $ 220.00 | |
| Courier Fee | to TitleFirst Title Insurance Agency, LLC | $ 30.00 | |
| Wire Fee | to TitleFirst Title Insurance Agency, LLC | $ 30.00 | |
| Document Prep Fee | to TitleFirst Title Insurance Agency, LLC | $ 35.00 | |
| Full Reconveyance for Thaddeus D.O.T. | to TitleFirst Title Insurance Agency, LLC | $ 120.00 | |
| **Impounds** | | | |
| **Title Charges & Escrow / Settlement Charges** | | | |
| Title - Lender's Title Insurance | | $ 690.00 | |
|   to TitleFirst Title Insurance Agency, LLC | | | |
|     Coverage: $ 200,000.00 | | | |
|     Premium: $ 690.00 | | | |
| **Government Recording and Transfer Charges** | | | |
| Recording Fees-D.O.T. | to TitleFirst Title Insurance Agency, LLC | $ 40.00 | |

EXH 2-7

Copyright 2015 American Land Title Association
All rights reserved

SMEAD PRODUCTION 9/18/25

S 178

(21064364.PFD/21064364/18)
Printed on 06/22/21 at 11:45·AM

**ALTA Settlement Statement Borrower/Buyer - Continued**

| | | Debit | Credit |
|---|---|---|---|
| **Payoffs** | | | |
| **Miscellaneous** | | | |
| Payoff | to Equity Trust Co. Cust FBO Thaddeus Faeth IRA | $ 38,656.41 | |
| Loan Funds paid outside of close | to Clinton Brown | $ 100,000.00 | |
| **Subtotals** | | $ 139,821.41 | $ 200,000.00 |
| **Balance Due TO** | | $ 60,178.59 | |
| **TOTALS** | | $ 200,000.00 | $ 200,000.00 |

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize TitleFirst Title Insurance Agency, LLC to cause the funds to be disbursed in accordance with this statement.

Clinton Brown

Approved by: Steve Smead, Lender

, Escrow Officer

EXH 2-8

Copyright 2015 American Land Title Association
All rights reserved

Printed on 06/22/21 at 11:45 AM

ALTA Settlement Statement Borrower/Buyer - Continued

| | | | Debit | Credit |
|---|---|---|---|---|
| **Payoffs** | | | | |
| | | | | |
| **Miscellaneous** | | | | |
| Payoff | to | Equity Trust Co. Cust FBO Thaddeus Faeth IRA | $ 38,656.41 | |
| Loan Funds paid outside of close | to | Clinton Brown | $ 100,000.00 | |
| **Subtotals** | | | $ 139,821.41 | $ 200,000.00 |
| **Balance Due TO** | | | $ 60,178.59 | |
| **TOTALS** | | | $ 200,000.00 | $ 200,000.00 |

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize TitleFirst Title Insurance Agency, LLC to cause the funds to be disbursed in accordance with this statement.

_____
Clinton Brown

_____  6-28-21
Approved by: Steve Smead, Lender

_____
, Escrow Officer

Copyright 2015 American Land Title Association
All rights reserved

**EXH 2-9**

(21064364.PFD/21064364/18)
Printed on 06/22/21 at 11:45 AM

SMEAD PRODUCTION 9/18/25                S 179

From:            "STEVE SMEAD" <stsmead@gmail.com>
Subject:         Re: Clinton Brown
Date:            Thu, June 17, 2021 1:33 pm
To:              Jeremy@titlefirstutah.com

Please provide an estimated closing statement,  statement of acreage for the property and copy of water rights for the property.

I can fund as soon as you are ready.

Thanks,  Steve

On Thu, Jun 17, 2021 at 10:12 AM Jeremy Gale <jeremy@titlefirstutah.com> wrote:

> Attached is the PR for Clinton Brown. He would like to be close this as
> fast as possible. What else do you need from us to get this process going?
> Thanks



> Titlefirst Title Insurance Agency, LLC
> P.O. Box 849
> 5 South Main Street
> Beaver, UT 84713
>
> ph. 435-438-5621
> fx. 435-438-5671

**Attachments:**

| untitled-[1] |
| --- |
| Size: 0.5 k |
| Type: text/plain |

EXH 1-2

```
> Cell: 310-487-6453
> Email: clinton <http://goog_183101203>@brownrealtygrp.com
> <clinton@brownrealtygrp.com>
> Website: www.brownrealtygrp.com
>
> Join me for a Zoom conference. <https://zoom.us/j/5189317177>
> [image: https://www.facebook.com/brownrealtygrp/]
> <https://www.facebook.com/brownrealtygrp/>
> <https://www.facebook.com/SellBuySmart/>
> <http://www.linkedin.com/in/brownrealtygrp>
> <https://www.linkedin.com/company/sellandbuysmart/>
> <http://instagram.com/brownrealty_grp>
> <https://twitter.com/brownrealty_grp>
>
> CalDRE:02047215
>
> How was your experience with Brown Realty Group?
> [image: Bad] <https://portal.oggvo.com/review/BrownRealtyGroup> [image:
> Subpar] <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Just
> Okay] <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Good]
> <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Great]
> <https://portal.oggvo.com/review/BrownRealtyGroup>Click to rate your
> experience with Brown Realty Group
> <https://portal.oggvo.com/review/BrownRealtyGroup>
>
```

Titlefirst Title Insurance Agency, LLC
P.O. Box 849
5 South Main Street
Beaver, UT 84713

ph. 435-438-5621
fx. 435-438-5671
--



**Clinton Brown**
**Broker & Developer**
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*

   
Bad　Subpa　Just　Good　Great

Click to rate your experience with Brown Realty Group

**Attachments:**

| untitled-[1] |
|---|
| Size: 4.8 k |
| Type: text/plain |

EXH 1-3

https://email.powweb.com/sqmail/src/printer_friendly_main.php?passed_ent2=&mailbox=INBOX&passed_id=87122&view_unsafe_images=1　　　2/2

From:      "Clinton Brown" <clinton@brownrealtygrp.com>
Subject:    Re: Fwd: Escrow for Refinance
Date:      Thu, June 17, 2021 2:01 pm
To:       Jeremy@titlefirstutah.com

---

Thank you! Do I sign anything? When can we close?

On Thu, Jun 17, 2021 at 10:11 AM Jeremy Gale <jeremy@titlefirstutah.com> wrote:
Attached is the PR for this property. I will send a copy to your lender as
well. Thanks

> Jeremy,
>
> Left you a voicemail. What do I need to do to get this closed?
>
>
> Thank you,
> Clinton
>
> ---------- Forwarded message ---------
> From: Clinton Brown <clinton@brownrealtygrp.com>
> Date: Wed, Jun 9, 2021 at 5:05 PM
> Subject: Escrow for Refinance
> To: jeremy@titlefirstutah.com <jeremy@titlefirstutah.com>
>
>
> Jermey,
>
> Hope you are well. I will be refinancing APN 8710-1  and can you please
> facilitate that? I will be paying off the 1st and adding a new 1st for
> $200,000.
>
> The lender's contact information is:
>
> Steve Smead
> Stsmead@gmail.com
> (805) 200-7411
>
> Do you need a contract or can we just write the escrow instructions? This
> is a private lender and I'm hoping that we can expedite this process, if
> possible, because I'm using the proceeds from my refinance to close on
> another property.
>
> Thank you,
> Clinton
> --
>
> *Clinton Brown*
> *Broker & Developer *
> *Brown Realty Group*
> Cell: 310-487-6453
> Email: clinton <http://goog_183101203>@brownrealtygrp.com
> <clinton@brownrealtygrp.com>
> Website: www.brownrealtygrp.com
>
> Join me for a Zoom conference. <https://zoom.us/j/5189317177>
> [image: https://www.facebook.com/brownrealtygrp/]
> <https://www.facebook.com/brownrealtygrp/>
> <https://www.facebook.com/SellBuySmart/>
> <http://www.linkedin.com/in/brownrealtygrp>
> <https://www.linkedin.com/company/sellandbuysmart/>
> <http://instagram.com/brownrealty_grp>
> <https://twitter.com/brownrealty_grp>
>
> CalDRE:02047215
>
> How was your experience with Brown Realty Group?
> [image: Bad] <https://portal.oggvo.com/review/BrownRealtyGroup> [image:
> Subpar] <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Just
> Okay] <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Good]
> <https://portal.oggvo.com/review/BrownRealtyGroup> [image: Great]
> <https://portal.oggvo.com/review/BrownRealtyGroup>Click to rate your
> experience with Brown Realty Group
> <https://portal.oggvo.com/review/BrownRealtyGroup>
> --
>
> *Clinton Brown*
> *Broker & Developer *
> *Brown Realty Group*

EXH 1-4

**From:** Clinton Brown <clinton@brownrealtygrp.com>
**Sent:** Friday, June 18, 2021 2:23 PM
**To:** jeremy@titlefirstutah.com
**Cc:** STEVE SMEAD <stsmead@gmail.com>
**Subject:** Deed of Trust for 8710-1

Jeremy,

The deed of trust terms will be $200,000 @ 10 percent interest and a 2 year balloon payment. $150 late charge if payment is received 10 days after the due date on the first of each month.

$100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000. The remaining funds from that will be sent to me.

Please let me know if you have any questions.

Thank you,

Clinton

--

**EXH 1-5**

2

SMEAD PRODUCTION 9/18/25                    S 211



**Clinton Brown**
Broker & Developer
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*

Click to rate your experience with Brown Realty Group

EXH 1-6

3

SMEAD PRODUCTION 9/18/25                    S 212

From:     "Clinton Brown" <clinton@brownrealtygrp.com>
Subject:   Deed of Trust for 8710-1
Date:     Fri, June 18, 2021 2:23 pm
To:      "jeremy@titlefirstutah.com" <jeremy@titlefirstutah.com>
Cc:      "STEVE SMEAD" <stsmead@gmail.com>

Jeremy,

The deed of trust terms will be $200,000 @ 10 percent interest and a 2 year balloon payment. $150 late charge if payment is received 10 days after the due date on the first of each month.

$100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000. The remaining funds from that will be sent to me.

Please let me know if you have any questions.

Thank you,
Clinton

--



**Clinton Brown**
**Broker & Developer**
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*
Click to rate your experience with Brown Realty Group

**Attachments:**

| untitled-[1] | |
|---|---|
| Size: | 1.2 k |
| Type: | text/plain |

EXH 1-7

jeremy@titlefirstutah.com

From:        STEVE SMEAD <stsmead@gmail.com>
Sent:        Monday, June 21, 2021 6:51 PM
To:          jeremy@titlefirstutah.com
Subject:     Re: Deed of Trust for 8710-1

Flag Status:    Flagged

Steve Smead is fine.  My address should be: 352 E. Harvard Blvd.  Santa Paula,  CA 93060

On Mon, Jun 21, 2021 at 2:14 PM <jeremy@titlefirstutah.com> wrote:

Clinton and Steve,

Attached is the settlement statement for you to approve. Please let me know if there are any changes you want made.

Steve, on the Note and D.O.T., do you want the beneficiary to read "Steve Smead"?  Once I know exactly the name you want on the documents, I will finish them up, and send to you for approval prior to sending to Clinton for signature.

16821 edgar st.
pacific palaeade
90272

Thank you,

Natalia Van Wyk, Assistant

Titlefirst Title Insurance Agency, LLC

P.O. Box 849

5 South Main

Beaver, UT 84713

Ph. 435-438-5621

Fx. 435-438-5671

EXH 1-8

1

SMEAD PRODUCTION 9/18/25                          S 301

**From:** Clinton Brown <clinton@brownrealtygrp.com>
**Sent:** Friday, June 18, 2021 2:23 PM
**To:** jeremy@titlefirstutah.com
**Cc:** STEVE SMEAD <stsmead@gmail.com>
**Subject:** Deed of Trust for 8710-1

Jeremy,

The deed of trust terms will be $200,000 @ 10 percent interest and a 2 year balloon payment. $150 late charge if payment is received 10 days after the due date on the first of each month.

$100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000. The remaining funds from that will be sent to me.

Please let me know if you have any questions.

Thank you,

Clinton

--

EXH 1-9

2



**Clinton Brown**
Broker & Developer
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*

Click to rate your experience with Brown Realty Group

EXH 1-10

3

SMEAD PRODUCTION 9/18/25                    S 303

**00224646**
B: 740 P: 669        Fee $40.00
Sierra Dickens, Millard Recorder      Page 1 of 2
03/08/2023 11:35:34 AM    By TITLEFIRST

After recording, mail to:
Steve Smead
352 E. Harvard Blvd.
Santa Paula, CA 93060

## TRUSTEE'S DEED

THIS INDENTURE made March 8, 2023, between *TitleFirst Title Insurance Agency, LLC* as Trustee, and *Steve Smead*, as Grantee, of 352 E. Harvard Blvd. Santa Paula, CA 93060

NOW, THEREFORE, Trustee in consideration of the premises recited and of the sum below mentioned bid and paid by Grantee, the receipt whereof is hereby acknowledged, and by thee presents, GRANT AND CONVEY unto Grantee, but without warranty, express or implied, the following described real property situated in MILLARD County, Utah:

**The Southwest quarter of Section 16, Township 25 South, Range 9 West, Salt Lake Base and Meridian.**

**Together with A Private easement for ingress and egress for roadway and utility purposes across the following land.**

**State of Utah, County of Millard**
**The Eastern 33 feet of the Northern 700 feet of Section 21, Township 25 South, Range 9 West.**

**The above easement is to be an appurtenant to and for access to the Grantee's land and all future owners of any land located within the boundary of: South half Section 16, Township 25 South, Range 9 West, Salt Lake Base an Meridian.**

**Tax Parcel No. 8710-1**

**Along with 1.73 ACFT of underground water as evidenced by Water Right No. 71-5613 as filed in the office of the State Engineer.**

### Recitals

A.   This conveyance is made pursuant to the powers conferred on Grantor by:
1.      That Trust Deed dated **June 22, 2021**, executed by **Clinton Brown** , Trustor, to **TitleFirst Title Insurance Agency, LLC**, Trustee, with **Steve Smead** as Beneficiary, recorded **June 29, 2021** as Entry No.**00215042** , in Book **703**, at Page **381**, official records of **Millard** County, Utah, conveying the property described above as security for the promissory note and other obligations as set forth in the Trust Deed.

B.   After satisfaction of the conditions authorizing this conveyance specified in said Trust Deed and by law, as follows:

1.      Breach and default occurred under the provisions of the Trust Deed in the manner set forth in the Notice of Default referred to below, such default continuing until time of sale.

2.      The then holder of the note secured by said Trust Deed and beneficiary under same; caused the Trustee to execute a written Notice of Default and of election to sell, which notice was duly recorded on **August 29, 2022** , as entry No.**00221473** , in Book **731** , at Page **548** , official records of Millard County, Utah.

3.      Not later than ten days after said Notice of Default was recorded, the Trustee duly mailed or otherwise provided in the manner required, all copies of such notice required under the Trust Deed or by law, including notice to the Trustor at its proper address and to all who properly filed for record Requests for Notice.

SMEAD PRODUCTION 9/18/25                    S 364                    EXH 9-1

4.      The Trustee, in consequence of the foregoing and of the passage of at least three months after said Notice of Default was recorded, executed its notice of Sale declaring the time and place of sale to be on **March 8, 2023** at the hour of **11:00 A.M.**, at **Main Entrance, Millard County Courthouse, 765 s. Highway 99, Fillmore, UT 84631**, in the County of Millard , State of Utah, and particularly describing the property and setting out the conditions of sale, and gave such notice of sale as follows:

a.      By posting such notice at least twenty days prior to the date of sale in a conspicuous place on the property to be sold and in at least three public places of the city or county in which the property to be sold is situated, as follows:

b.      By publishing such notice in **Millard County Chronicle Progress**, a newspaper of general circulation in Millard County, Utah, three times, once a week for three consecutive weeks on  :
**February 8, 15, and 22nd, 2023**

c.      By mailing copies of such notice, at least twenty days prior to sale, to those having the right to receive them under the Trust Deed and by law, including the Trustor thereunder.

5.      At the time and place of sale specified above, the Trustee duly sold at public auction to Grantee, **STEVE SMEAD** the highest bidder therefor, the above described property for the sum price of **$220,923.20** (opening bid in favor of Steve Smead) , lawful money of the United States by the Satisfaction **FULL** indebtedness then secured by said Deed of Trust.

6.      All other applicable Utah Statutory provision or Trust Deed terms have been complied with as to acts to be performed and notice to be given.

IN WITNESS THEREOF, said TITLEFIRST TITLE INSURANCE AGENCY, LLC, as Trustee, has caused its corporate name and seal to be hereto affixed this 8th day of March, 2023.

TITLEFIRST TITLE INSURANCE AGENCY, LLC

Attest:

_____     _____
Jeremy R. Gale, Manager

STATE OF UTAH             )
                          :ss.
COUNTY OF BEAVER          )

On the 8th of March, 2023, personally appeared before me Jeremy R. Gale who being by me duly sworn, did say, each and for himself, that the said Jeremy R. Gale, is the Managing Member of TITLEFIRST TITLE INSURANCE AGENCY, LLC and that the within and foregoing instrument was signed in behalf of said company by authority of resolution of its board of directors and said, Jeremy R. Gale each duly acknowledged to me that said Company executed the same and that the seal affixed is the seal of the said company.

*Natalia Van Wyk*
Notary Public



**NATALIA VAN WYK**
Notary Public
State of Utah
My Commission Expires 12/06/2024
COMMISSION NUMBER 715338

**00224646**
B: 740 P: 670        Fee $40.00
Sierra Dickens, Millard Recorder      Page 2 of 2
03/08/2023 11:35:34 AM      By TITLEFIRST

# PROMISSORY NOTE SECURED BY DEED OF TRUST
## (This Note contains an Acceleration Clause)
### PARTIALLY AMORTIZED BALLOON PAYMENT NOTE
### BUSINESS PURPOSE LOAN

Loan Number: **RMF4026550**  
Loan Amount: **$170,000.00**

Property Address: **APN: 4451-015-021, MALIBU, CA 90265**  
BURLINGAME, California

MARCH 16, 2020

In installments as herein stated, for value received, CLINTON BROWN, A SINGLE MAN, the undersigned Borrower(s), promise to pay to EXHIBIT D, the Beneficiary, or order, at a place that may be designated by the Beneficiary, the sum of: $170,000.00, ONE HUNDRED SEVENTY THOUSAND DOLLARS exactly with interest from the date of funding on the unpaid principal at the rate of 12.99% percent per annum, payable in 24 partially amortizing installments of $1,850.79 each, beginning on 05/01/2020, and continuing MONTHLY ON THE FIRST DAY OF EACH MONTH thereafter until maturity, 04/01/2022, at which time all sums of principal and interest then remaining unpaid shall be due and payable in full. Interest shall be calculated on a 360 day year and on an ordinary annuity calculation basis. At the option of the Beneficiary, each payment shall be credited first on interest then due, then on late charges, then on advances, then on fees and the remainder on principal; and interest shall thereupon cease upon the principal so credited.

**Default of payment.** Upon default in any payment of any installment, then the balance of this obligation shall become due immediately at the option of the Holder hereof. Principal, interest, and all funds due Beneficiary payable in lawful money of the United States of America. Except where federal law is applicable, this Note shall be construed and enforceable according to the laws of the State of California for all purposes and any terms herein inconsistent therewith are hereby modified to conform to said law at the time of signing of these loan documents. Time is of the essence for each and every obligation under this Note.

## THE FOLLOWING PROVISIONS MAY RESULT IN THE COMPOUNDING OF INTEREST ON YOUR LOAN

At the option of the Beneficiary, if any payment should be insufficient to pay the interest then due, the balance of interest remaining shall be added to principal and will bear interest at the Note rate as the principal.

At the option of the Beneficiary, if any principal and/or interest installments, late charges, advances and/or costs should be repaid through or by any forbearance, bankruptcy plan or similar repayment plan or foreclosure, the total sum of these amounts will bear interest at the Note rate from the date due or advanced until the date repaid.

If this Note is not paid when due, the Borrower(s) promise to pay, in addition to the principal and interest due under this Note, all costs of collection and any reasonable attorneys' fees incurred by the Beneficiary thereof on account of such collection, whether or not suit is filed hereon. Each Borrower consents to renewals, replacements, and extensions of time for payment hereof before, at, or after maturity; consents to the acceptance of security for this Note and waives demand, protest and any applicable statute of limitations. Advances shall bear interest at the interest rate stated in the note or the "Default" interest, whichever is higher, from date of advance until date paid in full.

**Payment late charge.** If any installment due hereunder is delinquent more than 10 days, the Borrower to this Note agrees to pay a late charge on each installment of $5.00 or 10.00% of the delinquent payment, whichever is larger. All late charges are to be paid immediately on demand.

Page 1 of 3

EXH 11-1

**Balloon late charge.** In addition, if any balloon payment is delinquent more than TEN days, the borrower will be charged **$17,000.00** as liquidated damages.

Borrower acknowledges that its failure to make timely payments under this Note will cause Lender to incur additional expenses in servicing and processing the Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charges provided for in this Note represent fair and reasonable estimates taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late payments. The late charges are payable in addition to, and not in lieu of, any default interest provided below.

**Return check charge.** Borrower and Beneficiary agree that it would be difficult to determine the actual damages to the Beneficiary or Beneficiary's agent for the return of an unpaid check provided by Borrower. It is hereby agreed that Borrower will pay the sum equal to 5% of the amount returned or $25.00, whichever is greater. However, in any event the maximum charge for an unpaid check is not to exceed the sum of $35.00. This amount is in lieu of any statutory monetary penalty, if any; however, Beneficiary does not waive any other rights that may be awarded under any statute. Should Borrower have two or more returned checks, for any reason, during the life of the loan, Beneficiary may demand that Borrower make payments in the form of cash, cashiers check or money order.

**Right to assign.** The holder of this Note shall have the right to sell, assign, or otherwise transfer, either in part or in its entirety, this Note, the Deed of Trust, and other instruments evidencing or securing the indebtedness of this Note to one or more investors without Borrower's consent.

**Prepayment penalty.** The principal and accrued interest on this loan may be prepaid in whole or in part at any time without penalty, however, Beneficiary is guaranteed to receive a minimum of **6 months** interest based on the original principal balance together with any interest paid or due in escrow.

**Default interest.** Should Borrower default on any terms and conditions of this loan, Borrower shall pay a default interest rate in the amount **6.00%** per annum, in addition to the current rate of 12.99%, based on the principal balance and on all outstanding advances and advances to be made after default has occurred. Default interest shall commence as of the date of the default and shall continue until such time default has been cured or loan has been paid off.

**Advancing Fee.** For any advances made to senior encumbrances and/or obligations to protect the Beneficiary's interest in this Note, there will be an advancing fee equal to three (3%) of the amount so advanced subject with a minimum fee of fifty dollars ($50) per advance (per lender). Advances will bear interest at the same rate that is charged on the principal of this Note from the date of advancement to such date when all monies are paid in full in the form of cash and/or certified funds. ALL ADVANCES TO BE REPAID AT NOTE RATE OR DEFAULT INTEREST RATE, WHICHEVER ONE IS HIGHER, FROM DATE OF ADVANCE UNTIL DATE FUNDS ARE RECEIVED BY BENEFICIARY.

**Oral Representations.** The undersigned Borrower hereby states that the Beneficiary, their representative(s) nor any employee RUSHMYFILE, INC. has alluded to, given actual details(s) or discussed other terms of this loan other than what has been agreed to in writing.

**SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.** The parties intend that the provisions of this Instrument and all other Loan Documents, including the Deed of Trust securing the indebtedness, shall be legally severable. If any term or provision of this Instrument or any other Loan Document, including the Deed of Trust securing the indebtedness, be determined to any extent by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document, including the aforesaid Deed of Trust, shall not be affected thereby and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument and the aforesaid Deed of Trust contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

EXH 11-2

SMEAD PRODUCTION 9/18/25                          S 006

**Binding.** This Note and all of the covenants, promises and agreements contained in it shall be binding on and insure to the benefit of the respective legal and personal representatives, devisees, heirs, successors, and assigns of the Borrower and the Beneficiary.

**Acceleration clause.** This Note is secured by a First Deed of Trust of even date herewith which contains the following provision:

In the event of sale or transfer, conveyance or alienation of said real property, or any part thereof, or any interest therein, whether voluntary or involuntary (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), Beneficiary shall have the right of acceleration, at its option, to declare the Note secured by the Deed of Trust, irrespective of the maturity date expressed therein, and without demand or notice, immediately due and payable. No waiver of this right shall be effective unless it is in writing. Consent by the Beneficiary to one such transaction shall not constitute waiver of the right to require such consent to succeeding transactions.

This Note is secured by a Deed of Trust to **SUPERIOR LOAN SERVICING**, as Trustee.

_____    4/14/20
CLINTON BROWN– Borrower          /Date

_____    _____
– Co-Borrower                    /Date

INTENTIONALLY BLANK

DO NOT DESTROY THIS NOTE: When paid, this Note, with Deed of Trust securing same, must be surrendered to the Trustee for cancellation before reconveyance or Trustee's Deed. This loan was originated by RUSHMYFILE, INC., License No. 01893519, NMLS No. 396905, a company licensed by the Bureau of Real Estate (formerly the Department of Real Estate).

Page 3 of 3

EXH 11-3

SMEAD PRODUCTION 9/18/25          S 007

# Exhibit D

<u>LENDER VESTING</u>

STEVE SMEAD, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

| Lenders | % Ownership | Amount |
|---|---|---|
| STEVE SMEAD | 100.0% | $170,000.00 |

EXH 11-4

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

Superior Loan Servicing
7525 Topanga Canyon Blvd
Canoga Park, CA 91303
Loan Number: RMF4026550

Property Address
APN: 4451-015-021
MALIBU, CA 90265

APN: 4451-015-021

2nd TD Malibu

SPACE ABOVE THIS LINE FOR RECORDERS USE

# DEED OF TRUST
# AND ASSIGNMENT OF RENTS

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19, 20 and 22. Certain rules regarding the usage of words used in this document are also provided in Section 15.

(A)  "Security Instrument" means this document, which is dated MARCH 16, 2020, together with all Riders to this document.

(B)  "Borrower" is CLINTON BROWN, A SINGLE MAN. Borrower is the trustor under this Security Instrument. Borrower's mailing address is: 10226 REGENT STREET, LOS ANGELES, CA 90034.

(C)  "Lender" is EXHIBIT D. Lender is the beneficiary under this Security Instrument.

(D)  "Trustee" is SUPERIOR LOAN SERVICING, to whom Borrower irrevocably grants, transfers and assigns property, in Trust, with Power of Sale.

(E)  "Note" means the promissory note signed by Borrower and dated MARCH 16, 2020. The Note states that Borrower owes Lender ONE HUNDRED SEVENTY THOUSAND DOLLARS exactly (U.S. $170,000.00) plus interest.

(F)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)  "Riders" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower : Assignment of Rents and Profits; Security Agreement and Protection of Lenders' Security Rider.

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association. homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

Page 1 of 16

EXH 11-5

(L)   "Escrow Items" mean those items that are described in Section 3.

(M)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5 for (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)   "Periodic Payment" means the regularly scheduled amount due for (1) principal and interest under the Note, plus (2) any amounts under Section 3 of this Security Instrument.

(P)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (a) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (b) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of LOS ANGELES, which currently has the address of APN: 4451-015-021, MALIBU, CA 90265 and fully described as:

SEE LEGAL DESCRIPTION ATTACHED

APN # 4451-015-021

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and nonuniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity or (d) Electronic Funds Transfer. Additionally, Lender can require payment due to senior encumbrances, including insurance, in the forms listed above.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment(s) or partial payment(s) if the payment(s) or partial payments are insufficient to bring the Loan current. Lender may accept any payment(s) or partial

SMEAD PRODUCTION 9/18/25                    S 010

EXH 11-6

# BORROWER STATEMENT OF ACCOUNT



**SUPERIOR** Loan Servicing™
*"superior service for superior clients"*

Payment Remittance Address: **File 1996**
**1801 W Olympic Blvd**
**Pasadena, CA 91199-1996**

7525 Topanga Canyon Blvd., Canoga Park, CA 91303
p (818) 483 - 0027 | f (818) 876 - 0337 · info@superiorloanservicing.com

| ACCOUNT NO. | RMF4026550 |
|---|---|
| STATEMENT DATE | 4/7/2021 |

**STATEMENT SUMMARY**

| | |
|---|---|
| Statement Period | 4/1/2020 - 4/7/2021 |
| Principal Balance | $169,911.97 |
| Reserve Balance | $0.00 |
| Impound Balance | $0.00 |
| Unpaid Late Charges | $718.30 |
| Unpaid Charges | $126.90 |
| Unpaid Interest | $0.00 |
| Regular Payment | $1,850.79 |
| Note Rate | 12.990% |
| Interest Paid in 2021 | $7,358.40 |
| Property: APN 4451-015-021 Malibu CA 90265 | |

**BORROWER**

Clinton Brown
10226 Regent Street
Los Angeles CA 90034

Please advise us immediately of any discrepancies in the transactions or investment activity on your statement of account or if you contemplate changing your address. When making inquiries by telephone or in writing please give your account number. We urge you to keep this statement with your investment records.

## ACCOUNT ACTIVITY

| Transaction Date | Pmt Due Date | Reference | Description | Transaction Amount | Interest | Principal | Late Chgs | Other | Trust | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Balance Forward | | | | | | | $0.00 |
| 4/21/2020 | | FUNDING | Funds Advanced | ($170,000.00) | $0.00 | ($170,000.00) | $0.00 | $0.00 | $0.00 | $170,000.00 |
| 4/30/2020 | 5/1/2020 | RESERVES | Payment - Thank You | $0.00 | $613.42 | $0.00 | $0.00 | $0.00 | ($613.42) | $170,000.00 |
| 4/30/2020 | | Housingfee | Affordable Housing Recording Fee | ($75.00) | $0.00 | $0.00 | $0.00 | ($75.00) | $0.00 | $170,000.00 |
| 6/9/2020 | 6/1/2020 | CK11409298 | Payment - Thank You | $350.79 | $1,840.25 | $10.54 | $0.00 | $0.00 | ($1,500.00) | $169,989.46 |
| 6/9/2020 | | CK11409301 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,989.46 |
| 6/9/2020 | | CK11409300 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,989.46 |
| 6/9/2020 | | CK11409299 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,989.46 |
| 7/9/2020 | 7/1/2020 | CK4097666 | Payment - Thank You | $351.00 | $1,840.14 | $10.86 | $0.00 | $0.00 | ($1,500.00) | $169,978.60 |
| 7/9/2020 | | CK4097669 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,978.60 |
| 7/9/2020 | | CK4097668 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,978.60 |
| 7/9/2020 | | CK4097667 | Payment - Other | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500.00 | $169,978.60 |
| 8/6/2020 | 8/1/2020 | CK1113711 | Payment - Thank You | $851.00 | $1,840.02 | $10.98 | $0.00 | $0.00 | ($1,000.00) | $169,967.62 |
| 8/6/2020 | | CK1113710 | Payment - Other | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,000.00 | $169,967.62 |
| 9/3/2020 | 9/1/2020 | CK4508356 | Payment - Thank You | $1,850.79 | $1,839.90 | $10.89 | $0.00 | $0.00 | $0.00 | $169,956.73 |
| 10/23/2020 | 10/1/2020 | CK2032697 | Payment - Thank You | $1,850.79 | $1,839.78 | $0.00 | $11.01 | $0.00 | $0.00 | $169,956.73 |
| 10/23/2020 | | CK2032697 | Late Charge | ($185.08) | $0.00 | $0.00 | ($185.08) | $0.00 | $0.00 | $169,956.73 |
| 12/7/2020 | | Denial | CA AB3088 Denial Letter | ($6.90) | $0.00 | $0.00 | $0.00 | ($6.90) | $0.00 | $169,956.73 |
| 12/31/2020 | 11/1/2020 | PAYMENT | Payment - Thank You | $0.00 | $1,839.78 | $0.00 | $11.01 | $0.00 | ($1,850.79) | $169,956.73 |
| 12/31/2020 | | PAYMENT | Late Charge | ($185.08) | $0.00 | $0.00 | ($185.08) | $0.00 | $0.00 | $169,956.73 |
| 12/31/2020 | | 0137998 | Payment - Other | $1,850.79 | $0.00 | $0.00 | $0.00 | $0.00 | $1,850.79 | $169,956.73 |
| 1/4/2021 | 12/1/2020 | 0138216 | Payment - Thank You | $1,850.79 | $1,839.78 | $11.01 | $0.00 | $0.00 | $0.00 | $169,945.72 |
| 1/4/2021 | | 0138216 | Late Charge | ($185.08) | $0.00 | $0.00 | ($185.08) | $0.00 | $0.00 | $169,945.72 |
| 1/5/2021 | 1/1/2021 | 0138450 | Payment - Thank You | $1,850.79 | $1,839.66 | $11.13 | $0.00 | $0.00 | $0.00 | $169,934.59 |
| 2/12/2021 | 2/1/2021 | 0141967 | Payment - Thank You | $1,850.79 | $1,839.54 | $11.25 | $0.00 | $0.00 | $0.00 | $169,923.34 |
| 2/12/2021 | | 0141967 | Late Charge | ($185.08) | $0.00 | $0.00 | ($185.08) | $0.00 | $0.00 | $169,923.34 |
| 2/16/2021 | | 0141967 | NSF | ($1,850.79) | ($1,839.54) | ($11.25) | $0.00 | $0.00 | $0.00 | $169,934.59 |
| 2/16/2021 | | 0141967 | Late Charge | $185.08 | $0.00 | $0.00 | $185.08 | $0.00 | $0.00 | $169,934.59 |
| 2/16/2021 | | | NSF Payment Charge | ($45.00) | $0.00 | $0.00 | $0.00 | ($45.00) | $0.00 | $169,934.59 |
| 2/22/2021 | 2/1/2021 | 0143089 | Payment - Thank You | $1,850.79 | $1,839.54 | $11.25 | $0.00 | $0.00 | $0.00 | $169,923.34 |
| 2/22/2021 | | 0143089 | Late Charge | ($185.08) | $0.00 | $0.00 | ($185.08) | $0.00 | $0.00 | $169,923.34 |
| 3/1/2021 | 3/1/2021 | 0143667 | Payment - Thank You | $1,850.79 | $1,839.42 | $11.37 | $0.00 | $0.00 | $0.00 | $169,911.97 |
| | | | | $19,011.69 | ($169,911.97) | ($718.30) | ($126.90) | ($613.42) | | |

## TRUST ACCOUNT ACTIVITY

| Transaction Date | Check# or Reference | From Whom Received or To Whom Paid | Description / Memo | Amount Paid Out | Amount Received | Daily Balance |
|---|---|---|---|---|---|---|
| | | | Balance Forward | | | $0.00 |
| 4/29/2020 | 88993 | Clinton Brown | Prepaid Interest | | $613.42 | $613.42 |

SMEAD PRODUCTION 9/18/25

EXH 11-7

## TRUST ACCOUNT ACTIVITY

| Transaction Date | Check# or Reference | From Whom Received or To Whom Paid | Description / Memo | Amount Paid Out | Amount Received | Daily Balance |
|---|---|---|---|---|---|---|
| 4/30/2020 | RESERVES | Clinton Brown | Borrower Payment | $613.42 | | $0.00 |
| 6/9/2020 | CK11409298 | Clinton Brown | Borrower Payment | $1,500.00 | | ($1,500.00) |
| 6/9/2020 | CK11409299 | Clinton Brown | Borrower Payment | | $500.00 | ($1,000.00) |
| 6/9/2020 | CK11409300 | Clinton Brown | Borrower Payment | | $500.00 | ($500.00) |
| 6/9/2020 | CK11409301 | Clinton Brown | Borrower Payment | | $500.00 | $0.00 |
| 7/9/2020 | CK4097666 | Clinton Brown | Borrower Payment | $1,500.00 | | ($1,500.00) |
| 7/9/2020 | CK4097667 | Clinton Brown | Borrower Payment | | $500.00 | ($1,000.00) |
| 7/9/2020 | CK4097668 | Clinton Brown | Borrower Payment | | $500.00 | ($500.00) |
| 7/9/2020 | CK4097669 | Clinton Brown | Borrower Payment | | $500.00 | $0.00 |
| 8/6/2020 | CK1113710 | Clinton Brown | Borrower Payment | | $1,000.00 | $1,000.00 |
| 8/6/2020 | CK1113711 | Clinton Brown | Borrower Payment | $1,000.00 | | $0.00 |
| 12/31/2020 | PAYMENT | Clinton Brown | Borrower Payment | $1,850.79 | | ($1,850.79) |
| 12/31/2020 | 0137998 | Clinton Brown | Borrower Payment | | $1,850.79 | $0.00 |
| | | | | $6,464.21 | $6,464.21 | |

## OUTSTANDING CHARGES AND ADVANCES

| Date of Charge | Reference | Description | | Interest Rate | Original Amount | Unpaid Balance | Accrued Interest | Total Amount Due |
|---|---|---|---|---|---|---|---|---|
| 4/30/2020 | Housingfee | Affordable Housing Recording Fee | D | 0.000% | $75.00 | $75.00 | $0.00 | $75.00 |
| 12/7/2020 | Denial | CA AB3088 Denial Letter | | 0.000% | $6.90 | $6.90 | $0.00 | $6.90 |
| 2/16/2021 | | NSF Payment Charge | | 0.000% | $45.00 | $45.00 | $0.00 | $45.00 |
| | | | | | $126.90 | $126.90 | $0.00 | $126.90 |

EXH 11-8

  SMEAD PRODUCTION 9/18/25     Account: RMF4026550

# NOTE SECURED BY A DEED OF TRUST

Loan Number: **BRG-051321**          Date: **05/14/2021**                                      Canoga Park, California

**21472 Calle Del Barco Malibu CA 90265**
Property Address
A.P.N.: 4451-015-021

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$300,000.00** (this amount will be called "principal"), plus interest, to the order of **Steve Smead, a married man as his sole and separate property, as to an undivided 100.000% interest** (who will be called "Lender"). I understand that the Lender may transfer this Note. The Lender or anyone else who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder(s)."

## 2. INTEREST

I will pay interest at a yearly rate as described in paragraph 3 below.

Interest commences on **the date of funding,** and, if paragraph 3 reflects more than one interest rate during the loan term, the rate will change on the date which is one (1) calendar month before each Payment Start Date.

Interest will be charged on unpaid principal until the full amount of principal has been paid.

I also agree to pay interest at the rate described in paragraph 3 below on the prepaid finance charges which are a part of the principal.

## 3. PAYMENTS

My payments are  ☑ Interest Only   ☐ Fully Amortized    ☐ Other
I will make my payments each month as follows:

| Number of Payments | Payment Start Dates | Interest Rates | Payment Amounts |
|---|---|---|---|
| 23 | Monthly beginning July 1, 2021 | 12.00% | $3,000.00 |
| 1 | June 1, 2023 | 12.00% | $303,000.00 |

I will make these payments until I have paid all of the principal and interest and any other charges that I may owe under this Note. If on **06/01/2023** (the Due Date) I still owe amounts under this Note (balloon balance), I will pay all those amounts, in full, on that date.

I will make my payments payable to **Superior Loan Servicing, 7525 Topanga Canyon Blvd Canoga Park CA 91303**, or at a different place if I am notified by the Note Holder or the Agent for the Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge For Overdue Payments.** If I do not pay the full amount of each monthly payment by the end of **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **10.000%** of my overdue payment or U.S. **$300.00**, whichever is more. I will pay this late charge only once on any late payment.

In the event a balloon payment is delinquent more than **10** days after the date it is due, I agree to pay a late charge in an amount equal to the maximum late charge that could have been assessed with respect to the largest single monthly installment previously due, other than the balloon payment, multiplied by the sum of one plus the number of months occurring since the late payment charge began to accrue.

**(B) Default.** If I do not pay the full amount of each monthly payment due under this Note by the date stated in paragraph 3 above, I will be in default, and the Note Holder may demand that I pay immediately all amounts that I owe under this Note.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(C) Payment of Note Holder's Costs and Expenses.** If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees. A default upon any interest of any Note Holder shall be a default upon all interests.

**(D) Remedy in Event of Default.** Upon the occurrence of an Event of Default, the entire balance of principal, together with all accrued interest, shall, at the option of the Lender, without demand or notice, immediately become due and payable. Upon the occurrence of an Event of Default (and for a period of no less than 6 months after such Event of Default may be remedied), the entire balance of principal, together with all accrued interest thereon, shall bear interest at the note rate plus **five percent (5.000%)** the ("Default Rate"). No delay or omission on the part of the Lender in exercising any right under this Note or under any of the Loan Documents shall operate as a waiver of such right.

Applied Business Software, Inc. (800) 833-3343
Note - Default Rate

BRG-051321/Brown
Page 1 of 3

EXH 12-1

SMEAD PRODUCTION 9/18/25                                     S 013

The occurrence of (but not limited to) any of the following shall be deemed to be an event of default ("Event of Default") hereunder:

    a) Default in the payment of principal or interest when due pursuant to the terms hereof; or

    b) The occurrence of an Event of Default under the Deed of Trust or other agreement (including any amendment, modification or extension thereof) now or hereafter evidencing or securing this Note (all such documents, together with this Note, constituting the "Loan Documents").

    c) A violation of any provisions of the Deed of Trust or other agreement (including any amendment, modification or extension thereof) now or hereafter evidencing or securing ANY Note (all such documents, together with this Note, constituting the "Loan Documents") on ANY property secured by this Lender.

## 5. BORROWER'S PAYMENTS BEFORE THEY ARE DUE - PREPAYMENT PENALTIES

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as "prepayment." If I pay all or part of the loan principal before it is due, whether such payment is made voluntarily or involuntarily, I agree to pay a prepayment penalty computed as follows: **No prepayment penalty (you will not be charged a penalty to pay off or refinance the loan before maturity).**

## 6. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else, also waives these rights. These persons are known as "guarantors, sureties and endorsers."

## 7. RESPONSIBILITIES OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of the guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that anyone of us may be required to pay all of the amounts owed under this Note.

## 8. THIS NOTE IS SECURED BY A DEED OF TRUST

In addition to the protection given to the Note Holder under this Note, a Deed of Trust (the "Security Instrument") with a Due-on-Transfer Clause dated the same date of this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

Some of those conditions are described as follows:

"Lender's Right to Require The Loan to be Paid Off Immediately. If the borrower shall sell, lease for a term of more than 6-years (including options to renew), lease with an option to purchase for less than the encumbrances for any term, or transfer all or any part of the Property or an interest therein, excluding (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) or a transfer by devise, descent, or by operation of law upon the death of a joint tenant, the Lender may, at its option declare the Note and any other obligations secured by this Deed of Trust, together with accrued interest thereon, immediately due and payable, in full. No waiver of the Lender's right to accelerate shall be effective unless it is in writing."

| | | |
|---|---|---|
| _(signature)_ | 5/14/21 | |
| Borrower  **Clinton Brown** | Date | Borrower | Date |

EXH 12-2

SMEAD PRODUCTION 9/18/25                    S 014

e-escrows, inc.
2501 N. Sepulveda Blvd Suite 110
Manhattan Beach, CA 90266
P. (310) 802-1888 F. (310) 802-1998

## BORROWER STATEMENT
Final

File No.: 22465-09
Officer/Escrow Officer: Diane Truong

Printed Date/Time: __05/24/2021__ - 9:48:37AM
Page    1  of 2
Closing Date:  05/21/2021
Disbursement Date:

Borrower:    Clinton Brown

Property: 21472 Calle Del Barco, Malibu, CA  90265

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | | |
| Initial Deposit | | 13,148.17 |
| **TITLE CHARGES** | | |
| Lender/Mortgagee Premium for 300,000.00: North American Title Company | 1,140.00 | |
| Sub Escrow Fee: North American Title Company | 75.00 | |
| Sub and Recon: North American Title Company | 50.00 | |
| Mortgage Recording Fee: North American Title Company | 37.00 | |
| Endorsement: North American Title Company | 50.00 | |
| Wire/Express: North American Title Company | 52.03 | |
| SB2-Affordable Housing and Jobs Act Fee: North American Title Company | 225.00 | |
| Recording Service Fee: North American Title Company | 25.00 | |
| **ESCROW CHARGES TO: e-escrows, inc.** | | |
| Settlement Agent Fee | 950.00 | |
| Document Preparation Fee | 100.97 | |
| **LENDER CHARGES** | | |
| New  to Superior Loan Servicing, Inc.: | | 300,000.00 |
| Prepaid Interest From  5/20/2021 To  5/31/2021, 11 Days, @ 100.0000/per day: Superior Loan Servicing, Inc. | 1,100.00 | |
| Underwriting Fee: Superior Loan Servicing, Inc. | 1,140.00 | |
| Document Preparation: Superior Loan Servicing | 795.00 | |
| **LOAN PAYOFF: Superior Loan Servicing, Inc.** | | |
| Principal Balance | 169,911.97 | |
| Interest From  3/01/2021 To  5/21/2021 | 4,966.10 | |
| Late Charge | 718.30 | |
| Accrued Late Charges | 370.16 | |
| Unpaid Charges | 186.90 | |
| Other Fees | 185.00 | |
| Total Loan Payoff | 176,338.43 | |
| **LOAN PAYOFF: Vince Sarkany** | | |
| Principal Balance | 119,000.00 | |
| Interest | 6,000.00 | |
| Reconveyance Fee | 45.00 | |
| Total Loan Payoff | 125,045.00 | |
| **TAXES:** | | |
| Property Tax/ 1st Installment to: Los Angeles County Tax Collector #4451-015-021 | 2,930.37 | |
| Property Tax/ 2nd Installment to: Los Angeles County Tax Collector | 2,940.35 | |
| Supplemental Taxes/ 1st Installment/Year 2020 to: Los Angeles County Tax Collector #4451-015-021 | 61.19 | |
| Supplemental Taxes/ 2nd Installment/Year 2020 to: Los Angeles County Tax Collector #4451-015-021 | 61.19 | |
| Supplemental Taxes/ 1st Installment/Year 2019 to: Los Angeles County Tax Collector #4451-015-021 | 15.82 | |
| Supplemental Taxes/ 2nd Installment/Year 2019 to: Los Angeles County Tax Collector | 15.82 | |

EXH 12-3

Escrows, Inc.
2501 N. Sepulveda Blvd. Suite 110
Manhattan Beach, CA 90266
P. (310) 802-1888 F. (310) 802-1998

**BORROWER STATEMENT**
Final

File No.: 22465-09

Printed Date/Time:    05/24/2021 - 9:48:37AM
Page    2  of 2

Property: 21472 Calle Del Barco, Malibu, CA  90265

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| #4451-015-021 | | |
| **SUBTOTALS** | 313,148.17 | 313,148.17 |
| **TOTALS** | 313,148.17 | 313,148.17 |

EXH 12-4

THIS IS A FINAL CLOSING STATEMENT

SMEAD PRODUCTION 9/18/25                S 017

Dep.:Mortg. Int. Inc.
1/1/2020 through 4/1/2023

Page 1

*Malibu Payments*

8/10/2025

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|---|---|---|---|---|---|---|---|---|
| 5/20/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #1 4/21 ... | Dep.:Mortg. In... | Malibu ... | R | 606.75 |
| 6/17/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #1 4/21 ... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 7/20/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #2 June... | Dep.:Mortg. In... | Malibu ... | R | 1,830.79 |
| 8/10/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #2 July ... | Dep.:Mortg. In... | Malibu ... | R | 1,831.00 |
| 9/15/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #3 Aug. ... | Dep.:Mortg. In... | Malibu ... | R | 1,831.00 |
| | | | | Pmt #4 Sept ... | Dep.:Mortg. In... | Malibu ... | R | 1,830.79 |
| 10/16/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #4 Sept ... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 11/12/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #5 Oct ... | Dep.:Mortg. In... | Malibu ... | R | 1,826.94 |
| 12/18/2020 | SS RENTALS | DEP | S BANK OF TH... | Pmt #5 Oct ... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 1/28/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt #6 Nov. ... | Dep.:Mortg. In... | Malibu ... | R | 1,826.94 |
| | | | | PmT #7 Dec ... | Dep.:Mortg. In... | Malibu ... | R | 1,830.79 |
| | | | | Pmt #8 Jan ... | Dep.:Mortg. In... | Malibu ... | R | 1,830.79 |
| 2/26/2021 | SS RENTALS | DEP | S BANK OF TH... | | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 3/24/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt Feb Ck ... | Dep.:Mortg. In... | Malibu ... | R | 1,830.79 |
| 5/3/2021 | SS RENTALS | EFT | BANK OF TH... | Payment Mal... | Dep.:Mortg. In... | Malibu ... | R | 3,000.00 |
| 5/21/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt Feb. Ck ... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 6/21/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt Feb Ck ... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 7/27/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt July. Ck... | Dep.:Mortg. In... | Malibu ... | R | 2,980.00 |
| 8/20/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt July. Ck... | Dep.:Mortg. In... | Malibu ... | R | 2,980.00 |
| 9/8/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt July. Ck... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 10/18/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt Sept. C... | Dep.:Mortg. In... | Malibu ... | R | 2,980.00 |
| 11/17/2021 | SS RENTALS | DEP | S BANK OF TH... | Pmt Sept. C... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 12/29/2021 | SS RENTALS | DEP | S | Pmt Sept. C... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 1/26/2022 | SS RENTALS | DEP | S BANK OF TH... | Pmt Sept. C... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 2/18/2022 | SS RENTALS | DEP | S BANK OF TH... | Pmt OCT. C... | Dep.:Mortg. In... | Malibu ... | R | 2,980.00 |
| 3/30/2022 | SS RENTALS | DEP | S | Pmt OCT. C... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 4/22/2022 | SS RENTALS | DEP | S BANK OF TH... | Pmt Nov. Ck... | Dep.:Mortg. In... | Malibu ... | R | 2,980.00 |
| 5/12/2022 | SS RENTALS | DEP | S BANK OF TH... | Pmt Nov. Ck... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| 6/27/2022 | SS RENTALS | DEP | S BANK OF TH... | Pmt Nov. Ck... | Dep.:Mortg. In... | Malibu ... | R | 0.00 |
| **1/1/2020 - 4/1/2023** | | | | | | | | **34,976.58** |

| | |
|---|---|
| TOTAL INFLOWS | 34,976.58 |
| TOTAL OUTFLOWS | 0.00 |
| NET TOTAL | 34,976.58 |

EXH 13

S 449

SMEAD PRODUCTION 9/18/25



**This page is part of your document - DO NOT DISCARD**



# 20221142021



**Pages: 0003**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**12/07/22 AT 08:00AM**

| | |
|---|---|
| FEES: | 32.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 107.00 |



**L E A D S H E E T**



202212071000003

00023016446



013812078

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



2190565CAD_Package_

E475702

SMEAD PRODUCTION 9/18/25    S 020

EXH 14-1

FOR REFERENCE ONLY: 20230046418   1-4-23

WFG National Default Services

RECORDING REQUESTED BY:
**Superior Loan Servicing**

AND WHEN RECORDED TO:
**Steve Smead**
**352 E. Harvard Blvd**
**Santa Paula, Ca 93060**

Forward Tax Statements to
The address given above

---

SPACE ABOVE LINE FOR RECORDER'S USE

TS #: 2022-01537                                    Order #: 2190565CAD
Loan #: BRG-051321

## TRUSTEE'S DEED UPON SALE

A.P.N.: 4451-015-021                          Transfer Tax: $NONE
THIS TRANSACTION IS EXEMPT FROM THE REQUIREMENTS OF THE REVENUE AND TAXATION CODE.
SECTION 480.3
The Grantee Herein was the Foreclosing Beneficiary.
The Amount of the Unpaid Debt was $372,338.14
The Amount Paid by the Grantee was $372,338.14
Said Property is in the City of **Malibu**, County of **Los Angeles**

**Superior Loan Servicing**, as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

## Steve Smead, a married man as his sole and separate property, as to an undivided 100.000% interest

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of Los Angeles, State of California, described as follows: Lot 182 of Tract 10570, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 161 Pages 36 to 42 inclusive of maps, in the office of the county recorder of Los Angeles County, State of California. Excepting therefrom all Minerals, Oil, Petroleum Asphaltum, Gas, Coal, Hydrocarbon substances and water contained in on, within and under said lands and every part thereof, this reservation shall not reserve or shall it be construed as reserving to grantor the right to go upon said lands for the purpose of Extracting any of said substance.

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **Clinton Brown a Single Man** as Trustor, dated **5/14/2021** of the Official Records in the office of the Recorder of Los Angeles, California under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default and Election to Sell under the Deed of Trust recorded on **5/21/2021**, instrument number **20210822632**, Book , Page of official records. Trustee having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b.

ACCOMODATION
This Document delivered to Recorder
As an accomodation only at the
Express request of the parties hereto.
It has not been examined as to
its effect or validity

EXH 14-2

SMEAD PRODUCTION 9/18/25                    S 021

## TRUSTEE'S DEED UPON SALE

TS #: **2022-01537**
Loan #: **BRG-051321**
Order #: **2190565CAD**

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on **1/4/2023**. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being **$372,338.14**, in lawful money of the United States, in pro per, receipt thereof is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **Superior Loan Servicing**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws.

Date: **1/4/2023**

                                        **Superior Loan Servicing, by Asset Default Management, Inc.,
                                        as Agent for Trustee**

                        By: _____
                                        **Julie Taberdo, Sr. Trustee Sale Officer**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF California
COUNTY OF Los Angeles

On 1/4/2023 before me, Donna Ex, Notary Public Personally appeared, Julie Taberdo who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Name                                    (Seal)

DONNA EX
Notary Public.- California
Los Angeles County
Commission # 2342218
My Comm. Expires Jan 18, 2025

**EXH 14-3**

SMEAD PRODUCTION 9/18/25                    S 022

*Copy
2nd JD
Harper lake* **NOTE**
**(INSTALLMENT - INTEREST INCLUDED)**

Escrow No.: 7102012953-MT

*2ndTL*

### DO NOT DESTROY THIS ORIGINAL NOTE
*When paid, this original Note, together with the Deed of Trust securing it, must be surrendered to Trustee for cancellation, before reconveyance will be made.*

$150,000.00                San Bernardino, California                September 21, 2020

In installments as herein stated, for value received, I/we promise to pay to

**Steve Smead**

or order, at 145 S. 8th Street, the sum of One Hundred Fifty Thousand And No/100 Dollars ($150,000.00), with interest from _November 10, 2020_, on the unpaid principal, at the rate of Eight Percent (8.000%) per annum. Principal and interest payable Monthly, in installments of One Thousand And No/100 Dollars, ($1,000.00), beginning on January 1st, 2021, and continuing until December 1st, 2022, at which time all unpaid principal and interest shall become immediately due and payable.

**LATE CHARGE:** Any payment received by holder of this Note more than Ten (10) days after its due date shall bear a late charge of No Dollars And No/100 Dollars ($60.00) and shall be due and payable at the same time and in addition to the delinquent payment.

**PREPAYMENT OF PRINCIPAL WITHOUT PENALTY:** Payor shall have the privilege to prepay this note in full, or in part, at anytime without penalty. Payment(s) shall first apply to interest then due and the balance to principal. Interest shall cease to accrue on any principal paid as of date of payment thereof. Interest only payments, if applicable, shall thereafter adjust accordingly.

Each payment shall be credited on interest then due, at the rate of Eight Percent (8.000%) per annum, and the remainder on principal; and interest shall thereupon cease upon the principal so credited. Should default be made in payment of any installment when due the whole sum of principal and interest shall become due at the option of the holder of this Note. Principal and interest payable in lawful money of the United States. If action be instituted on this Note I promise to pay such sum as the Court may fix as attorney's fees. This Note is secured by a Deed of Trust to Chicago Title Company, a California corporation, herein called Trustee.

Clinton Brown

Note Installment (Interest Included) FD 230 (Rev. 12/20/95)
SCA0000238.doc / Updated: 09.23.19                Page 1                Printed: 09.21.20 @ 11:49 AM by MT
CA-CT-FWIN-02180.055716-7102012953

EXH 15-1

# Chicago Title Company
560 E. Hospitality Lane, San Bernardino, CA 92408
Phone: (800)722-0824 | Fax: (909)384-7856

## FINAL BUYER'S STATEMENT

| | |
|---|---|
| **Settlement Date:** November 10, 2020 | **Escrow Number:** 7102012953 |
| **Disbursement Date:** November 11, 2020 | **Escrow Officer:** Corbi Smith |
| | **Email:** Corbi.Smith@ctt.com |

**Buyer:** Clinton Brown
10226 Regent St
Los Angeles, CA 90034

**Seller:** American Pacific Investments, LLC
P.O. Box 8181
La Verne, CA 91750

**Property:** Vacant Land-42829 Harper Lake Road
Hinkley, CA 92347
Parcel ID(s): 0490-091-09, 0490-091-19

**Lender:** Steve Smead
145 S. 8th Street
Santa Paula, CA 93060-0000

**Lender:** American Pacific Investments
P.O. Box 8181
La Verne, CA 91750

**Lender:** Seller Financing

| | | $ DEBITS $ | CREDITS |
|---|---|---|---|
| **FINANCIAL CONSIDERATION** | | | |
| Sale Price of Property | | 498,000.00 | |
| Loan Amount | Steve Smead | | 150,000.00 |
| Purchase Money Note | | | 348,000.00 |
| Proceeds from CDF 2 | | | 149,309.52 |
| **PRORATIONS/ADJUSTMENTS** | | | |
| County Taxes at $943.24 | 11/10/20 to 01/01/21 ($943.24 / 180 X 51 days) | 267.25 | |
| **NEW LOAN CHARGES - Steve Smead** | | | |
| **Total Loan Charges: $690.48** | | | |
| Prepaid Interest | | 690.48 | |
| $32.88 per day from 11/10/20 to 12/01/20 | | | |
| Steve Smead | | | |
| **TITLE & ESCROW CHARGES** | | | |
| Title - Escrow Fee | Chicago Title Company | 1,346.00 | |
| Title - Extra Parcel Charge | Chicago Title Company | 100.00 | |
| Title - Lender's Title Insurance | Chicago Title Company | 75.00 | |
| Title - Lender's Title Insurance | Chicago Title Company | 75.00 | |
| Title - Loan Service Fee (1st) | Chicago Title Company | 340.00 | |
| Title - Loan Service Fee 2nd | Chicago Title Company | 150.00 | |
| Title - Mobile Signing Fee (BORROWER) | U.S. Certified Signers | 350.00 | |
| Title - Recording Service fee | SYNRGO | 14.45 | |

Policies to be issued:

Loan Policy
  Coverage: $348,000.00   Premium: $75.00

Loan Policy
  Coverage: $150,000.00   Premium: $75.00

CERTIFIED COPY

(7102012953/108) November 11, 2020 09:18 AM

---

SMEAD PRODUCTION 9/18/25    S 153

EXH 15-2

| | | |
|---|---|---|
| Subtotals | 650,814.70 | 651,009.52 |
| Balance Due TO Buyer | 194.82 | |
| TOTALS | 651,009.52 | 651,009.52 |

THIS IS A CERTIFIED COPY OF THE ORIGINAL DOCUMENT(S) BY
CHICAGO TITLE COMPANY

Chicago Title Company, Settlement Agent

SAVE THIS STATEMENT FOR INCOME TAX PURPOSES

EXH 15-3

RECORDING REQUESTED BY
Chicago Title Inland Empire
AND WHEN RECORDED MAIL DOCUMENT TO:

NAME        Steve Smead

STREET
ADDRESS     145 S. 8th Street

CITY, STATE &
ZIP CODE    Santa Paula, CA 93060

Electronically
Recorded in Official Records
County of San Bernardino
Bob Dutton
Assessor-Recorder-County Clerk

## DOC# 2020-0446979

| | | |
|---|---|---|
| 11/10/2020 04:40 PM | Titles: 1 | Pages: 8 |
| SAN | Fees | $35.00 |
| | Taxes | $0.00 |
| 12950 | CA SB2 Fee | $0.00 |
| | Total | $35.00 |

SPACE ABOVE FOR RECORDER'S USE ONLY

## DEED OF TRUST

**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from the fee per GC 27388.1 (a) (2); This document is subject to Documentary Transfer Tax

☑ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☐ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

EXH 15-4

SMEAD PRODUCTION 9/18/25                    S 155

RECORDING REQUESTED BY:
Chicago Title Company
Order No.:   7102012953


When Recorded Mail Document To:
Steve Smead
145 S. 8th Street
Santa Paula, CA  93060

APN/Parcel ID(s):  0490-091-09
                   0490-091-19

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS

THIS DEED OF TRUST, made September 21, 2020, between

Clinton Brown,  a single man, herein called TRUSTOR, whose address is

10226 Regent St, Los Angeles, CA 90034

Chicago Title Company, a California corporation, herein called TRUSTEE, and

Steve Smead, herein called BENEFICIARY,

WITNESSETH:  That Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE, that property in the County of San Bernardino, State of California, described as:

### For APN/Parcel ID(s):  0490-091-09 and 0490-091-19

The West ½ And The West ½ Of The Southeast Quarter Of Section 20, Township 11 North, Range 4 West, San Bernardino Meridian, County Of San Bernardino, State Of California, According To The U.S. Government Survey Thereof.

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph ten (10) of the provisions incorporated herein by reference to collect and apply such rents, issues and profits.

For the Purpose of Securing:

1.    Performance of each agreement of Trustor incorporated by reference or contained herein.

2.    Payment of the indebtedness evidenced by one Promissory Note of even date herewith, and any extension or renewal thereof, in the principal sum of One Hundred Fifty Thousand And No/100 Dollars ($150,000.00) executed by Trustor in favor of Beneficiary or order.

3.    Payment of such further sums as the then record owner of said property hereafter may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

Deed of Trust - Short Form
SCA0000083.doc / Updated:  11.20.17

Page 1

Printed:  09.21.20 @ 11:47 AM
CA-CT-FWIN-02180.055716-7102012953

**EXH 15-5**

SMEAD PRODUCTION 9/18/25                          S 156

## SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS
(continued)

APN/Parcel ID(s):  0490-091-09
0490-091-19

**To Protect the Security of this Deed of Trust, Trustor Agrees:**  By the execution and delivery of this Deed of Trust and the note secured hereby, that provisions one (1) to fourteen (14), inclusive, of the fictitious deed of trust recorded in Santa Barbara County and Sonoma County October 18, 1961, and in all other counties October 23, 1961, in the book and at the page of Official Records in the office of the county recorder of the county where said property is located, noted below opposite the name of such county, viz:

| COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alameda | 435 | 684 | Kings | 792 | 833 | Placer | 895 | 301 | Sierra | 29 | 335 |
| Alpine | 1 | 250 | Lake | 362 | 39 | Plumas | 151 | 5 | Siskiyou | 468 | 181 |
| Amador | 104 | 348 | Lassen | 171 | 471 | Riverside | 3005 | 523 | Solano | 1105 | 182 |
| Butte | 1145 | 1 | Los Angeles | T2055 | 899 | Sacramento | 4331 | 62 | Sonoma | 1851 | 689 |
| Calaveras | 145 | 152 | Madera | 810 | 170 | San Benito | 271 | 383 | Stanislaus | 1715 | 456 |
| Colusa | 296 | 617 | Marin | 1508 | 339 | San Bernardino | 5567 | 61 | Sutter | 572 | 297 |
| Contra Costa | 3978 | 47 | Mariposa | 77 | 292 | San Francisco | A332 | 905 | Tehama | 401 | 289 |
| Del Norte | 78 | 414 | Mendocino | 579 | 530 | San Joaquin | 2470 | 311 | Trinity | 93 | 366 |
| El Dorado | 568 | 456 | Merced | 1547 | 538 | San Luis Obispo | 1151 | 12 | Tulare | 2294 | 275 |
| Fresno | 4626 | 572 | Modoc | 184 | 851 | San Mateo | 4078 | 420 | Tuolumne | 135 | 47 |
| Glenn | 422 | 184 | Mono | 52 | 429 | Santa Barbara | 1878 | 860 | Ventura | 2062 | 386 |
| Humboldt | 657 | 527 | Monterey | 2194 | 538 | Santa Clara | 5336 | 341 | Yolo | 653 | 245 |
| Imperial | 1091 | 501 | Napa | 639 | 86 | Santa Cruz | 1431 | 494 | Yuba | 334 | 486 |
| Inyo | 147 | 598 | Nevada | 305 | 320 | Shasta | 684 | 528 | | | |
| Kern | 3427 | 60 | Orange | 5889 | 611 | San Diego | Series 2 Book 1961, Page 183887 | | | | |

which provisions, identical in all counties, (printed on the attached unrecorded pages) are hereby adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that Trustor will observe and perform said provisions; and that the references to property, obligations and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

The undersigned Trustor requests that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at his address hereinbefore set forth.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

_Clinton Brown_

EXH 15-6

SMEAD PRODUCTION 9/18/25                    S 157

## SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS
(continued)

APN/Parcel ID(s):  0490-091-09
0490-091-19

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of ____California____

County of ____Los Angeles____

On ____10/25/2020____ before me, ____Andre Massengale____ Notary Public (here insert name and title of the officer), personally appeared Clinton Brown, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature _____

ANDRE MASSENGALE
Notary Public – California
Los Angeles County
Commission # 2200833
My Comm. Expires Jun 28, 2021

ANDRE MASSENGALE
Notary Public – California
Los Angeles County
Commission # 2200833
My Comm. Expires Jun 28, 2021

EXH 15-7

SMEAD PRODUCTION 9/18/25                    S 158

**Prepared By:**
Brown Realty Group
2945 Westwood Blvd
Los Angeles, CA 90064

**After Recording Return To**:
Steve Smead
145 S 8th St
Santa Paula, CA 93060

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Parcel Number (APN): 4451-015-021

## DEED OF TRUST

**THIS DEED OF TRUST (the "Trust") dated November 03, 2020, is made by and between:**

Clinton Brown of 10226 Regent St, Los Angeles, California 90034
(the "Borrower")

**-AND-**

Steve Smead of 145 S 8th St, Santa Paula, California 93060
(the "Lender")

**-AND-**

Brown Realty Group of 2945 Westwood Blvd, Los Angeles, California 90064
(the "Trustee")

**-AND-**

Clinton Brown of California, 10226 Regent St, Los Angeles 90034
(the "Guarantor")

**WITNESSETH:**

S 630

**EXH 16-** 1

**THAT FOR AND IN CONSIDERATION OF** the sum lent to the Borrower by the Lender, in the amount of $150,000.00 U.S. Dollars (the "Principal Amount") as evidenced by the promissory note (the "Note") dated November 03, 2020, the receipt of which the Borrower does hereby acknowledge itself indebted, the Borrower IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE, the following described real property (the "Property"), located at 21472 Calle Del Barco in the County of Los Angeles, State of California, with the following legal description:

TRACT NO 10570 LOT 182

**TOGETHER WITH** all the improvements now or hereafter erected on the Property, and all easements, appurtenances, and fixtures now or hereafter a part of the Property. All replacements and additions will also be covered by this Trust.

**BORROWER COVENANTS** that Borrower is the legal owner of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**To Protect the Security of this Deed of Trust, the parties do hereby agree as follows:**

## TERMS RELATING TO PAYMENT

**1. PROMISE TO PAY.** The Borrower, for value received, promises to pay to the Lender the Principal Amount, interest and all fees and costs on the terms outlined in this Trust or in any amendment, extension, or renewal of the Trust and any additional amounts secured by this Trust on the terms elsewhere provided for such debts and liabilities.

**2. INTEREST.** The Borrower agrees to pay the Principal Amount with interest before and after maturity and before and after default at the rate of 0 percent (the "Interest Rate"). The Interest Rate will be calculated from the date this Trust begins on _____ (the "Adjustment Date") and accrues until the whole of the Principal Amount is paid. The Loan will be repaid on the following terms:

a. The Principal Amount with interest will be repaid in consecutive annual installments of $150,000.00.

b. The Adjustment Date for this Trust is _____;

c. The balance, if any, of the Principal Amount and any interest thereon and any other moneys owed under this Trust will be due and payable on November 03, 2021 (the

**EXH 16-**2

"Maturity Date").

**3**. **PAYMENT LOCATION**. The Borrower will make payments to 145 S 8th St, Santa Paula, California 93060, or at such other place as may be designated by Lender at a later date.

**4**. **FUNDS FOR ESCROW ITEMS**. The Borrower will pay to Lender, on the day periodic payments are due under this Trust, until the Principal Amount is paid in full, a sum (the "Funds") to provide for payment for: (a) any taxes, assessments, or other items which can take priority over this Trust as a lien or encumbrance on the Property; (b) lease payments on the Property, if any; (c) premiums for any and all insurance, including Mortgage Insurance required by the Lender. These items are called "Escrow Items."

The Borrower must notify the Lender of all amounts to be paid under this Section. If the Lender requires, the Borrower must provide receipts evidencing such payments to the Lender. If the Borrower does not make payments on time, the Lender can, at its discretion, make any and all past due payments for Escrow Items and the Borrower will be obligated to repay the Lender for any such amount. The Lender may waive the Borrowers obligation to pay the Lender for any and all Escrow Items at any time by providing written notice to the Borrower. If such waiver occurs, the Borrower must pay directly, when and where payable, the amounts due for any and all Escrow Items. If the Borrower is obligated to pay Escrow Items directly, and the Borrower fails to make payments on time, then the Lender may exercise its rights under this Section and pay for any such amounts and Borrower will be obligated to repay Lender for any such amount.

The Borrower will collect and hold the Funds in accordance with the Real Estate Settlement Procedures Act (the "RESPA"). Lender will estimate the amount of Funds due in accordance with Applicable Law. If there is a surplus of Funds held in escrow, as defined under RESPA, the Lender must provide to Borrower the excess funds in accordance with RESPA. If there is a shortage or deficiency of Funds held in escrow, as defined under RESPA, Lender must notify Borrower in writing and Borrower must pay to Lender the amount necessary to make up the shortage or deficiency.

Upon payment in full of all Funds relating to Escrow Items, Lender will promptly refund to Borrower any excess Funds held by Lender.

**5**. **OBLIGATION TO PAY**. The Borrower agrees to pay all moneys payable pursuant to this Trust and all additional amounts secured by this Trust without abatement, set-off or counterclaim. Should the Borrower make any claim against the Lender either initially or by way of abatement, set-off or counterclaim, the Borrower agrees that any such claim will not reduce or postpone their obligation to make all payments as provided by this Trust.

**6**. **APPLICATION OF PAYMENTS**. All payments paid by the Borrower and received by the Lender will first be applied in payment of the interest calculated at the Interest Rate, and second in payment of the Principal Amount. Such payments will be applied in the order in which it became due. However, if the Borrower defaults on payment, then the Lender will have the right to apply

**EXH 16-** 3

any payments received while in default as the Lender so chooses.

**7**. **PREPAYMENT PRIVILEGES**. When not in default, the Borrower may prepay, without penalty, all or a portion of the Principal Amount and Interest earlier than it is due (i.e., make payment prior to the time that it is due). Partial prepayment will not postpone the due date of any subsequent payment or change the payment amount, unless the Lender otherwise agrees in writing. Rather, prepayments will first be applied to the interest calculated at the Interest Rate, and second to the Principal Amount.

**8**. **ADDITIONAL CHARGES AND ENCUMBRANCES**. The Borrower must pay all taxes, assessments, charges, fines, and all other impositions attributable to the Property and all trusts, liens, and other encumbrances on the Property. To the extent that these items are Escrow Items, the Borrower will pay them in the manner provided in Section 4.

**9**. **RELEASE AND RECONVEYANCE**. Upon payment of all sums secured by this Trust, including the Principal Amount and interest, the Lender will request the Trustee to reconvey the Property and must surrender this Trust and the Note evidencing debt secured by this Trust to Trustee. Trustee must reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs. The Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**10**. **NO SALE WITHOUT CONSENT**. The Trustee will not sell, transfer, assign, or otherwise dispose of all or part of the Property or any interest in the Property, without the Borrower's and Lender's prior written consent.

**11**. **PROPERTY INSURANCE**. The Borrower must keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which the Lender requires insurance. The insurance carrier providing the insurance will be chosen by the Borrower. However, the Lender will have the right to disapprove the Borrower's choice, which right may not be unreasonable.

If the Borrower fails to maintain any of the coverage's described above, then Lender may obtain insurance coverage, at Lender's discretion and Borrower's expense. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of the insurance that the Borrower could have obtained. However, any amounts paid by Lender will become additional debt of the Borrower and secured by this Trust. The amounts paid by the Lender will bear interest at the Interest Rate from the date of payment and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies must include a standard mortgage and/or trust clause and will name Lender as mortgagee and/or as an additional loss payee, stating that any loss is payable to the Lender. Borrower further agrees to generally assign rights to insurance proceeds to the Lender up to the

**EXH 16-** 4

amount of the outstanding loan balance. If, at the request of the Lender, Borrower will provide Lender (a) a copy of the insurance policy; (b) all receipts of paid premiums and renewal notices.

In the event of loss, the Borrower must give prompt notice to the insurance carrier and to the Lender. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds must be applied to restoration or repair of the Property, if the restoration or repair is economically feasible. If the restoration or repair is not economically feasible, the insurance proceeds will be applied to the remainder of this Trust, whether or not the balance of the Trust is then due, with the excess, if any, paid to the Borrower.

**12**. **OCCUPANCY, MAINTENANCE, AND REPAIR**. The Borrower will occupy, establish, and use the Property as Borrower's principal residence after the execution of this Trust. The Borrower will not allow the Property to become vacant without the written consent of the Lender. The Borrower will not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not the Borrower is residing at the Property, the Borrower will maintain the Property in order to prevent the Property from deteriorating or decreasing value due to its condition. Unless repair or restoration is not economically feasible, Borrower will promptly make all necessary repairs, replacements, and improvements to avoid any further deterioration or damage. The Lender may, whenever necessary, make reasonable entries upon and inspections of the Property. If the Borrower neglects to maintain the Property in good condition or allows the Property to deteriorate resulting in decreased property value, the Lender will have the right to make such repairs and improvements as it considers necessary to maintain the Property.

**13**. **HAZARDOUS SUBSTANCES**. The Borrower will not cause or permit the presence, use, disposal, storage, or release of any hazardous substances on the Property. Hazardous substances include pollutants, wastes, and those substances defined as toxic or hazardous substances by environmental law, as well as the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. Furthermore, the Borrower will not, nor allow anyone else to do, anything affecting the Property involving any hazardous substances that would materially affect the value of the Property. The Borrower will promptly take all necessary remedial actions under federal, state, and local laws regarding hazardous substances.

**14**. **GUARANTEE**. Each person or entity signing or joining in this Trust as a Guarantor, Covenantor, or Co-signer agrees to the following terms:

> a. Guarantor covenants and agrees that all obligations and liability under this Trust will be joint and several. Additionally, where there is more than one Guarantor, each Guarantor will be jointly and severally liable to the other Guarantor(s) and Borrower.

> b. The Guarantor is bound to fulfill the terms and conditions of this Trust, provided the Borrower, as principal debtor, fails to do so;

> c. The Guarantor guarantees full performance and release of all the Borrower's obligations

S 634

**EXH 16-** 5

under this Trust;

d. If the Guarantor assumes the Borrower's obligations under this Trust, the Guarantor will also obtain all of the Borrower's rights and benefits under this Trust;

e. The Guarantor must indemnify and hold harmless the Lender against all claims, damages, and payments, or loss which might arise or have arisen from the failure of the Borrower and/or Guarantor to pay the amounts owed under this Trust;

f. The Lender will have the choice to proceed against the Guarantor before proceeding against the Borrower to enforce any obligations due under this Trust in the event of default. Furthermore, any enforcement against such obligations can take place before, after, or during any enforcement of the Borrowers debts and/or obligations under this Trust;

g. The Lender can, without the consent or approval of the Guarantor, modify and/or amend the Interest Rate, the Principal Amount and any other term of the Trust or any obligation secured under this Trust. Furthermore, any amendment or modification of the Trust will not release or lessen the liability of the Guarantor;

h. The Guarantor will be bound and subject to any and all changes, modifications, variations, and amendments made to this Trust, regardless of whether such changes were made with or without the consent or approval of the Guarantor;

i. The Guarantor has read this Section and is aware of and fully agrees with its terms and in particular, the terms of this Section.

j. The Lender will serve notice to the Guarantor and any notice will be provided in same manner as provided in the Notice Section as outlines in this Trust.

## DEFAULT AND REMEDIES

**15**. **DEFAULT**. The Borrower will be considered in default under the terms of this Trust if any of the following conditions are met:

a. The Borrower fails to pay the sum of the Principal Amount, interest, or any other amounts due under this Trust.

b. The Borrower fails to perform or comply with any of the terms and conditions or any obligations or responsibilities due under this Trust.

c. The Borrower has given or made, at any time during the loan process, any materially false, misleading, or inaccurate information or statements to the Lender or any other party under this Trust in connection with the loan.

d. If any action or proceeding, whether civil or criminal, is begun that, in Lender's

S 635

**EXH 16-**6

judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Trust.

e. If a lien is registered against the Property, or if default occurs under any other lien or encumbrance existing against the Property;

f. The Borrower abandons or fails to occupy the Property.

g. The Property or any material part of the Property is expropriated.

**16**. **ACCELERATION**. If at any time the Borrower should be in default under this Trust, the Lender must give notice to the Borrower. The notice must specify: (a) the default; (b) the action required to cure the default (if allowable); (c) a date, not less than 30 days from the date of the notice, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Trust and sale of the Property. If the default is not curable and/or if the default is not cured on or before the date specified in the notice, the Lender at its option may require immediate payment in full of all sums, including the Principal Amount, interest, and all other amounts secured by this Trust. If the default is cured, the Trust will be reinstated. If the default is not cured, the Lender may invoke the power of sale and begin foreclosure proceedings.

The Lender will at all times retain the right to require immediate payment in full in the event of default. Any forbearance on the part of the Lender upon default, which includes but is not limited to acceptance of late payment, acceptance of payment from third parties, or acceptance of payments less than the amount due, will not constitute a waiver to enforce acceleration on default.

**17**. **PROTECTION OF LENDER'S INTEREST**. If at any time the Borrower fails to perform the covenants and agreements under this Trust, or if there is a legal proceeding that significantly affects the Lender's interest in the Property, or if the Borrower has abandoned the Property, then the Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property and/or rights under this Trust, which includes, but is not limited to:

a. Paying any sums secured by a lien which has priority over this Trust;

b. Appearing in court;

c. Paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Trust; and

d. Paying for reasonable costs to repair and maintain the Property.

The Lender will at all times retain the right to take action under this Section. However, the Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that the Lender will not incur any liability for not taking any or all actions to perform such tasks. Furthermore, any amounts paid by the Lender will become additional debt of the Borrower

S 636

**EXH 16- 7**

secured by this Trust.

**18**. **POWER OF SALE.** If at any time the Borrower is in default under this Trust, the Lender will have the right and authority to foreclose and force the sale of the Property without any judicial proceeding. Any delay in the exercising of this right will not constitute a waiver to exercise this right at a later date should the Borrower remain in default or subsequently default again in the future.

**19**. **REMEDIES**. The Lender will have the right to invoke all remedies permitted under Applicable Law, whether or not such remedies are expressly granted in this Trust, including but not limited to any foreclosure proceedings.

If the Lender invokes the power of sale, the Trustee will execute a written notice of the occurrence of an event of default and of the Lender's decision to sell the Property. The Lender or Trustee will mail copies of the notice to the Borrower and Guarantor and will also give public notice of sale in the manner provided by Applicable Law. After the time required by Applicable Law, the Trustee will sell the Property at a public auction to the highest bidder at the time and place and under the terms designated by the Trustee in the notice of sale. The Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Furthermore, the Lender or its designee may purchase the Property at any sale.

## MISCELLANEOUS TERMS

**20**. **GOVERNING LAW**. This Trust will be construed in accordance with the laws of the state of California ("Applicable Law"). Applicable Law will include all controlling applicable federal, state and local statutes. All rights and obligations under this Trust are subject to any requirements and limitations of Applicable Law.

**21**. **SEVERABILITY**. If any portion of this Trust will be held to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Trust is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited.

**22**. **JOINT SIGNATURES**. If the Borrower is more than one person or legal entity, each Borrower who signs this Trust will be jointly and severally bound to comply with all the obligations and liabilities of the other Borrower(s).

**23**. **STATUTORY PROVISIONS**. The provisions contained in this Trust are additional and supplemental, to the extent permitted by law, to the provisions set out in the Applicable Law as they relate to trusts.

**24**. **SUBSTITUTE TRUSTEE**. The Lender may, at its option, from time to time appoint a successor Trustee by an instrument executed and acknowledged by Lender and recorded in the

S 637

**EXH 16-** 8

office of the Recorder of the county in which the property is located. The instrument will contain the name of the original Lender, Trustee, and Borrower, the book and page where this Trust is recorded and the name and address if the successor Trustee. Without conveyance of the Property, the successor trustee will succeed to all the title, powers and duties of the Trustee.

**25**. **STATEMENT OF OBLIGATION FEE**. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by § 2943 of the Civil Code of California.

**26**. **NOTICE**. All notice given by either party in connection with this Trust must be in writing. Notice will be considered sufficient when mailed by first class or certified mail to the address of the recipient. The recipient's address will be the property address as stated under this Trust unless another address has been designated. If there is a change of address by any party, that party must promptly notify all parties under this Trust of the change of address. Any notice will be considered effective on the same day that it was sent, unless the day falls on a national holiday, Saturday, or Sunday, in which case, the next business day will be considered as the day of receipt.

 

 

   **IN WITNESS WHEREOF** this Trust has been executed by the Borrower and Guarantor in the manner prescribed by law as of November 03, 2020 as stated above.

 

 

**Borrower:**

By: _____ Date: _____
   Clinton Brown

**Guarantor**:

By: _____ Date: _____
   Clinton Brown

 

 

   **[Notary Acknowledgment to Follow]**

 

S 638

**EXH 16-** 9

## Borrower Acknowledgement

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Los Angeles )

On _____ before me, _____, personally appeared Clinton Brown, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____    (Notary Seal)
Notary Public

_____
My commission expires

**EXH 16-**10

**Guarantor Acknowledgement**

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                )

County of Los Angeles                        )

On _____ before me, _____, personally appeared Clinton Brown, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____       (Notary Seal)

Notary Public

_____

My commission expires

S 640

**EXH 16-**11

**EXH 16-** 12

# *SECURED PROMISSORY NOTE*

$150,000.00                                                    Date: November 03, 2020

For value received, the undersigned Clinton Brown (the "Borrower"), at 10226 Regent St, Los Angeles, California 90034, promises to pay to the order of Steve Smead (the "Lender"), at 145 S 8th St, Santa Paula, California 93060 (or at such other place as the Lender may designate in writing), the sum of $150,000.00 with no interest.

## I. TERMS OF REPAYMENT

### A. Payments

The unpaid principal shall be payable in full on November 03, 2021 (the "Due Date").

### B. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

## II. SECURITY

This Note shall be secured by a Deed of Trust to real property commonly known as 21472 Calle Del Barco, Malibu, California 90265, executed on November 03, 2020. The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower.

## III. PREPAYMENT

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date with no prepayment penalty.

## IV. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

## V. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

S 642

**EXH 16-** 13

This is a RocketLawyer.com document.

1) the failure of the Borrower to pay the principal and any accrued interest when due;

2) the liquidation, dissolution, incompetency or death of the Borrower;

3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

4) the application for the appointment of a receiver for the Borrower;

5) the making of a general assignment for the benefit of the Borrower's creditors;

6) the insolvency of the Borrower;

7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

8) the sale of a material portion of the business or assets of the Borrower.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any real estate pledged as collateral for the payment of this Note, or if there is a default in any security agreement which secures this Note.

## VI. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VII. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of this Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

## VIII. GOVERNING LAW

S 643

This is a RocketLawyer.com document.

**EXH 16-** 14

This Note shall be construed in accordance with the laws of the State of California.

## IX. SIGNATURES

This Note shall be signed by Clinton Brown and Steve Smead.

**[SIGNATURE PAGE FOLLOWS]**

This is a RocketLawyer.com document.

**EXH 16-**15

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.

Signed this _____ day of _____, _____, at _____,
_____ .

Borrower:
Clinton Brown

By: _____          Date: _____

    Clinton Brown

Lender:
Steve Smead

By: _____          Date: _____

    Steve Smead

S 645

This is a RocketLawyer.com document.

**EXH 16-** 16

## DO NOT DESTROY THIS NOTE

WHEN PAID this original Note together with the Deed of Trust securing the same, must be surrendered to the Borrower for cancellation and retention before any reconveyance can be processed.

**EXH 16-** 17

# *GUARANTY AGREEMENT*

This Guaranty Agreement (this "Guaranty") is made effective as of November 03, 2020 by Clinton Brown, (the "Guarantor") for $150,000.

This Guaranty is being given to Steve Smead, (the "Creditor").

This Guaranty is being given for the benefit of the Guarantor and for Clinton Brown, (the "Debtor").

**I. OBLIGATIONS.** This Guaranty is given by the Guarantor to induce the Creditor to extend credit to the Debtor, and in consideration of the Creditor doing so, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and further acknowledging that the Creditor intends to rely on this Guaranty, the Guarantor absolutely and unconditionally guarantees prompt payment when due of all payments and liabilities of the Debtor to the Creditor, whether voluntary or involuntary and however arising, whether secured or unsecured, absolute or contingent, liquidated or unliquidated, and regardless of whether the Debtor may be liable individually or jointly with others, regardless of whether recovery upon any such obligation may be or hereafter become barred or otherwise unenforceable, including interest and charges, and to the extent not prohibited by law, all costs and attorney's fees incurred in attempting to realize upon this Guaranty.

**II. DURATION.** This is a continuing Guaranty and shall not be revoked by the Guarantor. This Guaranty will remain effective until all obligations guaranteed by this Guaranty are completely discharged.

**III. NOTICE OF DEFAULT.** The Creditor shall not be required to notify the Guarantor of a default by the Debtor in the Debtor's commitments to the Creditor before proceeding against the Guarantor under this Guaranty.

**IV. AUTHORITY TO LEND MORE.** The Creditor shall have no duty to notify the Guarantor of any further advances made to the Debtor. Furthermore, the granting of credit from time to time by the Creditor to the Debtor in excess of the amount to which the right of recovery under this Guaranty is limited, if any, and without notice to the Guarantor, is explicitly authorized and shall in no way affect or impair this Guaranty.

**V. CREDITOR PROVISIONS.** The Guarantor expressly waives diligence on the part of the Creditor in collection of any part of the debt or other obligation owed by the Debtor. Further, the Creditor has no duty to bring suit against the Debtor (for collection of the debt or other performance which is due) before proceeding against the Guarantor. The Guarantor waives notice of the acceptance of this Guaranty and of any and all such indebtedness and liability. The Guarantor waives presentment, protest, notice, demand, or action on delinquency in respect of any

This is a RocketLawyer.com document.

**EXH 16-** 18

such indebtedness or liability, including any right to require the Creditor to sue or otherwise enforce payment. Until all obligations of the Debtor to the Creditor have been satisfied in full, the Guarantor waives all rights of subrogation to any collateral and remedies of the Creditor against the Debtor, and other persons or entities. Any indebtedness of the Debtor now or hereafter owed to the Guarantor is hereby subrogated to the indebtedness of the Debtor to the Creditor, and such indebtedness of the Debtor to the Guarantor, if the Creditor so requests, shall be collected, enforced, and received by the Guarantor as trustee for the Creditor and be paid over to the Creditor on account of the indebtedness of the Debtor to the Creditor, but without reducing or affecting in any manner the liability of the Guarantor under the provisions of this Guaranty.

**VI. AUTHORITY TO ALTER OBLIGATION.** The Guarantor agrees that, without notice to the Guarantor, the Creditor may (a) change the terms of payment or performance by the Debtor to the Creditor, and/or (b) release any security. In either event, the Guarantor shall not be released from any responsibility on the obligations of the Debtor. Liability under this Guaranty is not dependent or conditioned upon this instrument being signed by any person or persons. The Guarantor's liability under this Guaranty is several and is independent of any other guarantees. Guarantees of others, if any, may be released or modified, with or without consideration, without affecting the liability of the Guarantor.

**VII. ASSIGNMENT.** This Guaranty (a) shall bind the successors and assigns of the Guarantor (this Guaranty is not assignable by the Guarantor without the express written consent of the Creditor, and is not affected by the death of the Guarantor), (b) shall inure to the Creditor, its successors and assigns, and (c) may be enforced by any party to whom all or any part of the liabilities may be sold, transferred, or assigned by the Creditor.

**VIII. FINANCIAL CONDITION.** The Creditor has no duty to advise the Guarantor of the Debtor's financial condition.

**IX. CORPORATE AUTHORITY.** The Guarantor certifies that it is not prohibited under its articles of incorporation or bylaws (or its articles of organization or operating agreement, if a limited liability company) to act as the Guarantor.

**X. ENTIRE AGREEMENT.** This Guaranty contains the entire agreement of the parties with respect to the subject matter of this Guaranty and there are no other promises or conditions in any other agreement, whether oral or written. This Guaranty supersedes any prior written or oral agreements between the parties with respect to the subject matter of this Guaranty.

**XI. AMENDMENT.** This Guaranty may be modified or amended, if the amendment is made in writing and is signed by both parties.

**XII. SEVERABILITY.** If any provision of this Guaranty shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Guaranty is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

S 648

This is a RocketLawyer.com document.

**EXH 16-** 19

**XIII. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Guaranty shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Guaranty.

**XIV. APPLICABLE LAW.** This Guaranty shall be governed by the laws of the State of California.

**XV. RECEIPT.** The Guarantor acknowledges receipt of a copy of this Guaranty.

By: _____     Date: _____
Clinton Brown

**EXH 16-** 20

 Outlook

## Updated Documents for Review

**From** Clinton Brown <clinton@brownrealtygrp.com>
**Date** Tue 11/3/2020 3:24 PM
**To** STEVE SMEAD <stsmead@gmail.com>

3 attachments (166 KB)
updated document.pdf; securedpromissorynote11.03.pdf; deedoftrust-11.03.pdf;

Steve,

Please see attached documents. Chicago Title cannot record the deed of trust and so I can record that as a broker. Which document(s) do you need a wet signature? Let me know if anything needs editing or if we are good to go.

Thank you,

--



**Clinton Brown**
**Broker & Developer**
**Brown Realty Group**
Cell: 310-487-6453
Email: clinton@brownrealtygrp.com
Website: www.brownrealtygrp.com

Join me for a Zoom conference.

   

CalDRE:02047215

*How was your experience with Brown Realty Group?*



Click to rate your experience with Brown Realty Group

S 650

**EXH 16- 21**

Isl TD Harper Lake

**RECORDED AT THE REQUEST OF**
**CHICAGO TITLE - INLAND EMPIRE**

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL DOCUMENT TO:**

| | |
|---|---|
| **NAME** | Steve Smead |
| **STREET ADDRESS** | 352 E. Harvard Blvd. |
| **CITY, STATE & ZIP CODE** | Santa Paula CA 93060 |

Electronically
Recorded in Official Records
San Bernardino County
Bob Dutton
Assessor-Recorder-County Clerk

## DOC# 2022-0251090

| | | |
|---|---|---|
| 07/19/2022 04:38 PM SAN | Titles: 1 | Pages: 3 |
| | Fees | $32.00 |
| | Taxes | $0.00 |
| I5190 | CA SB2 Fee | $0.00 |
| | Total | $32.00 |

**SPACE ABOVE FOR RECORDER'S USE ONLY**

## Corporation Assignment of Deed of Trust
### Title of Document

Pursuant to Assembly Bill 1466 – Restrictive Covenant (GC Code Section 27388.2), effective July 1, 2022, a fee of two dollars ($2) for recording the first page of every instrument, paper, or notice required or permitted by law to be recorded per each single transaction per parcel of real property, except those expressly exempted from payment of recording fees, as authorized by each county's board of supervisors and in accordance with applicable constitutional requirements.

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

**Reason for Exemption:**

☐ Exempt from fee per GC 27388.1, recorded in connection with a transfer subject to the imposition of documentary transfer tax (DTT), or

☐ Exempt from fee per GC 27388.1, recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier, or

☑ Exempt from fee per GC 27388.1, recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on 11/10/2020 (date) as document number 1 _____ of Official Records. (Cap. $225.00)    2020-0446977

☐ Exempt from fee per GC 27388.1, fee cap of $225.00 reached, and/or

☐ Exempt from fee per GC 27388.1, not related to real property

Failure to include an exemption reason will result in the imposition of the $75.00 Building Homes and Jobs Act fee. Fees collected are deposited to the State and may not be available for refund.

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**    EXH 17-1

**RECORDING REQUESTED BY:**

**AND WHEN RECORDED MAIL DOCUMENT AND
TAX STATEMENT TO:**

Steve Smead
352 E Harvard Blvd
Santa Paula CA 93060

7102012953

THIS SPACE FOR RECORDER'S USE ONLY:

## CORPORATION ASSIGNMENT OF DEED TO TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, and transfers to **Steve Smead** all beneficial interest under that certain Deed of Trust dated **August 21, 2020** executed by **Clinton Brown**, Trustor, to **Chicago Title Company, A California Corporation**, Trustee, and recorded as Instrument No. 2020-0446978, on **November 10, 2020**, of Official Records in the County Recorders Office of San Bernardino California, describing land therein as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
A.P. # 0490-091-09-0-000 & 0490-091-19-0-000

Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated June 13, 2022

American Pacific Investments

By: _____

Iqbal Ahmed

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _LOS ANGELES_
On _07-08-2022_ before me, _ELIZABETH SMITH_ _____ A Notary Public personally appeared _IQBAL AHMED_ _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _Elizabeth Smith_

(Seal)

ELIZABETH SMITH
COMM. # 2404788
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires JUNE 14, 2026

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

**EXH 17-2**

# EXHIBIT "A"
## Legal Description

<u>**For APN/Parcel ID(s):  0490-091-09-0-000 and 0490-091-19-0-000**</u>

Parcel 1:  (APN: 0490-091-09-0-000)

The West ½ Of Section 20, Township 11 North, Range 4 West, San Bernardino Meridian, In The County Of San Bernardino, State Of California, According To The U.S. Government Survey Thereof.

Parcel 2:  (APN: 0490-091-19-0-000)

The West ½ Of The Southeast Quarter Of Section 20, Township 11 North, Range 4 West, San Bernardino Meridian, In The County Of San Bernardino, State Of California, According To The U.S. Government Survey Thereof.

EXH 17-3

# Exact Escrow

1025 Sentinel Drive, #106
La Verne, CA 91750
(909) 542-0162  Fax:  (909) 542-0172

*Purchase of 1st.*

Prepared by: SHANNON PACKARD

Printed: July 20, 2022  11:08am

## FINAL SETTLEMENT STATEMENT

| | | |
|---|---|---|
| **PROPERTY:** | Vacant Land-42829 Harper Lake Road<br>Hinkley, CA 92347 | **DATE:**     July 20, 2022 |

| | |
|---|---|
| **CLOSING/RECORD DATE:** | July 19, 2022 |
| **DISBURSEMENT DATE:** | July 20, 2022 |
| **ESCROW NO.:** | 016432-SP1 |

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Deposit from Steve Smead | | 370,350.00 |
| | | |
| **PAYOFF CHARGES - American Pacific Investments** | | |
| **[Total Payoff $369,413.00]** | | |
| Principal Balance | 348,000.00 | |
| Interest on Principal Balance at 8.0000% from 10/10/2021 to 07/22/2022 | 21,808.00 | |
| Less Escrow & Title Fees | -395.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Chicago Title Company** | | |
| Title - Lender Assignment of Mortgage | 200.00 | |
| Recording Assignment of TD | 32.00 | |
| Miscellaneous Recording Fees | 23.00 | |
| | | |
| **ESCROW CHARGES - Exact Escrow** | | |
| Title - Escrow Fee | 450.00 | |
| Title - Messenger Fee | 25.00 | |
| Title - Archive Fee | 30.00 | |
| Title - Wire Fee | 30.00 | |
| | | |
| **Total Refund to Steve Smead** | 147.00 | |
| | | |
| **TOTAL** | $   370,350.00 | $   370,350.00 |

**SAVE THIS STATEMENT FOR INCOME TAX PURPOSES**

EXH 17-4

SMEAD PRODUCTION 9/18/25                                S 165

Case 2:23-cv-02938-MEMF-KS    Document 178-4    Filed 05/14/26    Page 123 of 156    Page ID #:2523

Hinkly Loan Payments

## Cash Flow
### 1/1/2020 through 1/1/2023

| Category | 1/1/2020-1/1/2023 |
|---|---|
| **INFLOWS** | |
| Dep. | |
| Escrow Refund | 690.48 |
| Mortg. Int. Inc. | 4,000.00 |
| TOTAL Dep. | 4,690.48 |
| **TOTAL INFLOWS** | **4,690.48** |
| | |
| **OUTFLOWS** | |
| Bank Charge | 27.50 |
| Loan service expence | 3,477.00 |
| Loan To Other | 150,000.00 |
| Purchase TD | 370,350.00 |
| **TOTAL OUTFLOWS** | **523,854.50** |
| | |
| **OVERALL TOTAL** | **-519,164.02** |

Jan, Feb, March, April Payment
of $1,000 each

2nd TD
Purchase of 1st TD

EXH 19

S 450

SMEAD PRODUCTION 9/18/25

2nd TD
Harper Lane

Electronically
Recorded in Official Records
San Bernardino County

Assessor-Recorder-County Clerk

## DOC# 2023-0021452

WFG National-Default Services

RECORDING REQUESTED BY
**Same as below**

WHEN RECORDED MAIL TO

STEVE SMEAD
145 S. 8TH ST.
SANTA PAULA, CA 93060
Mail Tax Statement To:

SAME AS ABOVE

Trustee Sale No. CA-STS-22019423

| | |
|---|---|
| 01/31/2023 08:34 AM SAN | Titles: 1    Pages: 2 |
| F3010 | Fees $39.00 |
| | Taxes $0.00 |
| | CA SB2 Fee $75.00 |
| | Total $114.00 |

# TRUSTEE'S DEED

The undersigned grantor declares:
1. The Grantee herein was the foreclosing beneficiary.
2. The amount of the unpaid debt together with costs was $175,909.68.
3. The amount paid by the Grantee at the Trustee's Sale was $175,909.68.
4. The documentary transfer tax is $0.00.

**PEAK FORECLOSURE SERVICES, INC.,** a California corporation, as the duly appointed Trustee under the Deed of Trust hereinafter described (herein called TRUSTEE), hereby grants and conveys, but without warranty, express or implied, to:

STEVE SMEAD

Herein called GRANTEE, all of its right, title and interest in and to that certain property situate in the City of HINKLEY, County of SAN BERNARDINO, State of CALIFORNIA, described as follows:

THE WEST 1/2 AND THE WEST 1/2 OF THE SOUTHEAST QUARTER OF SECTION 20, TOWHNSHIP 11 NORTH, RANGE 4 WEST, SAN BERNARDINO MERIDIAN, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, ACCORDING TO THE U.S. GOVERNMENT SURVEY THEREOF.

TAX PARCEL NO:    0490-091-09-0-000 AND 0490-091-19-0-000

This conveyance is made pursuant to the powers conferred upon TRUSTEE by that certain Deed of Trust executed by CLINTON BROWN, A SINGLE MAN, as Trustors recorded 11/10/2020 , as Instrument No. 2020-0446979, of Official Records in the office of the Recorder of SAN BERNARDINO County, State of CALIFORNIA, and after fulfillment of the conditions as specified in said Deed of Trust authorizing this conveyance. Default occurred as set forth in a Notice of Default and Election to Sell which was filed for record in the office of the Recorder of said County, and such default still existed at the time of sale. All requirements of law regarding the mailing of copies of notices and posting and publication of copies of the Notice of Sale have been complied with.

Said property was sold by said Trustee at public auction on January 5, 2023, at the place named in the Notice of Sale, in the County of SAN BERNARDINO, CALIFORNIA, in which the property is situated. Grantee, being the highest bidder at such sale, became the purchaser of said property and paid therefore to said Trustee the amount bid being $175,909.68, in lawful money of the United States, or by the satisfaction, pro tanto, of the obligations then secured by said Deed of Trust.

**ACCOMODATION**
This Document delivered to Recorder
As an accomodation only at the
Express request of the parties hereto.
It has not been examined as to
its effect or validity

Page 1 of 2                    CA_TD

## EXH 20-1

Trustee Sale No. CA-STS-22019423

Date:    1/30/2023

PEAK FORECLOSURE SERVICES, INC., Trustee

By _____
Lilian Solano, Authorized Signor

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF <u>California</u>

COUNTY OF <u>Los Angeles</u>

On <u>1/30/2023</u>, before me, <u>Kelli J. Espinoza</u> notary public personally appeared <u>Lilian Solano,</u> who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

_____
NOTARY PUBLIC

KELLI J. ESPINOZA
Notary Public - California
Los Angeles County
Commission # 2364437
My Comm. Expires Jul 6, 2025

Page 2 of 2                                    CA_TD

EXH 20-2

SMEAD PRODUCTION 9/18/25                    S 176

# *GUARANTY AGREEMENT*

This Guaranty Agreement (this "Guaranty") is made effective as of November 02, 2020 by Clinton Brown, (the "Guarantor").

This Guaranty is being given to Steve Smead, (the "Creditor"),

This Guaranty is being given for the benefit of the Guarantor and for Atlas Development Group, LLC, (the "Debtor") for the extension of credit of $150,000 as outlined in the Loan Agreement dated September 24, 2020.

**I. OBLIGATIONS.** This Guaranty is given by the Guarantor to induce the Creditor to extend credit to the Debtor, and in consideration of the Creditor doing so, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and further acknowledging that the Creditor intends to rely on this Guaranty, the Guarantor absolutely and unconditionally guarantees prompt payment when due of all payments and liabilities of the Debtor to the Creditor, whether secured or unsecured, absolute or contingent, liquidated or unliquidated, and regardless of whether the Debtor may be liable individually or jointly with others, regardless of whether recovery upon any such obligation may be or hereafter become barred or otherwise unenforceable, including interest and charges, and to the extent not prohibited by law, all costs and attorney's fees incurred in attempting to realize upon this Guaranty.

**II. DURATION.** This is a continuing Guaranty and shall not be revoked by the Guarantor. This Guaranty will remain effective until all obligations guaranteed by this Guaranty are completely discharged.

**III. NOTICE OF DEFAULT.** The Creditor shall not be required to notify the Guarantor of a default by the Debtor in the Debtor's commitments to the Creditor before proceeding against the Guarantor under this Guaranty.

**IV. CREDITOR PROVISIONS.** The Guarantor expressly waives diligence on the part of the Creditor in collection of any part of the debt or other obligation owed by the Debtor. Further, the Creditor has no duty to bring suit against the Debtor (for collection of the debt or other performance which is due) before proceeding against the Guarantor. The Guarantor waives notice of the acceptance of this Guaranty and of any and all such indebtedness and liability. The Guarantor waives presentment, protest, notice, demand, or action on delinquency in respect of any such indebtedness or liability, including any right to require the Creditor to sue or otherwise enforce payment. Until all obligations of the Debtor to the Creditor have been satisfied in full, the Guarantor waives all rights of subrogation to any collateral and remedies of the Creditor against the Debtor, and other persons or entities.

**V. AUTHORITY TO ALTER OBLIGATION.** The Guarantor agrees that, without notice to

S 937

EXH 42-1

This is a RocketLawyer.com document.

the Guarantor, the Creditor may (a) change the terms of payment or performance by the Debtor to the Creditor, and/or (b) release any security. In either event, the Guarantor shall not be released from any responsibility on the obligations of the Debtor. Liability under this Guaranty is not dependent or conditioned upon this instrument being signed by any person or persons. The Guarantor's liability under this Guaranty is several and is independent of any other guarantees. Guarantees of others, if any, may be released or modified, with or without consideration, without affecting the liability of the Guarantor.

**VI. ASSIGNMENT.** This Guaranty (a) shall bind the successors and assigns of the Guarantor (this Guaranty is not assignable by the Guarantor without the express written consent of the Creditor, and is not affected by the death of the Guarantor), (b) shall inure to the Creditor, its successors and assigns, and (c) may be enforced by any party to whom all or any part of the liabilities may be sold, transferred, or assigned by the Creditor.

**VII. FINANCIAL CONDITION.** The Creditor has no duty to advise the Guarantor of the Debtor's financial condition.

**VIII. CORPORATE AUTHORITY.** The Guarantor certifies that it is not prohibited under its articles of incorporation or bylaws (or its articles of organization or operating agreement, if a limited liability company) to act as the Guarantor.

**IX. ENTIRE AGREEMENT.** This Guaranty contains the entire agreement of the parties with respect to the subject matter of this Guaranty and there are no other promises or conditions in any other agreement, whether oral or written. This Guaranty supersedes any prior written or oral agreements between the parties with respect to the subject matter of this Guaranty.

**X. AMENDMENT.** This Guaranty may be modified or amended, if the amendment is made in writing and is signed by both parties.

**XI. SEVERABILITY.** If any provision of this Guaranty shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Guaranty is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**XII. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Guaranty shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Guaranty.

**XIII. APPLICABLE LAW.** This Guaranty shall be governed by the laws of the State of California.

**XIV. RECEIPT.** The Guarantor acknowledges receipt of a copy of this Guaranty.

EXH 42-2

S 938

This is a RocketLawyer.com document.

By: _____    Date: _____

11/02/2020
05:17 PM PST

Clinton Brown

EXH 42-3

S 939

This is a RocketLawyer.com document.

# *LOAN AGREEMENT*

$150,000.00                                     Date: September 24, 2020

For value received for funding the 2nd Deed of Trust for 42829 Harper Lake Rd, Hinkley, CA, the undersigned Atlas Development Group, LLC (the "Borrower"), at 10226 Regent St, Los Angeles, California 90034, promises to pay to the order of Steve Smead (the "Lender"), at 145 S 8th St, Santa Paula, California 93060 (or at such other place as the Lender may designate in writing), the sum of $150,000.00 with no interest.

## I. TERMS OF REPAYMENT

### A. Payments

The unpaid principal shall be payable in full on September 24, 2022 (the "Due Date").

### B. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

## II. PREPAYMENT

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date with no prepayment penalty.

## III. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

## IV. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

   1) the failure of the Borrower to pay the principal and any accrued interest when due;

BROWN_0045                    EXH 43-1

This is a RocketLawyer.com document.

2) the liquidation, dissolution, incompetency or death of the Borrower;

3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

4) the application for the appointment of a receiver for the Borrower;

5) the making of a general assignment for the benefit of the Borrower's creditors;

6) the insolvency of the Borrower;

7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

8) the sale of a material portion of the business or assets of the Borrower.

## V. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VI. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of this Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

## VII. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of California.

## VIII. SIGNATURES

EXH 43-2

BROWN_0046

This is a RocketLawyer.com document.

This Note shall be signed by Clinton Brown, on behalf of Atlas Development Group, LLC and Steve Smead.

**[SIGNATURE PAGE FOLLOWS]**

EXH 43-3

BROWN_0047

This is a RocketLawyer.com document.

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.

Signed this _____ day of _____, _____, at _____, _____ .

Borrower:
Atlas Development Group, LLC

By: _____          Date: _____
    Clinton Brown

Lender:
Steve Smead

By: _____          Date: _____
    Steve Smead

EXH 43-4

BROWN_0048

This is a RocketLawyer.com document.

**Date:** Thu, 16 Sep 2021 14:17:40 -0700
**From:** Clinton Brown <projects@atlasdevelopmentgroupllc.com>
**To:** stsmead@gmail.com
**Cc:**
**Bcc:**
**Subject:** Common Stock Loan Request

Steve,

Hope you are enjoying your vacation. Please take a look at this and let me know if you'd be able to loan my company, Atlas, Inc. $100,000 against the company common stock.

**With this $100k I will be able to:**

1. Finish the Harper CUP which costs $29,000,

2. Receive a credit line from Brex that will allow me to ride out the next few months without worry until the Reg D offering begins near the end of November - The account requires a reserve of $50,000 and will allow a 10-20 times credit line on that account, so that would be in the account at all times.

3. Apply and reserve 1920 acres in Utah of BLM land near the fully CUP approved Utah project. We will be submitting several more BLM ROW-299 applications @ $15 an acre. This strategy, I believe, will allow for cheaper "acquisitions" leases for 25 years from BLM and we will be able to have a streamlined approval process for every project because the process is 99 percent the same in each BLM office. Also, as mentioned before, the 2020 Appropriations Bill signed into law last year allocates $25b in funding for BLM placement of solar with private companies.

4. Our application for a DOE loan guarantee has been submitted for Part 1 and is being reviewed. There are no application fees, so we will be applying for additional BLM/DOE projects.

5. Hire a full-time assistant, so I can get more things done.

6. Lastly, I'm putting together an Advisory Board for my company, Atlas, Inc. that brings together very experienced people I know and like. This Advisory Board will help me with securing a Reg D funding round with institutional investors from Castle Placement. with their experience and advice. There would be stock compensation for your time (which is really not much at all, a couple meetings here and there and maybe speaking with some of the institutional investors during the Reg D raise). Even if you don't loan me this money I'm requesting, I'd still like to have you on the Advisory Board. Call me crazy, but I believe in you too!

The Company that completed the 409a is an SEC Registered company and the 409a is an IRS document. So this is legit, believe it or not.

**How to proceed forward:**

1. If we are doing the 100k stock issuance for $100k cash, I will issue the stock and you will receive an email confirming that issuance from Adnales - an SEC regulated company that issues my company stock.

Each share is valued at a discounted rate of $13.59 per share and a retail value is $19.98 per share (see 409a Exhibit 1). The spread will be the return, which is quite generous but I'm only doing this once like this to move the company forward until we get the Reg D offering in place.

You will be issued 7,358 fully vested shares at $13.59 for a total of $100,000. You'd be able to exercise those options, if you so choose, after the closing of the Reg D offering at $19.98 per share or a total profit of $47,020. The timeline for this is by the end of the year at the latest.

2. Wire funds to:
The Atlas, LLC
c/o Clinton Brown
16821 Edgar Street
Pacific Palisades, CA 90272

Chase Bank
9801 Washington Blvd., Culver City, CA 90232
Account number:
702661338
Routing number:
021000021

EXH 53-1

BROWN_1346

3. Join the Advisory Board and let's make some millions!

I believe I owe you since May 2020 for Harper @ $1,000 a month. Is that what your record shows? Please confirm or let me know if I'm wrong.

I appreciate your consideration and would be happy to answer any questions.

Thank you,
Clinton

--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

   

*Managing Director is a Broker*

*CalDRE:02047215*

EXH 53-2

BROWN_1347

**Date:** Tue, 28 Sep 2021 14:41:41 -0700
**From:** Clinton Brown <projects@atlasdevelopmentgroupllc.com>
**To:** stsmead@gmail.com
**Cc:**
**Bcc:**
**Subject:** Fwd: Common Stock Loan Request

---

Steve,

Hope you are enjoying your vacation. Please take a look at this and let me know if you'd be able to loan my company, Atlas, Inc. $100,000 against the company common stock.

**With this $100k I will be able to:**

1. Finish the Harper CUP which costs $29,000,

2. Receive a credit line from Brex that will allow me to ride out the next few months without worry until the Reg D offering begins near the end of November - The account requires a reserve of $50,000 and will allow a 10-20 times credit line on that account, so that would be in the account at all times.

3. Apply and reserve 1920 acres in Utah of BLM land near the fully CUP approved Utah project. We will be submitting several more BLM ROW-299 applications @ $15 an acre. This strategy, I believe, will allow for cheaper "acquisitions" leases for 25 years from BLM and we will be able to have a streamlined approval process for every project because the process is 99 percent the same in each BLM office. Also, as mentioned before, the 2020 Appropriations Bill signed into law last year allocates $25b in funding for BLM placement of solar with private companies.

4. Our application for a DOE loan guarantee has been submitted for Part 1 and is being reviewed. There are no application fees, so we will be applying for additional BLM/DOE projects.

5. Hire a full-time assistant, so I can get more things done.

6. Lastly, I'm putting together an Advisory Board for my company, Atlas, Inc. that brings together very experienced people I know and like. This Advisory Board will help me with securing a Reg D funding round with institutional investors from Castle Placement. with their experience and advice. There would be stock compensation for your time (which is really not much at all, a couple meetings here and there and maybe speaking with some of the institutional investors during the Reg D raise). Even if you don't loan me this money I'm requesting, I'd still like to have you on the Advisory Board. Call me crazy, but I believe in you too!

The Company that completed the 409a is an SEC Registered company and the 409a is an IRS document. So this is legit, believe it or not.

**How to proceed forward:**

1. If we are doing the 100k stock issuance for $100k cash, I will issue the stock and you will receive an email confirming that issuance from Adnales - an SEC regulated company that issues my company stock.

Each share is valued at a discounted rate of $13.59 per share and a retail value is $19.98 per share (see 409a Exhibit 1). The spread will be the return, which is quite generous but I'm only doing this once like this to move the company forward until we get the Reg D offering in place.

You will be issued 7,358 fully vested shares at $13.59 for a total of $100,000. You'd be able to exercise those options, if you so choose, after the closing of the Reg D offering at $19.98 per share or a total profit of $47,020. The timeline for this is by the end of the year at the latest.

2. Wire funds to:
The Atlas, LLC
c/o Clinton Brown
16821 Edgar Street
Pacific Palisades, CA 90272

Chase Bank
9801 Washington Blvd., Culver City, CA 90232
Account number:
702661338
Routing number:
021000021

EXH 53-3

BROWN_1348

3. Join the Advisory Board and let's make some millions!

I believe I owe you since May 2020 for Harper @ $1,000 a month. Is that what your record shows? Please confirm or let me know if I'm wrong.

I appreciate your consideration and would be happy to answer any questions.

Thank you,
Clinton


--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

   

*Managing Director is a Broker*

*CalDRE:02047215*


--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

   

*Managing Director is a Broker*

*CalDRE:02047215*

EXH 53-4

BROWN_1349

**Date:** Tue, 28 Sep 2021 14:42:15 -0700
**From:** Clinton Brown <projects@atlasdevelopmentgroupllc.com>
**To:** stsmead@gmail.com
**Cc:**
**Bcc:**
**Subject:** Fwd: Common Stock Loan Request

Final Report

---------- Forwarded message ---------
From: **Clinton Brown** <projects@atlasdevelopmentgroupllc.com>
Date: Tue, Sep 28, 2021 at 2:41 PM
Subject: Fwd: Common Stock Loan Request
To: <stsmead@gmail.com>

Steve,

Hope you are enjoying your vacation. Please take a look at this and let me know if you'd be able to loan my company, Atlas, Inc. $100,000 against the company common stock.

**With this $100k I will be able to:**

1. Finish the Harper CUP which costs $29,000,

2. Receive a credit line from Brex that will allow me to ride out the next few months without worry until the Reg D offering begins near the end of November - The account requires a reserve of $50,000 and will allow a 10-20 times credit line on that account, so that would be in the account at all times.

3. Apply and reserve 1920 acres in Utah of BLM land near the fully CUP approved Utah project. We will be submitting several more BLM ROW-299 applications @ $15 an acre. This strategy, I believe, will allow for cheaper "acquisitions" leases for 25 years from BLM and we will be able to have a streamlined approval process for every project because the process is 99 percent the same in each BLM office. Also, as mentioned before, the 2020 Appropriations Bill signed into law last year allocates $25b in funding for BLM placement of solar with private companies.

4. Our application for a DOE loan guarantee has been submitted for Part 1 and is being reviewed. There are no application fees, so we will be applying for additional BLM/DOE projects.

5. Hire a full-time assistant, so I can get more things done.

6. Lastly, I'm putting together an Advisory Board for my company, Atlas, Inc. that brings together very experienced people I know and like. This Advisory Board will help me with securing a Reg D funding round with institutional investors from Castle Placement. with their experience and advice. There would be stock compensation for your time (which is really not much at all, a couple meetings here and there and maybe speaking with some of the institutional investors during the Reg D raise). Even if you don't loan me this money I'm requesting, I'd still like to have you on the Advisory Board. Call me crazy, but I believe in you too!

The Company that completed the 409a is an SEC Registered company and the 409a is an IRS document. So this is legit, believe it or not.

**How to proceed forward:**

1. If we are doing the 100k stock issuance for $100k cash, I will issue the stock and you will receive an email confirming that issuance from Adnales - an SEC regulated company that issues my company stock.

Each share is valued at a discounted rate of $13.59 per share and a retail value is $19.98 per share (see 409a Exhibit 1). The spread will be the return, which is quite generous but I'm only doing this once like this to move the company forward until we get the Reg D offering in place.

You will be issued 7,358 fully vested shares at $13.59 for a total of $100,000. You'd be able to exercise those options, if you so choose, after the closing of the Reg D offering at $19.98 per share or a total profit of $47,020. The timeline for this is by the end of the year at the latest.

2. Wire funds to:                                    BROWN_1350                     EXH 53-5
The Atlas, LLC
c/o Clinton Brown
16821 Edgar Street

Pacific Palisades, CA 90272

Chase Bank
9801 Washington Blvd., Culver City, CA 90232
Account number:
702661338
Routing number:
021000021

3. Join the Advisory Board and let's make some millions!

I believe I owe you since May 2020 for Harper @ $1,000 a month. Is that what your record shows? Please confirm or let me know if I'm wrong.

I appreciate your consideration and would be happy to answer any questions.

Thank you,
Clinton


--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

   

*Managing Director is a Broker*

*CalDRE:02047215*


--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

   

*Managing Director is a Broker*

*CalDRE:02047215*


--

**Clinton Brown**

**Managing Partner & Developer**

**Atlas Development Group, LLC**

Cell: 310-487-6453

Email: projects@atlasdevelopmentgroupllc.com

Website: www.atlasdevelopmentgroupllc.com

EXH 53-6

   

BROWN_1351

EXH 53-7

BROWN_1352

**Date:** Sat, 11 Jun 2022 21:59:39 -0700
**From:** Clinton Brown <clinton@atlasinc.solar>
**To:** STEVE SMEAD <stsmead@gmail.com>
**Cc:**
**Bcc:**
**Subject:** Re: Property taxes Harper Lake property

Steve,

I'd pay you before I paid the taxes to the government - if I had the money. There's a 5 year window on property taxes and I'm leveraging that. The taxes do not need to be paid in order to pay off the 1st deed of trust and make everything kosher like we agreed. I'll pay them when I sell the property and/or get the CUP issued and income coming in from the property from solar.

There's no issue here.

Thank you,
Clinton

On Thu, Jun 9, 2022 at 7:58 AM STEVE SMEAD <stsmead@gmail.com> wrote:
> Please pay property taxes that are past due as soon as possible.   I can not move forward with purchase of 1st trust deed until the taxes are current.
>
> Steve

--
**Clinton Brown**
**Atlas, Inc.**
CEO
Autonomous Solar Fields
Cell: 310-487-6453
clinton@atlasinc.solar
www.atlasinc.solar

**DISCLAIMER:**
This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

EX 54-1

BROWN_1453

**Date:** Sat, 11 Jun 2022 21:59:39 -0700
**From:** Clinton Brown <clinton@atlasinc.solar>
**To:** STEVE SMEAD <stsmead@gmail.com>
**Cc:**
**Bcc:**
**Subject:** Re: Property taxes Harper Lake property

Steve,

I'd pay you before I paid the taxes to the government - if I had the money. There's a 5 year window on property taxes and I'm leveraging that. The taxes do not need to be paid in order to pay off the 1st deed of trust and make everything kosher like we agreed. I'll pay them when I sell the property and/or get the CUP issued and income coming in from the property from solar.

There's no issue here.

Thank you,
Clinton

On Thu, Jun 9, 2022 at 7:58 AM STEVE SMEAD <stsmead@gmail.com> wrote:
> Please pay property taxes that are past due as soon as possible.   I can not move forward with purchase of 1st trust deed until the taxes are current.
>
> Steve

--
**Clinton Brown**
**Atlas, Inc.**
CEO
Autonomous Solar Fields
Cell: 310-487-6453
clinton@atlasinc.solar
www.atlasinc.solar

**DISCLAIMER:**
This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

EX 54-2

BROWN_1453

**Date:** Sun, 7 Aug 2022 15:52:18 -0700
**From:** STEVE SMEAD <stsmead@gmail.com>
**To:** Clinton Brown <clinton@atlasinc.solar>
**Cc:**
**Bcc:**
**Subject:** Re: Update on Utah, Harper and Malibu Properties, and Proposal for Harper Lake Promissory Note

Clinton,

I told you had to have a financing investor by August 1 and a funding date by September 1.   You said you had an investor and that you would send me a commitment letter and proof of funds.  That has not happened.  You also have also told me on several occasions that you had investors and/or buyers again nothing.

I have lost faith in your ability to get any of the projects you have been working on completed because you are project rich and cash poor.  Without funds to complete the work the projects are dead.

 I have given you more time than any lender would have.  I have been way beyond fair.  Every note you have signed as a promise to pay is severely in default.

 As for the Northern Nevada note, I would be happy to not take the 0% note and get my payments now.  I did that as a favor to you.  If you want the note you can have it.   I have checked the market value of the note is $20,000. or less.

I am not sure what you mean by a Viable agreement.   Give me a call.   As you know I will listen and consider a reasonable agreement.

 Steve

On Fri, Aug 5, 2022 at 8:24 PM Clinton Brown <clinton@atlasinc.solar> wrote:
> Steve,
>
> Per your email for filing the NOD's today. First, you had told me September 1st, 2022 as the day to file on two different phone calls. The assumption on your part I believe is that a 7-day close is not possible, which is what I did in Nevada though. Therefore, I believe there is still time to get this done and, in my view, filing an NOD only hurts us both.
>
> Furthermore, if you indeed plan to file the NOD then what incentive do I have to sell you the $44k note for $22k? Escrow has not recorded this, and you indicated that I still had time to decide because there still needs to be one more signature for the transaction to close. I didn't want to sell this in the first place, and it was a very poor choice on my part to move this far ahead with it.
>
> I forwarded you an email from Steve Weera about the funding and I really can't help that he committed to one thing and then changed to another due to his escrow closing on 8/15/2022. You are free to contact him via his email tonasut@cs.com or phone 818-436-2498, but I can't get blood out of a turnip here until 8/15 with him, at least.
>
> Lastly, I don't understand the hell fire urgency to torpedo projects that you and I know very well have the ability to succeed. I'm not sure how involved you were with your other private borrower's projects, but it seems to me that something doesn't add up here. I've been open to your advice and have taken it on multiple occasions and the bottom line is that it is a timing issue. An NOD doesn't do one thing to change my direction on these projects, it just seems like you have lost confidence in the projects we are doing or you need to get money in your bank account. Lord knows I need some.
>
> It is just very disappointing and for no good reason that I can see that this can't be worked out. However, we will make the best of it and exercise any and all rights we have under the law should you proceed, but I hope that I can spend my time and effort on these projects that benefit both of us instead.
>
> Hope we can reach a viable agreement,
> Clinton
>
>
>
> On Fri, Aug 5, 2022 at 2:07 PM Clinton Brown <clinton@atlasinc.solar> wrote:
>> Steve,
>>
>> See below from the investor.
>>
>> I'm sending a seperate email in response to you.

BROWN_1470

EX 55-1

Thanks,
Clinton

On Fri, Aug 5, 2022 at 12:55 PM Weera Tonasut <tonasut@cs.com> wrote:

> Clinton,
>
> I won't be able to make decision until the escrow close ( 8/15/22 ) and no definite time for the another condo. Will let you know.
> Steve Weera Tonasut
>
> -----Original Message--
>
> ---
> From: Clinton Brown <clinton@atlasinc.solar>
> To: Weera Tonasut <tonasut@cs.com>
> Sent: Thu, Aug 4, 2022 7:25 pm
> Subject: Re: Agoura Hills Ownership Structure/Investment

On Wed, Aug 3, 2022 at 8:34 AM STEVE SMEAD <stsmead@gmail.com> wrote:

> Need to see proof of funds before I will consider any negotiations on notes.
> If payments are not received by Friday August 5th NOD's will be filed.
>
> On Tue, Aug 2, 2022 at 2:02 PM Clinton Brown <clinton@atlasinc.solar> wrote:
>> Steve, I am writing to provide an update on the status of my properties in Utah, Harper and Malibu, as well as a proposal for a new Promissory Note for the Harper Lake property. As of 9/30/2022, the total amount owed on the Utah, Harper and Malibu properties is $67,625. The next quarterly payment is due on 12/31/2022 and the total amount due is $24,291. I am proposing a new Promissory Note for the Harper Lake property in the amount of $498,000 at 8 percent simple interest, with interest only payments to be paid quarterly in the amount of $9,960. The note would have a 2 year balloon payment.
>>
>> **Amounts Owed as of 9/30/22** Utah / Harper / Malibu $11,669 / $45,196 / $32,760 The total amount owed is $89,625. Subtract $22,000 for NV 640 Note The total amount owed is $67,625 through 9/30/2022. **Next Quarterly Payment on 12/31/2022** Utah, $5,001 Harper, $10,290 Malibu, $9,000 The total amount due on 12/31/2022 is $24,291. **Proposal for Harper Lake Promissory Note:** $498,000 note @ 8 percent simple interest, interest only payments paid quarterly is $9,960 with a 2 year balloon payment. $498,000 x 8% = $39,840 $39,840 / 4 = $9,960 The quarterly payment for the Harper Lake Promissory Note will be $9,960 Please let me know if you have any questions or require any further information. Thank you,
>>
>>
>> --
>> **Clinton Brown**
>> **Atlas, Inc.**
>> CEO
>> Autonomous Solar Fields
>> Cell: 310-487-6453
>> clinton@atlasinc.solar
>> www.atlasinc.solar
>>
>> **DISCLAIMER:**
>> This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

--
**Clinton Brown**
**Atlas, Inc.**
CEO
Autonomous Solar Fields
Cell: 310-487-6453
clinton@atlasinc.solar
www.atlasinc.solar

BROWN_1471

EX 55-2

**DISCLAIMER:**

This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

Case 2:23-cv-02368-MEMF-KS  Document 178-4  Filed 05/14/26  Page 144 of 156  Page ID #:2544

--
**Clinton Brown**
**Atlas, Inc.**
CEO
Autonomous Solar Fields
Cell: 310-487-6453
clinton@atlasinc.solar
www.atlasinc.solar

**DISCLAIMER:**
This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

EX 55-3

BROWN_1472

## *SECURED PROMISSORY NOTE*

$150,000.00                                    Date: November 04, 2020

For value received, the undersigned Clinton Brown (the "Borrower"), at 10226 Regent St, Los
Angeles, California 90034, promises to pay to the order of Steve Smead (the "Lender"), at 145 S
8th Street, Santa Paula, California 93060 (or at such other place as the Lender may designate in
writing), the sum of $150,000.00 with no interest.

## I. TERMS OF REPAYMENT

### A. Payments

Unpaid principal after the Due Date shown below shall accrue interest at a rate of 10% annually
until paid.

The unpaid principal shall be payable in full on November 02, 2022 (the "Due Date").

### B. Application of Payments

All payments on this Note shall be applied first in payment of accrued interest and any remainder in
payment of principal.

### C. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal
balance and any accrued interest shall become due immediately at the option of the Lender.

## II. SECURITY

This Note shall be secured by a Deed of Trust to real property commonly known as 21472 Calle
Del Barco, Malibu, California 90265, executed on November 04, 2020. The Lender is not
required to rely on the above security instrument and the assets secured therein for the payment of
this Note in the case of default, but may proceed directly against the Borrower.

## III. PREPAYMENT

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date
with no prepayment penalty.

## IV. COLLECTION COSTS

EXH 59-1

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

## V. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

    1) the failure of the Borrower to pay the principal and any accrued interest when due;

    2) the liquidation, dissolution, incompetency or death of the Borrower;

    3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

    4) the application for the appointment of a receiver for the Borrower;

    5) the making of a general assignment for the benefit of the Borrower's creditors;

    6) the insolvency of the Borrower;

    7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

    8) the sale of a material portion of the business or assets of the Borrower.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any real estate pledged as collateral for the payment of this Note, or if there is a default in any security agreement which secures this Note.

## VI. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VII. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of this Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of

EXH 59-2

the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

**VIII. GOVERNING LAW**

This Note shall be construed in accordance with the laws of the State of California.

**IX. SIGNATURES**

This Note shall be signed by Clinton Brown and Steve Smead.

**[SIGNATURE PAGE FOLLOWS]**

EXH 59-3

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.

Signed this _____ day of _____, _____, at _____,
_____ .

Borrower:
Clinton Brown

By: _____     Date: __11 | 5 | 2020__
Clinton Brown

Lender:
Steve Smead

By: _____     Date: _____
Steve Smead

EXH 59-4

**DO NOT DESTROY THIS NOTE**

WHEN PAID this original Note together with the Deed of Trust securing the same, must be surrendered to the Borrower for cancellation and retention before any reconveyance can be processed.

EXH 59-5

This is a RocketLawyer.com document.

## *GUARANTY AGREEMENT*

This Guaranty Agreement (this "Guaranty") is made effective as of November 04, 2020 by Clinton Brown, (the "Guarantor") of 10226 Regent St, Los Angeles, California 90034.

This Guaranty is being given to Steve Smead, (the "Creditor") of 145 S 8th Street, Santa Paula, California 93060.

This Guaranty is being given for the benefit of the Guarantor and for Clinton Brown, (the "Debtor") of 10226 Regent St, Los Angeles, California 90034.

**I. OBLIGATIONS.** This Guaranty is given by the Guarantor to induce the Creditor to extend credit to the Debtor, or to forebear in the exercise of the Creditor's rights against the Debtor, and in consideration of the Creditor doing so, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and further acknowledging that the Creditor intends to rely on this Guaranty, the Guarantor absolutely and unconditionally guarantees prompt payment when due of all payments and liabilities of the Debtor to the Creditor, whether voluntary or involuntary and however arising, whether secured or unsecured, absolute or contingent, liquidated or unliquidated, and regardless of whether the Debtor may be liable individually or jointly with others, regardless of whether recovery upon any such obligation may be or hereafter become barred or otherwise unenforceable, including interest and charges, and to the extent not prohibited by law, all costs and attorney's fees incurred in attempting to realize upon this Guaranty.

**II. DURATION.** This Guaranty is effective for all obligations incurred by the Debtor on or before November 04, 2022. The Guarantor will assume no responsibility for any obligation incurred by the Debtor after such date. No notice of the passing of the above date need be given to the Creditor for the termination of this Guaranty to have legal effect.

**III. NOTICE OF DEFAULT.** The Creditor shall not be required to notify the Guarantor of a default by the Debtor in the Debtor's commitments to the Creditor before proceeding against the Guarantor under this Guaranty.

**IV. CREDITOR PROVISIONS.** The Guarantor expressly waives diligence on the part of the Creditor in collection of any part of the debt or other obligation owed by the Debtor. Further, the Creditor has no duty to bring suit against the Debtor (for collection of the debt or other performance which is due) before proceeding against the Guarantor. The Guarantor waives notice of the acceptance of this Guaranty and of any and all such indebtedness and liability. The Guarantor waives presentment, protest, notice, demand, or action on delinquency in respect of any such indebtedness or liability, including any right to require the Creditor to sue or otherwise enforce payment. Until all obligations of the Debtor to the Creditor have been satisfied in full, the Guarantor waives all rights of subrogation to any collateral and remedies of the Creditor against the

EXH 59-6

This is a RocketLawyer.com document.

Debtor, and other persons or entities and indebtedness of the Debtor now or hereafter owed to the Guarantor is hereby subrogated to the indebtedness of the Debtor to the Creditor, and such indebtedness of the Debtor to the Guarantor, if the Creditor so requests, shall be collected, enforced, and received by the Guarantor as trustee for the Creditor and be paid over to the Creditor on account of the indebtedness of the Debtor to the Creditor, but without reducing or affecting in any manner the liability of the Guarantor under the provisions of this Guaranty.

**V. ASSIGNMENT.** This Guaranty (a) shall bind the successors and assigns of the Guarantor (this Guaranty is not assignable by the Guarantor without the express written consent of the Creditor, and is not affected by the death of the Guarantor), (b) shall inure to the Creditor, its successors and assigns, and (c) may be enforced by any party to whom all or any part of the liabilities may be sold, transferred, or assigned by the Creditor.

**VI. FINANCIAL CONDITION.** The Creditor has no duty to advise the Guarantor of the Debtor's financial condition.

**VII. CORPORATE AUTHORITY.** The Guarantor certifies that it is not prohibited under its articles of incorporation or bylaws (or its articles of organization or operating agreement, if a limited liability company) to act as the Guarantor.

**VIII. ENTIRE AGREEMENT.** This Guaranty contains the entire agreement of the parties with respect to the subject matter of this Guaranty and there are no other promises or conditions in any other agreement, whether oral or written. This Guaranty supersedes any prior written or oral agreements between the parties with respect to the subject matter of this Guaranty.

**IX. AMENDMENT.** This Guaranty may be modified or amended, if the amendment is made in writing and is signed by both parties.

**X. SEVERABILITY.** If any provision of this Guaranty shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Guaranty is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**XI. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Guaranty shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Guaranty.

**XII. APPLICABLE LAW.** This Guaranty shall be governed by the laws of the State of California.

**XIII. RECEIPT.** The Guarantor acknowledges receipt of a copy of this Guaranty.

EXH 59-7

By: _____     Date: _11_/_05_/_2020_
Clinton Brown

EXH 59-8

This is a RocketLawyer.com document.

 Gmail

## Does Current Mean Default

1 message

Clinton Brown <clinton@atlasinc.solar>
To: STEVE SMEAD <stsmead@gmail.com>

Tue, Aug 23, 2022 at 12:51 AM

Steve,

Does current meant default?

Paper has value and only a stupid lowlife motherfucker wouldn't see that. Your friends are right, you're fucking stupid. From 100% LTV and getting a refund for buying to 61% LTV (appraisals in writing from 3rd parties and I'm a fucking broker and can do a BPO) 409a says my company is worth $20.8m certified by a licensed fucking accountant and is an IRS document, if I ever got audited BUT nope, not worth nothing because "the figures came from management" aka me. So you're saying that I provided fake documents to a CPA with the risk of a 409a audit …and the CPA with a state license did diligence and signed off on it …but it's not reliable because the information came from me and was analyzed by a CPA - which I fucking guess you are- but thanks for reading the report and picking the only fucking negative thing about it. I was surprised as you were apparently that I actually have the ability to earn future earnings more than I am now. Isn't that what a fucking stock is? You're getting in on future earnings. So you have to be a motherfucker and take the rug out from underneath me for penny's when we can make dollars?

I didn't ask you for more money aka blanket loan - I asked you for time which is money but you're greedy and can't wait two fucking seconds for a return bigger than you're gonna get now, for sure. Fortunately for me, I'm Aladdin on a magic carpet ride and could give a fuck less for your $1m investment and petty fucking nature. The only thing you've taught me is don't fucking take anyone's word. You try to work something out a payment plan and then all the while I'm fucking now at 17 percent and you bitching about inflation?! You're not a risk taker and I congratulate you on being successful in your model that created your "wealth" but I do believe that going from 100 LTV to 61 LTV is something and yea it is the market for solar and a nice house on the beach and a fucking entitled piece of property in the fucking middle of Indian country. I know what the fuck I'm up to and I'll be damned, Steve Smead, if you fuck me over on this. If you don't believe the fucking values then why didn't you spend the NOD money to get 3 fucking appraisals and then maybe you'll see? No, wait you think appraisals are fake and yet I just filed on an appraiser that fucked up the value and so I'm determined, but what a waste of money and passing it down to me over a small-minded Santa Paula asshole! If you have kids then I pray to God they haven't killed themselves like my dad did! Anyhow, I'm not trying to be anything more or less than I am. I promised I'd make things right with the properties and I'm a cunt hair away. However, what I will not do is business with folks that can't see the bigger picture and worry about monthlies like a common person. I am in the position - supposedly like yourself - to make my own time and pay on my own time to ensure success for both the investor and invested. This may be just dollars or cents to you or food for your table - I don't know you and only know you in light of our interactions - and regardless what you think of me I thought you'd see

EXH 60-1

that bigger picture and realize I'm not a stupid person — that if you are truly "have so much money I don't know what to do with" and I realize this doesn't cost you shit to carry. My interest just keeps adding up. And so I'm from Missouri and I'm a Nerf or Nothing kind of guy and thus I will make this my life mission in the next 85 days (and by the fucking way, thanks for filing on August 16 when we were supposed to be in negotiations on fixing this- and you can't use the truth I told you about keeping a roof over my head —-as you rack up interest at 17 percent. It's just another disappointment from a generation that is selfish. Well, I'm not stopping. I already have another property in escrow and possibly another if I play my cards right. What I do at the moment in my life is not what anybody else can do successfully like I can. It's a total fucking shame you can't see that, but the information I got from our business relationship is absolutely priceless and will make me a more successful person. Hands down that's true and priceless.

P.S. the bitch at Superior said you didn't use the acceleration clause and so you better go clarify that if you're going to try to do that.

Take care,
Clinton



**Clinton Brown**
CEO, Atlas, Inc.
310-487-6453 | clinton@atlasinc.solar

16821 Edgar Street, Pacific Palisades, CA 90272
www.atlasinc.solar



 Click to schedule a meeting

DISCLAIMER: This message originates from the offices of Atlas, Inc. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient or is otherwise protected against unauthorized use or disclosure. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please advise the sender by immediate reply and delete the original message.

EXH 60-2

Dep.:Mortg. Int. Inc.
1/1/2020 through 4/1/2023

Utah Payments

| Date | Account | Num | Description | Memo | Category | Tag | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|-----|--------|
| 8/3/2021 | SS RENTALS | EFT | S BANK OF TH... | August Pay... | Dep.:Mortg. In... | UTAH L... | R | 1,667.00 |
| 9/3/2021 | SS RENTALS | EFT | S BANK OF TH... | Sept. Payme... | Dep.:Mortg. In... | UTAH L... | R | 1,667.00 |
| 2/1/2022 | SS RENTALS | DEP | S Bank OF TH... | Oct, Nov, De... | Dep.:Mortg. In... | UTAH L... | R | 6,668.00 |
| 3/1/2022 | SS RENTALS | EFT | BANK OF TH... | Utah Loan p... | Dep.:Mortg. In... | UTAH L... | R | 1,667.00 |
| **1/1/2020 – 4/1/2023** | | | | | | | | **11,669.00** |

| | |
|---|---|
| TOTAL INFLOWS | 11,669.00 |
| TOTAL OUTFLOWS | 0.00 |
| NET TOTAL | 11,669.00 |

EXH 74-1

S 451

SMEAD PRODUCTION 9/18/25

Case 2:23-cv-02938-MEMF-KS    Document 178-4    Filed 05/14/26    Page 155 of 156    Page ID #:2555

 

Bal 16-18-21
OK SS.

**BANK** OF THE **SIERRA**
PO Box 1930
Porterville CA 93258
(888) 454-2265


LENDER  **FDIC**

9580328

Date  4/30/21          Page      1

STEVE SMEAD
DBA Smead D&S Rentals
352 E Harvard Blvd
Santa ·  la CA 93060

## Checking Account

The Bank's Funds Availability Policy does not apply to deposits of checks or drafts drawn on financial institutions located outside the U.S. These items cannot be processed the same as checks or drafts drawn on U.S. financial institutions. Generally, the availability of funds for deposits of foreign checks or drafts will be delayed for the time it takes us to collect the funds from the financial institutions upon which they are drawn.

### Deposits and Credits

| Date | | | | |
|---|---|---|---|---|
| 4/28 | ACH PmL PPD | THE ATLAS LLC | 4,000.00 | Intrest |

### Checks in Numerical Order

MEMBER FDIC          NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION

S 877                                          EXH 75-1