Fred Hickman (#124406)
fredhickman@gmail.com
17602 17th St Ste 102-206
Tustin CA 92780
714-315-1565; fax 714-838-0835

Attorney for: Defendant Steve Smead

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CLINTON BROWN,<br><br>              PLAINTIFF,<br><br>VS.<br><br>STEVE SMEAD,<br><br>              DEFENDANTS. | Case No.: 2:23-cv-02938-MEMF(KSx)<br><br>DECLARATION OF STEVE SMEAD I.S.O. MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>DATE: 03/05/2026<br>TIME: 10:00 A.M.<br>CTRM: 8B |

I, Steve Smead, declare as follows:

1.    I am the defendant in this action. I make this declaration from personal knowledge and from refreshing my memory by review of the documents and records of mine as to my loans and dealings with Brown on the subjects described herein, and on the documents produced by Brown during the course of this litigation. If called to testify I would be able to testify competently hereon.

[Malibu Loan: Origination, Default, Foreclosure]

2.    In early April 2020, I saw a solicitation by Clinton Brown ("Brown") for a loan, listed on the public website of a California mortgage broker, Mr.

Andrew Dioli, doing business as American Private Money Group, CA Dept. of Real Estate License #01909075, FMC Lending Company, and requested information. The loan broker, Mr. Dioli, emailed me information. I reviewed the proposed Malibu loan, for a purchase money loan, second priority, that Brown would buy with the loan, to be secured by the vacant lot zoned residential with the property address of Assessors' Parcel No. 4451-015-021, Malibu, CA  90265 ("Malibu Lot"). The proposed loan was for the balance of the purchase price for Brown to buy the Malibu Lot from Vincent Sarkany. The loan I was to make was a second priority loan, behind Mr. Sarkany's. In considering whether to make the loan, I reviewed Brown's loan application, provided by the broker, the Uniform Residential Loan Application, signed and dated 4-4-2020 by Brown, stating his monthly income from Atlas Development Group, LLC was $11,000.00 monthly, and that his net worth was $205,375. I reviewed the appraisal of the Malibu Lot provided by Brown's broker. Thereafter I had direct communication with Brown by email regarding whether I would make the loan. I decided to make the loan, as Brown's income and assets appeared to be sufficient to service the obligation and the loan amount compared to the value of the Malibu Lot seemed sufficient.

3.     The terms of my loan for the Malibu Lot to Brown were $170,000 principal at 12.99% interest, interest only for two years and maturing with a balloon payment due in two years, and documented by a "Promissory Note Secured by Deed of Trust", dated 3/16/2020, made by Brown to me, and secured by a Deed of Trust of even date. It was a second priority loan for purchase money to Brown, behind the first priority loan of Mr. Sarkany, the seller. Attached hereto as Ex. 11-1-4 is a true and correct copy of the Promissory Note Secured by Deed of Trust, dated March 16, 2020 that Brown made to me, on this first loan that closed escrow on 04/21/2020.

/ / /

4.      Brown's loan from Sarkany came due for a balloon payment, Brown informed me. And Brown asked me to make a refinance loan that would consolidate the balance due on Sarkany's loan and my loan, into a "consolidated loan", so that he would have just one loan secured by the Malibu Lot. I agreed to make that consolidated loan to Brown, at the lower rate of 12%, reduced from 12.99% on the initial loan. He had already been in default of my initial loan on Malibu, running behind in payments until the new consolidated loan I made, as described below. Brown and I agreed to use "e-escrows, inc." to be the escrow to consummate the consolidated loan, as Brown and Sarkany had chosen them for the initial purchase money loan transaction.

5.      At the time Brown requested a consolidation loan from me to be secured by the Malibu Lot, Brown's payments in the last several months had been irregular, and some loan payments and late fees were due from him on the initial loan at the time I agreed to make the consolidated loan. These missed payments were caught up on the initial loan from me in the consolidated loan, described below, and as reflected in the final settlement statement from the escrow company upon consummation of the consolidated loan. (Attached as Ex. 12-3-4 is a true and correct copy of escrow closing statement on the consolidated loan to Brown, by escrow agent e-escrows, inc., the Borrower Statement Final, print date 05/24/2021 for closing date 05/21/2021).

6.      On May 21, 2021 my consolidated loan to Brown secured by the Malibu Lot was consummated, with the closing of escrow. The loan was documented by a "Note Secured by a Deed of Trust, dated 5-14-21, the "Malibu Note", and a Deed of Trust of even date. (Attached hereto is a true and correct copies of the Malibu Note (Exh. 12:1-2). The Malibu Note terms were for a 12% interest, interest payments only of $3,000 per month, and a balloon of all due on 6/1/2023(the "Malibu Loan").  (Attached as Ex. 12-3-4 is a true and correct copy of escrow closing statement on the consolidated loan to Brown, by escrow agent e-

escrows, inc., the Borrower Statement Final, print date 05/24/2021 for closing date 05/21/2021).

7.  Superior Loan Servicing was the loan servicer for the consolidated Malibu Loan, as it was for my initial loan to Brown for the purchase money. It was a professional loan servicer that I paid a monthly fee for servicing the loan. It had no participation or interest in the loan or its security or its payments, acting only to service the loan and keep track of payments and loan transaction items, and to communicate with the borrower as needed.  As an illustration of what the servicer does, attached as Ex. 11-7-8 is a true and correct copy of the Superior Loan Servicing Borrower Statement of Account on the initial Malibu loan from me to Brown, statement dated 4/7/2021).

8.  Brown defaulted on the consolidated Malibu Loan, immediately, being late and partial with the very first interest only payment due, that due on 7/1/21, making only a partial payment on it 7/20/21. And he never once became current on the payments. Ex. 13 attached hereto is a true and correct copy of the history of payments of Malibu Loan, it is a ledger payment history on initial and then the consolidated Malibu Loan period 2020 to 2023 that I personally kept that accurately reflects the payments made by Brown on the Malibu Loan and the initial loan on the Malibu Lot before that consolidated loan.  His payments were typically short, partial and sporadic. His last payment on the Malibu Loan was that due for November of 2021, and that made only in April 2022. He did not cure the payments default at any time. He did not pay off the Malibu Loan. He defaulted by failing to pay property taxes as they came due, a loan default under the deed of trust, as I learned in 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number.

9.  Regarding the Malibu Loan, due to the long-standing default, I instructed the foreclosure trustee, Superior Loan Servicing, by Asset Default Management, Inc., as Agent for Trustee, to commence the foreclosure process. I

authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me under the Malibu Loan at the time of the trustee's sale, which was $372,338.14 on the auction sale date, 1/4/2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. Then the trustee issued a Trustee's Deed Upon Sale ("Malibu TDUS"), dated 1/4/2023, and it was recorded. (Exh. 14-2-3 is a true and correct copy of Malibu TDUS). The Malibu TDUS made me the owner of the Malibu Lot. The Malibu Loan was fully satisfied by the foreclosure. No other amounts were due to me on or in connection with the Malibu Loan or the Malibu Lot, all debt related to it being satisfied by the Malibu TDUS.

10.     The Malibu Lot, as a vacant lot in zoned residential, never generated any revenue to Brown, that he mentioned to me. Nor while I owned it did it ever generate any revenue to me. Over two years later, I sold the Malibu Lot, in March of 2025.

[September thru November 2020--Brown Proposed Loans and Deals Rejected]

11.     In September through November 5, 2020, Brown made several proposals for me to fund his solar development business, sending me several written loan proposals and proposed loan documents he had drafted, and a proposal to buy stock or lend against stock he said he owned in "Atlas, Inc.", all of which I rejected. Mixed in with these proposals was to borrow more money from me. He sought several different loans in this time frame. One for "Atlas Development Group, LLC", which he proposed would be secured by another deed of trust encumbering the Malibu Lot; another one for himself personally, which would also encumber the Malibu Lot. I rejected all of these proposed loans, transactions and documentation. True and correct copies of these rejected proposals and documents from Brown are attached hereto as: (on 9/24/2020) Ex. 43-1-4 (proposed "Loan Agreement, dated Sept. 24, 2020" of loan to Atlas Dev. Group, LLP); (on 11/2/2020) Ex. 42-1-3 (proposed Guaranty of proposed loan to Atlas Dev. Group,

LLC; (on 11/3/2020) Ex. 16-1-21 (email Brown to Smead of 11/3/2020, and attached proposed loan documents for a new loan against the Malibu Lot); (on 11/5/2020) Ex. 59-1-8 (11/4/2020 proposed note and guaranty for new loan on Malibu Lot, signed by Brown). More detail on some of these rejected proposals follows.

12. In late Sept. Brown emailed me a proposed "Loan Agreement, dated Sept. 24, 2020, for a loan he proposed that I make to "Atlas Development Group, LLC, for a proposed $150,000 for "funding" of a second priority deed of trust on his hoped for purchase of a property in the Hinkley/Harper Lake, San Bernardino County ("Hinkley Lot"), a true and correct copy of which is attached as Ex. 43-1-4. It proposed a 2-year, no- interest loan, the balance due on 9/24/2022. It appeared to me that he had created and drafted this proposed Loan Agreement himself, as it looked odd to me. And it was not acceptable to me.

13. On or about November 2, 2020, Brown sent to me his proposed "Guaranty" of his for the "extension of credit" of $150,000 under the proposed Loan Agreement of Sept. 24, 2020, a true and correct copy of which is attached as Ex. 42-1-3. This was a purported guarantee for the loan he proposed that I make to "Atlas Development Group, LLC", the Ex. 43, above.

14. On November 3, 2020, Brown emailed to me his newly proposed loan documents. Attached as Ex. 16-1-21 is a true and correct copy of Brown's email to me that attached the documents, dated 11/3/2020 and a true and correct copy of the documents attached. In these documents and email, attached as Ex. 16, Brown proposed that I make an additional loan secured by the Malibu Lot. I had already lent on the Malibu lot, in the Malibu Loan. These documents he emailed to me that date included a "Deed of Trust" from Brown as borrower to me as lender, naming the "trustee" as "Brown Realty Group", including a separate "Guarany" by Brown himself, purporting to guaranty his own new proposed loan from me to him. The email also included a "Secured Promissory Note dated

11/3/2020 for $150,000 from Brown to me, with a one-year period of "no interest", the proposed loan maturing in one year.

15.    On or about November 5, 2020, Brown emailed to me a proposed "Secured Promissory Note", and "Guaranty Agreement, both dated 11/4/2020, and both with Brown's signature dated November 5, 2020, true and correct copies of which are attached hereto as Ex. 59-1-8. In these proposed loan documents, which I rejected, Brown proposed a new loan from me that would be secured by the Malibu Lot, proposing to be the maker to me of this note for $150,000 principal for one year at no interest, due in full on 11/2/22022, and if principal then due was unpaid, to accrue interest at the rate of 10% and a proposed personal guaranty by himself of his proposed promissory note. (Ex. 59 is a true and correct copy of these two documents, the "Secured Promissory Note" and the "Guaranty Agreement" both dated 11/4/2020).

[Hinkley/Harper Lake Loan: Origination, Default, Foreclosure]

16.    In September 2020 Brown requested one loan that I was willing to make. It was to fund a second priority purchase money loan for land in the Hinkley/Harper Lake area, a piece of vacant, raw, undeveloped land ("Hinkley Lot"). He hoped to build a solar power generating facility on it, and proposed to buy it from American Pacific Investments, Inc., which itself would make a "seller carry-back loan," ("AmPac"). AmPac would have the first priority security on its purchase money loan, and I would have a second priority loan, secured against the Hinkley Lot. So, on September 16, 2020, I wired $150,000 potential funds to the potential escrow agent, Chicago Titled, my bank records show, to hold pending Brown's purchase deal with AmPac, for purchase money for the Hinkley property, if he bought it. As Brown described and documented the proposed Hinkley Lot purchase and loan to me, as I considered the purchase money loan, it was vacant, raw, undeveloped, desert land. It generated no income at the time. However, in the September through November 2020 time-frame, before I made the loan to help him

buy the land, he represented to me that the Hinkley Lot would generate a large cash flow over time a solar power generating field, and that it would be sufficient to service all debt for it.

17.    In making a purchase money loan on the Hinkley Lot, But I required that the promissory note and the deed of trust be standard-form ones, in a form provided by Chicago Title Company, and as I wanted to assure myself of enforceability, and to obtain a lender's title policy from Chicago Title Company, as well. The transactional documents that Brown had been generating and emailing to me were strangely done, and so I would not use any document he generated to make this purchase money loan for the Hinkley Lot.

18.    The escrow company for Brown's purchase of the land and the loan from AmPac and the loan from me would be "Chicago Title Company". AmPac and Brown selected the escrow company, and I agreed to their selection for efficiency's sake.

19.    Brown proposed these loan terms, and I accepted his proposal. The loan terms were these: I would lend $150,000 at the rate of 8% from November 10, 2020, $1,000 per month beginning on January 1, 2021, which was an interest only loan, to mature and be payable in full on Dec. 1, 2022. I lent the $150,000 principal on those terms. The loan was documented by a promissory note, a "Note (Installment – Interest Included)" dated September 21, 2020 ("Hinkley Note", and a Short Form Deed of Trust and Assignment of Rents of even date ("Deed of Trust". (Attached hereto are true and correct copies of the Hinkley Note and the recorded Deed of Trust (Exh. 15:1 ("Note (Installment – Interest Included), 15:4-7 (Deed of Trust). Together, the Hinkley Note and Deed of Trust are referred to as the "Hinkley Loan," and the security property as the "Hinkley Lot." The Hinkley Note and Deed of Trust were done on standard forms provided to me by Chicago Title Company. There were no other terms or conditions or charges for the Hinkley Loan than those stated in the Hinkley Note and Deed of Trust. This is reflected on

the escrow agent's (Chicago Title Company) Final Buyer's Statement, the settlement statement for the Hinkley Loan and purchase of the Hinkley Lot, a true and correct copy of which is attached as Ex. 15:2-3, Settlement Date 11/10/2020).

20.   The Hinkley Loan and Brown's purchase of the Hinkley Lot closed, i.e., consummated on November 10, 2020. (Exh. 15:2-3). It shows that Brown paid $498,000 for the purchase, with seller taking back a note for $348,000 and my loan amount being $150,000. The statement settlement statement, Exh. 15:2-3, reflects that Brown made no down payment, borrowing 100% of his purchase price, as he also informed me at that time.

21.   I kept track of the Hinkley Loan payments from Brown, as I did not need an independent loan servicer for it. His payments were to be made to me directly, starting on January 1, 2021. However, he immediately defaulted on the Hinkley loan not making any payments for that due on the first of each of January, February, March and April. He did not make those payments until he had an entity called "Atlas LLC" send an electronic payment of $4,000 on April 28, 2021, as my bank record shows. He made no more payments at all on the Hinkley Note. Attached hereto are true and correct copies of the following: Ex. 19 is a ledger that I kept in the ordinary course of business to reflect loan payments I received from Brown; Ex. 75, is my bank statement dated 4/30/2021 Bates # S 877 (redacted) that reflects the Atlas LLC electronic deposit for the payments on behalf of Brown, referenced above. He remained in default on all payments due for May 1, 2021 and thereafter. He never cured the default. He did not pay off the Hinkley Note.

22.   Brown also defaulted on the Hinkley Loan by failing to pay property taxes, as I checked on the tax status for the Hinkley Lot in June 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number. This tax default was also a loan default under the deed of trust. I asked him to pay the defaulted property taxes, but he declined to do so, / / /

and sent me an email telling me that he would not do so. Attached as Exh. 54 is an email chain between Brown and me dated June 9 and June 11, 2022.

23. During Brown's default on the Hinkley Loan, he represented that it would eventually generate revenue from his intended solar development on the site, the Hinkley Lot. However, no such development or revenue ever occurred related to or arising from the Hinkley Lot. He made these same representations, of income in the future, or his prospective sale of the Hinkley Lot, or liquidation of other security properties, but none came to pass, ever, no revenue, no sales, no projects built to generate revenue. Brown and I exchanged email about, at true and correct copy of which is attached as Ex. 55-1-3, email chain dated Aug 7 & 5 & 3, 2022.

[Purchase of First-Priority Loan from AmPac on Hinkley/Harper Lake]

24. Brown also defaulted on AmPac's first priority loan secured by the Hinkley Lot, as I learned from its personnel during the course of the Hinkley Loan, and that it might do a foreclosure sale. If AmPac went to foreclosure sale on its higher priority loan, then that would eliminate the my security interest in the Hinkley Lot on my Hinkley Loan. So to avoid losing that security interest to AmPac, I bought AmPac's loan on Hinkley. The terms of my purchase of the AmPac first priority loan was the total due from Brown to it, approximately $370,350.00. I used Exact Escrow at AmPac's request to buy its loan. My loan purchase consummated on with assignment of its promissory note to me and the Corporation Assignment of Deed of Trust on July 19, 2022. (A composite, attached as Exh. 17-1-3 is a true and correct recorded copy of that Assignment and of the Final Settlement Statement on the purchase). The Final Settlement Statement shows that Brown made no payments to AmPac on his purchase money promissory note to it for any payments due from and after 10/10/2021 ("Interest on Principal Balance at 8% from 10/10/2021 to 07/22/2022 of $21,808.00") Now, as of

7/19/2022, Brown now owed me approximately $534,808 on the two promissory notes secured by the Hinkley Lot ($369,808 on the first to AmPac, and approximately $150,000 unpaid principal and $15,000 unpaid interest on my second priority Hinkley Loan, plus tax defaults uncured, not included in this figure). Brown made no payments to me on the first priority loan after I bought it from AmPac, no cure of default nor loan payoff occurred.

[Foreclosure on Hinkley Loan, the Second-Priority Loan]

25.     With the default uncured on my second priority loan, I instructed the trustee to commence the foreclosure sale process. On August 23, 2022, after Brown learned that I was proceeding with formal foreclosure proceedings, Brown emailed me asserting and complaining that his cumulative interest rates on the loans are 17%, in an angry email. Ex. 60 (email from Brown to Smead Aug. 23, 2022, 12:51 a.m.)

26.     On the Hinkley Loan, I authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me at that time on my second priority loan,  The full indebtedness on the second priority loan was at the time of foreclosure:175,909.68, unpaid principal of $150,000, and plus interest at the stated promissory note rate of 8%, plus late fees and foreclosure costs advanced to the trustee. The foreclosure sale on the Hinkley Loan (second priority) occurred on or about 01/31/2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. The trustee thereafter issued a Trustee's Deed Upon Sale ("Hinkley TDUS") dated 01/30/2023 stating the purchase price from me of the unpaid debt, and it was recorded. (Exh. 20 is a true and correct copy of the recorded Hinkley TDUS dated 01/30/2023, recorded 1/31/2023). It made me the owner of the Hinkley property. The Hinkley Loan was fully satisfied by the foreclosure. No other amounts were due to me on the Hinkley Loan than that set forth in the Hinley TDUS.

/ / /

27.     I still own the Hinkley property. I describe in detail my opinion of its value below, but it is worth less than the total indebtedness owed to me at the time of the foreclosure sale.

28.     The Hinkley property never generated any revenue to Brown, that he mentioned to me. At all times since I was the lender it was a raw land, undeveloped, unimproved, and in a desert area. Since I became the owner of the Hinkley property, it has remained in its raw, unimproved state, and it has not generated any revenue to me. I have never received any proposals for its leasing or its sale or for any use of it. There were no existing leases, or uses, or contracts of any sort pertaining to the Hinkley property that have ever been brought to my attention upon my becoming its owner.

[Utah Loan: Origination, Default, Foreclosure]

29.     In April 2021, Brown by phone asked me to make a refinance loan on property he owned in Millard County, Utah that was raw, undeveloped, and unimproved land ("Utah Lot"). He assured me that he would be able to develop a solar farm (solar panels generating electricity connected to a power grid), and that would generate a lot of revenue for him so that he would be able to service his proposed debt. He asked me to lend $100,000 for the refinance. He said or emailed to me in this time-frame, through early June 2021, that this would pay off a small existing encumbrance to the person who had sold him the land for $50,000, and would provide fresh cash to him for other commercial property acquisition for a solar farm elsewhere.

30.     I told Brown in April, by phone, that given his history of payment defaults and poor payment history on both the Hinkley Loan and the Malibu Loan, and his lack of any revenue on anything, that I did not want to make the loan, as too risky, and would not make it. Then, on April 28, 2021, he paid in a lump sum four months of defaulted payments on the Hinkley Loan. But then he re-defaulted on the Hinkley Loan, not making the payment due for due May 1, 2021. With his

tax defaults on both the Hinkley Lot and the Malibu Lot, and with his being in chronic and current default on the both the Hinkley Loan and the Malibu Loan, this was a highly risky proposed loan for the refinance of the Utah Lot. Further, the raw land of the Utah Lot that he paid $50,000 for would not prudently support a loan for double-that, a "refinance" loan of $100,000, as the loan would at inception be under-secured by 100%, in my view, then. And the Utah Lot had no presently known prospect to me of generating any revenue to fund payments on a new loan. I told him of these issues and reservations as the reason I would not make this new loan he proposed.

31.    Brown responded to my declining to make the new loan by proposing that he borrow from me on a promise to pay in the future an additional sum, over and above the new cash, for the risk, a risk fee, or a bonus, or a loan origination fee in the amount of $100,000. He proposed that this risk, bonus, or origination fee of $100,000 he would owe me on top of the new case loan amount that he would pay either when his anticipated solar farm generated enough revenue to pay off the origination fee and the loan of new money, or if he sold the property after developing it as a solar farm. He proposed that I would fund the loan with $100,000 cash into escrow, and that the risk- or bonus- or origination fee, which he would owe to me, i.e., borrow it too, would be added as principal to the new loan I would make, so that the loan would be for $200,000, at the stated rate on a promissory note of 10% on the entire sum, i.e., the origination fee he would pay to me at some point in the future of $100,000, and the new cash through escrow of $100,000. On those proposed terms, I agreed in early June 2021, to make this very risky loan. In retrospect, I should not have done this loan due to his history of loan defaults, even with the added incentive Brown offered for making this loan.

32.    Brown told me that he would tell the escrow in Utah for the new loan how to describe the $200,000 loan on the settlement statement. Then, on June 18, 2021, Brown emailed to the escrow officer, Jeremy Gale of TitleFirst Utah,

DECLARATION SMEAD I.S.O. MOTION SUMMARY JUDGMENT

*BROWN VS. SMEAD 23-cv-02938*

copying me on the email, stating that, and I quote: "The deed of trust terms will be $200,000 @ 10 percent interest and a 2 year balloon payment . . . .  $100,000 of this refinance has already been allocated to Steve Smead and therefore the remaining funds that will be sent by Steve will be $100,000. The remaining funds from that will be sent to me." Attached hereto as Ex. 1-7-9 is a true and correct copy of this email dated June 18, 2021, from Brown to Jeremy Gale and copied to me.

33.     Documenting the loan, the escrow officer then prepared the loan documents according to Brown's request, and Brown signed a "Trust Deed Note" for $200,000 made by Brown to me at the stated interest rate of 10%, monthly interest only payments of $1,667 beginning August 1st 2021 until its maturity on August 1, 2023, when all would be due and payable. The Trust Deed Note states: "This note is secured by a Trust Deed of even date herewith."  The Trust Deed is dated 22nd day of June 2021. (Attached hereto are true and correct copies of the Trust Deed Note (Exh. 2-1) and a recorded copy of the Trust Deed, recorded 06/29/2021 (Exh. 2-2 to 2-6). The loan consummated on June 29, 2021 (recording date of Trust Deed). This loan is called the "Utah Loan" and security property the "Utah Lot".

34.     The Settlement Statement for the Loan, approved by the signatures of both Brown and myself, includes the statement that: "Loan Funds paid outside of close to Clinton Brown $100,000.00" and describes a total loan amount of $200,000.  (Attached as Ex. 2-7-9 is a true and correct copy of  the Settlement Statement, Settlement Date of June 30, 2021). Given that Brown was a licensed real estate broker, as he told me, I trusted Brown to describe properly to escrow the loan documentation on this risk- or bonus- or origination fee, and I understood him to do so in his email of June 18, 2021, and on the Settlement Statement and in the Trust Deed Note.

/ / /

35.     Brown defaulted on the Utah Loan beginning with the third payment due, that of Oct. 1, 2021. He made no payment again until that of 02/01/2022, when he paid up for the loan payments due through January. Then on 03/01/2022, he made the payment on the February installment. He made no loan payments thereafter. And he paid no property taxes, defaulting on those too, a loan default under the deed of trust. I learned of the tax default in 2022 by going on-line to review the county tax assessor records through its web-site portal, checking by assessor's parcel number. Brown's total payments and the dates on the Utah Loan are set forth in Exh. 74, a true and correct copy of the loan payment ledger prepared by me at the time the loan payments were made. The total payments he made were $11,669.00. Brown never cured the Utah Loan default and never paid off the Utah Loan.

36.     Because of the long-standing default, I instructed the trustee to commence the private trustee sale process authorized under the Trust Deed. I authorized the trustee to bid at the foreclosure sale the full amount of the indebtedness owed to me at that time on my second priority loan, i.e., that documented by the Utah Loan. The full indebtedness on the Utah loan at the time of foreclosure was: $220,923.20, the sum of all unpaid principal, unpaid interest at the stated promissory note rate of 10%, plus late fees and foreclosure costs advanced to the trustee.  The foreclosure sale on the Utah Loan occurred on or about March 8, 2023. My credit bid, i.e., the amount owed to me, was the high bid at the trustee's auction. The trustee thereafter issued a Trustee's Deed ("Utah TDUS"), dated March 8, 2023, stating that the property was sold at the auction with a high bid of the credit, a credit-bid, of $220,923.20. (Exh. 9:1-2 is a true and correct copy of the recorded Utah TDUS). It made me the owner of the Utah security property. The Utah Loan was fully satisfied by the foreclosure. No other amounts were due to me on the Utah Loan than that set forth in the Utah TDUS.

/ / /

37.    I still own the Utah property. The land has no use, except for foraging of cattle in the period of December to February. But, it cannot be leased for even this, as the land is unfenced. It would have to be fenced at significant cost to graze any livestock there, and the annual payments for any lease for cattle foraging would be very low, it taking many years for such a foraging lease to recover the cost of fencing. It presently has no other potential use. I learned these things from the Utah title officer, Jeremy Gale, of TitleFirst Utah, who was the escrow agent and foreclosure trustee for the Utah Loan, and who says he owns the adjoining lot of similar size, where his sole use of the land is for this winter-time cattle grazing.

38.    The Utah property never generated any revenue to Brown, that he mentioned to me. At all times since I was the lender it was a raw land, undeveloped, unimproved, and in a desert area. Since I became the owner of the Utah property, it has remained in its raw, unimproved state, and it has not generated any revenue to me. I have never received any proposals for its leasing or its sale or for any use of it. There were no existing leases, or uses, or contracts of any sort pertaining to the Utah property that have ever been brought to my attention upon my becoming its owner.

[Analysis Of Utah Loan Payments]

39.    Utah Loan. This is my analysis of payments made and the effective interest rate that Brown paid on the Utah Loan. Brown made seven payments totaling $11,669 of interest. He made no other payments. Unpaid interest accrued for 19 months for the period July 1, 2021 to March 1, 2023. On the $100,000 cash advanced through escrow, if only interest were charged on that, then 10% interest on $100,000 would be a monthly amount of $833.32 during the life of the Utah Loan. Averaging his interest payments out over the 19 months when interest was due, until foreclosure, his payments amount to an average of $614 per month.  That rate would be an interest rate of approximately 7.4% on $100,000. This does not include calculation for the interest due on the $100,000 risk-based, bonus or

origination fee that Brown owed me in making the loan and that he chose to borrow in the Utah Loan and against the Utah Lot. If the $200,000 principal amount stated on the Utah Note is used to calculate the interest he paid during the time he owed the loan to me, then the effective interest rate he paid would be 3.7%. Thus, Brown paid an effective interest rate less than 10% interest during the life of the loan on the $100,000 cash advanced in the loan.

[Property And Business Re Security Properties Foreclosed Upon]

40.    Malibu Loan and Lot. The security property for the Malibu Loan was a vacant lot, and generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Malibu Lot.  To my knowledge it generated no income while Brown owed the vacant lot, and generated no income during the time I owned the vacant lot, as no person contacted me to say they had or were paying for any rights to the vacant lot, and I did not lease out the vacant lot while I owned it after the foreclosure sale. I eventually sold the Malibu Lot in March 2025.

41.    Hinkley Loan and Lot. The security property for the Hinkley Loan was raw, undeveloped, unimproved desert land. It generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Hinkley Lot, as Brown informed me of nothing that generated any revenue for him.  To my knowledge it generated no income while Brown owed the vacant lot. It generated no income during the time I owned the land after foreclosure, as no person contacted me to say they had or were paying for any rights to the land. No person has contacted me to propose any contract to generate income for the land. The land has never generated income during my time of ownership. I have not entered any contracts for any development, or leases, or anything that would generate revenue from the land, as any development is not cost-effective. It remains raw, unperforming land with no prospect of generating income to me now.

42.    Utah Loan and Lot.  The security property for the Utah Loan was raw, undeveloped, unimproved desert land. It generated no income when the loan was initiated, as none was disclosed to me, as there were no alleged leases or payment rights to Brown at the time I had loans against the Hinkley Lot, as Brown informed me of nothing that generated any revenue for him.  To my knowledge it generated no income while Brown owed the vacant lot. He forwarded to me a letter of intent by a third party for a purchase or lease, but Brown informed me and sent to me a notice of the cancellation of that potential agreement. It generated no income during the time I owned the land after foreclosure, as no person contacted me to say they had or were paying for any rights to the land. No person has contacted me to propose any contract to generate income for the land. The land has never generated income during my time of ownership. I have not entered any contracts for any development, or leases, or anything that would generate revenue from the land. It remains raw land, generating no income, at this time, with no prospects of generating net income that have come to may attention, and I continue to own the land at this time, with its only use as forage for cattle during December thru February, if fenced at considerable cost.

43.    Property Values and Interest Paid by Brown.

A: Malibu Lot. When I became owner of the Malibu Lot on foreclosure, the tax assessor valued the property at $350,000, I saw on its web-site, and in my opinion its value was approximately $425,000, based on my review of web-based data sources. Brown had paid only $15,000 in interest on the Malibu Loan (consolidated) of $300,000 principal, from my review of the ledger, Exhibit 13 (authenticated above). The Malibu TDUS was issued to me for the credit-bid of $372,338.14 in January 2023.

B:    Hinkley Lot. When I became owner of the HinkleyLot on foreclosure, the tax assessor valued the property at $406,368, I saw on its web-site, and in my opinion its value was approximately $475,000, though Brown paid to seller AmPac

(on borrowed money) $498,000. There were no comparable values to get an estimate for potential value in web-based sources I reviewed. Brown had paid only $4,500 in interest on the Hinkley Loan of $150,000 principal. The Hinkley TDUS was issued to me for the credit-bid of $175,902.68 in January 2023, which was based on my Hinkley Loan (a second-priority behind AmPac's loan). However, at that time, given that I was also the owner of the AmPac loan on the Hinkley Lot, itself with a balance due to me of over $370,000, the total owed to me at the time of foreclosure on both loans exceeded $546,000.

C:    Utah Lot. When I became owner of the Utah Lot on foreclosure, the tax assessor valued the property at $42,240, I saw on its web-site, and in my opinion its value may have been $50,000, based on my review of web-based data sources. Brown had paid only $11,669 in interest on the Utah Loan of $200,000 principal. The Utah TDUS was issued to me for the credit-bid of $220,923.20 in March 2023.

[No Enterprise Regarding Brown Loans]

44.    Escrows for Loan Closing/Consummation. The escrow for consummation of each of the three loans, the Malibu Loan, the Hinkley Loan, and the Utah Loan, was done by an escrow companies. Each escrow company charged a certain fee to Brown from the loan proceeds as reflected on the final closing statements. The escrow company final settlement statements for the three loans are attached hereto are true and correct copy of final settlement statements for each of the three loans showing these escrow charges to Brown, as follows, which have I have authenticated in the declaration where the exhibits is first mentioned:  Malibu Loan, Exh. 12-3-4; Hinkley Loan, Exh. 15-2-3; Utah Loan, Exh. 2-7-9; and my purchase of the AmPac first priority loan on the Hinkley Lot, Ex. 17-1-3 (on the AmPac first-priority loan purchase I paid the escrow fee—but did not foreclose on this loan).  I paid nothing to the escrow companies involved in loan originations. Rather, the escrow companies were paid by Brown from the loan proceeds, as

reflected on the settlement statements. The escrow companies had no involvement with the loans, and no involvement of any kind with the servicing of the loans, nor involvement with any payments on the loans, nor any rights in the security properties foreclosed upon, nor any rights in the foreclosed security properties, nor any proceeds from my subsequent sale of the Malibu Lot after I became the owner upon its foreclosure against Brown. The escrow companies did nothing regarding these loans to Brown from me except to consummate the escrows, and received no payment or promises of payment except what was charged at the time of the loan closing as set forth on the settlement statements. When I sold the Malibu Lot in March 2025, I shared payment of the escrow charges to close the sale as a fee for the escrow service.

45.     Foreclosure Trustees. The foreclosures under the deeds of trust for the loan defaults were done by trustees, foreclosures of the Malibu Loan, the Hinkley Loan, and the Utah Loan. I paid the fees and costs to each trustee for the service from the trustees for the foreclosure process, prior to the foreclosure sales, and then included those fees and costs I had advanced to the trustee in the total amount of loan indebtedness under the respective notes and deeds of trust, for the credit-bid on each of the three foreclosures. True and correct copies of the recorded trustee's deeds upon sale are attached hereto, as authenticated above where the respective foreclosures are discussed: the TDUS on Malibu Loan and Lot, Ex. 14-2-3; the TDUS on the Hinkley Loan and Lot, Ex. 20; and the TDUS Utah Loan and Lot, Ex. 9. I paid nothing to the foreclosure trustees named in the deeds of trust, who went on to be the foreclosure trustee's at the time of the foreclosure sales, except for my advance to them of the fees and costs for service as trustee in the process, as stated above. The foreclosure trustees had no other involvement and no payments or profits or rights in the loans, nor proceeds from the loans, nor payments of any other kind, nor profits of any kind, nor rights of any kind in the loans or in the real property securities foreclosed upon. The foreclosure trustees did

nothing regarding these loans to Brown from me except to process the foreclosures. They received nothing except their payment from me of fees and costs for the service of acting as foreclosure trustees, as described above.

46.     Title Insurance Companies. I bought a lender's policy of title insurance for each of the three loans, Malibu Loan, Hinkley Loan, and Utah Loan for a price certain based on the loan amount stated on the promissory notes. And none of them had any other involvement in the loans, except as the policy of title insurance gave them rights if I were to make a claim and receive coverage under the title policy. These title insurance escrow companies were not involved in loan origination, (except to issue a lender's title policy), nor in servicing, nor in enforcement, nor in the foreclosure process, and never had any interest nor rights in the loans, nor loan payments, nor the security properties, either pre- or post-foreclosure. . The title insurers' were paid nothing but the policy premium at the time each of the three loans originated, and never received any payment or property interest in the loan or the security property at any time.

47.     No Other Persons / No "Enterprise". No person, no individual, nor entity, was involved with receiving payments or proceeds on these loans to Brown, as these were individual loans from me to Brown. I made these loans as my business alone, and no person, individual, or entity had any ownership or rights in the loans, the payments on the loans, or the real property securities foreclosed upon.

I declare under penalty of perjury under the laws of the United States of America that this declaration is true and correct and that this declaration is executed in the State of California.

Date: Dec. 31, 2025         _____

                                                STEVE SMEAD